# EXHIBIT "A"

## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement ("Agreement") is entered into as of January 2, 2018 (the "Effective Date") by and between 777 Partners, LLC, one of its portfolio companies, or subsidiaries, (collectively, the "Company"), and **Christopher J. Pagnanelli** ("Executive").   For purposes of this Agreement, the Company and Executive are collectively to be referred to as "the Parties."

1.  TERM:   The Company hereby employs Executive, and Executive accepts employment with the Company, pursuant to the terms and provisions of this Agreement for the period commencing on the Effective Date and terminating on the third (3rd) anniversary of the Effective Date unless this Agreement is earlier terminated as provided herein.  If Executive is still employed by the Company upon expiration of this Agreement, Executive's status shall be one of at-will employment without the benefits of this Agreement, except as provided in Section 7(c) or as otherwise provided herein.

2.  TITLE AND DUTIES:  Executive shall serve as the Chief Executive Officer of Insurety Capital, LLC. Executive's duties, responsibilities, and authority shall be the usual and customary duties associated with such position.  Executive shall report to the Managing Partners of 777 Partners ("MP") or such other officer as the Board of Directors may from time to time designate.

3.  SERVICES TO BE EXCLUSIVE:  Executive agrees to devote his full productive time and best efforts to the performance of his duties for the Company.  Notwithstanding the foregoing, Executive may serve on other boards of directors or engage in religious, charitable, or other community activities as long as such services and activities are disclosed to the Company's Managing Partners and do not materially interfere with Executive's performance of his duties as provided in this Agreement.

4.  COMPENSATION:

    A.  Base Salary:  In accordance with the Company's usual pay practices, the Company will pay Executive a base salary of $225,000.00 per year ("Base Salary").  The Base Salary shall be prorated for any partial years of employment and payable in equal installments on regularly scheduled Company pay dates.

    B.  Bonus:  Executive is eligible to participate in the Company's annual incentive bonus program(s) applicable to Executive's position, if any, in accordance with the terms of such program(s). Executive's annual bonus will be targeted at 50% of Executive's base salary, subject to customary withholdings tax and other employment taxes and deductions as required by law. Additionally, Executive shall be considered for an annual bonus in the sole discretion of the Board of Directors. Also, Executive will receive a $98,082 sign-on bonus on the first pay date following the Effective Date, subject to customary withholdings tax and other employment taxes and deductions as required by law.

1

5. EXPENSES AND BENEFITS:

A. Reasonable and Necessary Expenses: The Company shall reimburse Executive for all reasonable, customary, and necessary expenses incurred in the performance of Executive's duties. Executive shall first account for such expenses in accordance with the policies and procedures set by the Company from time to time for reimbursement of such expenses. The amount, nature, and extent of such expenses shall always be subject to the control, supervision, and direction of the Company.

B. Vacation: Executive shall accrue vacation in accordance with the terms and conditions of the Company's policies, as may be modified from time to time at the Company's discretion. Subject to the maximum accrual permitted, Executive shall accrue vacation at the rate of three (3) weeks per year.

C. Fringe Benefits: During Executive's employment with the Company, the Company shall provide Executive with the opportunity to participate in the Company's insurance, retirement, and other benefit plans on the same terms and conditions as other similarly situated Executives. All such benefits shall be subject to the terms of such plans and policies, as the same may be modified from time to time in the sole discretion of the Company. Benefits shall become effective the first of the month following thirty (30) days of employment.

6. OTHER EXECUTIVE DUTIES AND OBLIGATIONS:

In addition to any other duties and obligations set forth in this Agreement, Executive shall be obligated as follows:

A. Compliance: Executive shall be required to comply with all policies and procedures of the Company as such shall be adopted, modified, or otherwise established by the Company from time to time. While employed by the Company pursuant to this Agreement, during at-will employment following expiration of the Agreement, or while receiving severance, incentive, or other payments or consideration from the Company following termination of this Agreement, Executive shall disclose in writing to the Company any arrest, indictment, or conviction for, or plea of guilty or *nolo contendere* to, a felony.

