J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| AMERICAN WORKERS INSURANCE SERVICES, INC., | ) | Case No. 19-44208-mxm11 |
| | ) | |
| ASSOCIATION HEALTH CARE MANAGEMENT, INC. | ) | Case No. 19-44209-mxm11 |
| | ) | **Jointly Administered Under** |
| Debtors. | ) | **Case No. 19-44208-mxm11** |

**DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST**
**777 PARTNERS, LLC AND INSURETY CAPITAL, LLC**

TO THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY JUDGE:

American Workers Insurance Services, Inc. ("AWIS") and Association Health Care

Management, Inc. ("AHCM," and together with AWIS, the "Debtors") file this *Motion to Enforce the*

*Automatic Stay against 777 Partners, LLC and Insurety Capital, LLC* (the "Motion"). In support of this

Motion, the Debtors state as follows:

**I. INTRODUCTION AND SUMMARY**

1. Since the Petition Date, the Debtors have paid more than $7 million to its prepetition

lender, Insurety Capital, LLC (and, together with 777 Partners, LLC,[1] "Insurety") from the runoff

premium payments generated from insurance policies for which Insurety made premium advances on a

prepetition basis. A major source of significant income to the Debtors, and one that is expected to

---

[1] The Debtors do not know the exact nature of the relationship between Insurety Capital, LLC and 777 Partners, LLC but believe they are affiliated entities.

increase in the future, is revenue received by AHCM from National Individual Insurance Agency, LLC ("NIIA") for various support services provided by AHCM to NIIA.[2]  This revenue stream, which currently totals approximately $250,000 per month, is critical to the Debtors' ability to reorganize and pay creditors in this case.  Indeed, this stream of income is vital to the Debtors' continued operations.

2.        However, NIIA's ability to continue operating (and thus provide this continuing revenue stream to AHCM) depends upon its ability to obtain funding from its lending partner (the "Advance Partner"), which enables it to pay advances on future commissions due under insurance policies to the individuals working in call centers who actually market and sell the individual insurance policies (the "Producers").  Without its Advance Partner, NIIA would be unable to make commission advances to the call center Producers.  If the call center Producers could no longer receive commission advances from NIIA, they would likely abruptly stop selling policies for NIIA and would instead sell policies for companies able to make commission advances.  Thus, the loss of NIIA's Advance Partner would start a domino effect resulting in the likely demise of not only NIIA, but the Debtors as well.

3.        From the inception of the case, Insurety has made it clear the Debtors' demise is its desired outcome.  Indeed, at the "first day" hearing on the Debtor's cash collateral motion, counsel for Insurety admitted that Insurety would prefer the complete destruction of the Debtors' business operations over their continued operations, even though it would inevitably lead to a terrible result for Insurety as a large creditor in this case:

> MR. PECK:  Well, to your point, Your Honor, is if the producers aren't paid tomorrow, the producers go away, the producers try to move their clients, who are generally in this premium stream –
>
> THE COURT:  But if I sustain your objection, isn't that inevitable?
>
> MR. PECK:  Yes.  I'm saying that, despite that fact, we're prosecuting this objection.  So, we understand that that could be the result, and we're okay with it.

See Excerpts from Transcript of Hearings on First Day Motions, October 17, 2019, attached hereto as

---

[2] The services provided by AHCM to NIIA include, e.g., member services support, information technology support, back-office software support, legal services, claims support, patient advocacy support, customer relationship management, and other services agreed upon between ACHM and NIIA.

2

**Exhibit 1** at pp. 182:8-11 and 191:22-192:5.

4. Due to the Debtors' reliance on income from NIIA, one surefire way to ensure the Debtors' demise would be to cut off the source of funds received by NIIA from its Advance Partner, thereby rendering NIIA unable to continue operating. At this point, however, Insurety does not know the identity of NIIA's Advance Partner and is desperately trying to obtain this information through discovery.[3] The Debtors (and NIIA) strenuously object to providing this information to Insurety because the identity of NIIA's Advance Partner is completely irrelevant to any fact at issue between the Debtors and Insurety in the instant bankruptcy case. Moreover, it is clear that Insurety, if it identifies the Advance Partner, will attempt to destroy that relationship. Consequently, the Debtors also object to providing this information to Insurety due to legitimate concerns that Insurety will (i) subpoena or otherwise attempt to engage NIIA's Advance Partner in costly litigation, or (ii) disparage NIIA and its principals to the Advance Partner, so that the Advance Partner will discontinue its business relationship with NIIA.

5. Undeterred by the potential inability to obtain the identity of NIIA's Advance Partner from the Debtors or NIIA through discovery in this bankruptcy case, Insurety has devised a backup plan that would potentially allow it to obtain this information from a former employee of Insurety, C.J. Pagnanelli ("Pagnanelli"). Specifically, Insurety sued Pagnanelli in federal district court in the Southern District of Florida, Miami Division, asserting a number of state law claims relating to alleged conduct of Pagnanelli following the termination of his employment by Insurety. A copy of the *Complaint for Monetary and Injunctive Relief* ("Pagnanelli Complaint") filed by Insurety against Pagnanelli is attached hereto as **Exhibit 2**. Of importance to this case is a claim by Insurety that Pagnanelli somehow tortiously interfered with Insurety's exclusive right to provide commission advances to AWIS' Producers by allegedly assisting Landon Jordan ("Jordan") and NIIA in obtaining an Advance Partner for NIIA (the

---

[3] As of the filing of this Motion, Insurety has served subpoenas duces tecum on NIIA and the Debtors' principal, Landon Jordan, seeking "[a]ny Documents or Communications (including contracts) reflecting the source and amounts of NIIA's funding for commission advances." See subpoenas served by Insurety on NIIA and Landon Jordan {Docket Nos. 158 and 163], Document Request Nos. 6 and 7, copies of which are attached hereto as **Exhibit 3** and **Exhibit 4**, respectively.

3

"Tortious Interference Claim"). See Exhibit 2, ¶¶46-51 and 125-128, and Affidavit of Joseph Sefina (the "Safina Affidavit") attached thereto as Exhibit D at ¶¶ 3-9.

6. Because Insurety's Tortious Interference Claim appears defective on its face, it was apparently included in the Pagnanelli Complaint for no reason other than to provide an alternate avenue for obtaining discovery regarding the identity of NIIA's Advance Partner. For example, the contract between AWIS and Insurety has not been assumed by AWIS and, therefore, is not enforceable by Insurety.[4] Because the Insurety/AWIS contract is not enforceable by Insurety against AWIS, there is no basis for Insurety's claim that Pagnanelli tortiously interfered with Insurety's rights thereunder. Further, Insurety's tortious interference claim does not allege that Pagnanelli interfered with Insurety's continued ability to provide commission advances to AWIS Producers or its ongoing business relationship with AWIS. Instead, because Insurety stopped providing commission advance funding to the Debtors long ago, Insurety is essentially arguing that by allegedly assisting Jordan and NIIA, Pagnanelli interfered with Insurety's ability to force the Debtors to fail due to a lack of premium advance funding. Thus, in addition to the absence of any enforceable contractual rights with which Pagnanelli could have interfered, any alleged interference with Insurety's desire to force the Debtors fail would not give rise to a claim for compensable damages.

7. Moreover, and more significantly, no explanation is offered by Insurety in the Pagnanelli Complaint as to how any alleged action by Pagnanelli in assisting Jordan and NIIA (which are separate and distinct legal entities from the Debtors) in finding an Advance Partner for NIIA could possibly tortiously interfere with the contract between Insurety and AWIS. Indeed, although Insurety alleges assistance by Pagnanelli to Jordan and NIIA, it contends such conduct was an attempt to source new commission advance funding for AWIS (not NIIA) in violation of the terms of the exclusivity agreement between Insurety and AWIS. (See Pagnanelli Complaint, ¶ 127). Although Insurety does not articulate

---

[4] *See, e.g., In re Wilson*, 69 B.R. 960, 965-66 (Bankr. N.D. Tex. 1987) (finding executory contracts are not enforceable against a debtor who has not assumed the contract and that the debtor need not comply with the terms of the contract prior to seeking the bankruptcy court's permission to assume or reject it) (*citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 700 (Bankr. W.D. Tex. 1988) (*citing Bildisco* and collecting cases finding that formal assumption of an executory contract is required before it can be enforced against a debtor).

4

Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 5 of 121

the mechanism by which Pagnanelli could tortiously interfere with a contract between Insurety and AWIS by providing alleged assistance to Jordan and NIIA (separate legal entities), its Tortious Interference Claim would only be viable if the separate forms of AWIS, NIIA and Jordan are disregarded.  In other words, although Insurety carefully avoids alleging that AWIS and NIIA are alter egos of each other (or Jordan) or that their corporate veils should be pierced, Pagnanelli's alleged assistance to Jordan and NIIA could only interfere with the contract between Insurety and AWIS if the corporate forms of NIIA and AWIS are disregarded.  Thus, although it is not expressly alleged, it is evident from the Pagnanelli Complaint that Insurety's Tortious Interference Claim is founded on the premise that AWIS and NIIA are alter egos (either of each other or of Jordan) and that, by allegedly assisting NIIA and Jordan, Pagnanelli tortiously interfered with the contract between Insurety and AWIS.

8.      As explained in greater detail below, by asserting a claim premised upon disregarding the corporate separateness of NIIA and AWIS (or NIIA, AWIS and Jordan), Insurety has violated the automatic stay by exercising control over property of the Debtors' estate (which includes any actions predicated on alter ego and veil piercing theories).  Consequently, the Debtors seek to enforce the automatic stay against Insurety by prohibiting it from moving forward on, or obtaining discovery on account of, its Tortious Interference Claim against Pagnanelli.

## II.     RELIEF REQUESTED

9.      By this Motion, the Debtors request that the Court enforce the automatic stay against Insurety under 11 U.S.C. § 362(a)(3) as it pertains to the Debtors' ability to pursue veil piercing and alter ego actions, which constitute property of the Debtors' estate.  Specifically, the Debtors request that the Court enforce the automatic stay against Insurety through the entry of an order (i) prohibiting Insurety from moving forward on its Tortious Interference Claim, and (ii) prohibiting any discovery on the Tortious Interference Claim, including discovery regarding the identity of NIIA's Advance Partner. Moreover, the Debtor reserves the right to amend this Motion to include a request for sanctions for Insurety's willful violation of the automatic stay if Insurety proceeds forward with its Tortious

Interference Claim before the Court has considered whether the assertion of Insurety's Tortious Interference Claim constitutes an exercise of control over property of the estate and ruled on this Motion.

### III.    BASIS FOR RELIEF

#### A.    *Overview of Insurety's Tortious Interference Claim*

10.    Prior to the Petition Date, Insurety decided to stop funding commission advances for AWIS.  Due to the provision of the Insurety/AWIS contract providing that Insurety had the exclusive ability to fund commission advances for AWIS, the Debtors could not obtain another Advance Partner for AWIS.  Likewise, given their financial condition, the Debtors also knew that it would not be possible to obtain a bank loan or other form of financing for AWIS that would enable it to pay the full amount of Insurety's debt.  Thus, by discontinuing commission advance funding for AWIS' Producers, with knowledge that AWIS could not retain its Producers without an Advance Partner, Insurety attempted to use the exclusivity provision in the Insurety/AWIS contract to put AWIS out of business (and not for its intended purpose of preventing the dilution of Insurety's business opportunity under the Insurety/AWIS contract).

11.    Rather than simply allowing the Debtors to die on the vine, and in an effort to retain the revenue stream from AHCM's servicing business, preserve jobs, and pay creditors, the Debtor's principals (who are not parties to the Insurety/AWIS contract) decided to originate new policies through NIIA, which would also be serviced by AHCM.  To do so, however, NIIA (a separate corporate entity) needed to find its own Advance Partner.  Although Insurety contends Pagnanelli tortiously interfered with the exclusivity provision of the Insurety/AWIS contract by attempting to locate a new advance partner for AWIS, the factual allegations supporting its Tortious Interference Claim involve alleged actions by Pagnanelli to help Jordan and NIIA locate an Advance Partner for NIIA (not AWIS). However, any alleged assistance by Pagnanelli to NIIA could only be viewed as tortiously interfering with Insurety's exclusive right to provide commission advances to AWIS under the Insurety/AWIS contract if the separate corporate forms of AWIS and NIIA are disregarded.

Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 7 of 121

12.     In Count VII of the Pagnanelli Complaint, Insurety describes its Tortious Interference Claim as follows:

> Pagnanelli intentionally and unjustifiably interfered with the business relationship between Plaintiffs [Insurety] and AWIS because, as further outlined in Paragraphs [45-51], Pagnanelli **actively attempted to source new commission advance funding for AWIS**, knowing any such agreement would violate the terms of the exclusivity agreement between Insurety and AWIS.

See Pagnanelli Complaint, ¶ 127 (emphasis added). Thus, Insurety's Tortious Interference Claim alleges that Pagnanelli tortiously interfered with the Insurety/AWIS contract by attempting to locate a new Advance Partner for AWIS (not NIIA). As support for this claim, however, Insurety references back to paragraphs 45-51 of the Pagnanelli Complaint. With the exception of certain unsupported allegations in paragraph 45, paragraphs 46-51 unequivocally describe alleged efforts by Pagnanelli to assist Jordan and NIIA in finding an Advance Partner for NIIA (not AWIS). See Pagnanelli Complaint, ¶¶ 46-51. Indeed, NIIA is twice specifically identified by name in these paragraphs. In the Safina Affidavit, Joseph Safina also expressly describes alleged attempts by Pagnanelli to obtain financing for commission advances for NIIA (not AWIS). See Safina Affidavit, Exhibit D to the Pagananelli Complaint, at ¶¶ 3-9. Finally, in paragraph 51, Insurety contends that "[b]y actively pursuing other sources or commission advance financing products for or on behalf of AWIS, Pagnanelli has directly and tortiously interfered with Insurety's business relationship with AWIS." See Pagnanelli Complaint, ¶ 51.

13.     Based on the language of the Pagnanelli Complaint, it is clear that Insurety contends that Pagnanelli's alleged attempt to locate an Advance Partner *for NIIA* constituted an action to locate an advance partner "*for or on behalf of AWIS*" in violation of the exclusivity provision in the Insurety/AWIS contract. The only way any alleged assistance by Pagnanelli in locating an Advance Partner for NIIA could ever be construed as an action to locate an Advance Partner "for or on behalf of" AWIS is if the separate and distinct structures of AWIS and NIIA (or AWIS, NIIA and Jordan) are disregarded. However, by filing the Tortious Interference Claim, which is predicated on the notion that

AWIS and NIIA (or AWIS, NIIA and Jordan) are alter egos or their separate forms should be disregarded, which claims belong the Debtors' bankruptcy estates, Insurety violated the automatic stay under section 362(a)(3) by exercising control over property of the Debtors' estates.

**B.      By Filing the Tortious Interference Claim, Insurety Violated the Automatic Stay**

14.      The automatic stay of section 362(a) of the Bankruptcy Code becomes effective upon the commencement of a debtor's bankruptcy case.[5]  Once a bankruptcy petition has been filed, section 362(a)(3) prohibits any entity from taking "any act to obtain possession of property of the estate or of property from the estate ***or to exercise control over property of the estate.***"[6]  The emphasized portion of section 362(a)(3) was added in 1984 and was intended to broaden the scope of the automatic stay.[7]  Thus, in addition to affirmative acts to "obtain possession" of property of the estate, the 1984 Amendments expanded the proscription of section 362(a)(3) to encompass acts which "exercise control" over property of the estate.[8]

15.      Here, claims predicated on piercing AWIS' corporate veil or finding that AWIS is the alter ego of NIIA or Jordan constitute property of their bankruptcy estate.  Section 541 of the Bankruptcy Code, which defines "property of the estate," provides in pertinent part as follows:

> (a) The commencement of a case under section 301, 302, or 303 of this creates an estate. Such estate is comprised of ***all the following property, wherever located and by whomever held***:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, ***all legal or equitable interests of the debtor in property as of the commencement of the case.***
>
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--
> (A) under the sole, equal, or joint management and control of the debtor; or
> (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

---

[5] *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 266 (Bankr. N.D. Tex. 2002) (Lynn, J.). (citing, 3 COLLIER ON BANKRUPTCY ¶ 362.02 (15th ed. rev. 2002) ("The stay is effective automatically upon the filing of a bankruptcy petition….")).

[6] 11 U.S.C. § 362(a)(3) (emphasis added).

[7] *In re Zaber*, 223 B.R. 102, 104 (Bankr. N.D. Tex. 1998).

[8] *Id.*

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

(4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--
(A) by bequest, devise, or inheritance;
(B) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or
(C) as a beneficiary of a life insurance policy or of a death benefit plan.

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. § 541(a) (emphasis added).

16.     Fifth Circuit authority is clear that any claims premised upon the notion that a debtor and certain other individuals and entities are alter egos constitute property of a debtor's bankruptcy estate subject to the automatic stay.  The issue of whether alter ego or veil piercing claims constitute property of a debtor's estate subject to the automatic stay was directly addressed by the Fifth Circuit in *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1149 (5th Cir. 1987) more than thirty years ago.  In that case, the Fifth Circuit initially found that section 362(a)(3) "implements a stay of any action, *whether against the debtor or third parties,* that seeks to obtain or exercise control over the property of the debtor." *S.I. Acquisition, Inc.*, 817 F.2d at 1148 (emphasis added).  Next, citing back to its earlier opinion in *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1273-74 (5th Cir. 1983), the court found that "property of the estate" is broadly defined in section 541(a)(1) to include "all legal and equitable interests of the debtor in property," and that such phrase is "all-encompassing and includes rights of action as bestowed by either federal or state law." *S.I. Acquisition,* 817 F.2d 1149.  Finally, the Fifth Circuit evaluated the alter ego remedy under state law and found that, because the remedy rests on an identity theory that would be available to all creditors so long as the requisite melding of the corporation and the control person or

9

entity are established, alter ego and veil piercing actions belong to the debtor, are property of the estate within the meaning of section 541(a)(1), and are subject to the automatic stay of section 362(a)(3). *Id.* at 1153.

17.     Subsequent Fifth Circuit cases are in accord. *See, e.g., Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 92 (5th Cir. 2016) (finding bankruptcy court correctly recognized that "alter ego and reverse piercing claims belong to the debtor, are property of the estate, lie within the control of the Trustee, and generally may not be brought by a creditor.") (internal quotations omitted); *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 258 (5th Cir. 2010) (reverse veil piercing claims belong to the debtor rather than to individual creditors); *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 361 (5th Cir. 1999) (reverse piercing claims advance a general grievance of all creditors and must be asserted, if at all, by the debtor on behalf of all creditors).

