**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE No. 20-20172-CIV-MARTINEZ-OTAZO-REYES

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

      Plaintiffs,

v.

CHRISTOPHER JAMES PAGNANELLI

      Defendant.

_____

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

      Plaintiffs, 777 Partners LLC ("**777 Partners**") and Insurety Capital LLC ("**Insurety**") (together "**Plaintiffs**" or the "**Company**"), pursuant to Federal Rule of Civil Procedure 56 and Southern District of Florida Local Rule 56.1, file this Statement of Material Facts in Support of their Motion for Partial Summary Judgment on Liability on Counts I (Breach of Contract) and II (Breach of Fiduciary Duty).  In support, the Company states:

      1.      The Company is a leading provider of short-term cash advances to independent marketing organizations ("IMOs"), allowing the IMOs to pay advance commissions to their independent insurance agents, commonly known as "producers." [DE 24, ¶ 14].

      2.      More specifically, in today's insurance marketplace, IMOs serve as intermediaries between insurance carriers and independent insurance agents. *Id.* at ¶ 15. The insurance carriers underwrite insurance policies while the IMOs market, distribute, and sell those policies through agents who work for the IMOs. *Id.* Insurance agents earn a commission on each insurance policy they sell, the amount of which varies based on the amount of the insurance premium. *Id.* Due to

the nature of insurance transactions, insurance agents typically do not receive their commissions until policyholders pay their policy premiums, usually on a monthly basis. *Id.* The Company offers IMOs the ability to satisfy and retain their insurance agents by advancing several months of future commissions earned by the insurance agents. *Id.* In exchange for the commission advance, the Company acquires the rights to the agent's future insurance commissions, plus an administrative fee, which may be known as the per member per month fee ("PMPM"). *Id.*

3. The Company is engaged in a highly competitive, nationwide business. As such, attracting clients and maintaining strong client relationships is at the core of the Company's success. *Id.* at ¶ 16.

4. The Company hired Defendant in January of 2018 to serve as its Chief Executive Officer. A true and correct copy of the Employment Agreement is attached as Exhibit "A."

5. Defendant was required under the Employment Agreement to, among other things, devote his full productive time and best efforts to the performance of his duties for the Company, Id., at ¶ 3, and comply with all Company policies regarding actual or apparent conflicts of interest. Id., at ¶ 6(F).

6. Defendant electronically reviewed and acknowledged receipt of the Company's "Conflicts of Interest Policy," which set forth several critically important principles (collectively, the "**Contractual Loyalty Duties**"), including, without limitation:

    a) that he would "act in the best interests of the Company" and conduct business "in accordance with all applicable laws, rules and regulations and the highest ethical standards;"

    b) that, as a condition of employment, he would "not engage in any work, paid or unpaid, or other activities that create a conflict of interest that materially and substantially disrupt the operations of the Company" and that such work or activities would include "directly or indirectly competing with the Company in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or

which is in direct competition with, the business in which the Company" is engaged;

c) that he would not "take part in or attempt to influence any Company decision or any business dealings with a current or potential competitor, customer, partner, vendor, supplier, or other business entity" in which he had "a direct or indirect financial interest;"

d) that "to avoid the appearance of a conflict" he would "disclose any direct or indirect financial interest in a current or potential competitor, customer, partner, vendor or supplier" with which he discovered the Company planned to do business;

e) that he "must not take personal advantage of or interfere with any existing or potential Company business opportunities;"

f) that his "outside business activities must not compete with or reflect adversely on the Company or give rise to a conflict of interest;"

g) that he "must not engage in any outside activity that is likely to involve disclosure of Company proprietary information or that is likely to divert time and attention from your responsibilities at the Company."

h) that he "must act with integrity, honesty, competence, and in an ethical manner when dealing with the public, regulators, clients, investors, prospective investors, and their fellow Employees;"

i) that he "must adhere to the highest standards with respect to any potential material conflicts of interest," and the he would not "enjoy a benefit at the expense of the Company;" and

j) that he would "preserve the confidentiality of information" and not use such information "in any way adverse to the interests of the Company."

A true and correct copy of the Conflicts of Interest Policy electronically reviewed and acknowledged by Defendant on January 8, 2018 is attached as Exhibit "B."

7. In addition, Defendant was prohibited, both during and after his employment, to use or disclose "Confidential Information" for any competitive purpose or divulge "Confidential Information" to any person other than the Company or persons with respect to whom the Company has given its written consent, except for limited purposes not at issue in the instant action. Specifically, ¶ 6(B)(ii) of the Employment Agreement states:

> While employed by the Company, Executive will have access to and become familiar with Confidential Information. Executive acknowledges that Confidential Information is owned and shall continue to be owned solely by the Company and/or its affiliates. Executive agrees that Executive will not, at any time, whether during or subsequent to Executive's employment by the Company and/or its affiliates, use *or* disclose Confidential Information for any competitive purpose, or divulge the same to any person other than the Company or persons with respect to whom the Company has given its written consent, unless Executive is compelled to make disclosure by a federal or state court, arbitrator, or any government authority, pursuant to subpoena, or as necessary to secure legal and financial counsel from third party professionals or to enforce his or her rights under this Agreement. In such case, Executive shall give reasonable notice to the Company prior to disclosing such information and shall assist the Company in taking such legally permissible . steps as are reasonable and necessary to protect the Confidential Information, including, but not limited to, the execution by the receiving party of a non-- disclosure agreement in a form acceptable to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by the Executive or a breach of a confidentiality obligation owed to the Company by any third party, or disclosure pursuant to any applicable law or court order.

