fUNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE No. 20-20172-CIV-MARTINEZ-OTAZO-REYES

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

      Plaintiffs

v.

CHRISTOPHER JAMES ("CJ") PAGNANELLI,

      Defendant.

_____

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs 777 Partners LLC ("777 Partners") and Insurety Capital LLC ("Insurety") (together "Plaintiffs" or collectively, "the Company"), by and through undersigned counsel, file this Second Amended Complaint ("Complaint") against Defendant Christopher James ("CJ") Pagnanelli and allege as follows:

**INTRODUCTION**

1.    This action arises from the misconduct of Insurety's former CEO, Christopher James Pagnanelli (in order to distinguish him from his father, hereinafter "CJ").

2.    In April 2019, CJ was terminated for cause after the Company discovered he was engaged in a host of misconduct, including self-dealing schemes to personally enrich himself at the Company's expense and the misappropriation of the Company's unique and proprietary trade secrets, including but not limited to, transaction structures, financial data, and industry specific financial models custom built by the Company to better serve its clients.

3.    Since his termination, CJ has brazenly breached the Non-Disclosure, Non-Solicitation, Non-Disparagement, and Non-Competition covenants of his Employment

1

Agreement. Among other things, CJ has disparaged Insurety in repeated attempts to solicit Insurety's customers to transfer their business from Insurety to a company or companies in which CJ is involved.

4. CJ actions – both before and after his employment – constitute unmistakable breaches of his fiduciary duties owed to the Company.

5. Accordingly, Plaintiffs seek injunctive relief and monetary damages through this action in order to remedy CJ's illegal conduct.

## THE PARTIES, JURISDICTION, AND VENUE

6. Insurety is a Delaware limited liability company with its principal place of business located in Miami, Florida.

7. 777 Partners is a Delaware limited liability company with its principal place of business located in Miami, Florida.

8. CJ is, upon information and belief, a resident of Miami, Florida. CJ is a former employee of the Company and the former CEO of Insurety.  CJ regularly uses the nickname "CJ."

9. This Court has subject matter jurisdiction over Plaintiffs' federal claim for Trade Secret Misappropriation under the Defect Trade Secrets Act of 2016 (Count IV) pursuant to 28 U.S.C. § 1331 because they arises under the laws of the United States.

10. The Court has subject matter jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. § 1367 because the state law claims arise out of a common nucleus of operative facts as the federal law claim.

11. Pursuant to paragraph 9(F) of the Employment Agreement, venue is proper and rests exclusively in Miami-Dade County, Florida, which also is the County where the causes of action arose.

12.    Venue is also proper under 28 U.S.C. § 1391(c) due to CJ's residence in Miami, Florida.

13.    All conditions precedent to bringing this action have been performed or waived.

### FACTUAL BACKGROUND

14.    Insurety is a leading provider of short-term cash advances to independent marketing organizations ("IMOs"), allowing the IMOs to pay advance commissions to their independent insurance agents, commonly known as "producers."

15.    More specifically, in today's insurance marketplace, IMOs serve as intermediaries between insurance carriers and independent insurance agents.  The insurance carriers underwrite insurance policies while the IMOs market, distribute, and sell those policies through agents who work for the IMOs. Insurance agents earn a commission on each insurance policy they sell, the amount of which varies based on the amount of the insurance premium.  Due to the nature of insurance transactions, insurance agents typically do not receive their commissions until policyholders pay their policy premiums, usually on a monthly basis.  Insurety offers IMOs the ability to satisfy and retain their insurance agents by advancing several months of future commissions earned by the insurance agents. In exchange for the commission advance, Insurety acquires the rights to the agent's future insurance commissions, plus an administrative fee, which may be known as the per member per month fee ("PMPM").

16.    Insurety is engaged in a highly competitive, nationwide business. As such, attracting clients and maintaining strong client relationships is at the core of Insurety's success.

### COUNT I

#### BREACH OF CONTRACT

17.    Plaintiffs repeat and re-allege paragraphs 16 through 18 as if fully set forth herein.

18.     On January 10, 2018, CJ executed his Employment Agreement ("Agreement"). A copy is attached as "Exhibit A" hereto.

19.     In consideration for the promises made by CJ under the Agreement and to perform his duties under the Agreement, the Company agreed to pay, and did pay, CJ an annualized base salary of $225,000 (gross) and a "sign-on bonus" of $98,082 (gross).  In further consideration for the promises made by CJ under the Agreement and to perform his duties under the Agreement, CJ was eligible to receive an annual bonus, targeted at 50% (gross) of his base salary. The Company also provided CJ various "fringe benefits" under paragraph 5(C) of the Agreement in further consideration for the promises made by CJ under the Agreement and to perform his duties under the Agreement.

