**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-20172-CIV-MARTINEZ/AOR**

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

      Plaintiffs,

v.

 CHRISTOPHER JAMES PAGNANELLI,

      Defendant.

_____/

**REPORT AND RECOMMENDATION**

THIS MATTER came before the Court upon Defendant Christopher James Pagnanelli's

("Defendant" or "Pagnanelli") Motion for Partial Summary Judgment (hereafter, "Motion") [D.E.

197]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable

Jose E. Martinez, United States District Judge [D.E. 213]. The undersigned held a hearing on this

matter on October 11, 2022 (hereafter, "Hearing") [D.E. 221]. For the reasons stated below, the

undersigned respectfully recommends that Defendant's Motion be GRANTED IN PART.

**BACKGROUND**

This suit stems from the alleged misconduct of Defendant during his employment with

Plaintiffs 777 Partners LLC ("777 Partners") and Insurety Capital LLC ("Insurety") (together,

"Plaintiffs"). See generally Third Am. Compl. [D.E. 146]. Defendant was an employee at 777

Partners when the company founded Insurety as a commission advancing business in the medical

insurance industry in January 2018. See Def.'s Statement of Material Facts ("Def.'s SOF") [D.E.

200-1 ¶ 1];[1] Plfs.' Response and Statement of Additional Material Facts ("Plfs.' RSOF" and "Plfs.' SOAF") [D.E. 203 ¶ 9]. As part of Defendant's business arrangement with 777 Partners, Defendant was named the Chief Executive Officer ("CEO") of Insurety. See id. As a commission advancing business, Insurety provides short-term cash advances to independent marketing organizations ("IMOs"), which serve as intermediaries between insurance carriers and independent insurance agents. See Third Am. Compl. [D.E. 146 at ¶¶ 16–17]. The IMOs use the cash advances from Insurety to pay the insurance agents pending receipt of the monthly insurance premiums owed by the policyholder; in exchange, Insurety receives the rights to the insurance agent's future commissions on each policy the agent sells, plus additional administration fees known as the per member per month fee. Id. ¶ 17.

Prior to Defendant working for Plaintiffs, he and his father, Chris Pagnanelli ("Pagnanelli Senior") developed a business model for commission advancing, called the "Pagnanelli Model". See Def.'s SOF [D.E. 200-1 ¶ 8]; Plfs.' RSOF [D.E. 203 ¶ 8]. Defendant introduced the Pagnanelli Model to Plaintiffs, who used it to build a pricing and operating model for Insurety. See Def.'s SOF ¶ 10 [D.E. 200-1]; Plfs.' RSOF ¶ 10 [D.E. 203]. Throughout his employment, Defendant was subject to the terms of an employment agreement (hereafter, "Employment Agreement"), which delineated various duties Defendant owed to 777 Partners and "one of its portfolio companies, or subsidiaries". See Employment Agreement [D.E. 146-1]. Defendant was Insurety's CEO until April 4, 2019, at which time Insurety suspended him pending an investigation for alleged misconduct. Id. at ¶ 22. On April 24, 2019, Insurety terminated Defendant "'for cause'". Id. at ¶ 24.

Plaintiffs allege that, after Defendant was terminated from Insurety, he and his father

---

[1] Although Defendant's Statement of Material Facts was filed under seal, the undersigned is only disclosing publicly available information in this Report and Recommendation.

created a financial model called the "Pagnanelli Updated Model" that used or relied upon Insurety's confidential information and trade secrets in violation of Defendant's Employment Agreement.  See Third Am. Compl. [D.E. 146 ¶ 128].  Plaintiffs further allege that Defendant used the Pagnanelli Updated Model to poach business from Insurety and that during his tenure as CEO, Defendant breached his contractual duties by disparaging Insurety, engaging in self-dealing, and soliciting Insurety's investors to obtain funding for a new start-up company to compete with Insurety.  See id. at ¶ 56.

Based on these allegations, Plaintiffs commenced this action against Defendant on January 15, 2020, seeking injunctive relief and asserting claims for: trade secret misappropriation under the federal Defend Trade Secret Act ("DTSA") and Florida's Uniform Trade Secrets Act ("FUTSA"); violation of the federal Computer Fraud and Abuse Act; breach of contract; breach of fiduciary duty; and tortious interference.  See Compl. [D.E. 1].

On July 20, 2020, the Court dismissed Plaintiffs' Complaint without prejudice and granted leave to amend.  See Order [D.E. 23].  Plaintiffs then filed an Amended Complaint [D.E. 24], which the Court also dismissed while granting further leave to amend.  See Order [D.E. 51].  Thereafter, Plaintiffs filed their Second Amended Complaint [D.E. 70] and Defendant moved to dismiss for failure to state any claims upon which relief could be granted [D.E. 78], prompting Plaintiffs to seek leave to amend their Second Amended Complaint.  See Motion for Leave to File Third Am. Compl. [D.E. 107].  The Court granted the Motion for Leave to File Third Amended Complaint on June 28, 2021.  See Order [D.E. 142].

