**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE No. 20-20172-CIV-MARTINEZ / OTAZO-REYES

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

Plaintiffs

v.

CHRISTOPHER JAMES PAGNANELLI

Defendant
_______________________________________/

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's November 7, 2022 Order [D.E. 231], Defendant Christopher James Pagnanelli submits his proposed findings of fact and conclusions of law.

**PROPOSED FINDINGS OF FACT**

***Plaintiffs' Employment of Defendant***

1. Defendant began employment with Plaintiff Insurety Capital LLC ("Insurety") in January 2018, after Josh Wander, a principal at Plaintiff 777 Partners LLC ("777"), asked Defendant to become Insurety's CEO and build the then newly-formed company into a commission advancing business in the medical insurance space. Pagnanelli Decl. [ECF 50-1] ¶ 3-5; Deposition of Robert Gray on behalf of 777 Partners LLC pursuant to Fed. R. Civ. P. 30(b)(6), May 27, 2021 ("Gray"), at 14:24-25. Defendant and 777 Partners entered a written employment agreement ("Employment Agreement") after Defendant commenced with employment for Insurety. *See* ECF 146-1.

2. Insurety was not a party or signatory to the Employment Agreement.

3. The Employment Agreement contains several restrictive covenants.

4. Section 6.D.II of the Employment Agreement provides, in pertinent part:

> Non-Competition: During Executive's employment and for one (1) year following the voluntary or involuntary termination of Executive's employment with the Company, Execute shall not, directly or indirectly, on Executive's behalf or on behalf of a third party, engage in any commercial activity in the United States that competes with the Company….

5. The Employment Agreement also contains a non-disparagement provision prohibiting either party from disparaging the other at any time. Specifically, Section 6.D.IV provides, in pertinent part:

> Non-Disparagement: The Parties agree that neither Party will at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statements concerning the other Party…."Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged.

6. The Employment Agreement provides for the payment of severance to Defendant should he be terminated without cause. Specifically, Section 7.A of the Employment Agreement provides, in pertinent part:

> Termination by the Company Without Cause or by Executive for Good Reason. Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below)….In the event of a termination by the Company without Cause…prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to eight (8) months of Executive's then annual compensation payable over the eight (8) months immediately following the last day of employment in accordance with the Company's payroll practices.

7. Pursuant to Section 7.A.II, "Cause" is defined as:

> Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement; (4) material misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or

> detrimental to the reputation or business affairs of the Company; (5) material violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or nolo contendere to, a felony or misdemeanor requiring jail time; (7) failure to cooperate with, or nay attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.

***<u>The Pagnanelli Pro Forma Summary Models</u>***

8. Before joining Insurety, Defendant was employed by Producer Advance [DRB Capital] and engaged in commission advancing. Pagnanelli Decl. ¶ 3.

9. While at Producer Advance, Defendant and his father developed a rudimentary, one-page, pro forma Excel spreadsheet that could illustrate returns on any given commission advancing transaction (the "Pagnanelli Model"). Deposition of Christopher Pagnanelli, May 5, 2021 ("Chris Pagnanelli""), at 20:12–23, 23:22–26:9.

10. Defendant and his father have a long history (going back to before 2010) of collaborating on financial analysis and estimating returns on investments. Chris Pagnanelli at 9:16-22, 17:24–18:15.

11. The Pagnanelli Model was purely conceptual – a pro forma analysis run entirely on assumptions – "essentially made up numbers." Chris Pagnanelli at 27:1–19.

12. Defendant presented the Pagnanelli Model to Josh Wander in late 2017. Deposition of Joshua Wander, May 3, 2021("Wander"), at 14:14–21:16.

13. The Pagnanelli Model utilized as its analysis variables the following parameters: number of policies, average premium, growth rate, attrition (or "persistency") rate, commission, fee, applied no-take (cancellation during initial coverage period), actual no-take, advance

multiplier and term. *See* Deposition of Jorge Beruff on behalf of Plaintiff 777 Partners LLC pursuant to Fed. R. Civ. P. 30(b)(6), Apr. 7, 2021("Beruff"), at Dep. Ex. 9.

14. The Pagnanelli Model applied simple mathematical operations (through basic Excel formulas) to assumed numerical parameters. Chris Pagnanelli at 27:1–19.

15. The Pagnanelli Model was developed before Defendant's employment with Insurety, and obviously therefore did not contain any Insurety trade secrets or confidential information. Beruff at 66:14–22, 68:16–69:6. The Pagnanelli Model is not a trade secret.

16. After Defendant's employment with Insurety ended, Defendant and his father updated their pro forma summary model (the "Pagnanelli Updated Model"). CJP at 30:18–24. Like the original Pagnanelli Model, the Pagnanelli Updated Model was wholly based on assumptions, including assumed values for average premium, average attrition, and number of policies. CJP at 35:1–36:7. The use of assumptions and their basis was unchanged – the Pagnanelli Updated Model followed the Pagnanelli Model that predated Defendant's employment with Insurety. CJP at 36:10–21, 39:14–40:7. None of the information Defendant had previous access to at Insurety was used in the Pagnanelli Updated Model. CJP at 177:11–178:9.

17. The models are nearly identical in their "analysis variables":

*Pagnanelli Model*

| Analysis Variables | |
|---|---|
| Initial Policies | 1000 |
| Average Premium | $80/mo |
| Growth Rate | 5%/mo |
| Nominal Attrition Rate | 10%/mo |
| Commission | 70% |
| Fee | 8% |
| Applied No-Take | 20% |
| Actual No-Take | 20% |
| Advance Multiplier | 4 |
| Term | 70 mos |

Dep. Ex. 9., Beruff at 65:8–68:8

*Pagnanelli Updated Model*

| Analysis Variables | |
|---|---|
| Initial Policies | 5000 |
| Average Commission | $130/mo |
| Year 1 Growth Rate | 5%/mo |
| Nominal Attrition Rate | (see 2nd tab) |
| Fee (PMPM) | $12.50 |
| No-Take | 20% |
| Advance Months | 6 |
| Analysis Term | 72 mos |

Dep. Ex. 8, Beruff at 85:9–86:16

18. The Pagnanelli Updated Model uses a "PMPM" [per member per month] fee as opposed to a flat percentage – this is the "fee for the life of the policy which greatly augments…returns" as referenced in Defendant's October 2017 email to Wander. Defendant's Deposition Ex. 10, Beruff 96:16–97:1 ("Josh really nice talking to you yesterday. Please find attached a little marketing one pager and a quick proforma I just [threw] together highlighting how cash flow works based on our out of the box product. As you recall I'm now structuring deals where we take a fee for the life of the policy which greatly augments my returns.").

19. Additionally, the Pagnanelli Updated Model contains a second sheet with a commission calculation – essentially taking the 10% attrition (or persistency) rate assumption and calculation from the Pagnanelli Model and reformatting it as its own tab in the Pagnanelli Updated Model. *See* Dep. Ex. 9, Dep. Ex. 8, Beruff at 94:8–22.