B. Non-Disclosure:

I. Confidential Information: As used in this Agreement, "Confidential Information" means trade secrets and other information specific to the business and investment activities and considerations of the Company. This includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information, strategic and marketing plans, compilations of customer and supplier information, performance of and compensation paid to Executives, contracts with third parties, information regarding the Company's training, financial and marketing books, sales, price and marketing projections, internal employer databases, analytical tools and services and information technology

2

9609512.1

products and services, other information related to the tools, products and services that facilitate the Company's ability to sell and manufacture its services, or other reports, manuals and information including information related to Company, its affiliate companies, or its customers, including those documents and items which Executive may develop or help develop while in Company's employ, whether or not developed during regular working hours or on Company's premises; provided, however, that Confidential Information shall not include any information that is or becomes public through written authorization by Company. Unless the context requires otherwise, the term "Confidential Information" shall include the original of such materials, any copies thereof, any notes derived from such materials, and any derivative work of such materials.

II.   Confidentiality: While employed by the Company, Executive will have access to and become familiar with Confidential Information.   Executive acknowledges that Confidential Information is owned and shall continue to be owned solely by the Company and/or its affiliates.   Executive agrees that Executive will not, at any time, whether during or subsequent to Executive's employment by the Company and/or its affiliates, use or disclose Confidential Information for any competitive purpose, or divulge the same to any person other than the Company or persons with respect to whom the Company has given its written consent, unless Executive is compelled to make disclosure by a federal or state court, arbitrator, or any government authority, pursuant to subpoena, or as necessary to secure legal and financial counsel from third party professionals or to enforce his or her rights under this Agreement. In such case, Executive shall give reasonable notice to the Company prior to disclosing such information and shall assist the Company in taking such legally permissible steps as are reasonable and necessary to protect the Confidential Information, including, but not limited to, the execution by the receiving party of a non-disclosure agreement in a form acceptable to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by the Executive or a breach of a confidentiality obligation owed to the Company by any third party, or disclosure pursuant to any applicable law or court order.

III.   Limitations:   Notwithstanding any other provision of this Agreement (i) Executive may disclose Confidential Information when required to do so by a court of competent jurisdiction, by any governmental agency having authority over Executive or the Company's business or by any administrative body or legislative body (including a committee thereof) with jurisdiction to order Executive to divulge, disclose, or make accessible such information, and (ii) nothing in this Agreement is intended to interfere with Executive's right to (A) report any act or omission Executive reasonably believes may constitute a violation of federal, state, or local law or regulation to any governmental or law enforcement agency or entity; (B) make other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation; (C) file a claim or charge with any federal, state, or local governmental agency or entity; or (D) testify, cooperate, assist, or participate in an investigation, hearing, or proceeding conducted by any governmental or law enforcement agency, entity, or court. For purposes of clarity, in making or initiating any such reports or disclosures or engaging in any of the conduct set forth in this Section 6(b)(iii), Executive may disclose Confidential Information to the extent necessary to such governmental or law

3

enforcement agency, entity, or court, need not seek prior authorization from the Company, and is not required to notify the Company of any such reports, disclosures, or conduct.

IV. Defend Trade Secrets Act of 2016: The Executive is hereby notified in accordance with the Defend Trade Secrets Act of 2016 that the Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

C. Intellectual Property:

I. Work Product: Executive agrees that during Executive's employment with the Company pursuant to this Agreement, all materials created or modified by Executive, including, without limitation, all works of authorship, inventions, innovations, improvements, processes, methods, designs, apparatus, plans, systems and computer programs, and other tangible and intangible materials relating to the design, manufacture, use, marketing, distribution, and management of the Company's and/or its affiliates' products or services (collectively, "Work Product"), shall be "work for hire" and that the Company shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents, or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire," Executive hereby assigns ownership of all such Work Product to the Company and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company. Executive hereby appoints the Company as Executive's attorney-in-fact with the limited power to execute assignments of such Work Product. The obligation to assign as provided in this Agreement does not apply to any Work Product to the extent such obligation would conflict with any state or federal law.