18.     As discussed above, Insurety's Tortious Interference Claim necessarily requires a finding that AWIS and NIIA (or AWIS, NIIA and Jordan) are alter egos to support its contention that Pagnanelli's alleged assistance of NIIA interfered with a contract between Insurety and AWIS.  Under the settled Fifth Circuit authority referenced above, any claims predicated on alter ego or veil piercing allegations constitute property of the Debtors' bankruptcy estate subject to the automatic stay. *E.g., S.I. Acquisition*, 817 F.2d at 1153.  Further, by asserting such a claim, Insurety violated the automatic stay under section 362(a)(3) by exercising control over property of the Debtors' estate (i.e., its alter ego and veil piercing claims). *Id.*  The fact that the Tortious Interference Claim was asserted against Pagnanelli rather than the Debtors is also irrelevant because the section 362(a)(3) imposes a stay over any action seeking to exercise control over property of the estate, not just a suit against the Debtors. *Id.* at 1148.  As a result, the Court should enforce the automatic stay against Insurety and enter an order (i) prohibiting Insurety from moving forward on its Tortious Interference Claim, and (ii) prohibiting Insurety from obtaining discovery on its Tortious Interference Claim, including discovery relating to the identity of NIIA's Advance Partner.

19.     Finally, although Insurety is not asserting alter ego or veil piercing for the purpose of

holding another entity responsible for a debt owed by the Debtors (i.e., it is not seeking to hold NIIA responsible for AWIS' debt), the Tortious Interference Claim nevertheless involves a claim predicated upon the notion that AWIS, NIIA and Jordan are alter egos and that the corporate forms of AWIS and NIIA should be disregarded. In the usual scenario, a creditor (Z) contends that the Debtor (D) and an affiliate (A) are alter egos such that their corporate forms should be disregarded and A should be responsible for D's debts. Here, by contrast, the Tortious Interference Claim is premised on the notion that AWIS and NIIA (and possibly Jordan) are alter egos such that, by allegedly assisting NIIA in obtaining an Advance Partner, Pagnanelli tortiously interfered with Insurety's exclusive contractual right to provide commission advances to AWIS (or, as here, to withhold making such commission advances in an effort to put the Debtors out of business). Although Insurety's Tortious Interference Claim does not seek to recover from NIIA as the alter ego of AWIS, it nevertheless requires the federal district court in Miami to make a determination that the separate forms of AWIS and NIIA (or AWIS, NIIA and Jordan) should be disregarded and, consequently, Pagnanelli's alleged assistance in locating an Advance Partner for NIIA constituted an attempt to locate a new advance partner for AWIS in violation of Insurety's exclusive rights under the AWIS/Insurety contract. Such a finding to disregard the separateness of the Debtors and NIIA or Jordan would also support a holding that the Debtors are liable for the debts of NIIA or Jordan. Indeed, such a result is inherent in any holding that the corporate forms are to be disregarded as between NIIA, Jordan and the Debtors.

20. Further, even if the Court were to find the distinction between making alter ego-type allegations in an effort to utilize the remedy and the making of such allegations for some other purpose to be meaningful, the ability to assert a claim premised upon the notion that AWIS and NIIA (or AWIS, NIIA and Jordan) are alter egos or that their separate forms should be disregarded is, at a minimum, arguably property of the Debtors' estate such that Insurety should have requested relief from the stay prior to asserting its Tortious Interference Claim against Pagnanelli. In *Brown v. Chesnut (In re Chesnut),* 422 F.3d 298 (5th Cir. 2005), the Fifth Circuit found that the "policy and structure of the Bankruptcy Code suggest that the stay covers at least some arguable property." *Chesnut,* 422 F.3d at

11

303.  In situations involving arguable property, the party seeking to exercise control over the arguable property must file a motion for relief from the automatic stay and cannot proceed in violation of the automatic stay until a determination has been made by the bankruptcy court regarding the property's characterization.  *Id.* at 306.  Such is the case here.  At a minimum, claims predicated on alter ego or veil piercing findings constitute arguable property of the estate such that Insurety should have sought relief from the automatic stay prior to filing its Tortious Interference Claim.  Having not done so, Insurety violated the automatic stay.  Further, to avoid a finding of a willful stay violation and possible sanctions, Insurety should not take any further action on account of its Tortious Interference Claim until a judicial determination has been made as to whether the assertion of such claim by Insurety constitutes the exercise of control over property of the Debtors' estate in violation of the automatic stay.

## **PRAYER**

WHEREFORE, the Debtors respectfully request entry of an order granting (a) the relief requested herein and (b) such other and further relief as is just and proper.

Dated: March 6, 2020.                              Respectfully submitted,

/s/ *J. Robert Forshey*
J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:   817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com
ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

12

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing document was served upon the parties listed below via email, and on the attached service list via United States Mail, first class postage prepaid, or via ECF electronic Notice, if available, on March 6, 2020.

United States Trustee
Attn: Erin Schmidt, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
Erin.Schmidt2@usdoj.gov
Charles Kelley
Robert S. Harrell
Andrew C. Elkhoury
Mayer Brown LLP
700 Louisiana Street, Suite 3400
*ckelley@mayerbrown.com*
rharrell@mayerbrown.com
*aelkhoury@mayerbrown.com*

United States Trustee
Attn: Elizabeth Young, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
Elizabeth.A.Young@usdoj.gov
Ian Peck
Jerome J. Yates
Haynes and Boone, LLP
301 Commerce St., Suite 2600
Fort Worth, TX 76102
Ian.peck@haynesboone.com
Jarom.yates@haynesboone.com

John Rezac
Jonathan Crumly
Taylor English Duma LLP
1600 Parkwood Circle, Suite200
Atlanta, GA 30339
jrezac@taylorenglish.com
jcrumly@taylorenglish.com

Christopher Arisco
Joseph Austin
Padfield & Stout LLP
420 Throckmorton St. Suite 1210
Fort Worth, TX 76100
carisco@padfieldstout.com
jaustin@padfieldstout.com

               /s/ *J. Robert Forshey*
               J. Robert Forshey

L:\BFORSHEY\American Workers Insurance  (Assc Health Care) #6050\Pleadings 19-44208-mxm11\Motion to Enforce the Automatic Stay 3.6.2020.doc

13

# Exhibit 1

**[Transcript Excerpts]**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In Re:                          )   **Case No. 19-44208-mxm-11**
                                )
AMERICAN WORKERS INSURANCE      )   Fort Worth, Texas
SERVICES, INC.,                 )   October 17, 2019
                                )   3:00 p.m.
        Debtor.                 )
                                )   FIRST DAY MOTIONS
                                )
_____ )
                                )
In Re:                          )   **Case No. 19-44209-mxm-11**
                                )
ASSOCIATION HEALTH CARE         )
MANAGEMENT, INC.,               )
                                )   FIRST DAY MOTIONS
        Debtor.                 )
_____ )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:            J. Robert Forshey
                            Laurie Rea
                            Dylan Ross
                            FORSHEY & PROSTOK, LLP
                            777 Main Street, Suite 1290
                            Fort Worth, TX   76102
                            (817) 877-8855

For Insurety Capital, LLC:  Ian T. Peck
                            HAYNES AND BOONE, LLP
                            201 Main Street, Suite 2200
                            Fort Worth, TX   76102
                            (817) 347-6613

For Insurety Capital, LLC:  Robert S. Harrell
                            MAYER BROWN, LLP
                            700 Louisiana Drive, Suite 3400
                            Houston, TX   77002
                            (713) 238-2700

**Debtors' Ex. 9, p. 001**

2

APPEARANCES, cont'd.:

For Agentra, LLC and          William S. Richmond
CyberX Group, LLC:            PLATT CHEEMA RICHMOND, PLLC
                              1201 N. Riverfront Blvd.,
                                 Suite 150
                              Dallas, TX  75207
                              (214) 559-2700

For State of Texas Office     J. Casey Roy
Of Attorney General,          OFFICE OF THE TEXAS ATTORNEY
Bankruptcy and Collections       GENERAL
Division:                     P.O. Box 12548 MC-008
(Telephonic)                  Austin, TX  78711-2548
                              (512) 475-4861

For the U.S. Trustee:         Elizabeth Ziegler Young
                              OFFICE OF THE UNITED STATES
                                 TRUSTEE
                              1100 Commerce Street, Room 976
                              Dallas, TX  75242
                              (214) 767-8967

For Landon Jordan:            Eric M. Van Horn
                              SPENCER FANE, LLP
                              2200 Ross Avenue, Suite 4800 West
                              Dallas, TX  75201
                              (214) 750-3610

Recorded by:                  Karyn Rueter
                              UNITED STATES BANKRUPTCY COURT
                              501 W. 10th Street
                              Fort Worth, TX  76102
                              (817) 333-6038

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063

Proceedings recorded by digital sound recording;
transcript produced by transcription service.

**Debtors' Ex. 9, p. 002**

182

THE COURT:  I understand.  And I'm with you on that. But with November 1st right around the corner, and we did hear testimony on what that means, and we have -- I think pretty much everyone in the room has decisions to make on what sort of policies they're going to look to for health coverage and all that starting next year, --

MR. PECK:  Uh-huh.

THE COURT:  -- if these producers aren't paid tomorrow, doesn't that -- isn't that bad for Insurety?

MR. PECK:  It's not great, Your Honor, but we think it's worse to leave the Debtors in place.

THE COURT:  And I hear you, but that's not before me today.

MR. PECK:  Yeah.  Correct.

THE COURT:  Well, I guess in a roundabout way, if the Court denies the motion to use cash collateral, it's certainly going to be a tailspin.

MR. PECK:  Right.

THE COURT:  But the issue of who should be in place tomorrow, next week, next month, fair question, fair issues, we can deal with that.  But I'm just afraid, with a stroke of a pen, those issues will become pretty moot and you're looking at the Chapter 7 trustee down the road doing a lot of forensic work that may or may be able to collect against whatever actions that may be out there.  I don't know.

**Debtors' Ex. 9, p. 003**

Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 18 of 121

191

MR. HARRELL: -- that's our -- that was our expectation, yes.

THE COURT: I understand the clarification.

MR. PECK: I suppose it's no different than a client that, you know, that you hold money for in your trust account. They probably don't know it's not in the trust account until they ask for it back and it's not there.

THE COURT: Excellent point.

MR. PECK: So, just to wrap up, I'd say, you know, what we're asking for you to do is deny the cash collateral motion, recognizing the implications -- on us, more than anyone, because we're the largest constituency, the largest constituent in this case -- and I recognize this result may seem a harsh one, but I guess two points. One, this is the nature of the contractual arrangement in this case and the contractual arrangement that is common to the industry.

And, again, you know, after all, we are the ones that stand to lose the most from the relief being denied. So, given that we're --

THE COURT: How are -- where are you going to lose that? Just help me out with that.

MR. PECK: Well, to your point, Your Honor, is if the producers aren't paid tomorrow, the producers go away, the producers try to move their clients, who are generally in this premium stream --

**Debtors' Ex. 9, p. 004**

192

THE COURT: But if I sustain your objection, isn't that inevitable?

MR. PECK: Yes. I'm saying that, despite that fact, we're prosecuting this objection. So, we understand that that could be the result, and we're okay with it.

THE COURT: All right.

MR. PECK: Thank you, Your Honor.

THE COURT: All right. Any brief rebuttal?

MR. FORSHEY: No, Your Honor. I think you've heard everything. Again, thank you for your patience.

THE COURT: It'll take me a couple minutes up here.

(Pause, 8:11 p.m. )

THE COURT: All right. Let me see if I can ramble through the various motions that are before the Court. And I apologize, it will not be as clear and concise as I would like, but given the hour and given the important issues of the day, I will do my best.

First, the motion for joint administration, which in the American Worker's case is Docket #4, and also in the Association Healthcare case, Docket #4, the Court finds that that motion has merit, should be granted as requested there. I don't think there was any opposition voiced from anybody. That's more of a procedural motion than anything else. So the Court will grant the motion for joint administration in each of the cases, pursuant to the request in the motion. I

**Debtors' Ex. 9, p. 005**

# Exhibit 2

**[Pagnanelli Complaint]**

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 21 of 117
Case 1:19-44208-mxmll Doc 176 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 21 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 1 of 30

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

777 PARTNERS LLC and        CASE No._____
INSURETY CAPITAL LLC,

    Plaintiffs

v.

CHRISTOPHER JAMES PAGNANELLI,

    Defendant

---

### COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF

Plaintiffs 777 Partners, LLC ("777 Partners") and Insurety Capital, LLC ("Insurety") (together "Plaintiffs" or "the Company"), by and through undersigned counsel, file this Complaint for Monetary and Injunctive Relief ("Complaint") against Defendant Christopher James Pagnanelli ("Pagnanelli"), and allege as follows:

### INTRODUCTION

1. This action arises from the misconduct of Insurety's former CEO, Christopher James ("CJ") Pagnanelli.

2. In April 2019, Pagnanelli was terminated for cause after the Company discovered he was engaged in a host of misconduct, including self-dealing schemes to personally enrich himself at the Company's expense and the misappropriation of the Company's unique and proprietary trade secrets—transaction structures, financials and industry specific financial models custom built by the Company to better serve its clients.

3. Since his termination, Pagnanelli has brazenly breached the Non-Disclosure, Non-Solicitation, Non-Disparagement, and Non-Competition covenants of his Employment Agreement. Among other things, Pagnanelli has disparaged Insurety in repeated attempts to

1

solicit Insurety's customers to transfer their business from Insurety to a company or companies in which Pagnanelli is involved.

4. Further, Pagnanelli has and continues to flagrantly interfere with Insurety's known business relationships.

5. Pagnanelli's actions – both before and after his employment – constitute unmistakable breaches of his contractual and fiduciary duties to the Company.

6. Accordingly, the action is for injunctive relief and monetary damages in order to remedy Pagnanelli's illegal conduct.

## THE PARTIES, JURISDICTION, AND VENUE

7. Insurety is a Delaware limited liability company with its principal place of business located in Miami, Florida.

8. 777 Partners is a Delaware limited liability company with its principal place of business located in Miami, Florida.

9. Pagnanelli is, upon information and belief, a resident of Miami, Florida. As noted above, he is a former employee of the Company and the former CEO of Insurety. Pagnanelli regularly uses the nickname "CJ."

10. This Court has subject matter jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States; Plaintiffs raise a claim for trade secret misappropriation under 18 U.S.C.A. § 1836(c).

11. The Court has subject matter jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. § 1367 because the state law claims arise out of a common nucleus of operative facts as the federal law claim.

2

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 23 of 117
Case 1:19-44208-mxnHL Doc 178 Filed 03/06/20 Entered 03/06/20 14:19:23 Page 23 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 3 of 30

12. Pursuant to paragraph 9(F) of the Employment Agreement, venue is proper and rests exclusively in Miami-Dade County, Florida, which also is the County where the causes of action arose.

13. Venue is also proper under 28 U.S.C. § 1391(c) due to Pagnanelli's residence in Miami, Florida.

14. All conditions precedent to bringing this action have been performed or waived.

## FACTUAL BACKGROUND

### GENERAL OVERVIEW OF BUSINESS OPERATIONS

15. Insurety is a leading provider of short-term cash advances to independent marketing organizations ("IMOs"), allowing the IMOs to pay advance commissions to their independent insurance agents, commonly known as "producers."

16. More specifically, in today's insurance marketplace, IMOs serve as intermediaries between insurance carriers and independent insurance agents. The insurance carriers underwrite insurance policies while the IMOs market, distribute, and sell those policies through agents who work for the IMOs. Insurance agents earn a commission on each insurance policy they sell, the amount of which varies based on the amount of the insurance premium. Due to the nature of insurance transactions, insurance agents typically do not receive their commissions until policyholders pay their policy premiums, usually on a monthly basis. Insurety offers IMOs the ability to satisfy and retain their insurance agents by advancing several months of future commissions earned by the insurance agents. In exchange for the commission advance, Insurety acquires the rights to the agent's future insurance commissions, plus an administrative fee, which may be known as the per member per month fee ("PMPM").

17. Insurety is engaged in a highly competitive, nationwide business. As such, attracting clients and maintaining strong client relationships is at the core of Insurety's success.

3

### PAGNANELLI'S TENURE AS INSURETY'S CEO AND FIDUCIARY DUTIES OWED

18. On January 10, 2018, Pagnanelli executed his Employment Agreement ("Agreement"). A copy is attached as "Exhibit A" hereto.

19. Pagnanelli served as Insurety's Chief Executive Officer between January 2018 and April 4, 2019, at which time the Company suspended him pending an investigation.

20. On April 24, 2019, the Company terminated Pagnanelli's employment "for cause," effective April 4, 2019.

21. During the period of his employment with the Company, Pagnanelli owed a fiduciary duty and a duty of loyalty to the Company, and to its affiliates, to act solely in the best interest of the Company and its affiliates, and to refrain from engaging in any self-dealing and/or self-interested conduct or transactions adverse to the legitimate business interests of the Company and its affiliates.

22. Pursuant to Paragraph 3 of the Agreement, Pagnanelli agreed to devote his full productive time and best efforts to the performance of his duties for the Company.

23. Pursuant to paragraph 6(F) of the Agreement, Pagnanelli was required to comply with all Company policies regarding actual or apparent conflicts of interest.

24. On January 8, 2018, Pagnanelli acknowledged receipt of the 777 Partners "Conflicts of Interest Policy," a copy of which is attached as "Exhibit B."

25. By its terms, that policy bound "employees of 777 Partners, LLC, and any portfolio company or subsidiary . . . ." By signing the policy, Pagnanelli acknowledged several critically important principles, including, without limitation:

   a. that he would "act in the best interests of the Company" and conduct business "in accordance with all applicable laws, rules and regulations and the highest ethical standards;"

4

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 25 of 117
Case 1:19-44208-mxHL Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 25 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 5 of 30

b.     that, as a condition of employment, he would "not engage in any work, paid or unpaid, or other activities that create a conflict of interest that materially and substantially disrupt the operations of the Company" and that such work or activities would include "directly or indirectly competing with the Company in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or which is in direct competition with, the business in which the Company" is engaged;

c.     that he would not "take part in or attempt to influence any Company decision or any business dealings with a current or potential competitor, customer, partner, vendor, supplier, or other business entity" in which he had "a direct or indirect financial interest;"

d.     that "to avoid the appearance of a conflict" he would "disclose any direct or indirect financial interest in a current or potential competitor, customer, partner, vendor or supplier" with which he discovered the Company planned to do business;

e.     that he "must not take personal advantage of or interfere with any existing or potential Company business opportunities;"

f.     that his "outside business activities must not compete with or reflect adversely on the Company or give rise to a conflict of interest;"

g.     that he "must not engage in any outside activity that is likely to involve disclosure of Company proprietary information or that is likely to divert time and attention from your responsibilities at the Company."

h.     that he "must act with integrity, honesty, competence, and in an ethical manner when dealing with the public, regulators, clients, investors, prospective investors, and their fellow Employees;"

i.     that he "must adhere to the highest standards with respect to any potential material conflicts of interest," and the he would not "enjoy a benefit at the expense of the Company;" and

j.     that he would "preserve the confidentiality of information" and not use such information "in any way adverse to the interests of the Company."

26.     In consideration for the promises made by Pagnanelli under the Agreement and to perform his duties under the Agreement, the Company agreed to pay, and did pay, Pagnanelli an annualized base salary of $225,000 (gross) and a "sign-on bonus" of $98,082 (gross). In further consideration for the promises made by Pagnanelli under the Agreement and to perform his

36011051.8

duties under the Agreement, Pagnanelli was eligible to receive an annual bonus, targeted at 50% (gross) of his base salary. The Company also provided Pagnanelli various "fringe benefits" under paragraph 5(C) of the Agreement in further consideration for the promises made by Pagnanelli under the Agreement and to perform his duties under the Agreement. Pagnanelli accepted the consideration recited in the Agreement yet breached his corresponding obligations.