<u>Exh.</u> A.

8. Paragraph 6(B)(I) of Defendant's Employment Agreement defines "Confidential information" as:

> As used in this Agreement, "Confidential information" means trade secrets and other information specific to the business and investment activities and considerations of the Company. This includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information, strategic and marketing plans, compilations of customer and supplier information, performance of and compensation paid to Executives, contracts with third parties, information regarding the Company's training, financial and marketing books, sales, price and marketing projections, internal employer databases, analytical tools and services and information technology products and services, other information related to the tools,

38072298.2
38072298.5

> products and services that facilitate the Company's ability to sell and manufacture its services, or other reports, manuals and information including Information related to Company, its affiliate companies, *or* Its customers, including those documents and items which Executive may develop or help develop while in Company's employ, whether or not developed during regular working hours or on Company's premises; provided, however, that Confidential Information shall not include any information that is or becomes public through written authorization by Company. Unless the context requires otherwise, the term "Confidential Information" shall Include the original of such materials, any copies thereof, any notes derived from such materials, and any derivative work of such materials.

Id.

9. Additionally, the Employment Agreement includes restrictive covenants that impose limitations on Defendant during and after his employment. Specifically, the Employment Agreement provides:

   a. <u>Non-Competition</u>. Defendant agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, engage in any commercial activity in the United States that competes with the business of the Company, namely, the insurance-related commission advance business.

   b. <u>Non-Disparagement</u>. Defendant agreed that he would not, at any time, make, publish, or communicate to any person or entity any "Disparaging" remarks, comments, or statements concerning the Company, its affiliates, their respective partners, members, or employees. Paragraph 6(D)(IV) of the Agreement defines a "Disparaging" remark as a remark, comment, or statement that impugns the other party's character, honesty, integrity, morality, business acumen, or abilities.

   c. <u>Non-Solicitation</u>. Defendant agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, among other things: (i) take any action to solicit or divert any Clients, Sources, or Sellers (as defined in the Agreement) away from the Company and/or any affiliates; or (ii) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or any affiliates.

(collectively, the "**Restrictive Covenants**"). Id., ¶ 6(D)(II), (IV), (V).

10. In paragraph 6(D)(VII) of the Employment Agreement, Defendant electronically reviewed and acknowledged that:

> [T]he restrictive covenants contained in this Section are essential, independent elements of this Agreement and that, but for Executive agreeing to comply with them, Company would not continue to employ Executive. Thus, even if Executive has a claim against Company, whether that claim is based on this Agreement or not, the claim by Executive shall not be a defense to Company's enforcement of the promises and restrictions in this Section. An alleged or actual breach of the Agreement by the Company will not be a defense to enforcement of the provisions of this Section, or other obligations of Executive to the Company. The covenants in this Section will remain in full force and effect whether Executive Is terminated by Company or voluntarily resigns.

Id.

11. Further, in paragraph 6(E) of the Employment Agreement, Defendant electronically reviewed and acknowledged that:

> [B]reach by Executive of the provisions of Section 6(b)-(d) will cause the Company irreparable harm that is not fully remedied by monetary damages. In the event of a breach or threatened breach by Executive of the provisions of Section 6(b)-(d), the Company shall be entitled to an injunction restraining Executive from directly or indirectly engaging in the activities prohibited herein, without posting a bond or other security. Nothing herein shall be construed as prohibiting the Company from pursuing any other equitable or legal remedies available to It for such breach or threatened breach, including the recovery of damages from Executive.

Id.

12. On April 24, 2019, the Company terminated Defendant "for cause", effective April 4, 2019.

13. [REDACTED]

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

14. ███████████████████████████████████████

███████████████████████████████

Dated this 16th day of February, 2021.

                Respectfully Submitted,

                /s/ *John Turner*
                John A. Turner
                Florida Bar No. 000922
                Steven M. Appelbaum
                Florida Bar No. 71399
                SAUL EWING ARNSTEIN & LEHR LLP
                **Counsel for Plaintiffs**
                515 North Flagler Drive
                West Palm Beach, FL 33401
                Telephone:    561-833-9800
                Facsimile:     561-655-5551
                Email:    John.turner@saul.com
                          Steven.appelbaum@saul.com
                          John.gekas@saul.com
                          Linda.dunne@saul.com
                          Wpb-ctdocs@saul.com
                          Jessica.Barrero@saul.com
                          Mia-ctdocs@saul.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on February 16, 2021 the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a copy of the foregoing document on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF to Andrew Bryan Zelmanowitz, Esq. and Kenneth W. Waterway, Esq., counsel for Defendant Christopher James Pagnanelli, at AZelman@bergersingerman.com, kwaterway@bergersingerman.com and drt@bergersingerman.com.

Respectfully submitted,

/s/John Turner
John A. Turner
Florida Bar No. 000922
Steven M. Appelbaum
Florida Bar No. 71399
SAUL EWING ARNSTEIN & LEHR LLP
***Counsel for Plaintiffs***
515 North Flagler Drive
West Palm Beach, FL 33401
Telephone:     561-833-9800
Facsimile:     561-655-5551
Email:    John.turner@saul.com
              Steven.appelbaum@saul.com
              John.gekas@saul.com
              Linda.dunne@saul.com
              Wpb-ctdocs@saul.com
              Jessica.Barrero@saul.com
              Mia-ctdocs@saul.com