20.     CJ served as Insurety's Chief Executive Officer between January 2018 and April 4, 2019, at which time the Company suspended him pending an investigation.

21.     During his employment with Insurety, CJ held himself out to others as its CEO. For instance, CJ had business cards that identified him as CEO of Insurety, which he would pass out to others at conferences and such. CJ also spoke at conferences where he identified himself as the CEO of Insurety. CJ also identified himself as "CEO" in his email correspondence.

22.     On April 24, 2019, the Company terminated CJ's employment "for cause," effective April 4, 2019.

23.     During the period of his employment with the Company, CJ, pursuant to the Agreement, owed a fiduciary duty and a duty of loyalty to the Company, and to its affiliates, to act solely in the best interest of the Company and its affiliates, and to refrain from engaging in any self-dealing and/or self-interested conduct or transactions adverse to the legitimate business interests of the Company and its affiliates.

38246324.6

24.     Specifically, pursuant to Paragraph 3 of the Agreement, CJ agreed to devote his full productive time and best efforts to the performance of his duties for the Company.

25.     Paragraph 6(F) of the Agreement also expressly provided that CJ was required to comply with all Company policies, including regarding actual or apparent conflicts of interest.

26.     On January 8, 2018, CJ acknowledged receipt of the 777 Partners "Conflicts of Interest Policy." A copy of 777's Conflicts of Interest Policy is attached as "Exhibit B." A copy of the electronic record evidencing CJ's receipt and acknowledgment of the Conflicts of Interest Policy – and all other Company policies, for that matter – is attached as Exhibit "C" hereto.

27.     By its terms, 777's conflicts of interest policy bound "employees of 777 Partners, LLC, and any portfolio company or subsidiary . . ."  By signing the policy, CJ acknowledged several critically important principles (collectively, the "**Contractual Loyalty Duties**"), including, without limitation:

a.      that he would "act in the best interests of the Company" and conduct business "in accordance with all applicable laws, rules and regulations and the highest ethical standards;"

b.      that, as a condition of employment, he would "not engage in any work, paid or unpaid, or other activities that create a conflict of interest that materially and substantially disrupt the operations of the Company" and that such work or activities would include "directly or indirectly competing with the Company in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or which is in direct competition with, the business in which the Company" is engaged;

c.      that he would not "take part in or attempt to influence any Company decision or any business dealings with a current or potential competitor, customer, partner, vendor, supplier, or other business entity" in which he had "a direct or indirect financial interest;"

d.      that "to avoid the appearance of a conflict" he would "disclose any direct or indirect financial interest in a current or potential competitor, customer, partner, vendor or supplier" with which he discovered the Company planned to do business;

e.    that he "must not take personal advantage of or interfere with any existing or potential Company business opportunities;"

f.    that his "outside business activities must not compete with or reflect adversely on the Company or give rise to a conflict of interest;"

g.    that he "must not engage in any outside activity that is likely to involve disclosure of Company proprietary information or that is likely to divert time and attention from your responsibilities at the Company."

h.    that he "must act with integrity, honesty, competence, and in an ethical manner when dealing with the public, regulators, clients, investors, prospective investors, and their fellow Employees;"

i.    that he "must adhere to the highest standards with respect to any potential material conflicts of interest," and the he would not "enjoy a benefit at the expense of the Company;" and

j.    that he would "preserve the confidentiality of information" and not use such information "in any way adverse to the interests of the Company."

28.    In addition to the Contractual Loyalty Duties, CJ, pursuant to paragraph 6(A) of the Agreement was "required to comply with all policies and procedures of the Company," including the Company's Confidentiality of Information policy that he likewise acknowledged on January 8, 2018. (*See* Exhibit B hereto.)

29.    Pursuant to paragraph 6(B) of the Agreement, CJ also agreed that he would not, during his employment with the Company or thereafter, use or disclose "Confidential Information" (as defined in paragraph 6(B)(I) of the Agreement, and together with the Company's Confidentiality of Information policy, the "**Contractual Confidentiality Obligations**,") for any competitive purpose or divulge "Confidential Information" to any person other than the Company or persons with respect to whom the Company has given its written consent, except for limited purposes not at issue in the instant action (such as compelled disclosure by a court or government authority or pursuant to subpoena)

30.     Pursuant to paragraph 6(B)(I), "Confidential Information" included, without limitation, trade secrets and other non-public information specific to the Company's business and investment activities, such as vendor lists, customer contact information, pricing information, strategic and marketing plans, compilations of customer and supplier information, and information relating to financial and marketing books, price and sales projections, and other information related to the tools, products, and services that facilitate the Company's ability to sell its services.