On July 1, 2021, Plaintiffs filed their Third Amended Complaint [D.E. 148], asserting claims for: breach of contract (Count I); breach of fiduciary duty (Count II); trade secret misappropriation under the DTSA (Count III); violations of FUTSA (Count IV); tortious

interference with contract (Count V); and fraud in the concealment (Count VI).  On July 15, 2021, Defendant moved to dismiss the Third Amended Complaint in its entirety for failure to state any claims upon which relief could be granted.  See Motion to Dismiss Third Am. Compl.  [D.E. 156]. The Court granted the motion in part and dismissed Count VI for fraud in the concealment but denied the motion as to Counts I–V.  See Order [D.E. 184 at 24].

On July 11, 2022, Defendant filed the instant Motion seeking summary judgment as to: (1) Count I for breach of contract, to the extent the claim is based on restrictive covenants in the Employment Agreement as to non-competition, non-solicitation, and non-disparagement but excluding confidentiality; (2) Count II to the same extent as Count I, as Count II is an alternative claim  for breach of fiduciary duty;[2] (3) Counts I and II to the extent Plaintiffs claim monetary damages; (4) Counts III and IV for misappropriation of trade secrets in their entirety; (5) alternatively, Counts III and IV to the extent Plaintiffs claim lost profits; and (6) Count V for tortious interference in its entirety.  See Motion [D.E. 197].  Additionally, Defendant makes several specific sub-arguments as to why he is entitled to summary judgment on the aforementioned counts.  The undersigned addresses Defendant's arguments below.

## **STANDARD OF REVIEW**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure (hereafter "Rule 56(a)") "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A fact is

---

[2] Count II for breach of fiduciary duty is pled in the alternative to Count I for breach of contract because the parties dispute whether Defendant's Employment Agreement was with both Plaintiffs or only with 777 Partners.  See Third Am. Compl. [D.E. 146 ¶ 75].

4

material if it 'might affect the outcome of the suit under the governing law.'" <u>Fonseca v. Wal-Mart Stores, E., LP</u>, No. 18-CV-62768, 2019 WL 7371813, at *2 (S.D. Fla. 2019) (quoting <u>Anderson</u>, 477 U.S. at 248).

The movant must support its assertion that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

When determining whether a genuine issue of material fact exists, courts "view all evidence and draw all reasonable inferences in favor of the nonmoving party." <u>Smith v. Royal Caribbean Cruises, Ltd.</u>, 620 F. App'x 727, 729 (11th Cir. 2015). Courts "resolve factual controversies in favor of the nonmoving party [] only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994). "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." <u>Id.</u> (emphasis in original).

## **DISCUSSION**

### A. **Breach of Contract (Count I)**

#### *1. Non-Competition Restrictive Covenant.*

Plaintiffs claim that Defendant breached the non-competition restrictive covenant in his Employment Agreement, which prohibits Defendant from "directly or indirectly, on [Defendant's] behalf or on behalf of a third-party, engag[ing] in any commercial activity in the United States that competes with the Company", for a period of one year following Defendant's voluntary or involuntary termination from the Company. <u>See</u> Employment Agreement [D.E. 146-1 at 6].

5

Plaintiffs base their claim on allegations that Defendant: attempted to setup and obtain funding for a new start-up company to compete with Insurety one-month after Defendant was terminated as Insurety's CEO; attempted to broker a business deal between one of Insurety's then-existing IMO customers, American Workers Insurance Services ("AWIS"), and one of Insurety's competitors, Producer Advance, for the purpose of replacing Insurety as the advance funder for AWIS; helped AWIS avoid its financial obligations to Insurety by transferring AWIS' business into a new IMO called National Individual Insurance Agency, LLC ("NIAA"); and attempted to solicit Insurety's competitors to serve as funders for NIAA.  See Third Am. Compl. [D.E. 14 at 2, 8–14]; Response [D.E. 204 at 12–13]; see also Plfs.' RSOF [D.E. 203 at ¶¶ 21–23].

Defendant argues that Plaintiffs' non-compete claim fails as a matter of law because neither NIAA nor AWIS compete with Plaintiffs and the "undisputed facts demonstrate that Plaintiffs would ***never*** have done business with NIAA on account of their antipathy toward Defendant and NIAA's principal, Landon Jordan."  See Motion [D.E. 197 at 3].  Defendant further argues that the testimony from Producer Advance's principal that "Defendant had contacted him 'looking for a funding partner on Landon Jordan's behalf' relating to AWIS . . . obviously [shows that Defendant] was not acting for Producer Advance . . . but to assist AWIS", a non-competitor of Insurety.  See id.