20. Analysis of data such as no-take and persistency rates is standard practice in commission advancing. Deposition of James Terlizzi, April 5, 2021 ("Terlizzi"), at 60:12–21. It would be "stagger[ing] if anybody doing commission advancing wasn't looking at the no-take and persistency data [and] they wouldn't be in the business terribly long if they don't." *Id*.

21. Although Plaintiffs claim that the Pagnanelli Updated Model is a "pretty blatant ripoff of a trade secret" because of the use of an Excel spreadsheet "waterfall" to illustrate the (same as in the 2017 original model) 10% attrition rate over time, Plaintiffs' 30(b)(6) deponent could not even identify the which of the models was original and which was updated until it was pointed out to him by Plaintiffs' counsel during the deposition. Beruff at 88:1–16, 91:10–16, 66:5–68:11.

22. The Pagnanelli Updated Model is not a trade secret and contains no trade secret of Plaintiffs'.

***Plaintiffs' Failure to Protect Purported Trade Secrets and Confidential Information***

23. Although Plaintiffs claim to have trade secrets and to protect their confidential business information, they did not in fact exercise any meaningful control over access to such material, or engage in any other reasonable efforts to maintain secrecy of such information. Beruff 57:2–58:4, 59:2–8, 109:13–20, 110:1–111:16; Wander 67:25–68:2. Indeed, principal Wander doesn't even know what the alleged trade secrets at issue in this matter are. Wander 68:3–4.

***Insurety, Defendant, and AWIS***

24. Although Defendant was nominally Insurety's CEO, he had very little executive authority and worked essentially in a sales function. Pagnanelli Decl. ¶¶ 10-11.

25. Any commissions advancing that Insurety did was subject to a multi-level diligence and approval process that involved not only Insurety, but also 777. Gray 79:16–24, 80:3–6, 81:25–82:9.

26. Defendant had no ability to extend funding to any Insurety client – rather, he would present funding opportunities for investigation/consideration and possible approval. CJP 91:23-92:7, 96:4-17, 97:24-98:7.

27. One such opportunity arose shortly after Defendant began employment with Insurety in 2018 and involved Agentra; Defendant had a previous business relationship with Agentra principal David Lindsey. Agentra was approved by Insurety/777 and became Insurety's first significant funding client. Pagnanelli Decl. ¶¶ 5, 8.

28. Defendant was forming a business relationship with medical insurance entrepreneur Landon Jordan. Jordan was interested in acquiring an insurance marketing company in 2018 and approached Defendant about the possibility of 777 financing the purchase. Defendant presented this opportunity to Beruff/777; Beruff declined. Pagnanelli Decl. ¶ 7.

29. Because Defendant saw AWIS as a huge potential client for Insurety, Defendant thereafter introduced Lindsey to Jordan, leading to Lindsey purchasing an insurance marketing company that would become AWIS, an IMO (independent marketing organization) which was run by Jordan (and which Lindsey ultimately sold to Jordan). Pagnanelli Decl. ¶ 8.

30. Despite Jordan's previous relationship with Producer Advance, Defendant's introduction resulted in him being able to present AWIS to Insurety as potential funding client; AWIS was approved by Insurety/777 and became an Insurety funding client in July 2018. Pagnanelli Decl. ¶ 8.

31. Lindsey and Jordan decided to reward Defendant financially for bringing them together in relation to AWIS. Defendant was appointed to a board and began receiving intermittent payments from an AWIS marketing affiliate, Mansfield, in late 2018. Pagnanelli Decl. ¶ 8. Defendant's understanding was that the money he was receiving was related to the board appointment.

32. Defendant disclosed his AWIS-related board appointment and payments to 777 Partners (through general counsel Ed Gehres) and Insurety (through general counsel Robert Gray), in January 2019. Neither Gehres nor Gray advised Defendant that there was a problem with these payments, and both indicated approval of Defendant's relationship with Jordan and AWIS. Pagnanelli Decl. ¶ 9.

33. Insurety continued funding AWIS commissions advances throughout Defendant's employment. Pagnanelli Decl. ¶ 12. The basic structure of the business and transaction cycle is shown in the following diagram:




34. Insurety's funding of AWIS was profitable and an advantageous business relationship for Insurety; nobody at Insurety or 777 expressed any concerns with the AWIS funding to Defendant during his employment. Gray at 72:17–20.

***Plaintiffs' Diminution, Unjustified Termination, and Disparagement of Defendant***

35. Throughout Defendant's employment, Beruff sought to undermine Defendant and prevent him from performing his role as CEO. For example, notwithstanding his title as CEO, Defendant was not authorized to hire or fire his own employees, could not agree to any financing terms with clients or potential clients, and was foreclosed from having any relationship with

Insurety's funding partners. Furthermore, every significant decision Defendant wanted to make had to be approved by Beruff. Pagnanelli Decl. ¶ 10.

36. This reached a level where Gray (then Insurety's general counsel) told Defendant that he should resign because of the belittling and his marginal role. Gray observed that, unlike a typical CEO, Defendant had no relationship with Insurety's biggest lender (Leadenhall), had little say in advances, and was micromanaged by Beruff in many functions. Pagnanelli Decl. ¶ 10.

37. Despite the ways in which he was hamstrung by Beruff, Defendant continued to focus on Insurety's success. Pagnanelli Decl. ¶ 11.

38. In addition to the diminution, Defendant was hampered by the increasing frequency with which 777 was withholding or disrupting the funds Insurety needed to make advances to its clients. Defendant was rebuffed by Beruff when he attempted to address the issue constructively and left to attempt to "explain the unexplainable" to Insurety's clients. Pagnanelli Decl. ¶ 13.

39. Defendant and Wander met in March 2019 to discuss how these funding difficulties were affecting Insurety's business. Defendant was concerned that Insurety was not funding its advances timely. At the meeting, Wander expressed anger and resentment that AWIS, and all of Insurety's clients, had become so successful with the help of Insurety's financing. Wander told Defendant that, despite any current agreements or contracts, Insurety would no longer be giving advances to clients unless Insurety or 777 had an ownership stake in that client. Pagnanelli Decl. ¶ 14.

40. This "loan to own" practice can be considered predatory in Defendant's view and was not consistent with Defendant's vision for Insurety. Defendant therefore told Wander that he would not participate in a loan-to-own scheme. Pagnanelli Decl. ¶ 14.

41. Shortly after his meeting with Wander, Defendant was removed as Insurety's CEO and then – purportedly on April 24, 2019 but with an "effective date" of April 4, 2019 – terminated "for 'Cause'" by 777. Third Am. Compl. 24; Pagnanelli Decl. ¶ 15.

42. On April 29, 2019, consistent with his Employment Agreement, Defendant sent 777 a notice of default detailing how 777 was in default of the Employment Agreement. Pagnanelli Decl. ¶ 17 and Exhibit B thereto. Pursuant to the Employment Agreement, 777 Partners had 30 days to respond. It did not respond timely, nor did it cure any of the defaults. Pagnanelli Decl. ¶ 17.