II. Disclosure of Work Product: Executive agrees to disclose in writing to the Board of Directors of the Company any Work Product relating to the business of the Company and/or its affiliates, which Executive develops, conceives and/or reduces to practice in connection with any work performed by Executive for the Company, either alone or with anyone else, while employed by the Company and/or within twelve (12) months of the termination of employment. Executive shall disclose all Work Product to the Company, even if Executive does not believe that assignment to the Company is required under this Agreement or applicable state or federal law. If the Company and Executive disagree as to whether or not such Work Product is included within the terms of this Agreement, such matters will be subject to the Arbitration Rights set forth in this Agreement with the additional requirement that it will be the responsibility of Executive to prove that it is not included.

D. Non-Competition and Non-Recruitment:

4

9609512.1

I.      General: The Company and Executive recognize and agree that: (1) Executive has received, and will in the future receive, substantial amounts of Confidential Information and Trade Secrets, as defined in the Florida Uniform Trade Secrets Act; (2) as a consequence of using or associating Executive with the Company's name, goodwill, and reputation, Executive will develop personal and professional relationships with the Company's current and prospective customers, clients, counterparties, and vendors; and (3) provision for non-competition and non-recruitment obligations by Executive is critical to the Company's continued economic well-being and protection of the Company's Confidential Information.

II.     Non-Competition:   During Executive's employment and for one (1) year following the voluntary or involuntary termination of Executive's employment with the Company, Executive shall not, directly or indirectly, on Executive's behalf or on behalf of a third party, engage in any commercial activity in the United States that competes with the Company; provided, however, Executive may own, directly or indirectly, solely as a passive investment, two percent (2%) or less of any class of securities of any entity traded on any national securities exchange.  At its sole option, the Company may, by express written notice to Executive, waive or limit the time and/or geographic area in which Executive cannot engage in competitive activity or the scope of such competitive activity.

III.    Other Executives:  While employed by the Company and for one (1) year thereafter, and except as may be required in the performance of Executive's duties hereunder, Executive shall not, directly or indirectly, cause or induce, attempt to cause or induce, or otherwise solicit or encourage any person now or hereafter employed by the Company or any of its affiliates to terminate such employment.

IV.     Non-Disparagement: The Parties agree that neither Party will at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statements concerning the other Partyor its affiliates or their respective partners, members, or employees. "Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged.  Nothing in this Agreement shall preclude the Parties from any truthful, good faith response to any inquires under oath or in response to governmental inquiry.  The Parties agree that neither Party will speak about the other Party and/or its affiliates and/or their management or business to the media, whether electronic, print or otherwise, without the express prior written approval of the other Party.

V.      Non-Solicitation:  Executive agrees that during Executive's employment with the Company and for one (1) year thereafter, Executive's employment terminates, Executive will not, directly or indirectly, on his/her own behalf or on behalf of any other person or entity (i) hire or solicit for hire or to provide services (whether as an employee, independent contractor, or otherwise) any employee of the Company and/or its affiliates, (ii) solicit, induce, or encourage the resignation of, or attempt to solicit, induce or encourage the resignation of, to persuade any employee of the Company and/or its affiliates, (iii) solicit, induce, or encourage any independent contractor providing services to the Company and/or its affiliates to terminate or diminish any relationship with the Company and/or its affiliates, (iv) seek to persuade any employee, vendor, or independent contractor to breach any

5

9609512.1

agreement with the Company and/or its affiliates, (v) take any action to solicit or divert any Clients, Sources, or Sellers (each as defined below) away from the Company and/or any of its affiliates, or (vi) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or its affiliates.  For purposes of this Agreement: "Clients" means all individuals or entities who or which were customers or clients of the Company and/or its affiliates, or who or which were solicited by the Company and/or its affiliates to become customers or clients of the Company and/or its affiliates (other than solicitations made solely through general, untargeted solicitations and/or mass industry mailings), during Executive's employment with the Company.  "Sources" means all brokers and persons who referred transactions to the Company and/or its affiliates, or who were solicited by the Company and/or its affiliates to refer structured settlement transactions to the Company and/or its affiliates, during Executive's employment with the Company.  "Sellers" means any person who has sold or agreed to sell a transaction to Company and/or its affiliates, or who has been solicited by the Company and/or its affiliates to sell a transaction to the Company and/or its affiliates, during Executive's employment with the Company.