### PAGNANELLI'S SELF-DEALING DURING TENURE AS CEO OF INSURETY

27.     Contrary to his contractual and common-law obligations, including his fiduciary duty, duty of care and duty of loyalty owed to the Company, and contrary to the principles outlined in the Conflicts of Interest Policy, Pagnanelli engaged in self-dealing and self-interested transactions during his employment with the Company, which he did not disclose to the Company, but rather hid from the Company, and which materially harmed the Company and interfered with the performance of Pagnanelli's job duties under the Agreement.

28.     As one example, Pagnanelli secretly contracted with one of the Company's largest clients, American Workers Insurance Services ("AWIS"), so that he was personally paid a fee – or "kickback" – for every referral.

29.     On February 20, 2019, Pagnanelli became a Member of Rendon Management Group, LLC ("Rendon"), which is believed to have held an ownership interest in AWIS. The Certificate of Amendment for Rendon, filed with the Office of the Secretary of State of Texas, is attached as "Exhibit C." Pagnanelli intentionally failed to disclose to the Company this obvious conflict of interest.

30.     Pagnanelli also intentionally failed to advise the Company of the relationship between two (2) of the Company's largest clients, AWIS and Agentra, namely, that David Lindsey held a direct or indirect ownership interest in both entities. Pagnanelli then recklessly

36011051.8

advanced significant funds to both clients, thereby creating a high "concentration risk" that may not have been assumed by the Company had Pagnanelli disclosed the relationship between AWIS and Agentra.

31. Pagnanelli not only assumed a high "concentration risk" by advancing significant funds to AWIS and Agentra, but also, at the same time, upon information and belief, pursued a personally beneficial business relationship with Mr. Landon Jordan, the primary owner of AWIS, that conflicted with Insurety's legitimate interests, financial and otherwise. Pagnanelli did not disclose to the Company his pursuit of a personally beneficial business relationship with Mr. Jordan.

32. In furtherance of his personal business relationship with Mr. Jordan, Pagnanelli implemented a 9-month commission advance program to AWIS, which was even riskier to Insurety than the 8-month advance program, for personal financial gain. Such program would not have been offered but-for Pagnanelli's self-dealing and self-interested transactions with AWIS. Pagnanelli knew that the 9-month commission advance program was not in Insurety's best interest, and, in fact, was contrary to Insurety's best interests, because the average length of the policies was less than 9 months, meaning that the Company was not likely to receive the advance money back if the commission advance program itself was for 9 months.

33. Pagnanelli admitted this relationship and his personal interest in a text message conversation with John Karlin, a previous employee of 777 Partners who was working in the insurance industry, when he told Karlin that AWIS was "crushing" because he, on behalf of Insurety, would buy "med supp books" and in exchange would make the Producers sell AWIS products. Pagnanelli (not Insurety) would get half of those sales, so he was "lin[ing] his own pockets."

36011051.8

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 28 of 117
Case 19-44208-mxHLL Doc 178 Filed 03/06/20   Entered 03/06/20 14:21:23   Page 28 of 121
Case 1:20-cv-20172-JEM   Document 1   Entered on FLSD Docket 01/15/2020   Page 8 of 30



34.     He "failed to act in the best interests of the Company" when he offered an 8-month advance program to Insurety's clients, knowing that such an advance program was bad for business. In a text message conversation between Pagnanelli and Karlin, Pagnanelli told Karlin that a client was making him offer an 8-month advance program and that he was "going down with the ship" and would just take his "fat pmpm" then get out:

36011051.8

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 29 of 117
Case 19-44208-mxm11   Doc 178   Filed 03/06/20   Entered 03/06/20 14:29:23   Page 23 of 121
Case 1:20-cv-20172-JEM   Document 1   Entered on FLSD Docket 01/15/2020   Page 9 of 30



35.    Pagnanelli further stated to Karlin that he should engage with a competitor of Insurety's as he knew he made a bad decision offering an 8-month advance program and just wanted to get his bonus from 777 and get out. Pagnanelli stated the following:

36011051.8



## THE RESTRICTIVE COVENANTS

36.   Pursuant to paragraph 6(B) of the Agreement, Pagnanelli agreed that he would not, during his employment with the Company or thereafter, use or disclose "Confidential Information" (as defined in paragraph 6(B)(I) of the Agreement) for any competitive purpose or divulge "Confidential Information" to any person other than the Company or persons with respect to whom the Company has given its written consent, except for limited purposes not at issue in the instant action (such as compelled disclosure by a court or government authority or pursuant to subpoena).

37.   Pursuant to paragraph 6(B)(I), "Confidential Information" included, without limitation, trade secrets and other non-public information specific to the Company's business and investment activities, such as vendor lists, customer contact information, pricing information, strategic and marketing plans, compilations of customer and supplier information, and

10

information relating to financial and marketing books, price and sales projections, and other information related to the tools, products, and services that facilitate the Company's ability to sell its services.

38. Pagnanelli was exposed to, and used and created in the performance of his duties as CEO for Insurety, Confidential Information that he was obligated to use solely for legitimate business interests, and certainly not for competitive purposes either during his employment with the Company or thereafter.

39. Pursuant to paragraph 6(D) of the Agreement, Pagnanelli agreed to honor various restrictive covenants, including the following:

    a. <u>Non-Competition</u> (paragraph 6(D)(II) of the Agreement). Pagnanelli agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, engage in any commercial activity in the United States that competes with the business of the Company, namely, the insurance-related commission advance business.

    b. <u>Non-Disparagement</u> (paragraph 6(D)(IV) of the Agreement). Pagnanelli agreed that he would not, at any time, make, publish, or communicate to any person or entity any "Disparaging" remarks, comments, or statements concerning the Company, its affiliates, their respective partners, members, or employees. Paragraph 6(D)(IV) of the Agreement defines a "Disparaging" remark as a remark, comment, or statement that impugns the other party's character, honesty, integrity, morality, business acumen, or abilities.

    c. <u>Non-Solicitation</u> (paragraph 6(D)(V) of the Agreement). Pagnanelli agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, among other things: (i) take any action to solicit or divert any Clients, Sources, or Sellers (as defined in the Agreement) away from the Company and/or any affiliates; or (ii) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or any affiliates.

40. The restrictive covenants set forth in the Agreement, and as referenced above, were and are reasonably necessary to protect the Company's legitimate business interests, including, without limitation, its trade secrets, its valuable confidential business information, its

11

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 32 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:29:23 Page 32 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 12 of 30

professional information, its substantial relationships with specific prospective and existing customers, its goodwill, and its business "know how" and practices. Indeed, Pagnanelli agreed in Paragraph 6(D)(VI) of the Agreement that the restrictions "are reasonable in scope and duration." He also acknowledged in paragraph 6(D)(VII) of the Agreement that the restrictions are essential, independent elements of the Agreement and that, but for his agreement to comply, the Company would not have employed or continued to employ him.

41.     The restrictive covenants survive the termination of the Agreement and Pagnanelli's employment thereunder.

42.     Pagnanelli agreed in paragraph 6(E) of the Agreement that his breach of the restrictive covenants would cause the Company irreparable harm that is not fully remedied by monetary damages, and that the Company would be entitled to injunctive relief in the event of a breach, in addition to any other legal or equitable remedies available.

### PAGNANELLI'S BREACH OF THE RESTRICTIVE COVENANTS

43.     Despite having accepted valuable consideration in connection with his execution of the Agreement, including, without limitation, employment, a significant base salary, a sign-on bonus, bonus eligibility, and other fringe benefits, Pagnanelli has breached the restrictive covenants in the Agreement, and caused damage to Insurety.

44.     For example, Pagnanelli has breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of his Employment Agreement since his termination by soliciting investors to fund a commission advance program.

45.     Pagnanelli has further breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of his Employment Agreement since his termination by trying to broker a commission advance program between AWIS and one of its competitors, Producer Advance.

12

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 33 of 117
Case 1:19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 33 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 13 of 30

46. When Producer Advance did not agree to provide advances, Pagnanelli worked with AWIS to find alternative financing. In concert with Mr. Jordan, Pagnanelli approached Joseph Safina of Financial Carrier Services and pitched the commission advance program. Pagnanelli told Safina that he and Mr. Jordan "owned or controlled another agency called NI[I]A" which was "not listed in the name of Mr. Pagnanelli or Mr. Jordan." NIIA is National Individual Insurance Agency, LLC. NIIA's controlling member, Harold "Rusty" Brock Jr. is the President of AWIS. Pagnanelli and Mr. Jordan were asking Safina to loan money to them for a commission advance program. Safina declined to provide this financing. See Exhibit ["D"], Affidavit of Joseph Safina.

47. Upon information and belief, Pagnanelli has also breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of his Employment Agreement by attempting to setup and obtain funding for a new start-up company to compete with Insurety, pursuant to which Pagnanelli is believed to be soliciting Insurety customers.

48. In fact, in a text message forwarded from one of Insurety's customers, an Insurety employee, JR, was told that AWIS was moving its business to Rusty's company and that CJ was facilitating everything:

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 34 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 34 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 14 of 30



49. This information was confirmed when AWIS notified the Bankruptcy Court in the Northern District of Texas that NIIA had in fact found a source of funding for a commission advance program.

50. In furtherance of the aforementioned conduct, Pagnanelli is believed to be in breach of the Non-Disparagement provisions of his Employment Agreement (Paragraph 6(D)(IV) by telling Insurety's customers that Insurety has no money and therefore could not continue to fund commission advances. These disparaging statements about Insurety are part of his effort to compete with Insurety and solicit its customers.

51. Not only do these actions violate the restrictive covenants in Pagnanelli's employment agreement, but they also rise to the level of interference with Insurety's known business relationship. As CEO, Pagnanelli was well aware that Insurety had an exclusive commission advance agreement with AWIS. Pursuant to that agreement, AWIS could not receive advances or similar financial products from another advance company. By actively

14

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 35 of 117
Case 19-44208-RAM Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 35 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 15 of 30

pursuing other sources or commission advance financing products for or on behalf of AWIS, Pagnanelli has directly and tortiously interfered with Insurety's business relationship with AWIS.

52.     Pagnanelli has further breached the Confidentiality, Non-solicitation, and Non-Competition provisions of his Employment Agreement because he used a Company computer to access, copy then email Company Microsoft Excel Files, containing confidential trade secret information, to his father and other individuals not affiliated with the Company.

53.     These unique Microsoft Excel files were created by the Company containing propriety trade secret information including, in particular, transaction structures and formulas and industry specific financial models developed by the Company and specific to each of its clients.

54.     Each file created by the Company broke out objective and subjective data in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase.

55.     These trade secrets were developed by two of Plaintiff's investment principals, working full time over several weeks. One of these professionals holds an M.B.A. from Wharton School at the University of Pennsylvania and has twelve (12) years of Wall Street experience. The other professional holds a B.A. in Economics from Harvard University and has nine (9) years of experience in financial and operational strategy. This work involved complicated calculations and modeling.

56.     The Company spent a significant amount of money and time developing these trade secrets.

57.     These trade secrets give the Company an advantage over its competitors by enabling it to efficiently determine and improve its sales and purchasing strategies.

36011051.8

58. The misuse of Insurety's trade secrets by Pagnanelli was entirely unauthorized and improper, and constitutes a theft and misappropriation of Insurety's trade secrets.

59. Insurety was and is the owner of all this information, documents and files stolen by Pagnanelli.

60. The Company has and continues to take reasonable steps to protect the secrecy of its trade secrets. The Company requires employees to maintain the confidentiality of its trade secrets by having them sign confidentiality agreements and including confidentiality terms within its employment agreements. Only high level employees have access to the trade secrets, and no third parties are allowed to view the information without the benefit of an executed non-disclosure agreement.

61. The Company used the trade secrets described above in interstate commerce.

62. Pagnanelli's misappropriation of this information and files has caused Plaintiffs damage in excess of $100,000, in that they are required to seek legal assistance to protect their trade secrets and are now suffering competitive damage in that Pagnanelli is now attempting to steal business from them by using their own trade secret information.

63. Plaintiffs cannot quantify the precise monetary losses that might continue to be suffered due to loss of goodwill, loss of sales, and the unfair economic advantages that Pagnanelli has gained or is likely to gain.

64. The loss of business that Pagnanelli threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of determining what business has or will be lost makes Plaintiffs' injury irreparable.

65. Furthermore, Pagnanelli's attempts to establish a competing business is sufficient to establish irreparable harm by reason of the threat of the continuation of such losses to

16

36011051.8

Plaintiffs' legitimate and ongoing businesses, creating ongoing competition with Insurety, making it difficult to identify or predict which customers Insurety will lose.

66.     As a result of Pagnanelli's breaches of the Agreement, and as a result of Pagnanelli's defamatory conduct and breach of his common law fiduciary duties, the Company has suffered and will continue to suffer significant damages, including, without limitation, loss of business, revenue, and corporate opportunities, and impairment of its reputation and goodwill.

67.     Plaintiffs have retained undersigned counsel and have agreed to pay undersigned counsel costs and attorneys' fees in connection with this matter. Plaintiffs are entitled to recover such costs and fees from Pagnanelli pursuant to Fla. Stat. § 542.335(1)(k), Fla. Stat. § 688.005(1)(k), and 18 U.S.C.A. § 1836(b)(3)(D).

## COUNT I

### TRADE SECRET MISAPPROPRIATION (DTSA)

68.     Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

69.     Plaintiffs possess trade secret information, including at least: Microsoft Excel files created by the Company that contained propriety trade secret information including, in particular, transaction structures and formulas and industry specific financial models developed by the Company and specific to each of its clients in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase. 18 U.S.C.A. § 1839(3).

70.     Plaintiffs took reasonable steps to protect the secrecy of these trade secrets, including by having employees execute confidentiality and non-disclosure agreements before having access to the trade secrets. Only high-level employees had access to the trade secrets. Moreover, no third parties were provided access to the information. *Id.*

17

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 38 of 117
Case 19-44208-rxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 38 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 18 of 30

71. Plaintiffs derive actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors. *Id.*

72. The trade secrets were provided to Pagnanelli pursuant to a duty of confidentiality.

73. The trade secrets were used in interstate commerce. 18 U.S.C.A. § 1836(b)(1).

74. Either Pagnanelli knew, or had reason to know, that the secrets were improperly obtained or Pagnanelli used improper means to obtain them. 18 U.S.C.A. § 1839(5)(A); 18 U.S.C.A. § 1839(5)(B)(i).

75. By means of the acts, practices, omissions, and conduct alleged above, Pagnanelli has violated 18 U.S.C. 1832 of the DTSA, in that he:

(a) with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
(4) attempts to commit any offense described in paragraphs (1) through (3); or

(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

76. Plaintiffs have been damaged by Pagnanelli's misappropriation of these trade secrets.

18

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 39 of 117
Case 1:19-44208-mxnHll Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 39 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 19 of 30

77.     Section 18 U.S.C. 1836(b)(1) & (3)(A) provides Insurety with an appropriate civil remedy against Pagnanelli for his wrongdoing, including the grant of injunctive relief both prohibiting continued misuse of the trade secrets and requiring protective measures.

78.     Section 18 U.S.C. 1836(3)(B) provides for the damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

79.     Section 18 U.S.C. 1836(c) grants this Court jurisdiction over such claim.

**WHEREFORE**, Plaintiffs request the Court to enter the following relief in favor of Plaintiff and against Defendant:

A.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant from using or disclosing any information that they improperly obtained;

B.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant or any other person acting with or for him from contacting any customers or other persons and transmitting any of the information Pagnanelli accessed, transferred, or downloaded in violation of the DTSA;

C.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendant from misappropriating and using the confidential and/or proprietary information alleged herein;

D.     That a mandatory injunction order be issued requiring Defendant to return to Plaintiff any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in their possession, or to which they may have access;

19

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 40 of 117
Case 1:19-44208-mxhi.i Doc 178 Filed 03/06/20 Entered 03/06/20 14:23:23 Page 40 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 20 of 30

E. That a mandatory injunction order be issued requiring Defendant to permit Plaintiff to collect a forensic image of Defendant computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiff;

F. That following the imaging described above, that Defendant be ordered to permanently delete all Plaintiff's confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G. That the Court grant additional relief to Plaintiff, including (i) an accounting of monies obtained through Defendant wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiff as a result of Defendant's wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT II

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

80. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

81. Plaintiffs use their computers, including the desktops and laptops that it had provided for use by the Defendant, in interstate and foreign commerce.

82. Defendant was at no time authorized to access those computers for the purpose of transferring information, documents, or files belonging to Plaintiff that were and are stored on Plaintiff's computers.

83. Plaintiffs' computers are protected computers within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

84. Defendant knowingly and intentionally, with the intent to defraud, without authorization and/or by exceeding her authorized access, in violation of their fiduciary duties of good faith and loyalty, destroyed, deleted, transferred, copied, downloaded, uploaded, and/or

20

36011051.8

deleted Plaintiff's confidential and proprietary information and other trade secrets in violation of 18 U.S.C. 1030(a)(2), (a)(4), and (a)(5)(A)-(C).

85. As a direct and proximate result of Pagnanelli's unlawful taking of Plaintiffs' confidential and/or proprietary information and other wrongful conduct, Plaintiffs have suffered damages in an amount yet to be determined, but in excess of $5,000, and Defendant has been unjustly enriched by his theft of these files and information by the possession and misuse of these files and information in the financial models to unknown persons by Defendant or others unknown at this time to Plaintiff.

86. Furthermore, the Defendants will continue to use such unlawfully gained information to benefit themselves unless the Court prevents them from using and disseminating such information in the future.

87. Defendant transferred such information outside of Plaintiffs' control for his own possession and the possession and use of third parties.

88. Defendant or others unknown to Plaintiffs utilized that information for promotional or solicitation purposes, or other purposes unknown to Plaintiff.

89. Defendant's conduct constitutes a violation of the CFAA.

90. Defendant's conduct has caused and continues to cause Plaintiffs substantial and immediate irreparable harm, including the actual and potential loss of client relationships and goodwill and confidential and proprietary information. Unless enjoined, Defendant will continue to cause further such irreparable harm.

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against Defendants:

21

36011051.8

A.  That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant from using or disclosing any information that he improperly obtained;

B.  That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant or any other person acting with or for him from contacting any clients or other persons and transmitting any of the information accessed, transferred, or downloaded in violation of the CFAA;

C.  That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendant from misappropriating and using the confidential and/or proprietary information alleged herein;

D.  That a mandatory injunction order be issued requiring the Defendant to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

E.  That a mandatory injunction order be issued requiring the Defendant to permit Plaintiffs to collect a forensic image of the Defendant computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiff;

F.  That following the imaging described above, that the Defendant be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.  That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through the Defendant wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendant wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT III

### TRADE SECRET MISAPPROPRIATION (FUTSA)

91.  Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

36011051.8

92.     This is a count brought under the Florida Uniform Trade Secrets Act.

93.     Plaintiffs possessed trade secret information, including at least: Microsoft Excel files created by the Company that contained propriety algorithms developed by the Company and specific to each of its clients in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase.