31.     As CEO of Insurety, CJ was privy to the development of the Company's Confidential Information, which he was obligated to use solely for Insurety's legitimate business interests, and certainly not for competitive purposes either during his employment with the Company or thereafter.

32.     Additionally, pursuant to paragraph 6(D) of the Agreement, CJ agreed to honor various restrictive covenants, including the following:

a.  <u>Non-Competition</u> (paragraph 6(D)(II) of the Agreement).  CJ agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, engage in any commercial activity in the United States that competes with the business of the Company, namely, the insurance-related commission advance business.

b.  <u>Non-Disparagement</u> (paragraph 6(D)(IV) of the Agreement).  CJ agreed that he would not, at any time, make, publish, or communicate to any person or entity any "Disparaging" remarks, comments, or statements concerning the Company, its affiliates, their respective partners, members, or employees.  Paragraph 6(D)(IV) of the Agreement defines a "Disparaging" remark as a remark, comment, or statement that impugns the other party's character, honesty, integrity, morality, business acumen, or abilities.

c.  <u>Non-Solicitation</u> (paragraph 6(D)(V) of the Agreement).  CJ agreed that during his employment with the Company, and for a period of one year thereafter, he would not, directly or indirectly, on his own behalf or on behalf of another, among other things: (i) take any action to solicit or divert any Clients, Sources, or Sellers (as defined in the Agreement) away from the Company and/or any

affiliates; or (ii) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or any affiliates.

(collectively, the "**Restrictive Covenants**")

33.    The Restrictive Covenants were and are reasonably necessary to protect the Company's legitimate business interests, including, without limitation, its trade secrets, its valuable confidential business information, its professional information, its substantial relationships with specific prospective and existing customers, its goodwill, and its business "know how" and practices.  Indeed, CJ agreed in Paragraph 6(D)(VI) of the Agreement that the restrictions "are reasonable in scope and duration."  CJ also acknowledged in paragraph 6(D)(VII) of the Agreement that the restrictions are essential, independent elements of the Agreement and that, but for his agreement to comply, the Company would not have employed or continued to employ him.

34.    The restrictive covenants survive the termination of the Agreement and CJ's employment thereunder.

35.    CJ agreed in paragraph 6(E) of the Agreement that his breach of the restrictive covenants would cause the Company irreparable harm that is not fully remedied by monetary damages, and that the Company would be entitled to injunctive relief in the event of a breach, in addition to any other legal or equitable remedies available.

36.    CJ accepted the considerations recited in the Agreement yet breached his corresponding Contractual Loyalty Duties, Contractual Confidentiality Obligations, and Restrictive Covenants.

37.    CJ breached his fiduciary duties to the Company by engaging in self-dealing and self-interested transactions during his employment with the Company, which he did not disclose

to the Company, but rather hid from the Company, and which materially harmed the Company and interfered with the performance of CJ's job duties under the Agreement.

38.     As one example, CJ secretly contracted with one of the Company's largest clients, American Workers Insurance Services ("AWIS"), so that he was personally paid a fee – or "kickback" – for every referral. For example:



39.     In his response to Plaintiff's motion for summary judgment that CJ filed with this Court on February 16, 2021, CJ admitted that his receipt of those payments and the authenticity of **Exhibits D** through **I** hereto was "Undisputed." (*See* CJ's Resp. to Pls.' Statement of Material Facts at ¶ 13 (Dkt. #50).)

40.     There is more. On February 20, 2019, CJ became a Member of Rendon Management Group, LLC ("Rendon"), which is believed to have held an ownership interest in

AWIS.  The Certificate of Amendment for Rendon, filed with the Office of the Secretary of State of Texas, is attached as "**Exhibit J**."  CJ intentionally failed to disclose to the Company this obvious conflict of interest.

41.     CJ also intentionally failed to advise the Company of the relationship between two (2) of the Company's largest clients, AWIS and Agentra, namely, that David Lindsey held a direct or indirect ownership interest in both entities. CJ then recklessly advanced significant funds to both clients, thereby creating a high "concentration risk" that may not have been assumed by the Company had CJ disclosed the relationship between AWIS and Agentra.