In response, Plaintiffs do not dispute that AWIS is not a competitor of Insurety's but maintain that the evidence shows Defendant intentionally diverted business away from Insurety by seeking alternative funders to compete with Insurety for AWIS' business.  See Response [D.E. 204 at 12]; Plfs.' RSOF [D.E. 203 at 5].  Plaintiffs also argue that the record evidence shows that Defendant contacted three different competitors of Insurety to obtain funding for NIAA, whom Plaintiffs viewed as a potential customer, for the ultimate purpose of helping AWIS avoid paying

fees it owed to Insurety by transferring all of AWIS' business into NIAA.  Id.

Thus, Plaintiffs have cited sufficient record evidence to create a factual dispute regarding Defendant's alleged attempt to compete with Plaintiffs by contacting three of Insurety's competitors, within the prescribed one-year period after his termination from Plaintiffs, in an purported effort to replace Insurety as the advance funder for AWIS while AWIS was still a client of Insurety.  This factual dispute regarding Defendant's breach of the non-compete covenant of the Employment Agreement must be resolved in favor of Plaintiffs for summary judgment purposes.  See Little, 37 F.3d at 1075.

Moreover, the parties cite conflicting witness testimony regarding the motivation behind Defendant's actions to facilitate NIAA's communications with potential advance funders, which in turn creates an issue of witness credibility.  To resolve conflicts of witness credibility in non-jury cases such as this one, the law in this Circuit requires the Court to personally observe the witnesses' testimony in a live trial.  See, e.g., Carnival Cruise Line v. Stankovic, No. 16-20353-CIV, 2017 WL 1378568, at *1 (S.D. Fla. Apr. 11, 2017) (citing Tippitt v. Reliance Standard Life Ins. Co., 276 F. App'x 912, 915 (11th Cir. 2008)).  Accordingly, the undersigned finds that granting summary judgment in favor of Defendant as to the non-compete portion of the breach of contract claim in Count I is not appropriate.

### 2.   *Non-Solicitation Restrictive Covenant.*

Defendant's Employment Agreement specifies that during Defendant's employment with "the Company", and for a period of one year thereafter, Defendant shall not "directly or indirectly, on [his] own behalf or on behalf of any other person or entity . . . (v) take any action to solicit or divert any Clients, Sources, or Sellers . . . away from the Company and/or any of its affiliates, or (vi) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship

with the Company and/or its affiliates." See Employment Agreement [D.E. 146-1 at 6–7].   The Employment Agreement defines "Clients" as "individuals or entities who or which were customers or clients of the Company . . . or who or which were solicited by the Company . . . to become customers or clients of the Company . . . during [Defendant's] employment with the Company." See id. "Sources" includes "all brokers and persons who referred transactions to the Company . . . or who were solicited by the Company . . . to refer structured settlement transactions to the Company . . . during [Defendant's] employment with the Company." Id. "Sellers" is defined as "any person who has sold or agreed to sell a transaction to the Company . . . or who has been solicited by the Company . . . to sell a transaction to the Company . . . during [Defendant's] employment with the Company." Id.

Plaintiffs' claim for breach of the non-solicitation restrictive covenant in Defendant's Employment Agreement is premised on allegations that: Defendant actively sought to find an advance funder for NIAA other than Insurety; and Defendant actively sought to replace Insurety as the advance funder for AWIS with a contacting competitor advance funder, Producer Advance, while AWIS was still a client of Insurety.  See Third Am. Compl. [D.E. 146 at 14]; see also Response [D.E. 204 at 13–14].

Defendant argues that Plaintiff's non-solicitation claim fails as a matter of law because: (1) it is "undisputed that NIAA was and is neither a 'client' nor 'source' nor 'seller'" and "did not even become operational until after . . . Defendant left Insurety"; and (2) Defendant's alleged communication with Producer Advance on behalf of AWIS did not lead to a loss of AWIS as a client for Insurety and therefore, Insurety suffered no damages from the alleged solicitation.  See Motion [D.E. 197 at 4].

Plaintiffs dispute Defendant's contention that NIAA was not a "client" of Insurety as

defined in the Employment Agreement.  Compare Def.'s SOF [D.E. 200-1 ¶ 30] with Plfs.' RSOF [D.E. 203 ¶ 30].  Plaintiffs reason that, because NIAA was created to assume all policies from AWIS so that AWIS could avoid repaying fees it owed Insurety, Defendant breached the non-solicitation provision of the Employment Agreement when it approached NIAA to assist with advance funding from a source other than Insurety.  See Plfs.' RSOF [D.E. 203 at 6]; Response [D.E. 204 at 14].  However, this argument ignores the Employment Agreement's requirement that a "client" must have been a customer during Defendant's employment with Insurety, which NIAA never was.  See Employment Agreement [D.E. 146-1 at 6–7].   At best, NIAA was only a potential customer of Insurety.  See Deposition of Plaintiffs' principal, Jorge Beruff ("Mr. Beruff") (hereafter, "Beruff Depo.") [D.E. 200-5 at 94].[3]