43. Plaintiffs made disparaging remarks about Defendant after his removal. Specifically, Wander told James Terlizzi (CEO of DRB Capital LLC) that Defendant "had stolen from us and that he been involved in an illicit kickback scheme and that most everything that he did while at Insurety was in the forwardance of that scheme." Wander at 26:1-4. Wander also told Terlizzi that "[Defendant] had stolen from us and that we were going to pursue him to the fullest extent of the law." *Id.* 58:24-59:1. In addition, Wander is "sure" he (Wander) told others Defendant stole from Insurety. *Id.* 59:9-17. By Terlizzi's recollection, Wander said Defendant was involved in a "nefarious" scheme to "defraud" 777/Insurety. Terlizzi 53:23-54:10.

***Insurety Stops Funding AWIS***

44. During Defendant's employment, there was no issue with AWIS's performance. Insurety stopped advancing funding to its client AWIS in July 2019. Gray at 74:2–4. Insurety stopped lending to AWIS for several reasons; the most important reason – according to Plaintiffs – was that "Landon Jordan had continued to convey…that…AWIS had [Insurety's] collection money that was due and that it was going to be wired…. And it was never wired." Gray at 74:5–10. An additional reason Insurety stopped advancing funding to AWIS was Plaintiffs' belief that



BERGER SINGERMAN

they "continued to get bad…incomplete and inconsistent information reporting [Insurety's] assets from [AWIS], and a low level of cooperation and transparency into their operations…so that [Insurety] could get more comfortable with what was actually going on there at the entity that [it] had poured tens of millions of dollars into." Gray at 74:11–17.

45. Notwithstanding these factors, as of the summer of 2019, 777 and Insurety still saw that the funding relationship with AWIS "under the right circumstances…could be a very profitable relationship;" but those "right circumstances" included taking an ownership interest in AWIS. Gray at 76:16–20, 77:9–78:1.

46. 777 and Insurety refused to continue lending to AWIS unless they could acquire an ownership stake in AWIS. Jordan at 208:6–18. Insurety wanted to own a percentage of AWIS and to exert control over AWIS through that ownership. Jordan at 205:3–13.

47. When Insurety stopped lending to AWIS in the summer of 2019, it destroyed AWIS' ability to continue operations. Jordan at 207:18–208:4. Indeed, Insurety's decision to stop lending to AWIS directly put AWIS into bankruptcy. Deposition of Harold "Rusty" Brock, May 20, 2021 ("Brock"), at 211:14–24.

48. AWIS and its TPA (third-party administrator) AHCM are now debtors in jointly administered bankruptcy proceedings in the Northern District of Texas (the "Bankruptcy"). Declaration of John Tittle Jr. ("Tittle") ¶ 2 (attached as Exhibit 9 to Defendant's Statement of Material Facts in Support of Motion for Partial Summary Judgment).

***Defendant, NIIA, and Advanced Plus***

49. After his separation from employment with Plaintiffs, Defendant participated in two or three brief communications (email and telephone calls) discussing alternative funding sources for AWIS; nothing ever came of these communications and AWIS never obtained

commission advance funding after Insurety's termination of funding. Terlizzi at 34:7-14, 43:9-44:19.

50. At around the same time, Rusty Brock was operationalizing a new IMO named NIIA. Jordan at 14:7–9. Jordan is sole owner of NIIA, since approximately the fall of 2019. Jordan at 14:12–15:6. NIIA was not operational before that time. Jordan 167:21-168:2.

51. NIIA was and is a distinct legal entity from AWIS; NIIA has its own structure of affiliated entities as follows:




52. NIIA's business is a not a mere continuation of or shifting over of AWIS' business. CJP at 179:1-6. NIIA mostly markets different products and work with different call centers and agents than AWIS.

53. NIIA was never an Insurety funding client. CJP at 44:6–7. Nor was NIIA ever even a potential Insurety funding client – 777 and Insurety would never have done business with NIIA because of their stance toward Defendant and NIIA's principal, Jordan. Beruff at 14:12–25.

54. Defendant was asked to participate in a few communications between NIIA and potential funding sources for commission advances. As part of these communications, Defendant shared the Pagnanelli Updated Model with NIIA and related contacts. CJP 30:18-24. Defendant did not share any trade secret of Plaintiffs' or any of Plaintiffs' confidential information with NIIA or any of the NIIA-related contacts.

55. NIIA eventually entered a commission advancing relationship with Advanced Plus, a company formed specifically for this business opportunity. Advanced Plus did not rely on the Pagnanelli Updated Model or any other information provided by Defendant in deciding to advance commissions to NIIA. Advanced Plus has and uses its own sophisticated metrics for commission advancing that were developed with no input or involvement from Defendant.

56. Defendant is not and has never been employed by Advanced Plus; Defendant has received no payment or financial compensation of any kind from Advanced Plus.

***Plaintiffs' Claim for Breach of Non-Competition Covenant***

57. Defendant was able to secure a job with AHCM in late 2019, managing certain sales call center relations for the third-party administrator. CJP at 20:21–21:24.

58. AHCM is a third-party administrator for AWIS; AHCM does not compete with 777/Insurety [Gray at 124:16–17], and Defendant's employment with AHCM within one year of the termination of his employment with Plaintiffs did not violate the non-competition provision in the Employment Agreement.

59. AWIS, an insurance IMO, does not compete with 777/Insurety [Gray at 124:10–12], and Defendant's participation in limited and unsuccessful communications relative to AWIS and potential alternative funding sources within one year of the termination of Defendant's

employment with Plaintiffs did not violate the non-competition provision in the Employment Agreement. Defendant did not instigate these communications with AWIS.

60. NIIA, an insurance IMO, does not compete with 777/Insurety [Gray at 124:13–14], and Defendant's participation in limited communications relative to NIIA and a potential funding source for commission advances within one year of the termination of Defendant's employment with Plaintiffs did not violate the non-competition provision in the Employment Agreement. Defendant did not instigate these communications with NIIA.

***Plaintiffs' Alleged Monetary Damages for Breach of Contract***

61. Plaintiffs are claiming several categories of economic damages which they characterize as "the foreseeable and normal consequences flowing directly and immediately from Defendant's wrongful conduct." Plaintiffs' Supplemental Response to Defendant's Interrogatory No. 2, Feb. 16, 2021 ("Supp. Int. Resp.") at 1; Plaintiffs' Amended Supplemental Response to Defendant's Interrogatory No. 2, May 4, 2021 ("Amd. Supp. Int. Resp.") at 1-2.

62. These categories of economic damages purportedly caused by Defendant's wrongful conduct include the "Outstanding AWIS Balance [owed to Insurety]," the "Cost of borrowing during the AWIS relationship," "Legal fees incurred," "Travel and out of Pocket Costs," and balances owed to Insurety on "8 Month Advance Program" and "9 Month Advance Program." Plaintiff 777 Partners LLC's Responses and Objections to Defendant Christopher Pagnanelli's First Set of Interrogatories, Jan. 14, 2021 (777 Int. Resp.) at Int. No. 2 (pp. 4–5); Plaintiff Insurety Capital LLC's Responses and Objections to Defendant Christopher Pagnanelli's First Set of Interrogatories, Jan. 14, 2021 (Ins. Int. Resp.) at Int. No. 2 (pp. 4–5).