VI.     Reformation:  Executive agrees and acknowledges that the restrictions contained in this Section are reasonable in scope and duration.  If one or more provisions of the forgoing protective covenants are declared invalid or unenforceable for any reason by a court of competent jurisdiction, the court must reform the covenant(s) to the extent necessary to cause the limitations contained in the covenants as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the Confidential Information, goodwill or other business interests of the Company.

VII.    Covenants Are Independent Elements:   The parties acknowledge that the restrictive covenants contained in this Section are essential, independent elements of this Agreement and that, but for Executive agreeing to comply with them, Company would not continue to employ Executive.  Thus, even if Executive has a claim against Company, whether that claim is based on this Agreement or not, the claim by Executive shall not be a defense to Company's enforcement of the promises and restrictions in this Section.  An alleged or actual breach of the Agreement by the Company will not be a defense to enforcement of the provisions of this Section, or other obligations of Executive to the Company.  The covenants in this Section will remain in full force and effect whether Executive is terminated by Company or voluntarily resigns.

E.  Remedies:  Executive agrees that breach by Executive of the provisions of Section 6(b)-(d) will cause the Company irreparable harm that is not fully remedied by monetary damages.  In the event of a breach or threatened breach by Executive of the provisions of Section 6(b)-(d), the Company shall be entitled to an injunction restraining Executive from directly or indirectly engaging in the activities prohibited herein, without posting a bond or other security.  Nothing herein shall be construed as prohibiting the Company from pursuing any other equitable or legal remedies available to it for such breach or threatened breach, including the recovery of damages from Executive.

6

9609512.1

F. Conflict of Interest: While employed by the Company, Executive shall comply with all Company policies regarding actual or apparent conflicts of interest with respect to Executive's duties and obligations to the Company.

G. Return of Company Property: Executive understands and agrees that all equipment, books, records, customer lists, and documents connected with the business of the Company and/or its affiliates are the property of and belong to the Company ("Company Property"). Under no circumstances shall Executive remove from the Company's facilities any Company Property, or any copies of Company Property, without the Company's permission, nor shall Executive make any copies of Company Property for use outside the Company's office except as specifically authorized by the Company. Executive shall return to the Company and/or its affiliates all Company Property upon termination of Executive's employment with the Company.

H. Survival: The provisions of Section 6(b)-(d) and 6(g)-(h) shall survive expiration of this Agreement and termination of employment.

## 7. TERMINATION AND SEVERANCE:

A. Termination by the Company Without Cause or by Executive for Good Reason: Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below) or by Executive for Good Reason. In the event of a termination by the Company without Cause or by Executive for Good Reason prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to eight (8) months of Executive's then annual compensation payable over the eight (8) months immediately following the last day of employment in accordance with the Company's normal payroll practices. Executive must execute (and not revoke) a complete release of claims, acceptable in form and substance to the Company, as a condition to receiving Basic Severance and reimbursement of COBRA premiums.

I. For purposes of this Agreement, "Good Reason" shall mean any of the following "Trigger Events": (1) a material breach of this Agreement or; (2) a material diminishment in the title, position, duties, or responsibilities of Executive. Notwithstanding the foregoing, no basis for a termination by Executive for Good Reason will be deemed to exist unless (a) Executive notifies the Company in writing within thirty (30) days after the Trigger Event occurs that Executive intends to terminate employment for Good Reason no earlier than thirty (30) days after providing such notice; (b) the Company does not cure such condition within thirty (30) days following its receipt of such notice or states unequivocally in writing that it does not intend to attempt to cure such condition; and (c) the Executive resigns from employment prior to expiration of thirty (30) days after the end of the cure period described in (b) above.