94.     Plaintiffs took reasonable steps to protect the secrecy of these trade secrets, including by having employees execute confidentiality and non-disclosure agreements before having access to the trade secrets. Only high-level employees had access to the trade secrets. Moreover, no third parties were provided access to the information.

95.     The trade secrets were provided to Pagnanelli pursuant to a duty of confidentiality.

96.     The trade secrets were misappropriated by Pagnanelli.

97.     Either Pagnanelli knew, or had reason to know, that the trade secrets were improperly obtained or that Pagnanelli used improper means to obtain them.

98.     Pagnanelli used Plaintiffs' trade secrets without express or implied consent when he knew or had reason to know, at the time of his use, that his knowledge of the trade secrets was acquired under circumstances giving rise to a duty to limit the use of or maintain the secrecy of the trade secrets. Fla. Stat. § 688.002(2)(b).

99.     Pagnanelli used Plaintiffs' trade secrets without express or implied consent when he knew or had reason to know, at the time of its use, that his knowledge of the trade secrets was derived through improper means. *Id.*

100.    Plaintiffs derive actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors. *Id.*

36011051.8

101. Pagnanelli's acquisition and use of the trade secrets caused Plaintiffs to suffer damages. Fla. Stat. § 688.004(1).

102. Pagnanelli's misappropriation of the trade secrets was willful and malicious. Fla. Stat. § 688.004(2).

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against Defendants:

A. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant from using or disclosing any information that he improperly obtained;

B. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendant or any other person acting with or for him from contacting any clients or other persons and transmitting any of the information accessed, transferred, or downloaded in violation of the CFAA;

C. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendant from misappropriating and using the confidential and/or proprietary information alleged herein;

D. That a mandatory injunction order be issued requiring the Defendant to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

E. That a mandatory injunction order be issued requiring the Defendant to permit Plaintiffs to collect a forensic image of the Defendant computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiff;

F. That following the imaging described above, that the Defendant be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G. That the Court grant additional relief to Plaintiffs, including (i) an accounting

36011051.8

of monies obtained through the Defendant wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendant wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT IV

### BREACH OF CONTRACT

103.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

104.    Plaintiffs and Pagnanelli executed the Agreement, which is supported by good and valuable consideration.

105.    During his employment as CEO of Insurety, Pagnanelli had a contractual obligation to devote his full productive time and best efforts to the performance of his duties for the Company, and to refrain from engaging in other business activities that were not disclosed to the Company's Managing Partners and that materially conflicted with the performance of his duties under the Agreement.

106.    Moreover, the restrictive covenants set forth in paragraphs 6(D) of the Agreement are reasonably necessary and reasonably tailored to protect the legitimate business interests of the Company. The restrictive covenants are reasonable in time, area, line of business, and otherwise.

107.    During his employment and during the one-year restricted periods outlined in paragraphs 6(D)(II) and 6(D)(V) of the Agreement, Pagnanelli breached (and continues to breach) the restrictive covenants outlined in paragraphs 6(D)(II) and 6(D)(V) of the Agreement by engaging in the conduct outlined above.

25

36011051.8

108. The one-year restricted periods outlined in paragraphs 6(D)(II) and 6(D)(V) of the Agreement must be tolled, or equitably tolled, such that Plaintiffs receive the bargained-for benefit of the full one-year restricted periods.

109. Pagnanelli also had (and continues to have) a contractual obligation to refrain from making, publishing, or communicating to any person or entity any disparaging remarks, comments, or statements concerning the Company.

110. Pagnanelli breached his contractual non-disparagement obligation by publishing to third parties that Insurety has no money, which is a knowingly false and malicious statement uttered solely to induce Insurety's customers and potential customers to refrain from, or cease, conducting business with Insurety.

111. Pagnanelli breached his contractual obligations by engaging in the conduct outlined above.

112. At all times, Plaintiff was in strict compliance with and fully performing its obligations under the employment agreement, which was in force, valid and enforceable.

113. Pagnanelli's contractual breaches have proximately caused (and continue to proximately cause) injury and damages to the Plaintiffs.

**WHEREFORE**, Plaintiffs request judgment against Pagnanelli for monetary damages, interest, attorneys' fees, costs, and such further relief as the Court deems proper.

## COUNT V

### BREACH OF FIDUCIARY DUTY

114. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

115. Pagnanelli, as CEO of Insurety, owed the Company a fiduciary duty to act loyally, in good faith, in a true and honest manner, and in the best interest of the Company.

116. The Company placed Pagnanelli in a position of trust and confidence.

36011051.8

117. Pagnanelli breached his fiduciary duty to act loyally, in good faith, and in the best interest of the Company by engaging in the conduct outlined above.

118. The breaches of Pagnanelli's fiduciary duties have proximately caused injury and damages to the Company.

**WHEREFORE**, Plaintiffs request judgment against Pagnanelli for monetary damages, interest, costs, and such further relief as the Court deems proper.

## COUNT VI

### DEFAMATION

119. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

120. Pagnanelli published to third parties that Insurety has no money, intending to induce Insurety's customers and potential customers from refraining from, or ceasing, to conduct business with Insurety.

121. Pagnanelli knew that such statement was (and is) false, or, at a minimum, exercised reckless disregard with respect for the truth.

122. Such statement constitutes defamation *per se*, in that the statement imputes to the Company characteristics incompatible with the proper exercise of its business.

123. Pagnanelli's defamatory conduct has proximately caused injury and damage to the Company.

**WHEREFORE**, Plaintiffs request judgment against Pagnanelli for monetary damages, interest, costs, and such further relief as the Court deems proper.

## COUNT VII

### TORTIOUS INTERFERENCE WITH KNOWN CONTRACTUALRELATIONSHIP

124. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

36011051.8

125. Plaintiffs had a business relationship with AWIS, one of the Company's largest clients. As part of this relationship, Plaintiff had the exclusive right to provide commission advances to AWIS' independent agents.

126. Pagnanelli had knowledge of Plaintiffs' business relationship with AWIS and the exclusivity agreement, as he was employed by the Company and worked on these matters, and communicated with a principal of AWIS in his role with the Company.

127. Pagnanelli intentionally and unjustifiably interfered with the business relationship between Plaintiffs and AWIS, because, as further outlined in Paragraphs [45-51], Pagnanelli actively attempted to source new commission advance funding for AWIS, knowing any such agreement would violate the terms of the exclusivity agreement between Insurety and AWIS.

128. Plaintiffs were damaged as a result of this interference.

**WHEREFORE**, Plaintiffs request judgment against Pagnanelli for monetary damages, interest, costs, and such further relief as the Court deems proper.

## COUNT VIII

### INJUNCTIVE RELIEF

129. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

130. Plaintiffs seek to enjoin Pagnanelli and his agents from maintaining and using the trade secrets Plaintiffs disclosed pursuant to the non-disclosure agreements. An injunction is the proper remedy here pursuant to 18 U.S.C.A. § 1836(b)(3)(A) and Fla. Stat. Ann. § 688.003.

131. There is a substantial likelihood that Plaintiffs will prevail on the merits of its trade secret misappropriation claims because the prior relationship between the parties and the proprietary trade information provided by the Company indicate a very high likelihood that Pagnanelli misappropriated the Company's trade secrets.

36011051.8

132.    If the Court does not grant an injunction, Pagnanelli will continue to misappropriate the Company's trade secrets.

133.    Plaintiffs will likely suffer irreparable injury if the Court does not enjoin Pagnanelli from utilizing its trade secrets in the loss of continuing business relationships, new business relationships, and loss of reputation among current and potential clients.

134.    Pagnanelli will not suffer undue hardship or loss as a result of the issuance of an injunction.

135.    Issuance of an injunction would not adversely affect the public interest.

136.    Plaintiffs are willing to post a bond in the amount the Court deems appropriate.

**WHEREFORE**, Plaintiffs request judgment against Pagnanelli for injunctive relief, attorneys' fees, costs, and such further relief as the Court deems proper.

Dated:  January 15, 2020.

*    *    *    *

Saul Ewing Arnstein & Lehr LLP
*Counsel for Plaintiff*
Northbridge Centre, Suite1400
515 North Flagler Drive
West Palm Beach, FL 33401
Telephone:    561-833-9800
Facsimile:    561-655-5551
Email: John.gekas@saul.com
        John.turner@saul.com
        Linda.dunne@saul.com
        Wpb-ctdocs@saul.com
        Steven.appelbaum@saul.com
        Jessica.Barrero@saul.com
        Bennett.Blachar@saul.com
        Bonnie.Mcleod@saul.com
        Mia-ctdocs@saul.com

29

36011051.8

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 50 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 50 of 121
Case 1:20-cv-20172-JEM Document 1 Entered on FLSD Docket 01/15/2020 Page 30 of 30

/s/John Turner
John A. Turner
Florida Bar No. 000922
Steven M. Appelbaum
Florida Bar No. 71399
Bennett R. Blachar
Florida Bar No. 123494

36011051.8

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 51 of 117
Case 19-44208-mxh11   Doc 176   Filed 03/06/20   Entered 03/06/20 14:21:23   Page 51 of 121
Case 1:20-cv-20172-JEM   Document 1-1   Entered on FLSD Docket 01/15/2020   Page 1 of 15

# EXHIBIT "A"

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 52 of 117
Case 19-44208-mxm11   Doc 178   Filed 03/06/20   Entered 03/06/20 14:21:23   Page 52 of 121
Case 1:20-cv-20172-JEM   Document 1-1   Entered on FLSD Docket 01/15/2020   Page 2 of 15

## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement ("Agreement") is entered into as of January 2, 2018 (the "Effective Date") by and between 777 Partners, LLC, one of its portfolio companies, or subsidiaries, (collectively, the "Company"), and **Christopher J. Pagnanelli** ("Executive"). For purposes of this Agreement, the Company and Executive are collectively to be referred to as "the Parties."

1. TERM: The Company hereby employs Executive, and Executive accepts employment with the Company, pursuant to the terms and provisions of this Agreement for the period commencing on the Effective Date and terminating on the third (3rd) anniversary of the Effective Date unless this Agreement is earlier terminated as provided herein. If Executive is still employed by the Company upon expiration of this Agreement, Executive's status shall be one of at-will employment without the benefits of this Agreement, except as provided in Section 7(c) or as otherwise provided herein.

2. TITLE AND DUTIES: Executive shall serve as the Chief Executive Officer of Insurety Capital, LLC. Executive's duties, responsibilities, and authority shall be the usual and customary duties associated with such position. Executive shall report to the Managing Partners of 777 Partners ("MP") or such other officer as the Board of Directors may from time to time designate.

3. SERVICES TO BE EXCLUSIVE: Executive agrees to devote his full productive time and best efforts to the performance of his duties for the Company. Notwithstanding the foregoing, Executive may serve on other boards of directors or engage in religious, charitable, or other community activities as long as such services and activities are disclosed to the Company's Managing Partners and do not materially interfere with Executive's performance of his duties as provided in this Agreement.

4. COMPENSATION:

    A. Base Salary: In accordance with the Company's usual pay practices, the Company will pay Executive a base salary of $225,000.00 per year ("Base Salary"). The Base Salary shall be prorated for any partial years of employment and payable in equal installments on regularly scheduled Company pay dates.

    B. Bonus: Executive is eligible to participate in the Company's annual incentive bonus program(s) applicable to Executive's position, if any, in accordance with the terms of such program(s). Executive's annual bonus will be targeted at 50% of Executive's base salary, subject to customary withholdings tax and other employment taxes and deductions as required by law. Additionally, Executive shall be considered for an annual bonus in the sole discretion of the Board of Directors. Also, Executive will receive a $98,082 sign-on bonus on the first pay date following the Effective Date, subject to customary withholdings tax and other employment taxes and deductions as required by law.

1

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 53 of 117
Case 19-44208-rxn11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 53 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 3 of 15

5. **EXPENSES AND BENEFITS:**

A. **Reasonable and Necessary Expenses:** The Company shall reimburse Executive for all reasonable, customary, and necessary expenses incurred in the performance of Executive's duties. Executive shall first account for such expenses in accordance with the policies and procedures set by the Company from time to time for reimbursement of such expenses. The amount, nature, and extent of such expenses shall always be subject to the control, supervision, and direction of the Company.

B. **Vacation:** Executive shall accrue vacation in accordance with the terms and conditions of the Company's policies, as may be modified from time to time at the Company's discretion. Subject to the maximum accrual permitted, Executive shall accrue vacation at the rate of three (3) weeks per year.

C. **Fringe Benefits:** During Executive's employment with the Company, the Company shall provide Executive with the opportunity to participate in the Company's insurance, retirement, and other benefit plans on the same terms and conditions as other similarly situated Executives. All such benefits shall be subject to the terms of such plans and policies, as the same may be modified from time to time in the sole discretion of the Company. Benefits shall become effective the first of the month following thirty (30) days of employment.

6. **OTHER EXECUTIVE DUTIES AND OBLIGATIONS:**

In addition to any other duties and obligations set forth in this Agreement, Executive shall be obligated as follows:

A. **Compliance:** Executive shall be required to comply with all policies and procedures of the Company as such shall be adopted, modified, or otherwise established by the Company from time to time. While employed by the Company pursuant to this Agreement, during at-will employment following expiration of the Agreement, or while receiving severance, incentive, or other payments or consideration from the Company following termination of this Agreement, Executive shall disclose in writing to the Company any arrest, indictment, or conviction for, or plea of guilty or *nolo contendere* to, a felony.

B. **Non-Disclosure:**

I. **Confidential Information:** As used in this Agreement, "Confidential Information" means trade secrets and other information specific to the business and investment activities and considerations of the Company. This includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information, strategic and marketing plans, compilations of customer and supplier information, performance of and compensation paid to Executives, contracts with third parties, information regarding the Company's training, financial and marketing books, sales, price and marketing projections, internal employer databases, analytical tools and services and information technology

2

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 54 of 117
Case 19-44208-rmm11 Doc 170 Filed 03/06/20 Entered 03/06/20 14:29:23 Page 54 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 4 of 15

products and services, other information related to the tools, products and services that facilitate the Company's ability to sell and manufacture its services, or other reports, manuals and information including information related to Company, its affiliate companies, or its customers, including those documents and items which Executive may develop or help develop while in Company's employ, whether or not developed during regular working hours or on Company's premises; provided, however, that Confidential Information shall not include any information that is or becomes public through written authorization by Company. Unless the context requires otherwise, the term "Confidential Information" shall include the original of such materials, any copies thereof, any notes derived from such materials, and any derivative work of such materials.

II. Confidentiality: While employed by the Company, Executive will have access to and become familiar with Confidential Information. Executive acknowledges that Confidential Information is owned and shall continue to be owned solely by the Company and/or its affiliates. Executive agrees that Executive will not, at any time, whether during or subsequent to Executive's employment by the Company and/or its affiliates, use or disclose Confidential Information for any competitive purpose, or divulge the same to any person other than the Company or persons with respect to whom the Company has given its written consent, unless Executive is compelled to make disclosure by a federal or state court, arbitrator, or any government authority, pursuant to subpoena, or as necessary to secure legal and financial counsel from third party professionals or to enforce his or her rights under this Agreement. In such case, Executive shall give reasonable notice to the Company prior to disclosing such information and shall assist the Company in taking such legally permissible steps as are reasonable and necessary to protect the Confidential Information, including, but not limited to, the execution by the receiving party of a non-disclosure agreement in a form acceptable to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by the Executive or a breach of a confidentiality obligation owed to the Company by any third party, or disclosure pursuant to any applicable law or court order.

III. Limitations: Notwithstanding any other provision of this Agreement (i) Executive may disclose Confidential Information when required to do so by a court of competent jurisdiction, by any governmental agency having authority over Executive or the Company's business or by any administrative body or legislative body (including a committee thereof) with jurisdiction to order Executive to divulge, disclose, or make accessible such information, and (ii) nothing in this Agreement is intended to interfere with Executive's right to (A) report any act or omission Executive reasonably believes may constitute a violation of federal, state, or local law or regulation to any governmental or law enforcement agency or entity; (B) make other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation; (C) file a claim or charge with any federal, state, or local governmental agency or entity; or (D) testify, cooperate, assist, or participate in an investigation, hearing, or proceeding conducted by any governmental or law enforcement agency, entity, or court. For purposes of clarity, in making or initiating any such reports or disclosures or engaging in any of the conduct set forth in this Section 6(b)(iii), Executive may disclose Confidential Information to the extent necessary to such governmental or law

3

9609512.1

enforcement agency, entity, or court, need not seek prior authorization from the Company, and is not required to notify the Company of any such reports, disclosures, or conduct.

IV. <u>Defend Trade Secrets Act of 2016</u>: The Executive is hereby notified in accordance with the Defend Trade Secrets Act of 2016 that the Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

C. <u>Intellectual Property</u>:

I. <u>Work Product</u>: Executive agrees that during Executive's employment with the Company pursuant to this Agreement, all materials created or modified by Executive, including, without limitation, all works of authorship, inventions, innovations, improvements, processes, methods, designs, apparatus, plans, systems and computer programs, and other tangible and intangible materials relating to the design, manufacture, use, marketing, distribution, and management of the Company's and/or its affiliates' products or services (collectively, "Work Product"), shall be "work for hire" and that the Company shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents, or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire," Executive hereby assigns ownership of all such Work Product to the Company and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company. Executive hereby appoints the Company as Executive's attorney-in-fact with the limited power to execute assignments of such Work Product. The obligation to assign as provided in this Agreement does not apply to any Work Product to the extent such obligation would conflict with any state or federal law.

II. <u>Disclosure of Work Product</u>: Executive agrees to disclose in writing to the Board of Directors of the Company any Work Product relating to the business of the Company and/or its affiliates, which Executive develops, conceives and/or reduces to practice in connection with any work performed by Executive for the Company, either alone or with anyone else, while employed by the Company and/or within twelve (12) months of the termination of employment. Executive shall disclose all Work Product to the Company, even if Executive does not believe that assignment to the Company is required under this Agreement or applicable state or federal law. If the Company and Executive disagree as to whether or not such Work Product is included within the terms of this Agreement, such matters will be subject to the Arbitration Rights set forth in this Agreement with the additional requirement that it will be the responsibility of Executive to prove that it is not included.

D. <u>Non-Competition and Non-Recruitment</u>:

4

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 56 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:29:23 Page 56 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 6 of 15

I. <u>General</u>: The Company and Executive recognize and agree that: (1) Executive has received, and will in the future receive, substantial amounts of Confidential Information and Trade Secrets, as defined in the Florida Uniform Trade Secrets Act; (2) as a consequence of using or associating Executive with the Company's name, goodwill, and reputation, Executive will develop personal and professional relationships with the Company's current and prospective customers, clients, counterparties, and vendors; and (3) provision for non-competition and non-recruitment obligations by Executive is critical to the Company's continued economic well-being and protection of the Company's Confidential Information.