42.     CJ not only assumed a high "concentration risk" by advancing significant funds to AWIS and Agentra, but also, at the same time, upon information and belief, pursued a personally beneficial business relationship with Mr. Landon Jordan, the primary owner of AWIS, that conflicted with Insurety's legitimate interests, financial and otherwise. CJ did not disclose to the Company his pursuit of a personally beneficial business relationship with Mr. Jordan.

43.     In furtherance of his personal business relationship with Mr. Jordan, and in violation of his Contractual Loyalty Duties, CJ implemented a 9-month commission advance program to AWIS, which was even riskier to Insurety than the 8-month advance program, for personal financial gain.  Such program would not have been offered but-for CJ's self-dealing and self-interested transactions with AWIS.  CJ knew that the 9-month commission advance program was not in Insurety's best interest, and, in fact, was contrary to Insurety's best interests, because the average length of the policies was less than 9 months, meaning that the Company was not likely to receive the advance money back if the commission advance program itself was for 9 months.

44.     CJ admitted this relationship and his personal interest in a text message conversation with John Karlin, a previous employee of 777 Partners who was working in the insurance industry, when he told Karlin that AWIS was "crushing" because he, on behalf of Insurety, would buy "med supp books" and in exchange would make the Producers sell AWIS products.  CJ (not Insurety) would get half of those sales, so he was "lin[ing] his own pockets."



45.     He "failed to act in the best interests of the Company" and breached his Contractual Loyalty Duties when he offered an 8-month advance program to Insurety's clients, knowing that such an advance program was bad for business.  In a text message conversation between CJ and Karlin, CJ told Karlin that a client was making him offer an 8-month advance program and that he was "going down with the ship" and would just take his "fat pmpm" then get out:

38246324.6



46.    CJ further stated to Karlin that he should engage with a competitor of Insurety's as he knew he made a bad decision offering an 8-month advance program and just wanted to get his bonus from 777 and get out.  CJ stated the following:



47.     During his employment, CJ also routinely violated his duty to maintain the confidentiality of the Company's Confidential Information.

48.     For example, in his recent deposition on March 17, 2021, Pagnanelli admitted that he shared the Company's information – including its confidential financial models, which are trade secrets – with his father, Chris Pagnanelli.

49.     Documents produced by CJ on March 15, 2021 – two days before his deposition – show that CJ was sharing Insurety information with his father, Chris Pagnanelli. When doing so, CJ used his personal Gmail address to communicate with this father – presumably in order to conceal such communications. An example of one such email is attached as **Exhibit K** hereto, a February 12, 2019 email from Chris Pagnanelli ██████████████ to CJ Pagnanelli ██████████████ bates stamped as PAGNANELLI0001170.

50.     CJ's disclosure of information to his father was a clear violation of his Contractual Confidentiality Obligations to Insurety and 777 Partners.

51.     During his employment and during the one-year restricted periods outlined in paragraphs 6(D)(II) and 6(D)(V) of the Agreement, CJ continued to breach (and continues to breach) the Restrictive Covenants.

52.     For example, CJ has breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of his Employment Agreement since his termination by soliciting investors to fund a commission advance program.

53.     CJ has further breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of the Agreement since his termination by trying to broker a commission advance program between AWIS and one of its competitors, Producer Advance.

54.     When Producer Advance did not agree to provide advances, CJ worked with AWIS to find alternative financing.  In concert with Mr. Jordan, CJ approached Joseph Safina of Financial Carrier Services and pitched the commission advance program.  CJ told Safina that he and Mr. Jordan "owned or controlled another agency called NI[I]A" which was "not listed in the name of Mr. Pagnanelli or Mr. Jordan."  NIIA is National Individual Insurance Agency, LLC.  NIIA's controlling member, Harold "Rusty" Brock Jr. is the President of AWIS.  CJ and Mr. Jordan were asking Safina to loan money to them for a commission advance program.  Safina declined to provide this financing.  See **Exhibit M**, Affidavit of Joseph Safina.

55.     CJ has also breached the Confidentiality, Non-Solicitation, and Non-Competition provisions of the Agreement by attempting to setup and obtain funding for a new start-up company to compete with Insurety, pursuant to which CJ is believed to be soliciting Insurety customers.

38246324.6

56.     In a text message forwarded from one of Insurety's customers, an Insurety employee, JR, was told that AWIS was moving its business to Rusty's company and that CJ was facilitating everything:



57.     This information was confirmed when AWIS notified the Bankruptcy Court in the Northern District of Texas that NIIA had in fact found a source of funding for a commission advance program.