With respect to Defendant contacting competitor Producer Advance to replace Insurety as the funder for AWIS, the parties do no dispute that Defendant's communications with Producer Advance "did not lead to any business between [Producer Advance and AWIS]".  Compare Def.'s SOF [D.E. 200-1 ¶ 31] with Plfs.' RSOF [D.E. 203 ¶ 31].  Indeed, the testimony Plaintiffs rely on from Mr. Beruff, and the affidavit of Joseph Safina ("Mr. Safina"), CEO of Financial Carrier Servicers ("FCS") only reinforces the conclusion that Plaintiffs suffered no lost "Clients, Sources, or Sellers" from Defendant's communications with competitor advance funders.  For instance, during his deposition, Mr. Beruff testified as follows:

> [Defendant] made an active effort to arrange financing for existing Insurety -- Producer clients at AWIS by pulling them over to NIIA and having a new financing source either, you know, like a Josephina or Producer Advance, provide advances to those agents. And those agents had existing blocks of commissions that were currently pledged to Insurety. So that's a very obvious example of a breach of non-solicitation.
>
> Q. So would those agents be client sources or sellers?

[3] Although Mr. Beruff's deposition transcript was filed under seal, the undersigned is only disclosing publicly available information in this Report and Recommendation.

A. Clients.

. . .

[James Terlizzi, the Chief Operating Officer at DRB Capital] did alert us to receiving a call from [Defendant] about providing -- Producer Advance providing advances to NIIA, **which he declined to them**, and immediately alerted us about.

Q. When did that occur?

A. I don't recall the exact date, but shortly after [Pagnanelli's] termination in April of 2019.

Q. Anything else under non-solicitation that the company is presently aware of?

A. Those are the two biggest breaches in my mind.

Q. Are you aware of any others that are not as big?

A. No, I'm not currently aware of any others beyond NIIA and AWIS.

See Beruff Depo. [D.E. 200-5 at 128–29] (emphasis added).  Similarly, Mr. Safina averred that, after Defendant approached him with a business proposal, he told Defendant that FCS "would not enter into a business relationship with [Defendant and his new business partner, Jordan Landon]." See Safina Affidavit [D.E. 146-4 ¶ 9].

Thus, Plaintiffs have not provided any evidence to show how they have suffered damages resulting from Defendant's unsuccessful solicitation attempts.  Accordingly, Plaintiffs have failed to establish an essential element of their breach of contract claim based on the non-solicitation restrictive covenant.  See, e.g., Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC, 857 F. Supp. 2d 1294, 1301 (S.D. Fla. 2012) (to prevail on a breach of contract claim, a plaintiff must establish damages); see also Massey Servs., Inc. v. Sanders, 312 So. 3d 209, 215 (Fla. 5th DCA 2021) (affirming trial court's holding that defendant's conduct did not amount to solicitation where, among other factors, defendant's "attempts of solicitation failed, as all the targeted employees remained working with" the plaintiff); S&G Labs Hawaii, LLC v. Graves, No. CV 19-00310, 2021

WL 62149, at *3 (D. Haw. Feb. 17, 2021) (granting summary judgment for defendant where his attempts to convince two employees to leave plaintiff were unsuccessful and plaintiff "did not suffer any damages as a result of the attempted solicitation"). Therefore, Defendant is entitled to summary judgment as to Plaintiffs' non-solicitation claim in Count I.

### 3. *Non-Disparagement Restrictive Covenant.*

The Employment Agreement specifies that neither "the Company" nor Defendant "will at any time make, publish, or communicate to any person or entity, any Disparaging . . . remarks, comments, or statements concerning the other Party or its affiliates or their respective partners, members, or employees." See Employment Agreement [D.E. 146-1 at 6]. To qualify as "Disparaging" under the Employment Agreement, a remark must "impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged." Id.

Defendant's alleged breach of the non-disparagement provision in the Employment Agreement is based on Plaintiffs' belief that Defendant told "Insurety customers that Insurety has no money and therefore could not continue to fund commission advances." Third Am. Compl. [D.E. 146 at 16]. Defendant argues that Plaintiffs lack any evidence to show that Defendant ever made this "broad, categorical statement" but that even assuming Defendant had said this, the statement falls short of the Employment Agreement's definition of disparagement. See Motion [D.E. 197 at 5–6]. Plaintiffs respond that Defendant's argument improperly seeks a credibility determination that is not appropriate on summary judgment. See Response [D.E. 204 at 16].