63. However, none of Insurety's alleged losses in this regard were caused by Defendant. As Insurety summarized its own position relative to AWIS in a bankruptcy proof of claim: Insurety purchased future commissions from AWIS since July 2018; Insurety exercised its

right to decline to purchase certain commissions offered by AWIS in July 2019; and after AWIS and AHCM ceased reporting and making payments to Insurety, Insurety commenced litigation in Harris County, Texas in August 2019 and AWIS and AHCM subsequently sought protection under federal bankruptcy law. Tittle ¶ 4.

64. All of the Insurety funding of AWIS was approved by 777 after a robust due diligence process. Gray at 79:16–24, 80:3–6, 81:25–82:9.

65. Nothing about the terms of Insurety's funding of AWIS was problematic from the perspective of Insurety's interests. Gray at 72:17–20.

66. Nor was there anything that would have been unfavorable or disadvantageous to Insurety in a business sense about the terms of the Insurety-AWIS relationship through Defendant's tenure as Insurety CEO. Jordan at 206:8–18. Monitoring AWIS's performance was not one of Defendant's job responsibilities.

67. Moreover, the damages Plaintiffs claim are neither actual damages nor lost profits; rather they consist of (1) the balances owed to Insurety by its former funding client AWIS, or by other funding clients pursuant to an eight-month or nine-month advance program, (2) certain expenses allegedly incurred to collect against those balances owed, and (3) the alleged "interest expense" associated with the AWIS balance owed. Amd. Supp. Int. Resp. at 1–2; Gray at 88:1–7, 104:3–20, 99:14–18, 102:9–11, 97:14–21.

68. Further, the balances owed to Insurety by AWIS and pursuant to an eight-month or nine-month advance program are perpetually decreasing; the AWIS balance in excess of $22 million has been paid down by more than half since Plaintiffs forced AWIS into bankruptcy in 2019, and by roughly $600,000 during the few months between Plaintiffs' supplementation of their

damages interrogatory answers. Gray at 90:22–91:20, 96:22–24. The balances owed on the eight-month and nine-month advance programs are likewise being retired. Gray at 108:1–14, 111:2–15.

69. Further, Insurety is *profiting* from its collection of amounts owed by AWIS or on the eight-month and nine-month advance programs – each dollar Insurety collects includes both a fee component *and* a "cash available" component that is "not booked as revenue" but is considered excess "working capital" at the company's disposal. Gray at 83:6–85:11, 120:1–20. Insurety has collected this fee income on the millions of dollars it has recovered from AWIS. Gray 96:22–97:4. In asserting their economic damages, Plaintiffs not only fail to identify their lost profits, but they also exclude the undisclosed fees that admittedly exist from their tabulation of Defendant's alleged responsibility, whereas including Insurety's collected fees would obviously reduce the amount of the alleged loss: "it would be significantly lower." Gray at 86:17–87:2.

70. Further, Insurety has been recovering its alleged losses from AWIS and AHCM in the bankruptcy proceeding. As of July 8, 2022, the total amount of commissions paid to Insurety by AWIS and AHCM pursuant to the bankruptcy proceeding was $15,913,413.23. Tittle ¶ 6. Through December 2022, AWIS/AHCM made principal payments to Insurety totaling $16,055,945.75, leaving an estimated balance of $5,705,305.25. [Bankr. DE 663-49].

71. Defendant was never a party to the lawsuits in Texas, nor was he involved in the Bankruptcy. When Defendant tried to move this case to the Bankruptcy Court so that Court could decide who was responsible for any damages and what those damages were, Plaintiffs objected.

## PROPOSED CONCLUSIONS OF LAW

### *I. General/Jurisdictional*

1. This Court has jurisdiction over the parties and subject matter.

2. In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the

credibility of witnesses, and deciding questions of fact, as well as issues of law. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

***3.*** A plaintiff in a civil case bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not true." *See Pattern Jury Instructions,* Basic Instruction No. 3.7.1, U.S. Eleventh Circuit District Judges Association (Civil Cases) (2022).

## ***II. Plaintiffs' Breach of Contract Claim (Count I)***

4. Under Florida law, the elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *J.J. Gumberg Co. v. Janis Servs., Inc*., 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003). The proponent bears the burden to prove by a preponderance of the evidence the existence of a contract, a breach, and damages flowing from the breach. *Knowles v. C.I.T. Corp*., 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977); *Carpenter Contractors of America, Inc. v. Fastener Corp. of America, Inc*., 611 So. 2d 564, 565 (Fla. 4th DCA 1992) (reversing judgment where there was no competent evidence of a breach).

5. Under Florida law, the measure of damages is the amount that will put the non-breaching party in the same position it would have been had the other party not breached the agreement. It is that amount which naturally results from the breach and can reasonably be said to have been contemplated by the parties at the time they entered into the agreement. *See Sharick v. Se. University of the Health Sciences, Inc*., 780 So. 2d 136, 139 (Fla. 3d DCA 2000) ("Damages recoverable by a party injured by a breach of contract are those which would naturally result from

the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made.").

6. Plaintiffs have failed to establish any breach of Defendant's obligations under the Employment Agreement by a preponderance of the evidence.

7. *First*, Plaintiffs have not established that Defendant violated the Conflict of Interest Policy by accepting payments from Mansfield. As the Court concluded in paragraph 32 *supra*, and in accordance with Section 3 of the Conflict of Interest Policy, Defendant disclosed he was to be put on a Board to Jorge Beruff, Ed Gehres (general counsel for 777) and Robert Gray (general counsel for Insurety), and disclosed his receipt of the payments to Mr. Gehres and Mr. Gray. Neither Mr. Gehres nor Mr. Gray advised Defendant that there was a problem with his receipt of the payments. No one objected to Defendant being on the Board. Accordingly, Plaintiffs have not established that Defendant's receipt of payments violated the Conflict of Interest Policy.

8. *Second*, Plaintiffs have not established that Defendant violated the Employment Agreement's non-competition restrictive covenant, which prohibits Defendant from "directly or indirectly, on [Defendant's] behalf or on behalf of a third-party, engag[ing] in any commercial activity in the United States that competes with the Company," for a period of one year following Defendant's voluntary or involuntary termination from the Company. *See* Employment Agreement [D.E. 146-1 at 6].

9. Plaintiffs base their claim on allegations that Defendant: attempted to setup and obtain funding for a new start-up company, NIIA, to compete with Insurety one-month after Defendant was terminated as Insurety's CEO; attempted to broker a business deal between one of Insurety's then-existing IMO customers, AWIS, and one of Insurety's competitors, Producer Advance, for the purpose of replacing Insurety as the advance funder for AWIS; helped AWIS

avoid its financial obligations to Insurety by transferring AWIS' business into a new IMO called NIIA; and attempted to solicit Insurety's competitors to serve as funders for NIAA.