7

II.    For purposes of this Agreement, "Cause" shall mean Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement; (4) material misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) material violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or *nolo contendere* to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.

III.    Notwithstanding anything else to the contrary in this Agreement, it is expressly understood that any obligation of the Company to pay Basic Severance shall be subject to Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the Company, its officers, Executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations (the "Continuing Obligations"). The Company will have no liability to pay any Basic Severance if Executive violates the Continuing Obligations, and the Executive shall be obliged to immediately repay any Basic Severance previously paid.

B.    <u>Termination by the Company for Cause or by Executive Without Good Reason</u>: Executive's employment under this Agreement may be terminated at any time by the Company for Cause or by Executive without Good Reason. In the event of such a termination, Executive shall be entitled to receive: (i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; and (iii) no other severance.

C.    <u>Termination by Executive for Non-Renewal</u>: Executive's employment pursuant to this Agreement may be terminated by Executive for Non-Renewal. Non-renewal means expiration after the third anniversary of the Effective Date. In the event of a termination of employment by Executive for Non-Renewal, Executive shall be entitled to receive Basic Severance as provided in Exhibit A, so long as Executive executes (and does not revoke) a complete release of claims, acceptable in form and substance to the Company. To exercise the right of termination for Non-Renewal, Executive must provide the Company with written notice of Executive's intent to do so, and the Company must fail to cure within forty-five (45) days of receiving such notice. It is expressly understood that if prior to the expiration of any applicable cure period (1) Executive and the Company enter into a new written employment agreement; (2) the Company offers Executive employment on substantially the same or better terms as existed under the Agreement; or (3) Executive's employment has otherwise been terminated pursuant to the terms of this Agreement, then Executive shall have no right or option to terminate employment for Non-Renewal.

8

D. Termination Due to Death or Disability: Employment by the Company shall immediately cease upon Executive's Death or Disability. Upon termination due to Death or Disability, Executive shall be entitled to receive any Base Salary accrued and unpaid as of the date of termination.

E. Termination by Mutual Agreement of the Parties: Executive's employment pursuant to this Agreement may be terminated at any time upon the mutual agreement in writing of the Parties. Any such termination of employment shall have the consequences specified in such agreement.

F. Golden Parachute Restrictions: To the extent that any or all of the payments and benefits provided for in this Agreement or in any other agreement between Company and Executive constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code (the "Code") and, but for this Section 7(g), would be subject to the excise tax imposed by Section 4999 of the Code, then the aggregate amount of such payments and benefits shall be reduced by the minimum amounts necessary to equal one dollar less than the amount which would result in such payments and benefits being subject to such excise tax. The reduction, unless the Executive elects otherwise, shall be in such order that provides Executive with the greatest after-tax amount possible. All determinations required to be made under this Section, including whether a payment would result in a parachute payment and the assumptions to be utilized in arriving at such determination, shall be made by a nationally recognized accounting firm selected by the Company and consented to by the Executive, such consent not to be unreasonably withheld. The Company shall pay the cost of the accounting firm, and the accounting firm shall provide detailed supporting calculations both to the Company and the Executive. The determination of the accounting firm shall be final and binding upon the Company and the Executive, except that if, as a result of subsequent events or conditions (including a subsequent payment or the absence of a subsequent payment or a determination by the Internal Revenue Service or applicable court), it is determined that the excess parachute payments, excise tax, or any reduction in the amount of payments and benefits, is or should be other than as determined initially, an appropriate adjustment shall be made, as applicable, to reflect the final determination.

G. Treatment of Basic Severance: Any Basic Severance Payment shall be subject to usual and customary Executive payroll practices and all applicable withholding requirements.