II. <u>Non-Competition</u>: During Executive's employment and for one (1) year following the voluntary or involuntary termination of Executive's employment with the Company, Executive shall not, directly or indirectly, on Executive's behalf or on behalf of a third party, engage in any commercial activity in the United States that competes with the Company; provided, however, Executive may own, directly or indirectly, solely as a passive investment, two percent (2%) or less of any class of securities of any entity traded on any national securities exchange. At its sole option, the Company may, by express written notice to Executive, waive or limit the time and/or geographic area in which Executive cannot engage in competitive activity or the scope of such competitive activity.

III. <u>Other Executives</u>: While employed by the Company and for one (1) year thereafter, and except as may be required in the performance of Executive's duties hereunder, Executive shall not, directly or indirectly, cause or induce, attempt to cause or induce, or otherwise solicit or encourage any person now or hereafter employed by the Company or any of its affiliates to terminate such employment.

IV. <u>Non-Disparagement</u>: The Parties agree that neither Party will at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statements concerning the other Partyor its affiliates or their respective partners, members, or employees. "Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged. Nothing in this Agreement shall preclude the Parties from any truthful, good faith response to any inquires under oath or in response to governmental inquiry. The Parties agree that neither Party will speak about the other Party and/or its affiliates and/or their management or business to the media, whether electronic, print or otherwise, without the express prior written approval of the other Party.

V. <u>Non-Solicitation</u>: Executive agrees that during Executive's employment with the Company and for one (1) year thereafter, Executive's employment terminates, Executive will not, directly or indirectly, on his/her own behalf or on behalf of any other person or entity (i) hire or solicit for hire or to provide services (whether as an employee, independent contractor, or otherwise) any employee of the Company and/or its affiliates, (ii) solicit, induce, or encourage the resignation of, or attempt to solicit, induce or encourage the resignation of, to persuade any employee of the Company and/or its affiliates, (iii) solicit, induce, or encourage any independent contractor providing services to the Company and/or its affiliates to terminate or diminish any relationship with the Company and/or its affiliates, (iv) seek to persuade any employee, vendor, or independent contractor to breach any

5

agreement with the Company and/or its affiliates, (v) take any action to solicit or divert any Clients, Sources, or Sellers (each as defined below) away from the Company and/or any of its affiliates, or (vi) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or its affiliates. For purposes of this Agreement: "Clients" means all individuals or entities who or which were customers or clients of the Company and/or its affiliates, or who or which were solicited by the Company and/or its affiliates to become customers or clients of the Company and/or its affiliates (other than solicitations made solely through general, untargeted solicitations and/or mass industry mailings), during Executive's employment with the Company. "Sources" means all brokers and persons who referred transactions to the Company and/or its affiliates, or who were solicited by the Company and/or its affiliates to refer structured settlement transactions to the Company and/or its affiliates, during Executive's employment with the Company. "Sellers" means any person who has sold or agreed to sell a transaction to Company and/or its affiliates, or who has been solicited by the Company and/or its affiliates to sell a transaction to the Company and/or its affiliates, during Executive's employment with the Company.

VI. Reformation: Executive agrees and acknowledges that the restrictions contained in this Section are reasonable in scope and duration. If one or more provisions of the forgoing protective covenants are declared invalid or unenforceable for any reason by a court of competent jurisdiction, the court must reform the covenant(s) to the extent necessary to cause the limitations contained in the covenants as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the Confidential Information, goodwill or other business interests of the Company.

VII. Covenants Are Independent Elements: The parties acknowledge that the restrictive covenants contained in this Section are essential, independent elements of this Agreement and that, but for Executive agreeing to comply with them, Company would not continue to employ Executive. Thus, even if Executive has a claim against Company, whether that claim is based on this Agreement or not, the claim by Executive shall not be a defense to Company's enforcement of the promises and restrictions in this Section. An alleged or actual breach of the Agreement by the Company will not be a defense to enforcement of the provisions of this Section, or other obligations of Executive to the Company. The covenants in this Section will remain in full force and effect whether Executive is terminated by Company or voluntarily resigns.

E. Remedies: Executive agrees that breach by Executive of the provisions of Section 6(b)-(d) will cause the Company irreparable harm that is not fully remedied by monetary damages. In the event of a breach or threatened breach by Executive of the provisions of Section 6(b)-(d), the Company shall be entitled to an injunction restraining Executive from directly or indirectly engaging in the activities prohibited herein, without posting a bond or other security. Nothing herein shall be construed as prohibiting the Company from pursuing any other equitable or legal remedies available to it for such breach or threatened breach, including the recovery of damages from Executive.

9609512.1

Case 1:19-44208-mxH11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 58 of 121

F. Conflict of Interest: While employed by the Company, Executive shall comply with all Company policies regarding actual or apparent conflicts of interest with respect to Executive's duties and obligations to the Company.

G. Return of Company Property: Executive understands and agrees that all equipment, books, records, customer lists, and documents connected with the business of the Company and/or its affiliates are the property of and belong to the Company ("Company Property"). Under no circumstances shall Executive remove from the Company's facilities any Company Property, or any copies of Company Property, without the Company's permission, nor shall Executive make any copies of Company Property for use outside the Company's office except as specifically authorized by the Company. Executive shall return to the Company and/or its affiliates all Company Property upon termination of Executive's employment with the Company.

H. Survival: The provisions of Section 6(b)-(d) and 6(g)-(h) shall survive expiration of this Agreement and termination of employment.

7. TERMINATION AND SEVERANCE:

A. Termination by the Company Without Cause or by Executive for Good Reason: Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below) or by Executive for Good Reason. In the event of a termination by the Company without Cause or by Executive for Good Reason prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to eight (8) months of Executive's then annual compensation payable over the eight (8) months immediately following the last day of employment in accordance with the Company's normal payroll practices. Executive must execute (and not revoke) a complete release of claims, acceptable in form and substance to the Company, as a condition to receiving Basic Severance and reimbursement of COBRA premiums.

I. For purposes of this Agreement, "Good Reason" shall mean any of the following "Trigger Events": (1) a material breach of this Agreement or; (2) a material diminishment in the title, position, duties, or responsibilities of Executive. Notwithstanding the foregoing, no basis for a termination by Executive for Good Reason will be deemed to exist unless (a) Executive notifies the Company in writing within thirty (30) days after the Trigger Event occurs that Executive intends to terminate employment for Good Reason no earlier than thirty (30) days after providing such notice; (b) the Company does not cure such condition within thirty (30) days following its receipt of such notice or states unequivocally in writing that it does not intend to attempt to cure such condition; and (c) the Executive resigns from employment prior to expiration of thirty (30) days after the end of the cure period described in (b) above.

9609512.1

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 59 of 117
Case 19-44208-mxh11   Doc 178   Filed 03/06/20   Entered 03/06/20 14:29:23   Page 59 of 121
Case 1:20-cv-20172-JEM   Document 1-1   Entered on FLSD Docket 01/15/2020   Page 9 of 15

II. For purposes of this Agreement, "Cause" shall mean Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement; (4) material misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) material violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or *nolo contendere* to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.

III. Notwithstanding anything else to the contrary in this Agreement, it is expressly understood that any obligation of the Company to pay Basic Severance shall be subject to Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the Company, its officers, Executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations (the "Continuing Obligations"). The Company will have no liability to pay any Basic Severance if Executive violates the Continuing Obligations, and the Executive shall be obliged to immediately repay any Basic Severance previously paid.

B. <u>Termination by the Company for Cause or by Executive Without Good Reason</u>: Executive's employment under this Agreement may be terminated at any time by the Company for Cause or by Executive without Good Reason. In the event of such a termination, Executive shall be entitled to receive: (i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; and (iii) no other severance.

C. <u>Termination by Executive for Non-Renewal</u>:   Executive's employment pursuant to this Agreement may be terminated by Executive for Non-Renewal. Non-renewal means expiration after the third anniversary of the Effective Date. In the event of a termination of employment by Executive for Non-Renewal, Executive shall be entitled to receive Basic Severance as provided in Exhibit A, so long as Executive executes (and does not revoke) a complete release of claims, acceptable in form and substance to the Company. To exercise the right of termination for Non-Renewal, Executive must provide the Company with written notice of Executive's intent to do so, and the Company must fail to cure within forty-five (45) days of receiving such notice. It is expressly understood that if prior to the expiration of any applicable cure period (1) Executive and the Company enter into a new written employment agreement; (2) the Company offers Executive employment on substantially the same or better terms as existed under the Agreement; or (3) Executive's employment has otherwise been terminated pursuant to the terms of this Agreement, then Executive shall have no right or option to terminate employment for Non-Renewal.

8

D. Termination Due to Death or Disability: Employment by the Company shall immediately cease upon Executive's Death or Disability. Upon termination due to Death or Disability, Executive shall be entitled to receive any Base Salary accrued and unpaid as of the date of termination.

E. Termination by Mutual Agreement of the Parties: Executive's employment pursuant to this Agreement may be terminated at any time upon the mutual agreement in writing of the Parties. Any such termination of employment shall have the consequences specified in such agreement.

F. Golden Parachute Restrictions: To the extent that any or all of the payments and benefits provided for in this Agreement or in any other agreement between Company and Executive constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code (the "Code") and, but for this Section 7(g), would be subject to the excise tax imposed by Section 4999 of the Code, then the aggregate amount of such payments and benefits shall be reduced by the minimum amounts necessary to equal one dollar less than the amount which would result in such payments and benefits being subject to such excise tax. The reduction, unless the Executive elects otherwise, shall be in such order that provides Executive with the greatest after-tax amount possible. All determinations required to be made under this Section, including whether a payment would result in a parachute payment and the assumptions to be utilized in arriving at such determination, shall be made by a nationally recognized accounting firm selected by the Company and consented to by the Executive, such consent not to be unreasonably withheld. The Company shall pay the cost of the accounting firm, and the accounting firm shall provide detailed supporting calculations both to the Company and the Executive. The determination of the accounting firm shall be final and binding upon the Company and the Executive, except that if, as a result of subsequent events or conditions (including a subsequent payment or the absence of a subsequent payment or a determination by the Internal Revenue Service or applicable court), it is determined that the excess parachute payments, excise tax, or any reduction in the amount of payments and benefits, is or should be other than as determined initially, an appropriate adjustment shall be made, as applicable, to reflect the final determination.

G. Treatment of Basic Severance: Any Basic Severance Payment shall be subject to usual and customary Executive payroll practices and all applicable withholding requirements.

H. Other: Except for the amounts specifically provided pursuant to this Section, Executive shall not be entitled to any further compensation, bonus, damages, restitution, relocation benefits, or other severance benefits upon termination of employment. The amounts payable to Executive pursuant to this Section shall not be treated as damages, but as compensation to which Executive may be entitled by reason of termination of employment under the applicable circumstances. The provisions of this Section shall not limit Executive's rights under or pursuant to any other agreement or understanding with the Company regarding any pension, profit sharing, insurance, or other Executive benefit plan of the Company to which Executive is entitled pursuant to the terms of such plan.

I. Internal Revenue Code Section 409A: It is intended that this Agreement will comply with Internal Revenue Code Section 409A and any regulations and guidelines issued thereunder (collectively "Section 409A") to the extent this Agreement is subject thereto. This Agreement shall be interpreted on a basis consistent with such intent. If any payments or benefits provided

9

9609512.1

Case 19-44208-rxm-11 Doc 170 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 61 of 121

to Executive by the Company, either per this Agreement or otherwise, are non-qualified deferred compensation subject to, and not exempt from, Section 409A ("Subject Payments"), the following provisions shall apply to such payments and/or benefits:

I.  For payments and benefits triggered by termination of employment, reference to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" from the Company (with such phrase determined under Treas. Reg. Section 1.409A-1(h), as uniformly applied by the Company) in tandem with Executive's termination of employment with the Company.

II.  If Executive is deemed on the date of Executive's "separation from service" to be a "specified Executive" (within the meaning of Treas. Reg. Section 1.409A-I(i)), then with regard to any payment that is required to be delayed pursuant to Code Section 409A(a)(2)(B) (the "Delayed Payments"), such payment shall not be made prior to the earlier of (1) the expiration of the six (6) month period measured from the date of Executive's "separation from service" and (2) the date of Executive's death. Any payments other than the Delayed Payments shall be paid in accordance with the normal payment dates specified herein. In no case will the delay of any of the Delayed Payments by the Company constitute a breach of the Company's obligations to Executive.

III.  If the sixty (60)-day period following a "separation from service" begins in one calendar year and ends in a second calendar year (a "Crossover 60-Day Period") and if there are any Subject Payments due Executive that are: (1) conditioned on Executive signing and not revoking a release of claims and (2) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

IV.  Lump-sum severance payments shall be made, and installment severance payments initiated, within sixty (60) days following Executive's "separation from service."

V.  The Executive's right to receive installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

VI.  Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

VII.  Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Subject Payment be subject to offset by any other amount unless otherwise permitted by Section 409A.

VIII.  To the extent that any reimbursement or in-kind benefits are Subject Payments: (1) the amount eligible for reimbursement or in-kind benefit in one calendar year may not

10

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 62 of 117
Case 19-44208-rmxh11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 62 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 12 of 15

affect the amount eligible for reimbursement or in-kind benefit in any other calendar year (except that a plan providing medical or health benefits may impose a generally applicable limit on the amount that may be reimbursed or paid), (2) the right to reimbursement or an in-kind benefit is not subject to liquidation or exchange for another benefit, and (3) subject to any shorter time periods provided herein, any such reimbursement of an expense or in-kind benefit must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred.

J. Forfeiture:

I. If the Company is required to prepare a material accounting restatement as a result of the intentional misconduct or gross negligence of Executive, then Executive shall forfeit and reimburse the Company for all of the following: (1) any bonus or other compensation paid based upon such erroneously stated financial information; (2) any bonus or other compensation received by Executive during the twelve (12) month period following the first issuance of the accounting restatement; (3) any profits realized from the sale of Company securities during that same twelve (12) month period; (4) any Basic Severance.

II. If the Executive is subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002, and the Company is required to prepare an accounting restatement due to the material noncompliance of the Company, as a result of misconduct (within the meaning of said Section 304), with any financial reporting requirement under the United States securities laws, then the Executive shall forfeit and reimburse the Company for all of the following: (1) any bonus or incentive compensation or equity compensation received by Executive during the twelve (12) month period following the earlier of the first public issuance or filing with the SEC of the financial document embodying the financial reporting requirement; and (2) any profits realized from the sale of Company securities during that same twelve (12) month period.

III. Executive acknowledges that Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, among other things, requires the United States Securities and Exchange Commission to direct the national securities exchanges to prohibit the continued listing of the securities of an issuer unless the issuer develops and implements a policy providing, among other things, for the recovery of certain erroneously awarded compensation. Upon the Company's adoption of such a policy, Executive agrees that this Agreement shall be automatically amended without any further consideration to incorporate the recovery provisions set forth in the policy. Upon the request of the Company, Executive agrees without further consideration to execute an amendment evidencing the incorporation of said provisions into this Agreement.

8. WAIVER OF JURY TRIAL: EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH

11

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 63 of 117
Case 19-44208-rxll11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 63 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 13 of 15

THIS AGREEMENT OR ANY RELATED INSTRUMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE RELATED AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.

9. MISCELLANEOUS:

A. Assignment: This Agreement shall be binding upon and shall inure to the benefit of the Parties and the successors and assigns of the Company. Executive shall have no right to assign Executive's rights, benefits, duties, obligations, or other interests in this Agreement, it being understood that this Agreement is personal to Executive.

B. Entire Understanding: This Agreement sets forth the entire understanding of the Parties hereto with respect to the subject matter hereof, and no other representations, warranties, or agreements whatsoever as to that subject matter have been made by Executive or the Company. This Agreement shall not be modified, amended, or terminated except by another instrument in writing executed by the Parties. As of the Effective Date, except as otherwise explicitly provided herein, this Agreement replaces and supersedes any and all prior understandings, plans, or agreements between Executive and the Company regarding employment and incentives.

C. Notices: Any notice, request, demand, or other communication required or permitted hereunder, shall be deemed properly given when actually received or within five (5) days of mailing by certified or registered mail, postage prepaid, to Executive at the address currently on file with the Company, and to the Company at:

Executive: Christopher J. Pagnanelli
6571 Radcliff Circle
Huntington Beach, CA 92648

Company: Chief Executive Officer, Insurety Capital, LLC
600 Brickell Ave Suite 1900
Miami, FL. 33131

Copy: Ed Gehres, General Counsel

or to such other address as Executive or the Company may from time to time furnish, in writing, to the other.

12

9609512.1

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 64 of 117
Case 19-44208-rmk1.1 Doc 173 Filed 03/06/20   Entered 03/06/20 14:21:23   Page 64 of 121
Case 1:20-cv-20172-JEM   Document 1-1   Entered on FLSD Docket 01/15/2020   Page 14 of 15

D. Headings: The headings of the several sections and paragraphs of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction of any term or provision hereof.

E. Waiver: Failure of either party at any time to require performance by the other of any provision of this Agreement shall in no way affect that party's rights thereafter to enforce the same, nor shall the waiver by either party of any breach of any provision hereof be held to be a waiver of any succeeding breach of any provision or a waiver of the provision itself.

F. Applicable Law: This Agreement shall constitute a contract under the internal laws of the State of Florida and shall be governed and construed in accordance with the laws of said state as to both interpretation and performance. Venue in any dispute arising under this Agreement shall rest exclusively in Dade County, Florida.

G. Severability: In the event any provision or provisions of this Agreement is or are held invalid, the remaining provisions of this Agreement shall not be affected thereby.

H. Taxes: Executive acknowledges that Executive is responsible for all taxes related to Executive's compensation and any other payments or benefits conferred upon Executive as the result of this Agreement or Executive's employment with the Company, except for those taxes for which the Company is obligated to pay under applicable law or regulation. Executive agrees that the Company may withhold any amounts that the Company is required to withhold under applicable law or regulation.

I. Counterparts: This Agreement may be executed in one or more counterparts which, when fully executed by the Parties, shall be treated as one agreement.

J. Construction: No ambiguity shall be construed against any party as the drafter.

9609512.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 65 of 117
Case 19-44208-mxh11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 65 of 121
Case 1:20-cv-20172-JEM Document 1-1 Entered on FLSD Docket 01/15/2020 Page 15 of 15

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have entered this Agreement on this 2 day of January, 2018.