58.     At his recent deposition on March 17, 2021, CJ also admitted to helping NIIA secure an advance partner.

59.     CJ's activities in that regard were a clear violation of his duties to the Company, including the non-compete provisions in Paragraph 6(D)(II) of the Agreement noted above.

60.     At his recent deposition on March 17, 2021, CJ also admitted that in helping NIIA secure a new advance partner, he and his father built an investment analysis pro forma for a specific deal structure and an accompanying PowerPoint presentation. In doing so, it is

15

impossible for CJ and his father to not have utilized the Company's confidential information and trade secrets that CJ was privy to as Insurety's CEO.

61.     CJ's breach of his post-employment covenants was not limited to his misappropriation of the Company's trade secrets on NIIA's behalf. CJ also actively participated in NIIA's solicitation and recruitment of an advance partner.

62.     In an email dated September 13, 2019 – which is obviously within the one-year non-compete provision of Paragraph 6(D)(II) of CJ's employment agreement, CJ sent an email to an unknown person or people in which he proposed that "we" (apparently considering himself part of NIIA) would pay the solicited advance partner a $15 pmpm. CJ further solicited such unknown person(s) by stating "[i]n our typical deal, we request the advance company pay the agents weekly and we will remit all renewals and fees monthly." A copy of that email is attached as **Exhibit L** hereto.

63.     Since his termination from Insurety, CJ is also believed to be in breach of the Non-Disparagement provisions of the Agreement (Paragraph 6(D)(IV)) by telling Insurety's customers that Insurety has no money and therefore could not continue to fund commission advances.  These disparaging statements about Insurety are part of his effort to compete with Insurety and solicit its customers.

64.     Pursuant to Paragraph 6(D)(IV) of the Agreement, CJ also had (and continues to have) a contractual obligation to refrain from making, publishing, or communicating to any person or entity any disparaging remarks, comments, or statements concerning the Company.

65.     CJ breached his contractual non-disparagement obligation by publishing to third parties that Insurety has no money, which is a knowingly false and malicious statement uttered

16

solely to induce Insurety's customers and potential customers to refrain from, or cease, conducting business with Insurety.

66.    As a result of CJ's breaches of the Agreement, the Company has suffered and will continue to suffer significant damages, including, without limitation, loss of business, revenue, and corporate opportunities, and impairment of its reputation and goodwill.

67.    At all times, Plaintiff was in strict compliance with and fully performing its obligations under the employment agreement, which was in force, valid and enforceable.

68.    CJ's contractual breaches have proximately caused (and continue to proximately cause) injury and damages to the Plaintiffs.

69.    Plaintiffs have retained undersigned counsel and have agreed to pay undersigned counsel costs and attorneys' fees in connection with this matter.

**WHEREFORE**, Plaintiffs request judgment against CJ Pagnanelli for monetary damages, interest, disgorgement of CJ's improper receipt of funds, an equitable order tolling CJ's post-employment restrictive covenants, attorneys' fees, costs, and such further relief as the Court deems proper.

## COUNT II

### BREACH OF FIDUCIARY DUTY

70.    Count II is alleged in the partial alternative to Count I as explained in more detail below.

71.    Plaintiffs repeat and re-allege paragraphs 14 – 16, 20 – 21, and 37 – 62 as if fully set forth herein.

72.     As set forth above, Plaintiffs allege that CJ owed a host of fiduciary duties to both Insurety and 777 Partners as a result of his employment agreement and the Company's policies incorporated and/or referenced therein.

73.     In responding to the Company's Motion for Summary Judgment, however, CJ asserts that his employment agreement was with 777 Partners *only*. (*See, e.g.,* Decl. of CJ Pagnanelli at ¶ 4 (Dkt. #0050-1).)

74.     Plaintiffs respectfully state that is a frivolous assertion and contrary to the plain and unambiguous terms of CJ's employment agreement. Nevertheless, in the partial alternative to Count I above, Plaintiffs allege that *if* the Court determines that CJ's employment agreement was with 777 Partners only, then CJ owed an analogous host of fiduciary duties to Insurety under Florida law.

75.     In particular, as CEO of Insurety, CJ owed Insurety a fiduciary duty to act loyally, in good faith, in a true and honest manner, and in the best interest of Insurety.

76.     Insurety placed CJ in a position of trust and confidence.

77.     CJ breached his fiduciary duty to act loyally, in good faith, and in the best interest of Insurety by engaging in the conduct in the above referenced paragraphs.