The undersigned agrees with Defendant that Plaintiffs have not offered any support for their claim that Defendant disparaged Plaintiffs. Plaintiffs do not cite to any specific instance wherein Defendant is alleged to have said "Insurety has no money" or that Insurety "could not continue to fund commission advances." Instead, Plaintiffs rely on generalized allegations from

11

Jaime Guli ("Ms. Guli"), the assistant to the owner of AWIS, David Lindsey ("Mr. Lindsey").  See Plfs.' SOAF [D.E. 203 ¶ 14]; Response [D.E. 204 at 14].  During her deposition, Ms. Guli testified that Defendant "didn't really communicate a lot with [her]" but that based on telephone conversations she overhead Defendant having with Mr. Lindsey, Defendant seemed to be "bad mouthing" Insurety and "doing not always the best thing as far as appearances go", which caused her not to trust Defendant.  See Guli Depo. [D.E. 207-7 at 70].[4]  When pressed to provide specifics, Ms. Guli offered that, based on the telephone conversations she overheard between Defendant and Mr. Lindsey, Defendant "tried to make it as if [he] wasn't there [at Insurety] or involved, that the place [Insurety] is going under"; that Defendant "never presented 777 in a good light. He just didn't"; and that "it was just this constant, don't listen to them, I'll take care of it. We'll get through it.  I'll figure it out."  Id. at 72–73, 95–96.

The undersigned finds that Ms. Guli's general impressions of Defendant's statements to her boss, Mr. Lindsey, lack the specificity necessary for Plaintiffs to make a sufficient showing that Defendant ever said "Insurety had no money" or how such a statement, even if made, "impugn[ed] the character, honesty, integrity, morality, business acumen, or abilities of" Insurety.  See Employment Agreement [D.E. 146-1 at 6].  Without more, Plaintiffs' overgeneralized allegation that Defendant is "believed to be in breach" of the Employment Agreement by "telling Insurety's customers that Insurety has no money" lacks sufficient specificity and support to survive summary judgment.  Thus, Plaintiffs have failed to offer any support for their claim that Defendant disparaged Plaintiffs and summary judgment in favor of Defendant as to the non-disparagement breach of contract claim is proper. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment is proper "after adequate time for discovery and upon motion, against a party

---

[4] Although Ms. Guli's deposition transcript was filed under seal, the undersigned is only disclosing publicly available information in this Report and Recommendation.

who fails to make a showing sufficient to establish the existence of an element essential to that party's case").

### B.  Breach of Fiduciary Duty

Plaintiffs bring Count II in the "partial alternative" to Count I, should the Court conclude that Insurety is not a party to the Employment Agreement.  The Employment Agreement specifies that the contract is between Defendant and 777 Partners and "one of its portfolio companies, or subsidiaries", which collectively are defined as "the Company".  See Employment Agreement [D.E. 146-1].  The parties do not dispute that 777 Partners created Insurety along with Defendant as a company to be operated under 777 Partners.  Nevertheless, the issue of whether the Employment Agreement also applies to Insurety as a party to that contract is not presently before the Court.  Therefore, the undersigned simply recommends at this juncture that summary judgment as to Count II be entered against Plaintiffs only to the same extent as Count I.

### C.  Monetary Damages (Counts I and II)

Plaintiffs seek an award of "monetary damages" as part of the relief sought in Counts I and II.  See Third Am. Compl. [D.E. 146 at 17–18].  Plaintiffs specifically categorize "monetary damages" as: "Outstanding AWIS Balance [owed to Insurety]"; the "Cost of borrowing during the AWIS relationship"; "Legal Fees incurred"; "Travel and out of Pocket Costs"; and balances owed to Insurety on "8 Month Advance Program" and "9 Month Advance Program."  See Def.'s SOF [D.E. 200-1 ¶ 60].

Defendant argues that these claimed damages are too far removed from any of his alleged conduct because he did not cause AWIS to stop paying Insurety.  See Motion [D.E. 197 at 7–9].  Specifically, Defendant contends that he "did not 'cause' Insurety to fund AWIS in a legally meaningful sense.  Although Plaintiffs titled Defendant as Insurety's 'CEO' to the outside,

internally he had no such authority. . . . Defendant certainly did not have the authority to approve AWIS's funding himself." See Motion [D.E. 197 at 8]; Def.'s SOF [D.E. 200-1 ¶¶ 61–65]. Plaintiffs dispute these contentions based on testimony from various witnesses, including Plaintiffs' principal, Mr. Beruff, and AWIS co-founder Landon Jordan. See Response [D.E. 204 at 15–16]; Plfs.' RSOF [D.E. 203 ¶¶ 61–65]. Given this evidence, a genuine issue of material fact exists as to Defendant's role in funding AWIS and whether his purported conduct caused AWIS to stop paying Insurety. The undersigned further finds Defendant's argument that Plaintiffs seek an invalid measure of damages and a double recovery unavailing given that "[q]uestions regarding the reasonableness and quantification of damages are generally issues of fact." Exim Brickell LLC v. PDVSA Servs. Inc., 516 F. App'x 742, 759 (11th Cir. 2013)

Accordingly, Defendant is not entitled to summary judgment with respect to Plaintiffs' claim for monetary damages in connection with the surviving claims in Counts I and II.