10. Plaintiffs non-compete claim fails as a matter of law because neither NIIA nor AWIS compete with Plaintiffs. AWIS and NIIA are both insurance agencies, rather than lenders.

11. The record also demonstrates that Plaintiffs would never have done business with NIIA because of their antipathy toward Defendant and NIIA's principal, Landon Jordan. Furthermore, Producer Advance's principal, James Terlizzi, testified at his deposition that Defendant had contacted him "looking for a funding partner on Landon Jordan's behalf" relating to AWIS. This testimony shows that Defendant was not acting for Producer Advance, but rather to assist AWIS, a non-competitor of Insurety.

12. *Third*, Plaintiffs have not established that Defendant breached the Employment Agreement's confidentiality provisions when he shared certain Insurety information with his father. Plaintiffs have failed to demonstrate that the information Defendant shared with his father meets the Employment Agreement's definition of "confidential information."

13. Accordingly, judgment shall be entered in favor of Defendant and against Plaintiffs under Count I.

### *III. Plaintiffs' Breach of Fiduciary Duty Claim (Count II)*

14. Under Florida law, the elements of a breach of fiduciary duty action are: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages flowing from the breach. *Miller v. Miller*, 89 So. 3d 962 (Fla. 5th DCA 2012).

15. Plaintiffs bring Count II in the partial alternative to Count I, should the Court conclude that Insurety is not a party to the Employment Agreement.

16. The Court indeed concludes that Insurety is not a party to the Employment Agreement. The Employment Agreement specifies that the contract is between Defendant and 777 Partners.

17. As CEO of Insurety, Defendant owed fiduciary duties to Insurety.

18. For the same reasons that Defendant did not breach his Employment Agreement with 777 Partners, Defendant did not breach his fiduciary duties to Insurety.

19. Accordingly, judgment shall be entered in favor of Defendant and against Plaintiffs under Count II.

***IV. Monetary Damages (Counts I and II)***

20. Plaintiffs' claimed damages associated with AWIS in the Bankruptcy fail as a matter of law because Plaintiffs have not sufficiently established causation.

21. Under Florida law, "a breach of contract claim requires a party to show that damages resulted from the breach." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012).

22. Here, the evidence show that Insurety decided to stop funding AWIS in July 2019 (approximately three months after Defendant left Insurety's employ) because AWIS had allegedly stopped paying Insurety, was not providing operations information that Insurety deemed sufficient, and was unwilling to give Insurety or 777 an ownership interest. *See* Gray 74:2-4, 74:5-25, 76:16-20, 77:9-78:1; Jordan 205:3-13, 208:6-18.

23. Insurety sued AWIS (and AHCM) in Harris County, Texas, and AWIS and AHCM subsequently sought the protection of a federal bankruptcy restructuring in the Northern District of Texas. Tittle ¶ 2.

24. This, rather than Defendant's conduct, is the causal explanation for why Insurety suffered the alleged losses manifesting in a claim for more than $28 million in the AWIS/AHCM bankruptcy (against which Insurety has collected payments totaling approximately $16 million and

counting). Tittle ¶ 2, 5, 6. *See, e.g.*, *James Crystal Licenses, LLC v. Infinity Radio Inc*., 43 So. 3d 68, 74 (Fla. 4th DCA 2010) (reversing award of compensatory damages where radio station failed to provide competent substantial evidence linking advertising losses to former employee's violation of non-compete agreement); *ProudfootConsulting Co. v. Gordon*, 576 F.3d 1223,1243 (11th Cir. 2009) (reversing a damages award where district court did not find that, absent defendant's breach of a non-compete, the plaintiff would have obtained a client project). Plaintiffs' effort to tie Insurety's alleged AWIS losses to Defendant is unsupported by the evidence.

25. Plaintiffs have also failed to establish the requisite causation as a matter of law because the evidence shows that Defendant did not "cause" Insurety to fund AWIS in a legally meaningful sense. Although Plaintiffs titled Defendant as Insurety's "CEO" to the outside, internally he had no such authority. All of the Insurety funding of AWIS (the basis of Plaintiffs' "monetary damages" claims) was approved by 777 only after a rigorous due diligence process, of which Defendant was not a participant. *See* Gray at 79:16–24, 80:3–6, 81:25–82:9, 81:18-82:4; CJP at 96:4-17.

26. Defendant did not have the authority to approve AWIS's funding himself. CJP at 91:23-92:7, 97:24-98:7. Insurety itself (by its current CEO Robert Gray) acknowledges that nothing about the terms of funding of AWIS was problematic from the perspective of Insurety's interests. *See* Gray at 72:17-20.

27. Plaintiffs' claim for compensatory damages fails as a matter of law for the independent and additional reason that the undisputed facts show Plaintiffs are attempting to recover an invalid measure of damages (not lost profits) and attempting to recover the identical amounts from Defendant as Plaintiffs are in the process of recovering in the AWIS/AHCM bankruptcy. It is well-settled that "[t]he measure of damages for a breach of a non-competition

agreement is the actual damages suffered as a result of the breach, which is generally loss of profits." *Camel Invs., Inc. v. Webber*, 468 So. 2d 340, 342 (Fla. 1st DCA 1985). The damages recoverable "are those that naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered into." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002). Yet, Plaintiffs acknowledge (again through Insurety's present CEO, Mr. Gray) that they seek neither lost profits nor true out-of-pocket costs. *See* Plaintiffs' Amd. Supp. Int. Resp. at 1–2; Gray at 88:1–7, 104:3–20, 99:14–18, 102:9–11, 97:14–21. Instead, Plaintiffs have concocted a novel claim for damages consisting of (1) the balances owed to Insurety by AWIS, or by other funding clients pursuant to an eight-month or nine-month advance program, (2) certain expenses allegedly incurred to collect against those balances owed by AWIS, and (3) the alleged "interest expense" associated with the balance owed by AWIS. *See id.*; *see also* Gray at 90:22–91:20, 96:22–24.

28. But balances owed to Insurety (by AWIS) and pursuant to an eight-month or nine-month advance program, obviously do not equate to lost profits or actual damages and are not a recoverable by Plaintiffs as a matter of law as monetary damages for breach of contract against Defendant.

29. Indeed, completely unrelated to Defendant, the AWIS balances at issue are perpetually decreasing; Insurety has received payments of approximately $16 million since October 2019 (with more money wired in every week). Tittle ¶¶ 5-6. There is no dispute that, if credited, these fees would decrease the purported quantum of "damages" Plaintiffs seek here from Defendant's unrelated conduct. Gray at 83:6–85:11, 86:17–87:2, 96:22–97:4, 120:1–20.