H. Other: Except for the amounts specifically provided pursuant to this Section, Executive shall not be entitled to any further compensation, bonus, damages, restitution, relocation benefits, or other severance benefits upon termination of employment. The amounts payable to Executive pursuant to this Section shall not be treated as damages, but as compensation to which Executive may be entitled by reason of termination of employment under the applicable circumstances. The provisions of this Section shall not limit Executive's rights under or pursuant to any other agreement or understanding with the Company regarding any pension, profit sharing, insurance, or other Executive benefit plan of the Company to which Executive is entitled pursuant to the terms of such plan.

I. Internal Revenue Code Section 409A: It is intended that this Agreement will comply with Internal Revenue Code Section 409A and any regulations and guidelines issued thereunder (collectively "Section 409A") to the extent this Agreement is subject thereto. This Agreement shall be interpreted on a basis consistent with such intent. If any payments or benefits provided

9

to Executive by the Company, either per this Agreement or otherwise, are non-qualified deferred compensation subject to, and not exempt from, Section 409A ("Subject Payments"), the following provisions shall apply to such payments and/or benefits:

I.  For payments and benefits triggered by termination of employment, reference to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" from the Company (with such phrase determined under Treas. Reg. Section 1.409A-1(h), as uniformly applied by the Company) in tandem with Executive's termination of employment with the Company.

II. If Executive is deemed on the date of Executive's "separation from service" to be a "specified Executive" (within the meaning of Treas. Reg. Section 1.409A-I(i)), then with regard to any payment that is required to be delayed pursuant to Code Section 409A(a)(2)(B) (the "Delayed Payments"), such payment shall not be made prior to the earlier of (1) the expiration of the six (6) month period measured from the date of Executive's "separation from service" and (2) the date of Executive's death.  Any payments other than the Delayed Payments shall be paid in accordance with the normal payment dates specified herein.  In no case will the delay of any of the Delayed Payments by the Company constitute a breach of the Company's obligations to Executive.

III. If the sixty (60)-day period following a "separation from service" begins in one calendar year and ends in a second calendar year (a "Crossover 60-Day Period") and if there are any Subject Payments due Executive that are:  (1) conditioned on Executive signing and not revoking a release of claims and (2) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

IV. Lump-sum severance payments shall be made, and installment severance payments initiated, within sixty (60) days following Executive's "separation from service."

V.  The Executive's right to receive installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

VI. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

VII. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Subject Payment be subject to offset by any other amount unless otherwise permitted by Section 409A.

VIII. To the extent that any reimbursement or in-kind benefits are Subject Payments: (1) the amount eligible for reimbursement or in-kind benefit in one calendar year may not

10

affect the amount eligible for reimbursement or in-kind benefit in any other calendar year (except that a plan providing medical or health benefits may impose a generally applicable limit on the amount that may be reimbursed or paid), (2) the right to reimbursement or an in-kind benefit is not subject to liquidation or exchange for another benefit, and (3) subject to any shorter time periods provided herein, any such reimbursement of an expense or in-kind benefit must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred.

J.   Forfeiture:

    I.   If the Company is required to prepare a material accounting restatement as a result of the intentional misconduct or gross negligence of Executive, then Executive shall forfeit and reimburse the Company for all of the following:   (1) any bonus or other compensation paid based upon such erroneously stated financial information; (2) any bonus or other compensation received by Executive during the twelve (12) month period following the first issuance of the accounting restatement; (3) any profits realized from the sale of Company securities during that same twelve (12) month period; (4) any Basic Severance.

    II.   If the Executive is subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002, and the Company is required to prepare an accounting restatement due to the material noncompliance of the Company, as a result of misconduct (within the meaning of said Section 304), with any financial reporting requirement under the United States securities laws, then the Executive shall forfeit and reimburse the Company for all of the following:   (1) any bonus or incentive compensation or equity compensation received by Executive during the twelve (12) month period following the earlier of the first public issuance or filing with the SEC of the financial document embodying the financial reporting requirement; and (2) any profits realized from the sale of Company securities during that same twelve (12) month period.