**EXECUTIVE**

_____
(Signature)

Christopher Pagnanelli
(Printed Name)

01/10/18
(Date)

**777 PARTNERS LLC**

_____        Principal
(Signature)                            (Title)

Jorge Beruff
(Printed Name)

1/10/2018
(Date)

14

9609512.1

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 66 of 117
Case 19-44208-rxm11 Doc 176 Filed 03/06/20   Entered 03/06/20 14:21:23   Page 66 of 121
Case 1:20-cv-20172-JEM   Document 1-2   Entered on FLSD Docket 01/15/2020   Page 1 of 9

# EXHIBIT "B"

Case 1:20-cv-20172-JEM Document 7-13 Entered on FLSD Docket 03/10/2020 Page 67 of 117
Case 19-44208-mxm11 Doc 176 Filed 03/06/20 Entered 03/06/20 14:11:23 Page 67 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 2 of 9



# 777 Partners LLC. Policy

| Policy Name: | CONFLICTS OF INTEREST POLICY | |
|---|---|---|
| WRITTEN BY: | Legal Department | |
| Applies to: | All portfolio companies | HR APPROVAL: Yes |
| EMPLOYEE SIGN OFF NEEDED: | Yes | MANAGEMENT APPROVAL: Yes |
| EFFECTIVE DATE: | November 10, 2017 | TRAINING DOCUMENTS CREATED: No |

## 1. STATEMENT OF PURPORSE AND RESPONSIBILITIES

a. The following sets forth a conflicts of interest policy for employees of 777 Partners, LLC, and any portfolio company or subsidiary (collectively, the "Company"). To the extent that any other internal policy of the Company or a Company subsidiary, business group, or office sets forth more stringent standards or requirements, such policy will control. Employees are committed to act in the best interests of the Company and to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards. The purpose of this conflicts of interest policy (the "Policy") is to set forth the policies of the Company with regards to certain conflicts of interest and to provide a formal reference for each of our Employees. This is a conduct policy and does not supersede or modify any confidentiality agreement signed as a condition of employment.

b. This Policy is predicated on the principle that employees owe a duty to act in the best interests of the Company. The Policy applies to the Company's members, partners, directors, principals and officers (or other persons occupying a similar status or performing a similar function), its employees (including investment professionals, associates, paraprofessionals, and executive assistants), and any other person who performs an investment function for the Company or has access to non-public information regarding the Company's investments and is subject to the Company's supervision and control (which may include consultants, advisors,

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 68 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 68 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 3 of 9



temporary employees, or officers of affiliates, or other persons designated by the Managing Partners, (collectively, "Employees").

Any questions with respect to the Policy may be directed to the Company's Legal Department.

## 2. POLICIES TO PREVENT CONFLICTS OF INTERESTS

During, and as a condition of employment with the Company, employees must not engage in any work, paid or unpaid, or other activities that create a conflict of interest that materially and substantially disrupt the operations of the Company. Such work and/or activities shall include, but is not limited to, directly or indirectly competing with the Company in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or which is in direct competition with, the business in which the Company is now engaged or in which the Company becomes engaged during the term of your employment with the Company, as may be determined by the Company in its sole discretion.

## 3. PERSONAL FINANCIAL INTERESTS

Employees must not take part in or attempt to influence any Company decision or any business dealings with a current or potential competitor, customer, partner, vendor, supplier, or other business entity in which you have a direct or indirect financial interest. In addition, to avoid the appearance of a conflict, you must disclose any direct or indirect financial interest in a current or potential competitor, customer, partner, vendor or supplier with which you discover Company plans to do business.

## 4. CORPORATE BUSINESS OPPORTUNITIES

Employees must not take personal advantage of or interfere with any existing or potential Company business opportunities. Company business opportunities include acquiring property, organizations, or pursuing lines of business that are related to Company's business mission and existing lines of business. Additionally, you must not direct any such opportunity to a relative, close personal friend, or to a business enterprise in which a relative or close personal friend is involved or has a direct or indirect financial interest. You must not accept payment (in any form) from another entity for work that you perform for the Company.

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

2

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 69 of 117
Case 19-44208-rkm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 69 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 4 of 9



## 5. OUTSIDE BUSINESS ACTIVITIES

a. Employee's outside business activities must not compete with or reflect adversely on the Company or give rise to a conflict of interest. You must not engage in any outside activity that is likely to involve disclosure of Company's proprietary information or that is likely to divert time and attention from your responsibilities at the Company. Additional approvals are required for media activities and promotions related to your board position(s) or outside investments:

   i. Media interviews or press releases must also be approved by the Company's Managing Partners or designated corporate communications contact. Approval would be dependent upon the subject matter and media outlet. You are not required to seek approval of the following activities:

   ii. Any affiliation with a trade association, professional association or other such organization related to your work or position at the Company. However, if the organization is involved in lobbying activities relating to the business of the Company and you are either an executive officer or board member of the organization or directly involved in the government relations activities of the organization, you must seek approval from the Company's Managing Partners, and consult with the Company's Legal Department.

   iii. Participation in non-profit civic or charitable activities, including serving as a member of a board of directors or technical advisory board.

   iv. Positions with co-op boards, condominium associations, and similar entities where the sole purpose of such participation would be to hold title to and/or manage real property in which you can or do reside.

   v. Positions with holding companies, trusts, or other non-operating entities established solely for purposes of you or your family's investment, estate or tax planning or to hold you, your family's real estate, or other investments that would not otherwise require disclosure under this Policy. You are expected to be alert to situations that may give rise to conflicts of interests or the appearance of conflicts of interests. You may be asked to discontinue an outside activity if it impacts or is perceived to impact your impartiality, effectiveness, productivity, or if the disclosure of the Company's proprietary information is at risk.

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

3



## 6. STANDARD OF CONDUCT

a. We are committed to conducting our business in accordance with the highest legal and ethical standards in furtherance of the interests of the Company and in a manner that is consistent with all applicable laws, rules, and regulations. Employees have an obligation to address or mitigate both conflicts of interest and the appearance of any conflicts of interest. Accordingly, we expect the following of all Employees:

   i. Employees must act with integrity, honesty, competence, and in an ethical manner when dealing with the public, regulators, clients, investors, prospective investors, and their fellow Employees;

   ii. Employees must adhere to the highest standards with respect to any potential material conflicts of interest with the Company — simply stated, no Employee should enjoy a benefit at the expense of the Company; and

   iii. Employees must preserve the confidentiality of information that they may obtain over the course of our business and use such information properly and not in any way adverse to the interests of the Company, subject to the legality of using such information.

## 7. COMPLIANCE WITH APPLICABLE LAWS

a. In addition to the general principles of conduct set forth above, the Policy requires all Employees to comply with applicable laws, regulations, and rules. With respect to Employees located in the U.S. or transacting in U.S. markets, these laws include the U.S. Securities Act of 1933, the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), the U.S. Sarbanes-Oxley Act of 2002, the U.S. Investment Company Act of 1940 (the "Company Act"), the U.S. Investment Advisers Act of 1940 (the "Advisers Act"), Regulation S-P (which protects the confidentiality of private investor information), any rules adopted by the U.S. Securities and Exchange Commission ("SEC") under any of the foregoing statutes, anti-money laundering laws and regulations, including the Bank Secrecy Act and Executive Order 13224 (which requires transaction reporting and vetting investors against the OFAC lists if terrorist individuals and organizations, among other things), and any

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

4

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 71 of 117
Case 19-44208-rkm11 Doc 176 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 71 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 6 of 9



rules adopted by the SEC or the U.S. Department of Treasury. In addition, some areas of particular concern, include:

b. Insider Trading: Company policy and the laws of many countries prohibit trading in securities (including equity securities, convertible securities, options, bonds, and any derivative of the foregoing) of any company while in possession of material, nonpublic information (also known as "inside information") regarding the company. If you believe you have come into possession of inside information, you may not execute any trade in the securities of the subject company without first consulting with the Legal Department, who will determine whether such trade would violate the Policy or applicable laws. It is also illegal in many countries to "tip" or pass on inside information to any other person if you know or reasonably suspect that the person receiving such information from you will misuse such information by trading in securities or passing such information on further, even if you do not receive any monetary benefit from the tippee.

c. Market Abuse and Rumors: Most jurisdictions have laws or regulations that prohibit market abuse or manipulative trading activities. Any attempt by an Employee to manipulate or tamper with the markets or the prices of securities, options, futures, or other financial instruments will not be tolerated, including corroborating with other funds in order to manipulate markets or prices. Additionally, most jurisdictions have laws and regulations prohibiting the dissemination of false or misleading information. The policy of the Company is to prohibit the circulation of trading based on unsubstantiated rumors or sensational information that might reasonably be expected to affect market conditions for one or more securities, a sector or market, or unjustly affect any person or entity. Any such rumors or information heard by an Employee from a source within the Company or directed to the Company in the course of business should be reported to the Legal Department promptly and should not be forwarded or shared within or outside the Company.

    i. Frontrunning: Employees may not engage in what is commonly known as "frontrunning" or "scalping:" the buying or selling of securities prior to a purchase or sale by the Company, in order to benefit from any price movement that may be caused by the Company's transactions.

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

5

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 72 of 117
Case 1:19-44208-mxmED Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 72 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 7 of 9



## 8. ANTI-BRIBERY AND CORRUPTION

The Policy requires that all Employees conduct their activities in full compliance with all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act. A failure to do so will place both the Company's business reputation and business success in serious jeopardy and may subject both the Company and the individuals involved to civil and/or criminal liability, including possible extradition and imprisonment. In sum, giving or offering anything of value to anyone to improperly obtain or retain business or a business advantage must be avoided.

## 9. CROSS HOLDINGS

Where the Company has holdings in other funds which in their turn invest in the Company, any such cross holding should be noted at the time of investment and should be reviewed periodically by the Legal Department, and the Managing Partners. In addition, the Company should neither grant nor receive any preferential terms.

## 10. PROVISION OF CODE OF ETHICS TO FUND INVESTORS

The Company is required, upon request, to include investors in our private investment funds with a copy of the Policy. The Company will coordinate the distribution of the Policy to any investors who request a copy.

## 11. GIFTS AND ENTERTAINMENT

Neither the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA") nor the UK Bribery Act (the "Bribery Act") prohibits the provision of small gifts, non-extravagant entertainment, or similar items of nominal value to foreign officials, if these items are not offered with improper intent. In order to address conflicts of interest that may arise when an Employee accepts or gives a gift, favor, entertainment, special accommodation, or other items of value, the Company places restrictions on gifts and entertainment. The following specific restrictions apply:

a. Gifts: No Employee may receive any gift, service, or other item of more than $500 in value per year from any person or entity that does or seeks to do business with or on behalf of the Firm without the prior written approval of the Managing Partners. No Employee may give or offer any gift of more than de minimis value (*i.e.,* $250 for the U.S. or an applicable lower amount) to existing investors, prospective investors, or any entity that does business with or on behalf of the Company without the prior written approval of the Managing Partners. In order to

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

6

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 73 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 73 of 121
Case 1:20-cv-20172-JEM Document 1-2 Entered on FLSD Docket 01/15/2020 Page 8 of 9



maintain compliance with applicable anti-corruption laws, including the FCPA and the Bribery Act, while simultaneously conducting business in accordance with local custom, Employees may provide token gifts only when such offerings are of nominal value, not unlawful under the law of the government official's country, and when such offerings are in keeping with the custom or practice of the government official's country. Notwithstanding the foregoing, no Employee may provide or accept gifts having an aggregate value of $100 per year to or from any person associated with a broker-dealer.

b. Cash: No Employee may give or accept cash gifts or cash equivalents to or from an investor, prospective investor, or any entity that does or seeks to do business with or on behalf of the Company.

c. Government Officials: Many countries, states, and local jurisdictions have laws restricting gifts (*e.g.*, meals, entertainment, transportation, lodging or other things of value) that may be provided to government officials or their families. Government officials include employees of sovereign wealth funds, public pension funds, and state owned business enterprises. In addition, the FCPA and the Bribery Act outline very serious provisions against bribery, including the payment, or promise of payment, of anything of value to foreign officials (including any person employed by or representing a foreign government, officials of public international organizations and candidates for foreign office) or others. Payment made indirectly through a consultant, contractor, or other intermediary is also prohibited. Subsequently, notification to the Legal Department is required for any gift to or entertainment of a government official or their families regardless of value. Gifts or entertainment provided to a government official as part of normal course investor relations activities (for example, during an investor relations event sponsored by the Company), where the official is acting as a representative of an investment vehicle sponsored by a related government entity that is an investor in the Company, the gift and entertainment policies set out above will apply.

## 12. REPORTING

a. Each Employee should report to the Legal Department any gifts or entertainment received in connection with the Employee's employment that the Employee reasonably believes exceeded the amounts outlined above.

i. Solicited Gifts - no Employee may use his or her position with the Company to obtain anything of value from a client, supplier, person to whom the Employee refers business, or any other entity with which the Company does business.

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

7



## 13. REFERRALS

Employees may not make referrals to clients (*e.g.*, accountants, attorneys, or the like) if the Employee expects to personally benefit in any way from the referral, without approvals from the Managing Partners.

## 14. PUBLIC SPEAKING, BOOKS AND OTHER PUBLICATIONS

As with outside business activities, personal and business-related speaking engagements (including, for example, lectures at an educational institution, presentations at trade associations, or participation on panels) must not compete with or reflect adversely on the Company, nor should they give rise to a conflict of interest. For all employees, except Principal and above, prior to accepting a position for a speaking engagement, the proposed activity(s) must first be disclosed and approval obtained from the Company's Managing Partners.

## 15. VIOLATIONS OF CONFIDENTIALITY OF INFOMRATION POLICY

Employees who deliberately, or with reckless disregard, violate this or other policies or agreements, will be subject to disciplinary action up to and including termination and in certain cases may be liable for civil action or subject to criminal prosecution. Incidents involving computer crime or other illegal activities will be reported to law enforcement. Employees who violate this Policy may further be subject to disgorgement of profits and/or restitution of an amount equal to the difference between the price paid or received by the Company and any more advantageous price paid or received by the Employee.

I specifically acknowledge that I have read and understand the entirety of the Policy. I understand my rights and obligations under the Policy.


Signature:

Printed Name:

Date:

Current as of November 10, 2017 | 600 Brickell Ave, Suite 1900 | Miami, FL 33131 | Office: 855.611.1140 | Fax: 866.611.1150
We reserve the right to change the terms of this Policy at any time, and you agree to abide by the most recent version of this Policy

8

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 75 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20   Entered 03/06/20 14:21:23   Page 75 of 121
Case 1:20-cv-20172-JEM   Document 1-3   Entered on FLSD Docket 01/15/2020   Page 1 of 4

# EXHIBIT "C"

| Form 424 | | |
|---|---|---|
| **(Revised 05/11)** | **Certificate of Amendment** | This space reserved for office use. |
| Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | | **F I L E D**<br>In the Office of the<br>Secretary of State of Texas<br>**FEB 2 0 2019**<br>**Corporations Section** |

## Entity Information

The name of the filing entity is:

RENDON MANAGEMENT GROUP LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                     ☐ Professional Limited Liability Company

☐ Cooperative Association                    ☐ Professional Association

☑ Limited Liability Company                  ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: 0803012259

The date of formation of the entity is:   05/09/2018

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424

6

02/19/2018 3:58 PM FAX       ☑ 0003/0004

### Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

OR

☐ B. The registered agent is an individual resident of the state whose name is:

| First Name | M.I. | Last Name | Suffix |
| --- | --- | --- | --- |

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

| Street Address (No P.O. Box) | City | State | Zip Code |
| --- | --- | --- | --- |
| | | TX | |

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☑ Add each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

MEMBER: CHRISTOPHER JAMES PAGNANELLI
1409 LONG AND WINDING RD
MANSFIELD, TX 76063

☐ Alter each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

☐ Delete each of the provisions identified below from the certificate of formation.

### Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424         7

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 78 of 117
Case 19-44208-mxm11 Doc 170 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 78 of 121
Case 1:20-cv-20172-JEM Document 1-3 Entered on FLSD Docket 01/15/2020 Page 4 of 4

02/19/2019 5:38 PM FAX

☑ 0004/0004

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:   02/19/2019

By: _____

Signature of authorized person

LANDON A JORDAN, MANAGING MEMBER

Printed or typed name of authorized person (see instructions)

Form 424

8

Case 1:20-cv-20172-JEM   Document 7-1   Entered on FLSD Docket 03/10/2020   Page 79 of 117
Case 19-44208-rxmH11 Doc 178 Filed 03/06/20   Entered 03/06/20 14:10:23   Page 79 of 121
Case 1:20-cv-20172-JEM   Document 1-4   Entered on FLSD Docket 01/15/2020   Page 1 of 4

# EXHIBIT "D"

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 80 of 117
Case 19-44208-mxm11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 80 of 121
Case 1:20-cv-20172-JEM Document 1-4 Entered on FLSD Docket 01/15/2020 Page 2 of 4

CAUSE NO. 2019-53545

| | | |
|---|---|---|
| INSURETY CAPITAL LLC, | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § § | |
| AMERICAN WORKERS INSURANCE SERVICE, INC., AND ASSOCIATION HEALTH CARE MANAGEMENT, INC., | § § § § § | HARRIS COUNTY, TEXAS |
| Defendants. | § § § | 215th JUDICIAL DISTRICT |

## AFFIDAVIT OF JOSEPH SAFINA

| | |
|---|---|
| STATE OF FLORIDA | § |
| | § |
| COUNTY OF BROWARD | § |

Before me, the undersigned authority, on this day personally appeared Joseph Safina, the affiant, known to me to be the person whose name and signature appears on this document. After, being duly sworn upon oath, Mr. Safina stated the following:

1. I am more than twenty-one years of age and fully competent to make this affidavit.

2. I co-own a factoring company called Financial Carrier Services, which provides factoring services to the trucking industry. Factoring involves loaning money to businesses. The obligation to repay this financing is secured by certain assets of the borrower, often accounts receivable.

3. I was recently introduced to Landon Jordan and Christopher ("CJ") Pagnanelli about a potential business transaction. I understand Landon Jordan is a principal in American Workers Insurance Service, Inc. ("AWIS") and related companies that sell certain insurance

policies and similar products. I understand that CJ Pagnanelli is a former employee of Insurety Capital and Producer Advance, both companies that provide advances for insurance companies, like AWIS, based on future commissions.

4. Mr. Pagnanelli then told me that he and Mr. Jordan owned or controlled another agency called NIAA, which had another book of business with another list of agents. NIAA is not listed in the name of Mr. Pagnanelli or Mr. Jordan.

5. I had calls with both Mr. Jordan and Mr. Pagnanelli. Our counsel, Nichele Marks had other telephone conferences with Mr. Pagnanelli regarding commission advances for the agency NIIA. Mr. Pagnanelli pitched the commission advance business model, which included providing me with detailed spreadsheets and other documents about the model.

6. Financial Carrier Services factors or finances only when it can have priority rights to the collateral. My team ran UCC lien searches for the agencies NIIA presented to receive advance commissions and discovered that Insurety Capital had UCC filings on these commissions.

7. Mssrs. Jordan and Pagnanelli told me that Insurety's liens were unenforceable.

8. Mr. Pagnanelli told us that Mr. Jordan was already writing new business under this new agency, NIIA.

9. Mr. Pagnanelli and Mr. Landon wanted my company to loan money to be used in connection with their sales for NIAA. Because company policy requires Financial Carrier Services to have first priority security interest, we told Mssrs. Jordan and Pagnanelli we would not enter into a business relationship with them.

10. Mr. Jordan told me that the TRO issued in this case was not enforceable and that Insurety had no credible claim to collect the commissions.