78.     The breaches of CJ's fiduciary duties have proximately caused injury and damages to the Company.

**WHEREFORE**, Plaintiffs request judgment against CJ Pagnanelli for monetary damages, interest, disgorgement of CJ's improper receipt of funds, an injunction prohibiting CJ's further breach of his fiduciary duties, attorneys' fees, costs, and such further relief as the Court deems proper.

## COUNT III

## TRADE SECRET MISAPPROPRIATION (DTSA)

79.     Plaintiffs repeat and re-allege paragraphs 14 – 16, 20 – 21, and 37 – 62 as if fully set forth herein.

80.     In breach of his Contractual Confidentiality Obligations, CJ used a Company computer to access, copy then email Company Microsoft Excel Files, containing confidential trade secret information, to his father, Chris Pagnanelli, and other individuals not affiliated with the Company.

81.     These unique Microsoft Excel files were created by the Company containing propriety trade secret information including, in particular, transaction structures and formulas and industry specific financial models developed by the Company and specific to each of its clients.

82.     Each file created by the Company broke out objective and subjective data in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase.

83.     These trade secrets were developed by two of Plaintiff's investment principals, working full time over several weeks. One of these professionals holds an M.B.A. from Wharton School at the University of Pennsylvania and has twelve (12) years of Wall Street experience. The other professional holds a B.A. in Economics from Harvard University and has nine (9) years of experience in financial and operational strategy. This work involved complicated calculations and modeling.

84.     The Company spent a significant amount of money and time developing these trade secrets.

85.     These trade secrets give the Company an advantage over its competitors by enabling it to efficiently determine and improve its sales and purchasing strategies.

86.     At his recent deposition on March 17, 2021, CJ admitted that in 2019 he built an investment model and accompanying PowerPoint presentation in order to help NIIA solicit and secure a new advance partner.

87.     At his deposition on March 17, 2021, CJ revealed that his father was directly involved in building the model for NIIA in 2019.

88.     On information and belief, CJ and Chris Pagnanelli used the Company's confidential information and trade secrets that CJ had access to during his tenure as Insurety's CEO – and which, without authorization, CJ shared with his father through their personal Gmail addresses.

89.     Indeed, it is inevitable that in building a model for NIIA in 2019, CJ and Chris Pagnanelli incorporated and/or relied on the Company's Confidential Information and trade secrets that CJ was privy to during his tenure as Insurety's CEO.

90.     The misuse of Insurety's trade secrets by CJ and Chris Pagnanelli was entirely unauthorized and improper, and constitutes a theft and misappropriation of Insurety's trade secrets.

91.     Insurety was and is the owner of all this information, documents, and files stolen and used by CJ and Chris Pagnanelli.

92.     The Company has and continues to take reasonable steps to protect the secrecy of its trade secrets. The Company requires employees to maintain the confidentiality of its trade secrets by having them sign confidentiality agreements and including confidentiality terms within its employment agreements.  Only high level employees have access to the trade secrets,

and no third parties are allowed to view the information without the benefit of an executed non-disclosure agreement.

93.     Indeed, CJ tacitly conceded that this information was confidential at his deposition on March 17, 2021 by dubiously claiming (for the first time) that in his capacity as Insurety's CEO, he authorized "a verbal NDA" with his father, the terms of which were "that this is confidential, you're not allowed to share it with anyone. That was that. He agreed."

94.     CJ's dubious assertion of "a verbal NDA" is flawed for numerous reasons, including the facts that it was never disclosed and it would have been a violation of the Company's Confidentiality of Information policy that CJ was required to follow. Nevertheless, the fact that CJ tried to excuse the clear breach of his confidentiality obligations to the Company by asserting the existence of "a verbal NDA" concedes that he understood that the information was, in fact, confidential.

95.     The Company used the trade secrets described above in interstate commerce.

96.     The entirety of the damage caused by CJ's misappropriation of the Company's information and files is impossible to quantify. At a minimum, it has caused Plaintiffs' damage in excess of $100,000, in that they are required to seek legal assistance to protect their trade secrets and are now suffering competitive damage as a result of the Pagnanelli's use of the information to divert business and usurp corporate opportunities from the Company.

97.     Plaintiffs cannot quantify the precise monetary losses that might continue to be suffered due to loss of goodwill, loss of sales, and the unfair economic advantages that CJ has gained, is likely to gain, or have helped a competitor of the Company to gain.

38246324.6

98.     The loss of business that CJ's misappropriation threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of determining what business has or will be lost makes Plaintiffs' injury irreparable.