### D. Misappropriation of Trade Secrets (Counts III and IV)

In Counts III and IV, Plaintiffs allege that Defendant misappropriated Insurety's "trade secrets" in violation of the DTSA and FUTSA by sharing Plaintiffs' "unique Microsoft Excel files" with Defendant's father, Pagnanelli Senior, and using those files to build the Pagnanelli Updated Model for the benefit of NIAA. See Third Am. Compl. [D.E. 146 at 19–20, 24–25]. Defendant argues that Plaintiffs have failed to demonstrate how Defendant misappropriated Insurety's trade secrets because: (1) Plaintiffs do not own the Pagnanelli Updated Model; (2) the financial planning and pricing models within the Pagnanelli Updated Model are not trade secrets; (3) even if they were considered trade secrets, Plaintiffs have failed to protect their secrecy; and (4) there is no evidence that Defendant misappropriated any trade secret of Plaintiffs. See Motion [D.E. 197 at 9–17].

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. "A plaintiff bringing a claim under the DTSA must plausibly allege that it (i) 'possessed information of independent economic value' that (a) 'was lawfully owned by' the plaintiff and (b) for which the plaintiff 'took reasonable measures to keep secret,' and (ii) the defendant 'used and/or disclosed that information,' despite (iii) 'a duty to maintain its secrecy.'" Trinity Graphic, USA, Inc. v. Tervis Tumbler Co., 320 F.Supp.3d 1285, 1293 (M.D. Fla. 2018) (citations omitted).

Similarly, FUTSA provides a cause of action for the misappropriation of trade secrets. See Fla. Stat. §§ 688.001–009. "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." Advantor Sys. Corp. v. DRS Tech. Servs., Inc., 678 F. App'x 839, 853 (11th Cir. 2017). Because the analysis of DTSA and FUTSA are nearly the same, the undersigned addresses them both together. See, e.g., Hurry Family Revocable Tr. v. Frankel, No. 8:18-cv-2869-T-33CPT, 2019 WL 6311115, at * 13 (M.D. Fla. Nov. 25, 2019) ("Plaintiffs' claims under [DTSA and FUTSA] require very similar showings, namely, the existence of a trade secret and the defendant's misappropriation of that trade secret.").

### 1. Ownership.

The parties dispute ownership of the "Paganelli Updated Model", which Defendant argues is a model he and his father updated after he left Insurety based on their original model, the Pagnanelli Model. See Motion [D.E. 197 at 11]. The parties do not dispute that the Pagnanelli Model was developed before Defendant became employed with Insurety, hence is not a trade secret of Plaintiffs. However, Plaintiffs dispute the contention that they do not own the Pagnanelli Updated Model. Specifically, Plaintiffs argue that the Pagnanelli Updated Model contains

"specific fee structures that originated from Insurety financial models and pricing models, specifically the per member per month fee structure and waterfall commission structure." See Response [D.E. 204 at 17]; Plfs.' RSOF [D.E. 203 ¶¶ 41, 43, 46, 47, and 57]. Plaintiffs contend that these models were "built primarily" by Plaintiffs' principals Mr. Beruff and Adam Ross ("Mr. Ross") with Defendant only providing his "input". Beruff Depo. [D.E. 200-5 at 84–85]. For instance, Mr. Beruff testified that the waterfall commission structure is something that he built for Insurety that "expanded on the very rudimentary spreadsheet that [Defendant] shared with [Plaintiffs] in 2017" and that the per member per month fee, known as "PM/PM", is something that "Insurety . . . began rolling out during [Defendant's] tenure". Id. at 84–85, 87, 92–93, 95, 100. Based on this evidence, a genuine issue of material fact exists as to ownership of the Pagnanelli Updated Model.

## 2. Definition and Protection of "Trade Secrets".

A "trade secret under the DTSA is defined broadly as follows:

[A]ll forms of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–
(A) the owner thereof has taken reasonable measures to keep such information secret; and
(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (2016). Similarly, a "trade secret" under FUTSA is defined as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

Here, Defendant argues that the PM/PM structure and waterfall commission structure within the Pagnanelli Updated Model are not Plaintiffs' trade secrets because those models are nothing more than "basic [Excel] spreadsheets showing hypothetical returns on investment based on certain assumptions" that are "generally known and readily ascertainable in the commission advancing industry."  See Motion [D.E. 197 at 11, 13].  However, Mr. Beruff testified that the Pagnanelli Updated Model, unlike the Pagnanelli Model, uses a per member per month fee structure as opposed to a net fee structure, that it was developed by Defendant during his tenure as CEO of Insurety and that, to his knowledge, this fee structure was not customary in the commission advancing "industry until Insurety started doing it."  See Beruff Depo. [D.E. 200-5 at 71–72, 88].  Mr. Beruff also testified that he built the waterfall commission structure with Mr. Ross specifically for Insurety to be able to predict fee amounts and length of advances when pricing new deals with insurance companies, which gave them a significant business advantage.  See id. at 105–106.  Defendant counters that the waterfall commission tab is nothing more than a "reformatted" Excel tab using common industry data.  See Reply in Support of Motion ("Reply") [D.E. 210 at 7].  In light of Mr. Beruff's testimony, the undersigned finds this issue is better left for trial to allow for a "full presentation of evidence."  See Trinity Graphic, USA, Inc., 320 F. Supp. 3d at 1293 ("The question of whether information constitutes a trade secret is a question of fact normally resolved by a jury after full presentation of evidence."  (citing Lear Siegler, Inc., v. Ark-Ell Springs, Inc., 569 F.2d 286, 289 (5th Cir. 1978)).