30. Moreover, Plaintiffs admit that Insurety is actually profiting from its ongoing collections through the AWIS/AHCM bankruptcy – each dollar coming in includes both a fee

component and a "cash available" component that is "not booked as revenue" but is considered excess "working capital" at the company's disposal. Gray at 83:6–85:11, 120:1–20. It is axiomatic that a party injured by a breach of contract is not entitled to be placed "in a position better than that which he would have occupied had the contract been performed." *Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273, 1285 (M.D. Fla. 2011), *aff'd*, 453 F. App'x 929 (11th Cir. 2012). Thus, not only do the damages have nothing to do with Defendant – the amounts alleged by Plaintiffs do not correspond to anything like their actual damages.

31. Accordingly, as a matter of law and fact, monetary damages are not a recoverable remedy for Count I or Count II.

32. Furthermore, Plaintiffs' novel calculation of damages associated with AWIS is a form of special damages which were not specifically pled by Plaintiffs and could not have been in reasonable contemplation of the parties at the time the Employment Agreement was entered into. *See Williams v. Atlantic Coast Line R. Co.*, 48 So. 209, 211 (Fla. 1908) ("damages which do not arise naturally from a breach of the contract, or which were not within the reasonable contemplation of the parties at the time the contract was made, are not recoverable.").

33. "[S]pecial damages are damages that do not follow by implication of law merely upon proof of the breach." *DeMello v. Buckman*, 916 So. 2d 882 (Fla. 4th DCA 2005). Fed. R. Civ. P. 9(g) requires special damages to be "specifically stated." Special damages must therefore be particularly specified in a complaint in order to apprise the opposing party of the nature of the special damages claimed. If special damages are not specifically pled, then evidence of them is inadmissible. *See Democratic Republic of Congo v. Air Cap. Grp., LLC*, No. 12-20607-CIV, 2013 WL 2318904, at *2 (S.D. Fla. May 28, 2013) (citing *Precision Tune Auto Care, Inc. v. Radcliffe*, 804 So.2d 1287 (Fla. 4th DCA 2002)).

34. Here, Plaintiffs failed to specifically plead the so-called "AWIS damages" in their Third Amended Complaint. Accordingly, evidence of the AWIS damages is inadmissible.

### *V. Disgorgement (Count I)*

35. Plaintiffs' request for disgorgement in Count I fails as a matter of law. Disgorgement of profits earned is not an appropriate remedy for breach of contract. *Burger King Corp. v. Mason,* 710 F. 2d 1480, 1494 (11th Cir. 1983); *see also Proudfoot Consulting Co. v. Gordan*, 576 F. 3d 1223, 1245 (11th Cir. 2009) ("Damages for breach of a non-compete are intended to make the prior employer whole, not to punish employees.").

### *VI. Misappropriation of Trade Secrets (Counts III and IV)*

36. Plaintiffs seek to establish that Defendant misappropriated trade secrets in violation of in violation of the Defend Trade Secrets Act ("DTSA") and Florida Uniform Trade Secrets Act "FUTSA").

37. Because the analysis of DTSA and FUTSA claims is nearly the same, they are typically assessed together. *See, e.g., Hurry Family Revocable Tr. v. Frankel,* No. 8:18-cv-2869-T-33CPT, 2019 WL 6311115, at *13 (M.D. Fla. Nov. 25, 2019) ("Plaintiffs' claims under [DTSA and FUTSA] require very similar showings, namely, the existence of a trade secret and the defendant's misappropriation of that trade secret.").

38. To prevail on a DTSA claim, Plaintiffs must demonstrate that (1) they own a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate or foreign commerce. *See* 18 U.S.C. § 1836(b)(1).

39. Under the DTSA, a trade secret is defined as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored,

> compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

*Id.* § 1839(3)(A), (B).

40. "Misappropriation" under the DTSA includes both the acquisition and disclosure or use of trade secrets. *Id.* § 1839(5). "Misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Fin. Info. Techs., Inc. v. iControl Sys., USA, LLC*, No. 8:17-cv-190-T-23MAP, 2018 WL 3391379, at *4 (M.D. Fla. June 12, 2018) (citations omitted).

41. Similarly, to prevail on a FUTSA claim, "a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (citing *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017)). Under FUTSA, a "trade secret" is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

42. "Misappropriation" includes the

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> 1. Used improper means to acquire knowledge of the trade secret; or
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
> a. Derived from or through a person who had utilized improper means to acquire it;
> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

43. Here, Plaintiffs have failed to identify any trade secrets that warrant protection.

44. The only alleged trade secret identified by Plaintiffs is the Pagnanelli Updated Model. Although Defendant and his father created the Pagnanelli Updated Model after Defendant left Insurety, Plaintiffs contend that the Pagnanelli Updated Model incorporates Plaintiffs' trade secrets through use of a "pmpm" (per member per month) fee and "waterfall commission structure." Plaintiffs also claim that the numerical assumptions used in the Pagnanelli Updated Model are Plaintiffs' trade secrets.

45. Plaintiffs' claim of trade secret misappropriation fails for several reasons.

46. *First*, Plaintiffs do not own the Pagnanelli Updated Model. Defendant and his father created the Pagnanelli Updated Model after Defendant's separation from Insurety. Furthermore, the Pagnanelli Updated Model was based on the original Pagnanelli Model created

by Defendant and his father prior to Defendant's employment with Insurety. Accordingly, neither the Pagnanelli Model nor the Pagnanelli Updated Model belong to Plaintiffs.

47. *Second*, the Pagnanelli Updated Model is a simple spreadsheet that uses basic Excel formulas to show hypothetical returns on investment based on certain assumptions. A similar spreadsheet could be created by anyone with modest knowledge of Excel. Indeed, use of Excel is "generally known" and "readily ascertainable," *see* § 688.002(4), Fla. Stat., such that it cannot constitute a trade secret. Therefore, the Pagnanelli Updated Model has no independent economic value, is generally known to others, and is readily ascertainable. As such, the Pagnanelli Updated Model does not constitute a trade secret. *See, e.g.*, *Yellowstone Landscape v. Fuentes*, No. CV 4:20-1778, 2020 WL 4547150, at *4 (S.D. Tex. Aug. 6, 2020").

48. Nor do the assumptions themselves used in the Pagnanelli Updated Model (such as persistency rates, commission percentages, and "no-take" percentages) constitute trade secrets. The evidence shows that Defendant and his father did not incorporate any figures from Insurety into the Pagnanelli Updated Model, but rather used made up numbers for purposes of illustration. Furthermore, even if Defendant's Insurety experience informed his creation of the Pagnanelli Updated Model, Defendant was free to use his past industry knowledge and expertise without running afoul of DTSA and FUTSA. *See, e.g.*, *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 290 (Fla. 2d DCA 1989) (explaining an employer may not preclude its former employee from "utilizing contacts and expertise gained during his former employment ... or even customer lists he himself developed"); *RLM Commcations, Inc. v. Tuschen*, 66 F. Supp. 3d 681 (E.D.N.C. 2014), *aff'd*, 831 F.3d 190 (4th Cir. 2016) (holding that employee did not misappropriate trade secrets by acquiring and using knowledge and experience gained from working with her former employer).