    III.   Executive acknowledges that Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, among other things, requires the United States Securities and Exchange Commission to direct the national securities exchanges to prohibit the continued listing of the securities of an issuer unless the issuer develops and implements a policy providing, among other things, for the recovery of certain erroneously awarded compensation.  Upon the Company's adoption of such a policy, Executive agrees that this Agreement shall be automatically amended without any further consideration to incorporate the recovery provisions set forth in the policy. Upon the request of the Company, Executive agrees without further consideration to execute an amendment evidencing the incorporation of said provisions into this Agreement.

8.   **WAIVER OF JURY TRIAL**: EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH

11

9609512.1

THIS AGREEMENT OR ANY RELATED INSTRUMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE RELATED AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.

9.   MISCELLANEOUS:

A.   Assignment:  This Agreement shall be binding upon and shall inure to the benefit of the Parties and the successors and assigns of the Company.  Executive shall have no right to assign Executive's rights, benefits, duties, obligations, or other interests in this Agreement, it being understood that this Agreement is personal to Executive.

B.   Entire Understanding:  This Agreement sets forth the entire understanding of the Parties hereto with respect to the subject matter hereof, and no other representations, warranties, or agreements whatsoever as to that subject matter have been made by Executive or the Company. **This Agreement shall not be modified, amended, or terminated except by another instrument in writing executed by the Parties.**  As of the Effective Date, except as otherwise explicitly provided herein, this Agreement replaces and supersedes any and all prior understandings, plans, or agreements between Executive and the Company regarding employment and incentives.

C.   Notices:   Any notice, request, demand, or other communication required or permitted hereunder, shall be deemed properly given when actually received or within five (5) days of mailing by certified or registered mail, postage prepaid, to Executive at the address currently on file with the Company, and to the Company at:

>   Executive:      Christopher J. Pagnanelli
>                   6571 Radcliff Circle
>                   Huntington Beach, CA 92648

>   Company:        Chief Executive Officer, Insurety Capital, LLC
>                   600 Brickell Ave Suite 1900
>                   Miami, FL. 33131

>                   Copy:  Ed Gehres, General Counsel

or to such other address as Executive or the Company may from time to time furnish, in writing, to the other.

12

9609512.1

D. <u>Headings</u>: The headings of the several sections and paragraphs of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction of any term or provision hereof.

E. <u>Waiver</u>: Failure of either party at any time to require performance by the other of any provision of this Agreement shall in no way affect that party's rights thereafter to enforce the same, nor shall the waiver by either party of any breach of any provision hereof be held to be a waiver of any succeeding breach of any provision or a waiver of the provision itself.

F. <u>Applicable Law</u>: This Agreement shall constitute a contract under the internal laws of the State of Florida and shall be governed and construed in accordance with the laws of said state as to both interpretation and performance. Venue in any dispute arising under this Agreement shall rest exclusively in Dade County, Florida.

G. <u>Severability</u>: In the event any provision or provisions of this Agreement is or are held invalid, the remaining provisions of this Agreement shall not be affected thereby.

H. <u>Taxes</u>: Executive acknowledges that Executive is responsible for all taxes related to Executive's compensation and any other payments or benefits conferred upon Executive as the result of this Agreement or Executive's employment with the Company, except for those taxes for which the Company is obligated to pay under applicable law or regulation. Executive agrees that the Company may withhold any amounts that the Company is required to withhold under applicable law or regulation.

I. <u>Counterparts</u>: This Agreement may be executed in one or more counterparts which, when fully executed by the Parties, shall be treated as one agreement.

J. <u>Construction</u>: No ambiguity shall be construed against any party as the drafter.

13

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have entered this Agreement on this 2 day of January, 2018.

**EXECUTIVE**

_____
(Signature)

_____
(Printed Name)

_____
(Date)

**777 PARTNERS LLC**

_____
(Signature)

_____
(Printed Name)

_____
(Date)

_____
(Title)

14