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 82 of 117
Case 19-44208-rmr11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 82 of 121
Case 1:20-cv-20172-JEM Document 1-4 Entered on FLSD Docket 01/15/2020 Page 4 of 4

11. In performing my due diligence in order to decide whether to do business with Mr. Jordan and Mr. Pagnanelli, I contacted representatives of Insurety to discuss NIIA's offer and Insurety's view of its relationship with AWIS. Insurety provided me with pleadings from this case and answered my questions. I then decided on my free will to provide this affidavit.

12. I swear that all of the statements above are true and correct.

Joseph Safina

SUBSCRIBED AND SWORN TO before me on August 27 2019.

Notary Public in and for the State of __F L__

My commission expires: __07/17/2023__

Notary Public State of Florida
David F Schneider
My Commission GG 315129
Expires 07/17/2023

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 83 of 117
Case 19-44208-rmmll Doc 176 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 83 of 121
Case 1:20-cv-20172-JEM Document 1-5 Entered on FLSD Docket 01/15/2020 Page 1 of 1

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS** 777 PARTNERS LLC and INSURETY CAPITAL LLC

**DEFENDANTS** CHRISTOPHER JAMES PAGNANELLI

**(b)** County of Residence of First Listed Plaintiff Miami Dde
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Miami Dade
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John A. Turner/Bennett R. Blachar/Steven M. Appelbaum
Saul Ewing Arnstein & Lehr LLP, 515 North Flagler Drive
West Palm Beach, Florida 33401

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)* *(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)** *(See instructions):*
a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO
JUDGE                    DOCKET NUMBER

**VII. CAUSE OF ACTION** Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity):*
Breaches of fiduciary and contractual duties. 28 U.S.C. Section 1331 and 18 U.S.CA. Section 1836(c).
LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 100,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE January 15, 2020
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### SUMMONS IN A CIVIL ACTION

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

          Plaintiffs

v.

CHRISTOPHER JAMES PAGNANELLI,

          Defendant

                                    /

CASE No. _____

**TO:** **CHRISTOPHER JAMES PAGNANELLI**
115 NE 3rd Avenue, Apt 608
Fort Lauderdale, FL 33301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it ) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed.R.Civ.P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> John A. Turner, Esq.
> Steven M. Appelbaum, Esq.
> Bennett R. Blachar, Esq.
> Saul Ewing Arnstein & Lehr LLP
> Northbridge Centre, Suite 1400
> 515 North Flagler Drive
> West Palm Beach, Florida 33401

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                                    CLERK OF COURT

Date: _____

                              _____
                              Signature of Clerk or Deputy Clerk

36424639.1

Case 1:20-cv-20172-JEM Document 7-1 Entered on FLSD Docket 03/10/2020 Page 85 of 117
Case 19-44208-rmh11 Doc 178 Filed 03/06/20 Entered 03/06/20 14:21:23 Page 85 of 121
Case 1:20-cv-20172-JEM Document 1-6 Entered on FLSD Docket 01/15/2020 Page 2 of 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed.R.Civ.P. 4(l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ ,

☐   I personally served the summons on the individual at (place) _____
_____ on *(date)* _____ ; or

☐   I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐   I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of (name of organization) _____
_____ on (date) _____ ; or

☐   I returned the summons unexecuted because _____ ; or

☐   Other (specify):

My fees are $ _____ for travel and $ _____ for services, for a total; of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Error! Unknown document property name.Error! Unknown document property name.

36424639.1

# Exhibit 3

**[NIIA Subpoena]**

Ian T. Peck, TBN #24013306
Jarom J. Yates, TBN #24071134
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
**MAYER BROWN LLP**
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11 cases** |
| | ) | |
| **AMERICAN WORKERS INSURANCE SERVICES, INC.,** *et al.* | ) | **Case No. 19-44208-mxm-11** |
| | ) | |
| | ) | **Case No. 19-44209-mxm-11** |
| **Debtors.** | ) | |
| | ) | |
| | ) | **(Jointly Administered)** |
| | ) | |

### NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE

**TO:**   National Individual Insurance Agency, LLC
c/o its registered agent, Harold L. Brock Jr.
7996 Mansfield Hwy
Kennedale, TX 76060

**PLEASE TAKE NOTICE** that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, made applicable to this proceeding by Bankruptcy Rules 9014 and 9016, Insurety

Capital, LLC, by and through its undersigned counsel, caused to be served on National Individual

Insurance Agency, LLC ("**NIIA**") the attached Subpoena requesting NIIA produce and permit for

inspection and copying the documents listed on **Schedule A** annexed to the Subpoena

(collectively, the "**Document Requests**") on or before the 17th day of February, 2020, at 9:00 a.m.

736176922.1 4-Feb-20 14:45                                         1

at the offices of Haynes and Boone, LLP, 301 Commerce Street, Suite 2600, Fort Worth, Texas 76102, or at such other agreed time and place. A true and correct copy of the Subpoena is attached hereto and incorporated herein by reference.

RESPECTFULLY SUBMITTED this 5th day of February, 2020.

By: */s/ Jarom J. Yates*

**HAYNES AND BOONE, LLP**
Ian T. Peck
State Bar No. 24013306
Jarom J. Yates
State Bar No. 24071134
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

and

**MAYER BROWN LLP**
Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

**ATTORNEYS FOR INSURETY CAPITAL, LLC**

Case 1:19-42063-mkn DDoc 1136 Filed 03/20/20 Entered 03/20/20 14:25:23 Pages 3 of 131

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 5, 2020, true and correct copies of the foregoing were served upon all parties on the attached service list via United States first class mail, postage prepaid, or via electronic notice, if available, pursuant to the Court's ECF electronic noticing procedures.

/s/ *Jarom J. Yates*
Jarom J. Yates

**Service List**
**AWIS/AHCM**
**#6050**

American Workers Insurance Services, Inc.
2305 Ridge Road #205
Rockwall, TX 75087

Association Health Care Management, Inc.
11111 Richmond Ave., Suite 200
Houston, TX 77082

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Comptroller of Public Accounts
111 E. 17th St.
Austin, TX 78774-0100

United States Trustee
Elizabeth Young, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242

Texas Workforce Commission
Labor Law Section
101 East 15th St.
Austin, TX 78778-0001

Alliance Shared Health
3155 Sutton Blvd., Suite 201
St. Louis, MO 63143

Ally Financial
PO Box 9001951
Louisville, KY 40290-1951

Ascension on the Bayou
150 W Sam Houston Pkwy N
Houston, TX 77024-4733

Co-Nexus Communication Systems
PO Box 609
Cedar Rapids, IA 52406

Daiker Partners Ltd.
PO Box 1059
Rockwall, TX 75087-1059

Data Partnership Group, LP
4500 Hugh Howell Rd., Suite 620-B
Tucker, GA 30084

First Continental Life
101 Parklane Blvd, Suite 301
Sugar Land, TX 77478

Free Market Administrators
16633 Dallas Pkwy., #320
Addison, TX 75001

Joanna Cheng and Putative Class
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Landon Jordan
Jennifer Cellmar
1409 Long and Winding Road
Mansfield, TX 76063-5608

Lincoln Automotive Financial Services
PO Box 650575
Dallas, TX 75265-0575

Mansfield Business Management
1409 Long and Winding Rd.
Mansfield, TX 76063

Multiplan, Inc.
115 Fifth Avenue
New York, NY 10003

National Association of Preferred Providers
11111 Richmond Ave. #250
Houston, TX 77082

Payroc Payment Systems, LLC
Attn: Aaron Johnson
1350 E Touhy Ave., Suite 210W
Des Plaines, IL 60018-3303

Spectrum Internet/Telephone Service
4145 S. Falkenburg Rd.
Riverview, FL 33578-8652

The Verde Law Firm PLLC
4600 Highway 6 N, Suite 320
Houston, TX 77084-2983

Catherine Shanahan
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Robert D. Kline, J.D.
2256 Fairview Rd.
McClure, PA 17841

Franchise Tax Board
Attn: Rebecca Estonilo, Claim Agent
Bankruptcy Section MS A340
PO Box 2952
Sacramento, CA 95812-2952

GreatAmerica Financial Services Corp.
Attn: Peggy Upton
625 First St. SE, Suite 800
Cedar Rapids, IA 52401

American Express National Bank
c/o Elizabeth M. Redmond
Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

Ally Bank
PO Box 130424
Roseville, MN 55113-0004

Ally Bank
c/o Adam Kopp, Bankruptcy Coordinator
Ally Servicing LLC
4000 Lexington Ave. N, Suite 100
Shoreview, MN 55126

Chargeback Gurus
Attn: Debbie Tank, Office Operations Mgr.
8951 Collin McKinney Pkwy, Suite 1001
McKinney, TX 75070

# TWENTY LARGEST UNSECURED CREDITORS

Agentra Healthcare Solutions
4201 Spring Valley Rd., Suite 1500
Dallas, TX 75244

American Express
PO Box 650448
Houston, TX 75265

Assured Benefits Administration
PO Box 679145
Dallas, TX 75267-9145

BlueCross BlueShield of Texas
PO Box 731428
Dallas, TX 75373-1428

Capital One, N.A.
PO Box 60024
New Orleans, LA 70160

**Comcast**
**PO-Bo*-660618**
**Dallas,-T X-7S:266-0618**

CyberX Group LLC - 212 Connect
1677 E Miles Ave., Bldg. 2
Hayden, ID 83835

Dell
PO Box 731381
Dallas, TX 75373-1381

FCAWMA
10878 Westheimer Rd.
Houston, TX 77042

Insurety Capital, LLC
600 Brickell Ave., Suite 1900
Miami, FL 33131

Iron Mountain
PO Box 915004
Dallas, TX 75391-5004

James Wise CPA
12345 Jones Rd., Suite 185
Houston, TX 77070

Level 3 Communications LLC
PO Box 910182
Denver, CO 80291-0182

Lone Star Coffee
PO Box 691634
Houston, TX 77269-1634

Mike Rabie
1723 Parklake Village Dr.
Katy, TX 77450

Neopost USA, Inc.
Dept. 3689
PO Box 123689
Dallas, TX 75312-3689

NxSource
3654 Dumbarton St.
Houston, TX 77025

VeriTrust Corporation
7804 Fairview Rd., Suite 153
Charolotte, NC 28226

Voicetext.com
3706 Speedway
Austin, TX 78705

Zenith Real Estate
PO Box42146
Houston, TX 77242-2146

# NOTICE OF APPEARANCE AND REQUEST FOR NOTICE PARTIES

Case 19-34208-hxml1 Doc 166 Filed 06/06/20 Entered 06/06/20 14:23:23 Page 92 of 121

Rockwall CAD
c/o Laurie A. Spindler/Elizabeth Weller
Linebarger Goggan et al.
2777 N. Stemmons Frwy, Suite 1000
Dallas, TX 75207

Agentra, LLC / Cyberx Group, LLC
c/o William S. Richmond/Kimberly Moore
Platt Cheema Richmond PLLC
1201 N. Riverfront Blvd., Suite 150
Dallas, TX 75307

Harris County/Cypress-Fairbanks ISD
c/o John P. Dillman
Linebarger Goggan et al.
PO Box 3064
Houston, TX 77253-3064

Insurety Capital, LLC
c/o Charles E. Harris II
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Insurety Capital LLC
c/o Ian T. Peck / Jarom J. Yates
Haynes and Boone, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219

Insurety Capital LLC
c/o Robert S. Harrell / Andrew Elkhoury
Mayer Brown LLP
700 Louisiana St., Suite 3400
Houston, TX 77004

Texas Department of Insurance
c/o J. Casey Roy, Asst. Attorney General
Bankruptcy & Collections Div.
PO Box 12548 – MC 008
Austin, TX 78711-2548

Data Partnership Group, LP
c/o Christopher Arisco/Joseph D. Austin
Padfield & Stout, LLP
420 Throckmorton St., Suite 1210
Fort Worth, TX 76102

Data Partnership Group, LP
c/o John K. Rezac
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339

Payroc Payment Systems, LLC
c/o John M. Heaphy
Harrison & Held, LLP
333 W. Wacker Dr., Suite 1700
Chicago, IL 60606-1247

NXT Level Health, LLC
c/o Jacob L. McBride
Weinstein Radcliff Pipkin LP
8350 N. Central Expwy., Suite 1550
Dallas, TX 75206

American Healthcare Benefits Cooperative
c/o William S. Richmond/Kimberly Moore
Platt Cheema Richmond PLLC
1201 N Riverfront Blvd., Suite 150
Dallas, TX 75307

Case 19-44208-mxm11 Doc 106 Filed 02/06/20 Entered 02/06/20 14:29:23 Page 3 of 11

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ Northern _____  District of  _____ Texas _____

In re American Workers Insurance Services, Inc., et al

                      Debtors

Case No. 19-44208-mxm-11

Case No. 19-44209-mxm-11

(Jointly Administered)

Chapter 11

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  National Individual Insurance Agency, LLC, c/o Harold L. Brock, Jr., Registered Agent, 7996 Mansfield Hwy, Kennedale, TX  76060

                    *(Name of person to whom the subpoena is directed)*

[X]  *Production*:  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the

material: SEE SCHEDULE A, ATTACHED

| PLACE | DATE AND TIME |
|---|---|
| Haynes and Boone, LLP, 301 Commerce Street, Suite 2600, Fort Worth, Texas 76102 | February 17, 2020, at 9:00 a.m. |

[ ]  *Inspection of Premises*:  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

       The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  February 5, 2020

               CLERK OF COURT

                               OR

_____     /s/  Andrew Elkhoury

    *Signature of Clerk or Deputy Clerk*            _____

                                   *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Insurety Capital, LLC , who issues or requests this subpoena, are: Andrew Elkhoury, Mayer Brown LLP, 713-238-2841, aelkhoury@mayerbrown.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

# PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____  .

     I declare under penalty of perjury that this information is true and correct.

Date:  _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
   (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
   *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
   *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
   *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**SCHEDULE A**

**DEFINITIONS**

Unless otherwise stated below, all terms used in these Document Requests have the meaning given by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Northern District of Texas or by common usage unless otherwise required by the context. For the purposes of the Document Requests, the following Definitions shall apply:

1. "AWIS" means American Workers Insurance Services, Inc. and its estate, officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

2. "AHCM" means Association Health Care Management, Inc. and its estate, officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

3. "Document" or "Documents" has the meaning set forth in Rule34(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure, and shall include, but are not limited to, originals and copies of any and all writings and recordings of whatever nature, however produced or stored or reproduced (e.g., on paper, computer disk, computer hard drive, computer tape, microfiche, or microfilm), whether signed or unsigned or transcribed and whether assertively privileged or not, including, without limitation, any letter, request, order, notice, schedule, tabulation, newspaper clipping, internal file, working paper, communication, correspondence, memorandum, telex, telegram, electronic mail, communication or back-up tape, voicemail communication or back-up tape, cable, contract, agreement, amendment, instructions, specifications, product information, receipt, manual, journal, ledger, diary, calendar, summary or record of telephone or other conversation (e.g., personal conversation, interview, meeting or conference), invoices, surveys, minutes, bill, voucher, income statement, financial statement, statement of account, checkbooks, canceled checks, deposit ticket, charge slip, statement requesting payment, requisition, file, report, record, study, handwritten note, working paper, chart, informational accumulations, tape, voice recording, computer output or input, and magnetic phonograph, photographic or graphic matter, CyberX files, and Admin123 files. Different version of the same document (e.g. copies of a printed document with differing handwritten notations, and superseded drafts) are different documents within the meaning of that term as used herein.

4. "Communication" or "Communications" means any oral or written exchange of words, thoughts, or ideas with another person(s) or entity, whether person to person, in a group, in

Case 19-44208-mxm11 Doc 1133 Filed 03/09/20 Entered 03/09/20 14:54:23 Page 91 of 151

a meeting, by telephone, letter, telefax, electronic mail, or otherwise, and including without limitation any printed, typed, handwritten or other readable document, any tape recording, correspondence, memorandum, report, computer file, contract, diary, logbook, minutes, note, study, survey, and forecast.

5. "CyberX" means CyberX Group LLC, d/b/a 212Connect and its officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

6. "NIIA" means National Individual Insurance Agency, LLC.

7. "NIIA Motion" means the Debtors' Motion for Authority to Enter into Servicing Agreement Between Association Healthcare Management, Inc. and National Individual Insurance Agency, LLC, pending in the Chapter 11 cases jointly administered under Case No. 19-44208-mxm11 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

8. "Relating to," "related," "concerning," and "reflecting" mean directly or indirectly reflecting, containing, pertaining to, indicating, showing, concerning, constituting, evidencing, describing, discussing, or mentioning upon a stated subject matter.

## **INSTRUCTIONS**

1.       Each Document Request shall be answered fully and in writing and, where required by the applicable rules, under oath.

2.       The use of the singular shall be deemed to include the plural, and the use of masculine, feminine, or neutral gender shall include each gender, as appropriate in context.

3.       The terms "and" or "or" shall mean and include both the conjunctive and the disjunctive.

4.       If you claim a privilege as to any of the information requested to be identified and/or produced in the Document Requests, specify the privilege claimed, the communication or other matter as to which such claim is made, the subject of the communication or other matter and the basis upon which you assert the claim of privilege.

5.       If, in answering these Document Requests, you encounter any ambiguity in construing a Document Request, or a definition or instruction relevant to the inquiry contained therein, set forth the matter deemed "ambiguous" and set forth the construction chosen or used in answering the Document Request.

6.       In answering these Document Requests, furnish such information as is available to you, not merely such information as is within your knowledge.  This means that you are to furnish information that is known by, available to, or in the possession of your affiliates, employees, servants, or agents, including your attorney or any agent for you or your attorney (unless privileged).

7.       If you object to any Definition or Instruction or to any of the specific Document Requests set forth below, the precise grounds of your objection(s) shall be stated, with particularity.  If any objection rests in whole or in part on a claim of privilege, the privilege claims

should be stated and all facts and all documents relied upon in support of such claim shall be stated or identified with particularity.

8.    If you object to or claim a privilege with respect to only a portion of a given Document Request, you are requested to answer that portion of the Document Request as to which you have no objection or claim of privilege.

## DOCUMENT REQUESTS

1. All records reflecting the names of insurance policyholders holding policies marketed by NIIA.

2. All records reflecting the names of third-party insurance agents who market NIIA policies.

3. All Documents and Communications relating to or reflecting the financial and/or services relationship between NIIA and AHCM.

4. All Documents and Communications reflecting the relationship (contractual or otherwise) between NIIA and Landon Jordan, Harold Brock, Delbert Lee, Omar Kasani, Randee Mascorro, and/or any of entity of which the aforementioned individuals are direct or indirect owners, directors, shareholders, employees, or agents.

5. All Documents and Communications relating to any financing transactions or arrangement entered into or contemplated by NIIA relating to the provision of commission advance payments, including but not limited to loans, mortgages, credit agreements, factoring agreements, and assignments, and draft versions thereof.

6. Any Documents or Communications (including contracts) reflecting the source and amounts of NIIA's funding for commission advances.

7. All Documents and Communications reflecting NIIA's projected cash streams.

8. All Documents and Communications between AHCM and NIIA, including but not limited to any reports provided by AHCM to NIIA.