99.     Furthermore, CJ's assistance of a competing business is sufficient to establish irreparable harm by reason of the threat of the continuation of such losses to Plaintiffs' legitimate and ongoing businesses, creating ongoing competition with Insurety, making it difficult to identify or predict which customers Insurety will lose.

100.    Plaintiffs possess trade secret information, including at least: Microsoft Excel files created by the Company that contained propriety trade secret information including, in particular, transaction structures and formulas and industry specific financial models developed by the Company and specific to each of its clients in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase. 18 U.S.C.A. § 1839(3).

101.    Plaintiffs derive actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors. *Id.*

102.    The trade secrets were provided to CJ pursuant to a duty of confidentiality.

103.    CJ knew, and/or had reason to know, that the secrets were improperly obtained or he used improper means to obtain them. 18 U.S.C.A. § 1839(5)(A); 18 U.S.C.A. § 1839(5)(B)(i).

104.    By means of the acts, practices, omissions, and conduct alleged above, CJ has violated 18 U.S.C. 1832 of the DTSA, in that he:

> (a) with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
(4) attempts to commit any offense described in paragraphs (1) through (3); or

(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

105.    Plaintiffs have been damaged by CJ's misappropriation of their trade secrets.

106.    Section 18 U.S.C. 1836(b)(1) & (3)(A) provides Insurety with an appropriate civil remedy against CJ for his wrongdoing, including the grant of injunctive relief both prohibiting continued misuse of the trade secrets and requiring protective measures.

107.    Section 18 U.S.C. 1836(3)(B) provides for the damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

108.    Section 18 U.S.C. 1836(c) grants this Court jurisdiction over such claim.

109.    Plaintiffs are entitled to recover such costs and fees from CJ pursuant to Fla. Stat. § 542.335(1)(k), Fla. Stat. § 688.005(1)(k), and 18 U.S.C.A. § 1836(b)(3)(D).

**WHEREFORE**, Plaintiffs request the Court to enter the following relief in favor of Plaintiffs and against Defendant, CJ Pagnanelli:

38246324.6

A.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining CJ from using or disclosing any information that they improperly obtained;

B.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining CJ or any other person acting with or for him from contacting any customers or other persons and transmitting any of the information that CJ accessed, transferred, or downloaded in violation of the DTSA;

C.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining CJ from misappropriating and using the confidential and/or proprietary information alleged herein;

D.      That a mandatory injunction order be issued requiring the Defendant to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in their possession, or to which they may have access;

E.      That a mandatory injunction order be issued requiring CJ to permit Plaintiffs to collect a forensic image of his computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.      That following the imaging described above, that CJ be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.      That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through CJ's wrongful acts, (ii) disgorgement of the monies obtained through his wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of CJ's wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

38246324.6

## COUNT IV

### TRADE SECRET MISAPPROPRIATION (FUTSA)

110.    Plaintiffs repeat and re-allege paragraphs 14-16, 18-19, 28-31, 47-50, and 80 - 103 as if fully set forth herein.

111.    This is a count brought under the Florida Uniform Trade Secrets Act.

112.    Plaintiffs possessed trade secret information, including at least: Microsoft Excel files created by the Company that contained propriety algorithms developed  by the Company and specific to each of its clients in order to determine the current value of projected future commission streams that insurance producers wanted the Company to purchase.

113.    Plaintiffs took reasonable steps to protect the secrecy of these trade secrets, including by having employees execute confidentiality and non-disclosure agreements before having access to the trade secrets.  Only high-level employees had access to the trade secrets. Moreover, no third parties were provided access to the information.

114.    The trade secrets were provided to CJ pursuant to a duty of confidentiality.

115.    The trade secrets were misappropriated by CJ.

116.    CJ knew, or had reason to know, that the trade secrets were improperly obtained and/or that he had used improper means to obtain them.

117.    CJ used Plaintiffs' trade secrets without express or implied consent when he knew or had reason to know, at the time of his use, that his knowledge of the trade secrets was acquired under circumstances giving rise to a duty to limit the use of or maintain the secrecy of the trade secrets. Fla. Stat. § 688.002(2)(b).