Defendant also argues that the pricing and financial models are not Plaintiffs' trade secrets because Plaintiffs did not take reasonable efforts to maintain their secrecy.  Specifically, Defendant

argues that, because Mr. Beruff testified that he did not supervise whether Defendant shared these models with third parties and had no knowledge of how long Plaintiffs' confidentiality policies had been in place or whether confidentiality obligations were uniform for all of Plaintiffs' employees, Plaintiffs did not take efforts to maintain the secrecy of their models. See Motion [D.E. 197 at 13–14]. However, a genuine dispute of material fact exists on this point as well, given that Mr. Beruff testified that the information was not to be shared with customers and that, to his knowledge, only the investment team and Insurety's operating professionals had access to the models. Beruff Depo. [D.E. 200-5 at 60]. Moreover, the terms of Defendant's Employment Agreement also prohibit Defendant from sharing "non-public information specific to [Plaintiffs'] business . . . pricing information . . . compilations and supplier information . . . ." See Employment Agreement [D.E. 146-1 at 4]. In light of these terms, coupled with Mr. Beruff's testimony, the undersigned finds that at a minimum, a genuine issue of material fact exists as to whether Plaintiffs took reasonable steps to protect their alleged trade secrets.

### 3. *Misappropriation.*

Defendant argues that even if the Court finds that the pricing and financial models at issue are indeed Plaintiffs' trade secrets, Plaintiffs claims still fail because no misappropriation by Defendant occurred. A trade secret is "misappropriated" by, *inter alia*, "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret". 18 U.S.C.A. § 1839(5)(B)(ii)-(iii); see also Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, 898 F.3d 1279, 1297 (11th Cir. 2018) ("'Misappropriation,' generally, is defined as the acquisition of a secret 'by someone who knows or has reason to know

that the secret is improperly obtained or who used improper means to obtain it.'" (citing Advantor, 678 F. App'x at 583 and Fla. Stat. § 688.002(2)).

Here, the Employment Agreement specifies that Defendant "will not, at any time, whether during or subsequent to [his] employment by [Plaintiffs] . . . use or disclose Confidential Information for any competitive purpose, or divulge the same to any person other than [Plaintiffs] or persons with respect to whom [Plaintiffs] has given [their] written consent".  See Employment Agreement [D.E 146-1 at 4].  As previously noted, "Confidential Information" includes "non-public information specific to [Plaintiffs'] business . . . pricing information . . . compilations and supplier information" and "those documents and items which [Defendant] may develop or help develop while in [Plaintiffs'] employ, whether or not developed during regular working hours or on [Plaintiffs'] premises."  Id.  Defendant does not dispute that he shared the work he did at Insurety with his father, Pagnanelli Senior, or that he shared this information with his father to update the original Pagnanelli Model but maintains that no misappropriation occurred since the modifications to the Model occurred after he left Insurety and Defendant and his father testified to not using the alleged trade secrets in their modifications.  See Motion [D.E. 197 at 15–16].  However, the terms of the Employment Agreement were clear: Defendant was not to share Plaintiffs' "Confidential Information" with anyone besides Plaintiffs.  Moreover, the issue of what information Defendant and his father relied on in creating the Pagnanelli Updated Model is an issue of fact better left for trial.  See Trinity Graphic, USA, Inc., 320 F. Supp. 3d at 1293.

Accordingly, the undersigned finds that Defendant is not entitled to summary judgment on Plaintiffs' misappropriation of trade secret claims in Counts III and IV.

**E.  Lost Profits (Counts III and IV)**

Plaintiffs request an award of lost profits as part of the relief sought in Counts III and IV

for their trade secret claims.  Defendant argues that Plaintiffs are prohibited from proceeding with

a claim for lost profits because they failed to provide a computation of such damages.  Motion

[D.E. 197 at 17–18].

As part of its initial disclosures, a party must provide "a computation of each category of

damages claimed."  Fed. R. Civ. P. 26(a)(1)(A)(iii).  A party must then supplement or correct the

disclosures "in a timely manner if the party learns that in some material respect the disclosure or

response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  If the party fails to supplement

its disclosures in a timely manner, as required by Rule 26(e), "the party is not allowed to use [the

undisclosed] information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  However, pursuant to

Rule 56(d) of the Federal Rule of Civil Procedure:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it
> cannot present facts essential to justify its opposition, the court may: (1) defer
> considering the motion or deny it; (2) allow time to obtain affidavits or declarations
> or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

Plaintiffs do not dispute that they failed to provide a computation of lost profits in their

initial disclosures or in response to a specific damages interrogatory propounded by Defendant.