49. The assumptions in the Pagnanelli Updated Model also do not meet the statutory definition of a trade secret because they are generally known and readily ascertainable in the commission advancing industry. Analysis of factors such as no-take and persistency rates is commonplace in the industry. Indeed, one of Insurety's competitors testified that he would be "would be staggered if anybody doing this wasn't looking at the no-take and persistency data. And they wouldn't be in the business terribly long if they don't." Terlizzi at 60:12-21. "'An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret.'" *Keystone Plastics, Inc. v. C & P Plastics, Inc.*, 340 F. Supp. 55, 74 (S.D. Fla. 1972) (quoting *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315 (5th Cir. 1971)). Thus, the assumptions in the Pagnanelli Updated Model fail to qualify as trade secrets.

50. The pmpm fee used in the Pagnanelli Updated Model is also not a trade secret of Plaintiffs'. The record evidence establishes that Defendant introduced the concept of a pmpm fee to Plaintiffs in October 2017—months before his employment with 777 began. After discussing the advance funding business model with 777's managing partner, Joshua Wander, Defendant wrote:

> Josh really nice talking to you yesterday. Please find attached a little marketing one pager and a quick proforma I just [threw] together highlighting how cash flow works based on our out of the box product. **As you recall I'm now structuring deals where we take a fee for the life of the policy which greatly augments my returns.**

*See* Ex. 10 to Defendant's Dep. (emphasis added).

51. The "fee for the life of the policy" is the "pmpm" fee that Plaintiffs now assert originated from their models. *See* Exhibit 12 to Defendant's SOF; Beruff at 96:16-97:1.

52. The same is true for what Plaintiffs claim is a "waterfall commission structure" on the second sheet of the Pagnanelli Updated Model. The record evidence shows that this "structure"

was likewise based on the original Pagnanelli Model, rather than any independent work of Plaintiffs'. The Pagnanelli Updated Model simply took the 10% attrition rate assumption and calculation from the original Pagnanelli Model and reformatted it as its own tab. *See* Defendant's Dep. Ex. 8 & 9; Beruff at 94:8–22. 45.

53. *Third*, Plaintiffs have not identified reasonable efforts to maintain the secrecy of the contents of the Pagnanelli Updated Model. Plaintiffs' principals, Wander and Beruff, failed to articulate any steps taken to protect the alleged trade secrets. Beruff 109:13–15; Wander 67:25–68:2. Indeed, Wander doesn't even know what the alleged trade secrets at issue in this matter are. Wander 68:3–4. They could not identify who met the definition of the "high-level employees" who supposedly had access to the trade secrets. Beruff at 57:2-58:4, 59:2-8, 109:17-20. Nor could they explain whether there was any monitoring of the protection of alleged trade secrets in terms of information shared with clients and prospective clients. *Id*. Beruff was not even aware how long Plaintiffs' confidentiality policies had been in place or whether contractual confidentiality obligations were uniform in the companies' employment agreements. *Id*. These efforts are insufficient as a matter of law. *See, e.g.*, *HCC Ins. Holdings v. Flowers*, 237 F. Supp. 3d 1341, 1351–52 (N.D. Ga. 2017). Moreover, even assuming all employees agreed to a confidentiality policy, a company's use of a general confidentiality agreement or policy "does not alone demonstrate that its efforts to maintain secrecy were reasonable." *Diamond Power Int'l, Inc. v. Davidso*n, 540 F. Supp. 2d 1322, 1335 (N.D. Ga. 2007).

54. Finally, Plaintiffs have failed to establish misappropriation, whether by acquisition, disclosure, or use. First, there is no evidence Defendant used improper means to acquire the Pagnanelli Updated Model; rather, the evidence shows that he created it himself (with assistance from his father) and did not rely on or incorporate any Insurety information. Second, while

Defendant acknowledges that he occasionally shared Insurety information with his father, there is no evidence that anything constituting Plaintiffs' trade secrets was disclosed, and Defendant's father never disclosed anything Defendant sent to him. Third, there is no evidence that Defendant used any of Insurety's trade secrets in creating the Pagnanelli Updated Model. Defendant and his father both testified that there was no such use; Plaintiffs' belief that such use was "inevitable" does not constitute evidence. *See HCC Ins. Holdings, Inc. v. Flowers*, 237 F. Supp. 3d 1341, 1351–52 (N.D. Ga. 2017) (refusing to allow "circumstantial evidence of acquisition or use of a trade secret to defeat direct evidence of non-acquisition or use offered by the defendant"); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) (affirming summary judgment for defendant where plaintiff lacked direct evidence of misappropriation and instead "resort[ed] to relying on various forms of circumstantial evidence").

55. Accordingly, judgment shall be entered in favor or Defendant and against Plaintiffs under Counts III and IV.

## VII. ***<u>Defendant's Affirmative Defenses</u>***

56. Plaintiffs' claim for breach of the non-compete provision in the Agreement fails to state a cause of action because the Court has concluded that the entities Defendant has performed work for since his separation from Insurety, AHCM and NIIIA, do not compete with Insurety. Furthermore, Defendant's subsequent employment activity involves neither prospective nor existing customers of Insurety and therefore does not constitute competition.

57. Plaintiffs' claim for breach of contract is barred by the doctrine of prior breach. 777 breached the Employment Agreement by undermining Defendant's ability to perform his role as CEO of Insurety. Among other actions, 777 Partners, together with Insurety, refused to permit Defendant to hire and terminate his own employees, refused to let Defendant agree to any financing terms with clients or potential clients, and required any significant decision of his to be approved

by 777 Principal Jorge Beruff, notwithstanding Defendant's position as CEO. 777 Partners and Insurety also prevented Defendant from having any relationship with Insurety funding partners.

58. Plaintiffs' claim for breach of contract is barred by Plaintiffs' own breach to the extent their claim is premised on continuing obligations under the Employment Agreement, including but not limited to obligations relating to confidentiality, non-disparagement, and non-solicitation. Plaintiffs themselves breached the Employment Agreement by failing to pay Defendant severance due under the Agreement and by disparaging Defendant repeatedly in violation of the Agreement.

59. Plaintiffs' claim for breach of fiduciary duty is barred by the business judgment rule. The Court concludes that, as a matter of law, Defendant exercised reasonable care, diligence, and good faith in performing his role as CEO, including as it relates to Insurety's decision to provide advance funding to AWIS.

60. Plaintiffs are not entitled to any relief in Counts III and IV because the Pagnanelli Model and Pagnanelli Updated Model are not owned by Plaintiffs. The Pagnanelli Model was developed by Defendant and his father prior to Defendant's employment with Insurety. The Pagnanelli Updated Model, which is simply an updated version of original Pagnanelli Model, was created by Defendant and his father after Defendant's separation from Insurety. Furthermore, neither Model contained any private or confidential Insurety information.

61. Plaintiffs are not entitled to any relief in Counts III and IV because the Pagnanelli Model and Pagnanelli Updated Model are not cognizable trade secrets; rather, they are simply basic spreadsheets showing hypothetical returns on investment based on certain assumptions.