9. All Communications reflecting discussions regarding the formation and operation of NIIA.

10. All records reflecting the ownership interests of NIIA.

11. All Documents (including contracts) reflecting transfers of money between:

   - AHCM and NIIA,

   - AWIS and NIIA,

   - NIIA and the Rusty Brock Agency,

   - Landon Jordan and NIIA,

   - Harold Brock and NIIA,

   - Delbert Lee and NIIA,

   - Randee Mascorro and NIIA, or

736176922.1 4-Feb-20 14:45                                8

Case 1:19-cv-20063-xxxx   Doc 1169   Filed 02/06/20   Entered 02/06/20 14:25:23   Page 95 of 121

- Omar Kasani and NIIA.

12. All Documents and Communications reflecting discussions or communications by or to or including Landon Jordan, Delbtert Lee, Randee Mascorro, Omar Kasani, or Harold Brock relating to the formation of NIIA.

13. All Documents and Communications relating to the NIIA Motion.

14. All Documents and Communications between NIIA and Mansfield Business Management, LLC.

736176922.1 4-Feb-20 14:45                                        9

# Exhibit 4
**[Jordan Subpoena]**

Ian T. Peck, TBN #24013306
Jarom J. Yates, TBN #24071134
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
**MAYER BROWN LLP**
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11 cases** |
| | ) | |
| **AMERICAN WORKERS INSURANCE SERVICES, INC.,** *et al.* | ) ) | **Case No. 19-44208-mxm-11** |
| | ) | |
| | ) | **Case No. 19-44209-mxm-11** |
| **Debtors.** | ) | |
| | ) | |
| | ) | **(Jointly Administered)** |
| | ) | |

**NOTICE OF SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE**

**TO:** Landon Jordan
1409 Long and Winding Road
Mansfield, Texas 76063

**PLEASE TAKE NOTICE** that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rules 9014 and 9016, Insurety Capital, LLC, by and through its undersigned counsel, caused to be served on Landon Jordan ("**Jordan**") the attached Subpoena requesting Jordan produce and permit for inspection and copying the documents listed on **Schedule A** annexed to the Subpoena (collectively, the "**Document Requests**") on or before the 19th day of February, 2020, at 9:00 a.m. at the offices of Haynes and Boone, LLP, 301 Commerce Street, Suite 2600, Fort Worth, Texas 76102, or at such

736209488.1 6-Feb-20 17:13                    1

other agreed time and place. A true and correct copy of the Subpoena is attached hereto and

incorporated herein by reference.

RESPECTFULLY SUBMITTED this 10th day of February, 2020.

By: /s/ Jarom J. Yates

**HAYNES AND BOONE, LLP**
Ian T. Peck
State Bar No. 24013306
Jarom J. Yates
State Bar No. 24071134
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com

and

**MAYER BROWN LLP**
Robert S. Harrell
State Bar No. 09041350
Andrew Elkhoury
State Bar No. 24097648
700 Louisiana Street, Suite 3400
Houston, Texas 77004
Telephone: (713) 238-2700
Facsimile: (713) 238-4888
Email: rharrell@mayerbrown.com
Email: aelkhoury@mayerbrown.com

**ATTORNEYS FOR INSURETY CAPITAL, LLC**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February10, 2020, true and correct copies of the

foregoing were served upon all parties on the attached service list via United States first class

mail, postage prepaid, or via electronic notice, if available, pursuant to the Court's ECF

electronic noticing procedures.

*/s/ Jarom J. Yates*
Jarom J. Yates

**Service List
AWIS/AHCM
#6050**

American Workers Insurance Services, Inc.
2305 Ridge Road #205
Rockwall, TX 75087

Association Health Care Management, Inc.
11111 Richmond Ave., Suite 200
Houston, TX 77082

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Comptroller of Public Accounts
111 E. 17th St.
Austin, TX 78774-0100

United States Trustee
Elizabeth Young, Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242

Texas Workforce Commission
Labor Law Section
101 East 15th St.
Austin, TX 78778-0001

Alliance Shared Health
3155 Sutton Blvd., Suite 201
St. Louis, MO 63143

Ally Financial
PO Box 9001951
Louisville, KY 40290-1951

Ascension on the Bayou
150 W Sam Houston Pkwy N
Houston, TX 77024-4733

Co-Nexus Communication Systems
PO Box 609
Cedar Rapids, IA 52406

Daiker Partners Ltd.
PO Box 1059
Rockwall, TX 75087-1059

Data Partnership Group, LP
4500 Hugh Howell Rd., Suite 620-B
Tucker, GA 30084

First Continental Life
101 Parklane Blvd, Suite 301
Sugar Land, TX 77478

Free Market Administrators
16633 Dallas Pkwy., #320
Addison, TX 75001

Joanna Cheng and Putative Class
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Landon Jordan
Jennifer Cellmar
1409 Long and Winding Road
Mansfield, TX 76063-5608

Lincoln Automotive Financial Services
PO Box 650575
Dallas, TX 75265-0575

Mansfield Business Management
1409 Long and Winding Rd.
Mansfield, TX 76063

Multiplan, Inc.
115 Fifth Avenue
New York, NY 10003

National Association of Preferred Providers
11111 Richmond Ave. #250
Houston, TX 77082

Payroc Payment Systems, LLC
Attn: Aaron Johnson
1350 E Touhy Ave., Suite 210W
Des Plaines, IL 60018-3303

Spectrum Internet/Telephone Service
4145 S. Falkenburg Rd.
Riverview, FL 33578-8652

The Verde Law Firm PLLC
4600 Highway 6 N, Suite 320
Houston, TX 77084-2983

Catherine Shanahan
c/o Mark L. Javitch
Javitch Law Office
480 S. Ellsworth Ave.
San Mateo, CA 94401

Robert D. Kline, J.D.
2256 Fairview Rd.
McClure, PA 17841

Franchise Tax Board
Attn: Rebecca Estonilo, Claim Agent
Bankruptcy Section MS A340
PO Box 2952
Sacramento, CA 95812-2952

GreatAmerica Financial Services Corp.
Attn: Peggy Upton
625 First St. SE, Suite 800
Cedar Rapids, IA 52401

American Express National Bank
c/o Elizabeth M. Redmond
Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

Ally Bank
PO Box 130424
Roseville, MN 55113-0004

Ally Bank
**c/o Adam Kopp, Bankruptcy Coordinator**
**Ally Servicing LLC**
**4000 Lexington Ave. N, Suite 100**
**Shoreview, MN 55126**

Chargeback Gurus
Attn: Debbie Tank, Office Operations Mgr.
8951 Collin McKinney Pkwy, Suite 1001
McKinney, TX 75070

# TWENTY LARGEST UNSECURED CREDITORS

Agentra Healthcare Solutions
4201 Spring Valley Rd., Suite 1500
Dallas, TX 75244

American Express
PO Box 650448
Houston, TX 75265

Assured Benefits Administration
PO Box 679145
Dallas, TX 75267-9145

BlueCross BlueShield of Texas
PO Box 731428
Dallas, TX 75373-1428

Capital One, N.A.
PO Box 60024
New Orleans, LA 70160

**Comcast**
**PO Box 660618**
**Dallas, TX 75266-0618**

CyberX Group LLC - 212 Connect
1677 E Miles Ave., Bldg. 2
Hayden, ID 83835

Dell
PO Box 731381
Dallas, TX 75373-1381

FCAWMA
10878 Westheimer Rd.
Houston, TX 77042

Insurety Capital, LLC
600 Brickell Ave., Suite 1900
Miami, FL 33131

Iron Mountain
PO Box 915004
Dallas, TX 75391-5004

James Wise CPA
12345 Jones Rd., Suite 185
Houston, TX 77070

Level 3 Communications LLC
PO Box 910182
Denver, CO 80291-0182

Lone Star Coffee
PO Box 691634
Houston, TX 77269-1634

Mike Rabie
1723 Parklake Village Dr.
Katy, TX 77450

Neopost USA, Inc.
Dept. 3689
PO Box 123689
Dallas, TX 75312-3689

NxSource
3654 Dumbarton St.
Houston, TX 77025

VeriTrust Corporation
7804 Fairview Rd., Suite 153
Charolotte, NC 28226

Voicetext.com
3706 Speedway
Austin, TX 78705

Zenith Real Estate
PO Box 42146
Houston, TX 77242-2146

# NOTICE OF APPEARANCE AND REQUEST FOR NOTICE PARTIES

Rockwall CAD
c/o Laurie A. Spindler/Elizabeth Weller
Linebarger Goggan et al.
2777 N. Stemmons Frwy, Suite 1000
Dallas, TX 75207

Agentra, LLC / Cyberx Group, LLC
c/o William S. Richmond/Kimberly Moore
Platt Cheema Richmond PLLC
1201 N. Riverfront Blvd., Suite 150
Dallas, TX 75307

Harris County/Cypress-Fairbanks ISD
c/o John P. Dillman
Linebarger Goggan et al.
PO Box 3064
Houston, TX 77253-3064

Insurety Capital, LLC
c/o Charles E. Harris II
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Insurety Capital LLC
c/o Ian T. Peck / Jarom J. Yates
Haynes and Boone, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219

Insurety Capital LLC
c/o Robert S. Harrell / Andrew Elkhoury
Mayer Brown LLP
700 Louisiana St., Suite 3400
Houston, TX 77004

Texas Department of Insurance
c/o J. Casey Roy, Asst. Attorney General
Bankruptcy & Collections Div.
PO Box 12548 – MC 008
Austin, TX 78711-2548

Data Partnership Group, LP
c/o Christopher Arisco/Joseph D. Austin
Padfield & Stout, LLP
420 Throckmorton St., Suite 1210
Fort Worth, TX 76102

Data Partnership Group, LP
c/o John K. Rezac
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339

Payroc Payment Systems, LLC
c/o John M. Heaphy
Harrison & Held, LLP
333 W. Wacker Dr., Suite 1700
Chicago, IL 60606-1247

NXT Level Health, LLC
c/o Jacob L. McBride
Weinstein Radcliff Pipkin LP
8350 N. Central Expwy., Suite 1550
Dallas, TX 75206

American Healthcare Benefits Cooperative
c/o William S. Richmond/Kimberly Moore
Platt Cheema Richmond PLLC
1201 N Riverfront Blvd., Suite 150
Dallas, TX 75307

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ Northern _____ District of _____ Texas _____

In re American Workers Insurance Services, Inc., et al

                    Debtors

Case No. 19-44208-mxm-11

Case No. 19-44209-mxm-11

(Jointly Administered)

Chapter 11

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Landon Jordan, 1409 Long and Winding Road, Mansfield, Texas 76063

_(Name of person to whom the subpoena is directed)_

[X] _Production_: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the

material: SEE SCHEDULE A, ATTACHED

| PLACE | DATE AND TIME |
|---|---|
| Haynes and Boone, LLP, 301 Commerce Street, Suite 2600, Fort Worth, Texas 76102 | February 19, 2020 at 9:00 a.m. |

[ ] _Inspection of Premises_: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

       The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: February 10, 2020

               CLERK OF COURT

                           OR

                               /s/ Andrew Elkhoury

_____     _____

     _Signature of Clerk or Deputy Clerk_          _Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_ Insurety Capital, LLC , who issues or requests this subpoena, are: Andrew Elkhoury, Mayer Brown LLP, 713-238-2841, aelkhoury@mayerbrown.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
   (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

Case 1:19-41203-mxm11 Doc 1163 Filed 02/26/20 Entered 02/26/20 09:20:24 Page 112 of 121

**SCHEDULE A**

**DEFINITIONS**

Unless otherwise stated below, all terms used in these Document Requests have the meaning given by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Northern District of Texas or by common usage unless otherwise required by the context. For the purposes of the Document Requests, the following Definitions shall apply:

1. "AWIS" means American Workers Insurance Services, Inc. and its estate, officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

2. "AHCM" means Association Health Care Management, Inc. and its estate, officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

3. "Document" or "Documents" has the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure, and shall include, but are not limited to, originals and copies of any and all writings and recordings of whatever nature, however produced or stored or reproduced (e.g., on paper, computer disk, computer hard drive, computer tape, microfiche, or microfilm), whether signed or unsigned or transcribed and whether assertively privileged or not, including, without limitation, any letter, request, order, notice, schedule, tabulation, newspaper clipping, internal file, working paper, communication, correspondence, memorandum, telex, telegram, electronic mail, communication or back-up tape, voicemail communication or back-up tape, cable, contract, agreement, amendment, instructions, specifications, product information, receipt, manual, journal, ledger, diary, calendar, summary or record of telephone or other conversation (e.g., personal conversation, interview, meeting or conference), invoices, surveys, minutes, bill, voucher, income statement, financial statement, statement of account, checkbooks, canceled checks, deposit ticket, charge slip, statement requesting payment, requisition, file, report, record, study, handwritten note, working paper, chart, informational accumulations, tape, voice recording, computer output or input, and magnetic phonograph, photographic or graphic matter, CyberX files, and Admin123 files. Different version of the same document (e.g. copies of a printed document with differing handwritten notations, and superseded drafts) are different documents within the meaning of that term as used herein.

736209488.1 6-Feb-20 17:13          4

Case 19-44208-mxm11 Doc 1163 Filed 03/06/20 Entered 03/06/20 19:20:54 Page 3 of 121

4.  "Communication" or "Communications" means any oral or written exchange of words, thoughts, or ideas with another person(s) or entity, whether person to person, in a group, in a meeting, by telephone, letter, telefax, electronic mail, or otherwise, and including without limitation any printed, typed, handwritten or other readable document, any tape recording, correspondence, memorandum, report, computer file, contract, diary, logbook, minutes, note, study, survey, and forecast.

5.  "CyberX" means CyberX Group LLC, d/b/a 212Connect and its officers, directors, employees, principals, direct or indirect owners, agents, trustees, consultants, managers, parents, subsidiaries, affiliates, predecessors, predecessors-in-interest, successors, successors-in-interest, and all persons acting or purporting to act on its behalf.

6.  "NIIA" means National Individual Insurance Agency, LLC.

7.  "NIIA Motion" means the Debtors' Motion for Authority to Enter into Servicing Agreement Between Association Healthcare Management, Inc. and National Individual Insurance Agency, LLC, pending in the Chapter 11 cases jointly administered under Case No. 19-44208-mxm11 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

8.  "Relating to," "related," "concerning," and "reflecting" mean directly or indirectly reflecting, containing, pertaining to, indicating, showing, concerning, constituting, evidencing, describing, discussing, or mentioning upon a stated subject matter.

Case 1:19-cr-20063-xxxx Doc 163 Rec 0020620 Entered 06200201020264 Pages 14 of 121

## INSTRUCTIONS

1.      Each Document Request shall be answered fully and in writing and, where required by the applicable rules, under oath.

2.      The use of the singular shall be deemed to include the plural, and the use of masculine, feminine, or neutral gender shall include each gender, as appropriate in context.

3.      The terms "and" or "or" shall mean and include both the conjunctive and the disjunctive.

4.      If you claim a privilege as to any of the information requested to be identified and/or produced in the Document Requests, specify the privilege claimed, the communication or other matter as to which such claim is made, the subject of the communication or other matter and the basis upon which you assert the claim of privilege.

5.      If, in answering these Document Requests, you encounter any ambiguity in construing a Document Request, or a definition or instruction relevant to the inquiry contained therein, set forth the matter deemed "ambiguous" and set forth the construction chosen or used in answering the Document Request.

6.      In answering these Document Requests, furnish such information as is available to you, not merely such information as is within your knowledge.  This means that you are to furnish information that is known by, available to, or in the possession of your affiliates, employees, servants, or agents, including your attorney or any agent for you or your attorney (unless privileged).

7.      If you object to any Definition or Instruction or to any of the specific Document Requests set forth below, the precise grounds of your objection(s) shall be stated, with particularity.  If any objection rests in whole or in part on a claim of privilege, the privilege claims

Case 1:34-42055-xxxx-1 Doc 1163 Filed 06/06/20 Entered 06/06/2020 09:20:54 Pages 15 of 121

should be stated and all facts and all documents relied upon in support of such claim shall be stated or identified with particularity.

8.     If you object to or claim a privilege with respect to only a portion of a given Document Request, you are requested to answer that portion of the Document Request as to which you have no objection or claim of privilege.

## DOCUMENT REQUESTS

1. All Documents and Communications relating to or reflecting the financial and/or services relationship between NIIA and AHCM.

2. All Documents and Communications relating to or reflecting the relationship between NIIA and Graford Business Management LLC (or Grayford Business Management, LLC).

3. All Documents and Communications relating to or reflecting the relationship between NIIA Mansfield Business Management, LLC.

4. All Documents and Communications relating to or reflecting the relationship between Mansfield Business Management, LLC and you, Harold Brock, Delbert Lee, Omar Kasani, or Randee Mascorro.

5. All Documents and Communications reflecting the relationship (contractual or otherwise) between you and NIIA, Harold Brock, Delbert Lee, Omar Kasani, Randee Mascorro, and/or any of entity of which the aforementioned individuals are direct or indirect owners, directors, shareholders, employees, or agents.

6. All Documents and Communications relating to any financing transactions or arrangement entered into or contemplated by you or NIIA relating to the provision of commission advance payments, including but not limited to loans, mortgages, credit agreements, factoring agreements, and assignments, and draft versions thereof.

7. Any Documents or Communications (including contracts) reflecting the source and amounts of NIIA's funding for commission advances.

8. All Documents and Communications reflecting NIIA's projected cash streams.

9. All Communications reflecting discussions regarding the formation and operation of NIIA.

10. All Communications reflecting discussions regarding the formation and operation of Graford Business Management LLC (or Grayford Business Management, LLC).

11. All records reflecting the ownership interests of or in NIIA.

12. All records reflecting the ownership interests of or in Graford Business Management LLC (or Grayford Business Management, LLC).

13. All Documents (including contracts) reflecting transfers of money between:

    - AHCM and NIIA,

    - AWIS and NIIA,

    - NIIA and the Rusty Brock Agency,

    - You and NIIA or Graford Business Management LLC LLC (or Grayford Business Management, LLC),

Case 1:19-mc-20300-xxxx Doc 1163 Filed 06/06/20 Entered 06/06/20 20:05:04 Pages 1 of 121

- Harold Brock and NIIA or Graford Business Management LLC (or Grayford Business Management, LLC),

- Delbert Lee and NIIA or Graford Business Management LLC LLC (or Grayford Business Management, LLC),

- Randee Mascorro and NIIA or Graford Business Management LLC LLC (or Grayford Business Management, LLC), or

- Omar Kasani and NIIA or Graford Business Management LLC LLC (or Grayford Business Management, LLC).

14. All Documents and Communications reflecting discussions or communications by or to or including you, Delbert Lee, Randee Mascorro, Omar Kasani, or Harold Brock relating to the formation of NIIA.

15. All Documents and Communications reflecting discussions or communications by or to or including you, Delbert Lee, Randee Mascorro, Omar Kasani, or Harold Brock relating to the formation of or Graford Business Management LLC LLC (or Grayford Business Management, LLC).

16. All Documents and Communications relating to the NIIA Motion.

17. All Documents and Communications between NIIA and Mansfield Business Management, LLC.

736209488.1 6-Feb-20 17:13                                                9