118.     CJ used Plaintiffs' trade secrets without express or implied consent when he knew or had reason to know, at the time of its use, that their knowledge of the trade secrets was derived through improper means.  *Id.*

119.     Plaintiffs derive actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors.  *Id*.

120.     CJ's acquisition and use of the trade secrets caused Plaintiffs to suffer damages. Fla. Stat. § 688.004(1).

121.     CJ's misappropriation of the trade secrets was willful and malicious.  Fla. Stat. § 688.004(2).

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against the Defendant:

A.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining CJ from using or disclosing any information that he improperly obtained;

B.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining CJ or any other person acting with or for him from contacting any clients or other persons and transmitting any of the information accessed, transferred, or downloaded;

C.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining CJ from misappropriating and using the confidential and/or proprietary information alleged herein;

D.     That a mandatory injunction order be issued requiring CJ to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

E.     That a mandatory injunction order be issued requiring CJ to permit Plaintiffs to collect a forensic image of CJ's computers, email accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic

storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.      That following the imaging described above, that CJ be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.      That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through CJ's wrongful acts, (ii) disgorgement of the monies obtained through his wrongful acts, (iii) lost profits incurred by CJ as a result of CJ's wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT V

### TORTIOUS INTERFERENCE WITH CONTRACT

122.    Count V is brought in the alternative to Paragraphs 93 and 94 above.

123.    At his recent deposition on March 17, 2021, CJ asserted for the first time that in his capacity as CEO of Insurety, he entered into "a verbal NDA" with his father, Chris Pagnanelli, to assist CJ in the performance of his duties as the Company's CEO by reviewing and commenting upon the Company's financial models and other confidential and/or trade secret information.

124.    According to CJ, "[t]he terms were that this is confidential, you're not allowed to share it with anyone. That was that. He agreed."

125.    The existence of this "verbal NDA" was never disclosed or authorized, nor was the fact that CJ was relying on his father to perform the duties of Insurety's CEO that CJ was expected (and paid) to perform himself.

126.    Nevertheless, if CJ testified truthfully under oath at his deposition, and an oral non-disclosure agreement between Insurety and Chris Pagnanelli was legitimately formed, then

the Company had a business relationship with Chris Pagnanelli under which the Company had legal rights.

127.    CJ intentionally and unjustifiably interfered with the non-disclosure relationship between Insurety and Chris Pagnanelli by enlisting his father to breach his confidentiality obligations to the Company through their assistance of NIIA's solicitation of a new advance partner, including but not limited to the development of a financial model and accompanying PowerPoint presentation that used and/or relied on the Company's confidential information and trade secrets that Chris Pagnanelli was required to protect.

128.    The entirety of the damage caused by CJ's interference with Chris Pagnanelli's non-disclosure agreement is impossible to quantify. At a minimum, it has caused Plaintiffs damage in excess of $100,000, in that they are required to seek legal assistance to protect their information and are now suffering competitive damage as a result of Chris Pagnanelli's breach of his agreement.

129.    Plaintiffs cannot quantify the precise monetary losses that might continue to be suffered due to loss of goodwill, loss of sales, and the unfair economic advantages that the CJ has gained, are likely to gain, or have helped a competitor of the Company to gain.

130.    The loss of business that CJ threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of determining what business has or will be lost makes Plaintiffs' injury irreparable.

131.    The loss of business that CJ threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of determining what business has or will be lost makes Plaintiffs' injury irreparable.

**WHEREFORE**, Plaintiffs request judgment against CJ Pagnanelli for monetary damages, interest, attorneys' fees, costs, and such further relief as the Court deems proper.

\*    \*    \*    \*

Dated:   March 22, 2021.

Saul Ewing Arnstein & Lehr LLP
*Counsel for Plaintiffs*
Northbridge Centre, Suite 1400
515 North Flagler Drive
West Palm Beach, FL 33401
Telephone:     561-833-9800
Facsimile:     561-655-5551
Email: John.gekas@saul.com
       John.turner@saul.com
       Linda.dunne@saul.com
       Wpb-ctdocs@saul.com
       Steven.appelbaum@saul.com
       Jessica.Barrero@saul.com
       Bonnie.Mcleod@saul.com
       Mia-ctdocs@saul.com

/s/John A. Turner
John A. Turner
Florida Bar No. 000922
Steven M. Appelbaum
Florida Bar No. 71399

38246324.6

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 22nd of March, 2021, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will serve a copy of the foregoing document on all counsel of record via transmittal of Notice of Electronic Filing generatred by CM/ECF to:

*Andrew B. Zelmanowitz*
*Marianne Curtis*
**BERGER SINGERMAN LLP**
*Counsel for Defendant*
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Tel. (954) 525-9900 / Fax (954) 523-2872
azelman@bergersingerman.com
kwaterway@bergersingerman.com
drt@bergersingerman.com
*MCurtis@bergersingerman.com*

/s/John A. Turner
John A. Turner
Florida Bar No. 000922
Steven M. Appelbaum
Florida Bar No. 71399

38246324.6