By way of justification for this failure, Plaintiffs argue that they lacked the "opportunity to engage

in any meaningful discovery" with the "individuals/companies responsible for providing funding

to NIAA", and request that Defendant's "Motion as to lost profits for Count III and IV be deferred

until after trial" so the Court can "evaluate the necessity for Plaintiffs to take discovery from

Advance Funders."  See Response [D.E. 204 at 20–21].  The undersigned finds Plaintiffs' rationale

unavailing, given their failure to file an affidavit or a declaration attesting to their inability to

conduct the discovery necessary to calculate their lost profits as permitted by Fed. R. Civ. P. 56(d).

Given their non-compliance with the requirements of Fed. R. Civ. P. 56(d), Plaintiffs' request to defer the issue of whether they may seek lost profits is not justified.

Accordingly, the undersigned concludes that Defendant is entitled to summary judgment with respect to the lost profits claim is Counts III and IV.

### F.  Tortious Interference with Contract (Count V)

 During his tenure as Insurety's CEO, Defendant allegedly entered into a verbal NDA with his father, Pagnanelli Senior, regarding what Plaintiffs allege are Insurety trade secrets, such as updates to the Pagnanelli Model and Insurety's pricing models.  See Third Am. Compl. [D.E. 146 ¶¶ 124–128].  Plaintiffs claim Defendant tortiously interfered with the verbal NDA "by enlisting his father to breach his confidentiality obligations to the Company through their assistance of NIAA's solicitation of a new advance partner, including but not limited to the development of a financial model and accompanying PowerPoint presentation that used and/or relied on the Company's confidential information and trade secrets that [Pagnanelli Senior] was required to protect."  Id. ¶ 128.

A claim for tortious interference with a contract requires "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach."  Special Purpose Accounts Receivable Coop. Corp. v. Prime One Capital Co., 125 F. Supp. 2d 1093, 1103 (S.D. Fla. 2000).  A mere attempt to procure a breach of the NDA is insufficient; a claim for tortious interference with a contract "requires that [the defendant] actually succeed."  Treco Int'l S.A. v. Kormka, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010).  Moreover, a defendant who interferes with a contractual relationship "must be a third party or a stranger to the business [or contractual] relationship."  Special Purpose, 125 F. Supp. 2d at 1103 (citing Salit v.

Ruden McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 385 (Fla. 4th DCA 1999)).

Defendant contends that this count fails because Plaintiffs cannot establish the third element—that is, that Defendant intentionally procured a breach of the NDA between Plaintiffs and Pagnanelli Senior, or that Defendant actually succeeded in doing so. Defendant further argues that Plaintiffs have offered no evidence to show that either Defendant or his father relied on Insurety's alleged trade secrets or that Pagnanelli Senior shared any alleged trade secrets with anyone. See Motion [D.E. 197 at 19–20]; Reply [D.E. 210 at 10]. Plaintiff's only argument in response is that Defendant and his father shared the alleged Insurety trade secrets with NIAA and thus, Defendant "used the Company's confidential Information and trade secrets." Response [D.E. 204 at 20].

Setting aside the factual dispute over the alleged Insurety trade secrets, the undersigned finds that Plaintiffs have failed to establish that Defendant's father breached the NDA. While Plaintiffs contend that Defendant procured a breach of the NDA, they provide no evidence that Pagnanelli Senior engaged in any breach of the NDA. Moreover, Plaintiffs' emphasis on Defendant's alleged breach of the NDA is misplaced. Because Defendant was a party to the NDA with his father, Defendant was not a "third party or a stranger" to that contractual relationship, and therefore, could not have tortiously interfered with a contract to which he was a party. See Special Purpose, 125 F. Supp. 2d at 1103; see also Romika-USA, Inc. v. HSBC Bank USA, N.A., 514 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007) ("The interfering defendant must be a third party, a stranger to the business relationship."). Therefore, the undersigned concludes that Defendant is entitled to summary judgment a to Count V for tortious interference with a contract.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Defendant's Motion [D.E. 197] be GRANTED IN PART as to the following claims: Plaintiffs' non-solicitation and non-disparagement breach of contract claims in Count I; Plaintiffs' non-solicitation and non-disparagement breach of fiduciary duty claims in Count II, to the same extent as Count I; Plaintiffs' claim for lost profits in Counts III and IV; and the claim for tortious interference in Count V; and that the Motion be otherwise DENIED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P.-3).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, this 16th day of November, 2022.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Judge Jose E. Martinez
        Counsel of Record