62. Plaintiffs are not entitled to any relief in Counts III and IV because they failed to establish that they took reasonable efforts to protect the secrecy of the Models consistent with the

requirements of Fla. Stat. § 688.002 and 18 U.S.C. § 1839. The Models were not designated as confidential information and their accessibility to employees and clients was not monitored.

63. Plaintiffs are not entitled to any relief in Counts III and IV because they do not establish that Defendant misappropriated the Models.

64. Plaintiffs' claims are barred by the doctrine of unclean hands due to the actions they took to undermine Defendant's ability to perform his role as CEO of Insurety. Specifically, among other actions, 777, together with Insurety, refused to permit Defendant to hire and terminate his own employees, refused to let Defendant agree to any financing terms with clients or potential clients, and required any significant decision of his to be approved by 777 Principal Jorge Beruff, notwithstanding Defendant's position as CEO. 777 and Insurety also prevented Defendant from having any relationship with Insurety funding partners.

65. Plaintiffs are also barred from any recovery against Defendant because they failed to take reasonable measures to mitigate any damages they may have incurred. Specifically, Insurety's decision to stop lending to AWIS in the summer of 2019 destroyed AWIS's ability to continue operations, forced AWIS into bankruptcy, and prevented AWIS from fully repaying Insurety for the advance funding Insurety provided. Given Plaintiffs' own role in destroying AWIS's ability to fully repay Insurety, the Court disagrees with Plaintiffs' contention that Defendant is responsible for AWIS's default.

66. To the extent Plaintiffs are entitled to recover any sums against Defendant, Defendant is entitled to a setoff for any amounts recovered by Plaintiffs from AWIS's bankruptcy proceeding in the Northern District of Texas.

67. With respect to Counts I and II, Plaintiff are barred from recovering damages from Defendant for any outstanding balance owed by AWIS to Insurety; the cost of borrowing during

the AWIS relationship; legal fees; travel and out-of-pocket costs; and balances owed to Insurety on an "8 Month Advance Program" and "9 Month Advance Program." Plaintiffs have incorrectly characterized these alleged monetary damages as "the foreseeable and normal consequences flowing directly from Defendant's wrongful conduct." Plaintiffs have failed to demonstrate that their supposed damages resulted from Defendant's alleged breaches, as opposed to any alleged breach by AWIS or others.

68. With respect to Counts I and II, Plaintiff are barred from recovering damages from Defendant for any outstanding balance owed by AWIS to Insurety; the cost of borrowing during the AWIS relationship; legal fees; travel and out-of-pocket costs; and balances owed to Insurety on an "8 Month Advance Program" and "9 Month Advance Program." Plaintiffs are applying an invalid measure of damages because they seek neither lost profits nor true out-of-pocket costs.

69. Finally, Plaintiffs' requests throughout their Third Amended Complaint to recover attorney's fees lack any basis in contract or statute such that even if Plaintiffs prevail on one or more of their claims, there is no valid basis for the Court to award Plaintiffs attorney's fees.

**VIII. *Defendant's Counterclaim***

70. Pursuant to the Employment Agreement, 777 Partners had 30 days to respond to Defendant's notice of default.

71. 777 Partners breached the Employment Agreement by (i) failing to respond timely to Defendant's notice of default and (ii) failing to cure any of the defaults.

72. 777 was obligated to pay Pagnanelli severance in accordance with Section 7.A of the Employment Agreement if it terminated him without cause.

73. 777 breached the Employment agreement because it lacked Cause to terminate Defendant under the Employment Agreement but failed to pay Defendant severance in accordance with the Employment Agreement.

74. Defendant has suffered damages as a result of 777's breaches of the Employment Agreement.

75. Furthermore, Defendant is entitled to recover attorney's fees pursuant to Fla. Stat. § 448.08 specifically with respect to 777's failure to pay severance due under the Employment Agreement, which is deemed and classified as "compensation" by Section 7.H of the Employment Agreement.

76. Accordingly, judgment shall be entered in favor of Defendant and against Plaintiffs on Defendant's counterclaim that Plaintiff breached Section 7.A of the Employment Agreement by failing to pay Defendant severance after it terminated him without cause, with the amount of severance and attorneys' fees owed to Defendant to be determined at a later hearing.

77. 777 further breached the Employment Agreement's non-disparagement clause. Wander's remarks about Defendant, summarized in paragraph 43 of the above Findings of Fact, constitute disparagement within the meaning of the Employment Agreement because they impugn Defendant's character, honesty, integrity, morality, business acumen, and abilities.

78. Defendant has suffered damages as a result of 777's breach of the Employment Agreement.

79. Accordingly, judgment shall be entered in favor of Defendant and against Plaintiffs on Defendant's counterclaim that Plaintiffs breached Section 6.D.IV of the Employment Agreement by disparaging Defendant.

## IX. ***Plaintiffs' Affirmative Defenses to Defendant's Counterclaim***

80. As a matter of fact and as a conclusion as a matter of law, Plaintiffs have not established either of their affirmative defenses to Defendant's counterclaim for breach of contract.

81. In their first affirmative defense, Plaintiffs claim that Defendant fails to state a cause of action for breach of contract because he was terminated for cause and therefore not owed

severance pay under the terms of the Employment Agreement. But as the Court has already concluded, Plaintiffs lacked cause to terminate Defendant within the meaning of the Employment Agreement. *See* ¶ 73 *supra*.

82. Plaintiffs also rely on Section 7(A)(iii), which conditions the obligation of 777 to pay severance on "states "Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the company, its officers, executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations."

83. This provision is also unavailing, as the Court has concluded that Defendant did not breach Section 6 of the Employment Agreement and did not disparage Plaintiffs. *See* ¶¶ 6-13 *supra*.

84. In their second affirmative defense, Plaintiffs assert that Defendant's counterclaim for breach of contract is barred because he "repudiated any right to a severance package when he materially breached the Employment Agreement for engaging in self-dealing schemes and misappropriating the Company's proprietary trade secrets, and was therefore terminated with cause as a result."

85. However, the Court has concluded that Defendant did not engage in "self-dealing schemes," did not misappropriate Plaintiffs' trade secrets, and was not terminated for cause. *See* ¶¶ 6-13, 73, 45-54 *supra*.

86. Thus, the evidence does not support Plaintiffs' claim that Defendant "repudiated" his right to his severance package, and this affirmative defense fails.



BERGER SINGERMAN

Respectfully submitted on December 27, 2022.

**BERGER SINGERMAN LLP**
*Attorneys for Defendant*
201 E. Las Olas Blvd. Suite 1500
Fort Lauderdale FL 33301
ph: 954-525-9900 / fx: 954-523-2872

By: */s/ Kenneth W. Waterway*
Kenneth W. Waterway
Florida Bar No. 0994235
kwaterway@bergersingerman.com
Jessica Z. Greenburg
Florida Bar No. 100827
jgreenburg@bergersingerman.com