**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE No. 20-20172-CIV-MARTINEZ-OTAZO-REYES

777 PARTNERS LLC and
INSURETY CAPITAL LLC,

      Plaintiffs,

v.

CHRISTOPHER JAMES PAGNANELLI,

      Defendant.

_____

## PLAINTIFFS' CLOSING ARGUMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

   A.   The Cloning of AWIS and Defendant's Shell Game.......................................... 2

   B.   Defendant Lied to Escape Liability For His Kickback Scheme and the Subsequent Wrongs He Committed To Preserve and Protect It. ...................................... 5

II.   PLAINTIFFS' REQUESTED RELIEF. .......................................................... 11

   A.   Defendant Should Be Held Responsible For the Damage Caused to Plaintiffs. ........ 11

   B.   Defendant Should Be Ordered To Provide A Full Accounting Of All Payments From AWIS, NIIA, and Related Entities. ................................................ 17

   C.   Defendant Should Be Ordered To Disgorge All Payments From AWIS and NIIA... 18

III.   DEFENDANT'S COUNTERCLAIM SHOULD BE REJECTED................................ 20

IV.   CONCLUSION ................................................................................................ 20

# I.       INTRODUCTION

Honesty matters. Responsibility matters. *Truth matters*. But unfortunately, these things do not matter to Defendant CJ Pagnanelli ("CJ" and/or "Defendant").

As this Court was able to observe firsthand, Defendant repeatedly demonstrated that he believed he could lie his way out of trouble. Plaintiffs apologize for the use of that word, but respectfully submit that it is not hyperbole or exaggerated rhetoric here. *Lie* is the most fair and accurate word to describe Defendant's testimony at trial.

This Court is entrusted and empowered with a powerful responsibility to weigh the credibility of the witnesses that come before it. Plaintiffs respectfully submit that in the face of Defendant's attempt to lie his way out of responsibility for his own bad acts, Plaintiffs have proven by a preponderance of the evidence that Defendant is liable on all counts. Defendant should be held responsible accordingly.

In their opening statement, Plaintiffs asked this Court to award damages which naturally flowed from Defendant's bad acts.  Plaintiffs identified two general categories of those damages. Now that the evidence is closed, Plaintiffs renew their request. Specifically: *first* Plaintiffs ask this Court to hold Defendant responsible for the losses he caused to Plaintiffs. *Second*, Defendant should be equitably ordered to account — under penalty of perjury and contempt of Court — all amounts that he has received, and in the future he expects to receive, from the interconnected "umbrella" of Landon Jordan companies with whom Defendant conspired to abuse and exploit Defendant's position as CEO of Insurety.[1] *Third*, Defendant should be ordered to disgorge all

---

[1] "Umbrella" is Defendant's word. (*See* 1/3/2023 Trial Tran. (Vol. 1) 127:13 – 127:23.) Plaintiffs respectfully submit that "shell game" more accurately describes the nature and relationship of these entities.

1

payments he has received from his kickback scheme and the subsequent wrongs that he committed to perpetuate it. Quite simply, *cheaters shouldn't prosper.*

A.      **The Cloning of AWIS and Defendant's Shell Game.**

As a refresher, below is Defendant's own chart showing the relevant entities and the interrelationship and dependency of those entities that make up the insurance funding "food chain":



Notably, the use of a "shell game" originated from Landon Jordan himself. On March 10, 2021 (Dkt. #55), and admitted into evidence as Exhibit 102, NIIA and AHCM filed a motion for a protective order to prevent Defendant from disclosing the name of NIIA's new advance funder. Recall that Insurety sued AWIS in Texas state court and obtained a TRO ordering AWIS to remit payments, and AWIS was subsequently held in contempt for violating that order. (*See* 1/4/2023 Trial Tran. (Vol. 3) at 91:01 – 92:12.)  In a remarkable admission of their deliberate efforts to escape liability, NIIA itself admitted to this Court:

Jordan was able to arrange a workaround to provide AWIS and AHCM hope. Jordan already owned NIIA *as a shell entity* and in late 2019 set it up to function the same way AWIS had. NIIA (*with the assistance of Pagnanelli who became an employee of AHCM*) obtained a new commission advance partner.

See Exhibit 102 at p. 4-5 (emphasis added) (internal citations omitted).

Landon Jordan's associate, Rusty Brock, corroborated this use of NIIA in his designated deposition testimony:

> Q.   When did you and Landon Jordan first discuss migrating AWIS's business operations into a new entity?
>
> **A.   Probably sometime August, September, sometime in that range there.**
>
> Q.   Okay.  August, September of 2019?
>
> **A.   Correct.**
>
> …
>
> Q.   Does NIIA perform substantially the same business function along the same business model that AWIS did?
>
> **A.   Yes.  Yes.**
>
> Q.   Okay. So finding a new funding partner was priority number one for you and Landon Jordan before you could launch the operations of a new company to take over the business that was going into bankruptcy with AWIS, correct?
>
> **A.   Yes.**
>
> …
>
> Q.   Okay.  So, after -- when AWIS went into bankruptcy, what was your plan with respect to new business generation?  Was it your plan that new business would continue to be generated by AWIS or that new business would be generated by a new entity to be formed later?

> **A.  It was my understanding that new business would be generated by a different entity.**
>
> Q.  And ultimately that worked out to be NIIA, right?
>
> **A.  Correct.**

(Brock Deposition 139:07 - 139:12,  139:20 - 140:04, 143:24 - 144:09 [D.E. 229-9].)

The designated deposition testimony of Jaime Guli further proves the deliberate use of a "shell game." Guli was the Chief Operating Officer of Agentra, another Insurety client who had regular interactions with Defendant. She testified that Defendant, together with his cohorts, Rusty Brock and Landon Jordan, had "a contingency plan" in place to "pump and dump" Insurety's customer, AWIS, while they pivoted to NIIA:

> Q.  When you say they had a contingency plan as a backup, who are you talking about?
>
> **A.  Landon, Rusty and CJ.**
>
> Q.  And what do you mean, a contingency plan?
>
> **A.  So, Landon referred to, which is why we were not — so Landon kind of referred to AWIS as a pump and dump. Make it as big as you can as fast as you can and then dump it. Because while you're burning it, basically you already have another entity [NIIA] in full operation ready to pick it up where you're leaving off.**

(Guli Deposition ( Vol. 1) 51:12 – 51:23 [D.E. 229-3].)

The evidence at trial was clear that Defendant worked mightily to that effect. (*See, e.g.*, Exhibits 42, 43, 44, 45, 46, 47, 52, 57, 70.) Brock testified in his designated deposition testimony that "CJ was in the lead for NIIA." (Brock Deposition at 65:04 – 65:11; 65:18 – 65:22 [D.E. 229-9].) And it was all done to preserve and protect the payment stream that Defendant brokered for himself with his original kickback scheme.

4

**B.     Defendant Lied to Escape Liability For His Kickback Scheme and the Subsequent Wrongs He Committed To Preserve and Protect It.**

At the center of this case is Defendant's use of false pretense, false representations, and actual fraud in breach of his duties to Plaintiffs. Defendant has repeatedly lied in furtherance of his original self-dealing and kickback scheme, and thereafter, his subsequent wrongs to preserve and protect it. Through 2021, Defendant has received kickbacks from either AWIS, or its successor/clone NIIA, of *at least* $860,471.25:

| **AWIS (via Mansfield)** | **NIIA (via HIK)** |
|---|---|
| 2018: $13,263.55 | 2019: $8,448.05 |
| 2019: $116,986.85 | 2020: $252,029.55 |
| — | 2021: $469,543.25 |
|  | — |
| $130,250.40[2] | $730,020.85[3] |

At his deposition, Defendant lied that he had not received any payments in connection with any policies sold through AWIS:

> Q.    All right. Have you ever received a payment for any policies sold through AWIS?
>
> **A.    Not to my knowledge.**

(CJ Deposition at 71:25 - 72:02 [D.E. 229-2].)

---

[2] *See* Exhibits J-14 and J-15.

[3] *See* Exhibits 25, 26, and 27. In addition to the testimonial declaration of Rusty Brock at Exhibit 24, Exhibits 25, 26, and 27 are admissible as business records under FRE 803(6). Moreover, they are not being admitted to prove the truth of the matter asserted because there is no dispute about the existence of those payments because Defendant admitted it. (1/3/2023 Trial Tran. at 118:08 – 118:12; 125:08 – 125:23.)

As proved by the designated deposition testimony of Landon Jordan, that was a lie. While he was serving as Chief Executive Officer of Insurety, Defendant was paid a total of $130,000 through an entitlement called "Mansfield Business Management" for a percentage of policies sold by Insurety's customer, AWIS:

> Q.   And Mansfield paid CJ with what money?
>
> **A.   With dollars that were coming in from sales that were made by AWIS.**

(Jordan Deposition at 29:05 – 29:07 [D.E. 229-8].)

At his deposition, CJ also lied about his receipt of payments from NIIA:

> Q.   Have you ever received any payments for policies sold through NIIA?
>
> **A.   Again, not to my knowledge.**

(CJ Deposition at 72:06 - 72:08 [D.E. 229-2].)[4]

That was another lie. CJ has been paid at least another $730,020.85 through 2021 through another Jordan entity called "Health Insurance King" for a percentage of all policies sold through NIIA:

> Q.   Okay.   And  did  NIIA,  when  it  started operations  in October and November of 2019, did it pick up the practice of paying referral fees  for policies as we see here to, let's start with CJ?
>
> **A.   Yes.**
>
> ...
>
> Q.   Okay.  For NIIA's referral fees, where was CJ -- from what entity did CJ receive payment?

---

[4] A point to be discussed later is that Defendant would not have lied about his payments on policies sold through NIIA if there was an honest and innocent explanation for it.

      **A.   An entity called Health Insurance King.**

      **Q.   HIK?**

      **A.   Just like -- HIK.**

(Brock Deposition at 107:22 – 108:01; 108:05 – 108:09 [D.E. 229-9]. *See also* PX 24.)[5]

Knowing he was caught in a lie going into trial — and demonstrating *yet again* his utter disregard for the truth and his sworn oath to tell it — Defendant tried to concoct a new lie. On the stand at trial, Defendant testified for the first time that his payments from HIK were part of his compensation at AHCM, yet another Landon Jordan entity under the same "umbrella" as AWIS, NIIA, Mansfield, and HIK. (1/3/2023 Trial Tran. (Vol. 1) at 28:14 – 28:21.) But Defendant's new lie was contradicted by the above quoted testimony of Messrs. Jordan and Brock (as well as Brock's Affidavit introduced into evidence at PX 24 – *see* Para. 4). It also contradicts Defendants' prior deposition testimony, with which he was immediately impeached at trial:

---

[5] Despite Defendants' oral motion to reconsider its admission at trial, Exhibit 24 should not be retroactively excluded from evidence because Defendants have failed to satisfy the high standard for reconsideration. *See, e.g., Battle v. Gladstone Law Group, PA*, 2013 WL 12077795, * 1 (S.D. Fla. Sep. 27, 2013) (Martinez, J.). Among other reasons, it was not legal error to admit Exhibit 24 because: 1) a motion to reconsider is not an opportunity for Defendant to make new arguments they should have made before the admission of PX 24 (including their failure to file a motion *in limine* ahead of trial); 2) Plaintiffs did not have a better method of obtaining the same discovery because of Defendant's perjury at his deposition; and 3) it is well established that the Court has wide discretion to admit hearsay evidence at trial where the Court determines that it has sufficient indicia of trustworthiness. *See Rivers v. United States*, 777 F.3d 1306, 1312 (11th Cir. 2015) ("We are "particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a 'definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'").

Moreover, Rusty Brock's Declaration is not hearsay under FRE 801(d)(2)(A), (C), and/or (D) because Rusty Brock was authorized by Defendant to process Defendant's payments from AWIS and NIIA (1/3/2023 Trial Tran. at 44:04 – 44:10, 46:13 – 51:04, 122:10 – 122:17.) The Declaration is also not hearsay under FRE 801(d)(2)(D) because Mr. Brock was a co-conspirator of Defendant. (*See, e.g.,* CJ Deposition at 30:12 – 30:24 [D.E. 229-2].)

Finally, Defendant attended Brock's deposition and had the opportunity to cross-examine him regarding Defendant's payments from HIK as a percentage of policies sold through NIIA. (*See* Brock Deposition at 107:22 – 109:09 [229-9].)

Q.   What is your compensation at AHCM?

**A.   $125,000 a year plus discretionary bonus.**

Q.   And are there criteria for the discretionary bonus?

**A.   I don't know.**

Q.   Do you know if its in your employment agreement?

**A.   I don't know it would be, it would not be.**

Q.   Do you get – do you know if you get any kind of fee or referral based on sales or advances or commissions or anything of that nature?

**A.   I don't know.**

Q.   Have you ever received any payments for policies sold through AHCM?

**A.   Not to my knowledge.**

(*See* 1/3/2023 Trial Tran. (Vol. 1) at 28:22 – 28:17 (impeaching with CJ Deposition at 25:15 –

25:25, 72:03 – 72:05 [D.E. 229-2].)  And when he was pressed further for a clear explanation of

how these payments originated, he couldn't provide it:

Q.   If you're employed by AHCM, why would you be getting paid for policies sold through other entities?

**A.   I can't answer that. All I know is I took a job under this umbrella – and that's why you're confusing me with these entities – and the job was a base salary plus a profit bonus, and through deposition testimony I found out, okay, it's HIK where the profits entities paid me from. They could probably have AHCM pay me that profit, I just don't know how the accounting for all this works. But I get paid to recruit call centers a profit interest. That's my compensation. And that's my testimony. The entities is very confusing to me.**

8

(1/3/2023 Trial Tran. (Vol. 1) at 127:13 – 23.) Plaintiffs respectfully submit that Defendant was

lying when he testified that he doesn't know why he has been paid through HIK for policies sold

through NIIA (and funded by Advance Plus), given Defendant's direct involvement in finding

Advance Plus as the new commission funding partner, which enabled NIIA to migrate the business

away from Insurety's customer, AWIS.

      Defendant's most persistent, yet obvious lie was that all of the foregoing payments he

received were not kickbacks, but compensation for serving "on a board." (1/3/2023 Trial Tran.

(Vol. 1) at 98:17 – 98:22.) By a preponderance of the evidence, Defendant was not merely

confused – he was abjectly lying about receiving payments for board service.  For starters, Landon

Jordan himself flatly contradicted Defendant's lie:

> Q.   Okay.  Was CJ ever on the Board of either AWIS
>      or AHCM?
>
> **A.   Not that I'm aware.**
>
> Q.   Okay.  Are you aware of CJ serving on any
>      boards in connection with AWIS or AHCM?
>
> **A.   Not that I am aware of.**

(Jordan Deposition at 78:12 – 78:17 [D.E. 229-8].)

      Moreover, Defendant's explanation that he served on the Board was exposed as an

obvious lie by his own testimony:

> Q.   At your deposition you told me that you didn't
>      know what board you were going to be put on?
>
> **A.   I didn't know what board I was on.  Which
>      entity.**
>
> Q.   Okay. The board never met, right?
>
> **A.   We never had a meeting.**
>
> Q.   Okay. You never participated in any board
>      meetings?

> **A.    Well, we had — no, we had no board meetings.**
>
> Q.    You didn't know if you had ever been invited to a board meeting did you?
>
> **A.    It was a six-month period of time. I didn't think much about it. I was super busy at Insurety. At the time I never followed up when a meeting would be. I assumed there would be one in the coming year.**
>
> Q.    In your deposition on March 17th of 2021 you couldn't tell me who else was on the board, right?
>
> **A.    I could not.**
>
> Q.    Do you know who else was on the board as you sit here today?
>
> **A.    I remember looking at the public filing. Tammy Brown, Landon Jordan, I don't remember who else.**
>
> Q.    Do you know that these other people were on the board or are you only reading that from the public filing that you've referenced?
>
> **A.    I learned about it from the public filing.**

(1/3/2023 Trial Tran. (Vol. 1) at 43:03 – 43:25.)

Finally, Defendant admitted that he received numerous emails from Rusty Brock while he was Insurety's CEO. (*See* Exhibits 16, 17, 18 19, and 20.) Attached to those emails were spreadsheets showing Defendant's cut from the commissions generated by policies sold by AWIS, and funded by Insurety. (*See, e.g.,* Exhibit 17.) Those payments were obviously not Board payments. *They were kickbacks*. Plain and simple. Nevertheless, at trial, Defendant doubled and tripled down on his lie by claiming "I don't know what a board payment looks like. I don't know the definition of that." (1/3/2023 Trial Tran. (Vol. 1) at 48:02 – 48:04.)

Defendant is 39 years old and has a sterling academic resume indicating above-average intelligence: (i) he has a Bachelor's Degree from the University of California, Los Angeles in applied mathematics and economics, (ii) a Master's Degree in real estate development from the University of Southern California, and (iii) a second Master's Degree in quantitative finance from the London School of Economics. (27:17 - 28:07.)  Despite his corrupt and dishonest judgment, the evidence at trial shows that Defendant is of above-average intelligence, and it is patently obvious to anyone of just average intelligence that these were not board payments. Thus, Plaintiffs respectfully submit that this Court should not believe Defendant when he tries to play dumb.

## II.      PLAINTIFFS' REQUESTED RELIEF.

### A.      Defendant Should Be Held Responsible For the Damage Caused to Plaintiffs.

First and foremost, Defendant should be held responsible for the damage caused to Plaintiffs by his various bad acts in furtherance of his kickback scheme and the subsequent acts he took to preserve and protect it.

As Insurety's CEO, Defendant was required to put the Company's interests before his own. (*See* 1/3/2023 Trial Tran. (Vol. 1) at 37:01 – 38:03.)[6]  Instead, Defendant breached his duties to Plaintiffs by perpetrating his undisclosed kickback scheme.[7] Plaintiffs' representatives, Jorge Beruff (managing director at 777) and Robert Gray (former general counsel, and current CEO of Insurety) both testified how Defendant led them into the AWIS deal without disclosing his conflict of interest and self-dealing. (*See, e.g.,* 1/4/2023 Trial. Tran. (Vol. 2) at 86:05 – 90:25 (Beruff) and

---

[6] Defendant also admits that he owed Insurety fiduciary duties. (*Id.* at 34:07 – 10. *See also* Exhibits 4 & 5 at ¶ 76 (Defendant's judicial admission that as CEO of Insurety, he owed Insurety a fiduciary duty to act loyally, in good faith, in a true and honest manner, and in the best interests of the Company).)

[7] Defendant's testimony that he disclosed his receipt of "board payments" to Ed Gehres and Bob Gray – approximately six months *after* perpetrating it, mind you – should not be believed, and was credibly denied at trial by Messrs. Gehres and Gray.

1/4/2023 Trial Tran. (Vol. 3) at 73:07 – 73:19, 75:03 – 75:08 (Gray).) Defendant's text messages

prove that Defendant knew what he was doing. (*See* Exhibits 10 and 87.) Indeed, it was

Defendant's plan from the beginning. As Landon Jordan admitted:

> Q.   Did CJ ever tell you that he was in a position,
>      as Insurety's CEO, to help AWIS by providing
>      advanced funding?
>
> **A.   Yes.**
>
> Q.   Okay. And did he tell you that going into the
>      deal?
>
> **A.   Yes.**
>
> …
>
> Q.   Okay. So the fact that CJ would be receiving
>      a percentage of AWIS's PM/Pms was discussed
>      before Insurety began funding AWIS; is that
>      right?
>
> **A.   Yes.**

(Jordan Deposition at 51:21 – 52:02; 55:01 – 55:04 [D.E. 229-8]. *See also id.* at 70:14 – 71:07.)

After Defendant's self-dealing was discovered and he was fired for cause in April 2019, he

immediately began committing additional bad acts to preserve and protect those payments. First

he violated his 1-year non-competition restriction in Paragraph 6(D)(II) of his Employment

Agreement. (*See, e.g.,* 1/3/2023 Trial Tran. (Vol. 1) at 102:06 – 103:04. *See also* Exhibits 42 –

45.) Defendant eventually succeeded with Advance Plus, helping AWIS/NIIA replace Insurety

with a new advance funder. (*See, e.g.,* 1/3/2023 Trial Tran. (Vol. 1) at 104:09 – 104:21. *See also*

Exhibits 69 – 72, 76, 77, 82, and 83.) Importantly, Defendant admitted that Advance Plus is

Insurety's competitor. Thus, Defendant's efforts directly resulted in a competitor stepping in to

breathe life into Defendant's "contingency plan." That was exactly what Defendant agreed not to

do when he agreed to the non-compete provision of his Employment Agreement, which prohibits

Defendant from "directly or indirectly, on [Defendant's] behalf or on behalf of a third party, engag[ing] in any commercial activity in the U.S that competes with [Insurety]." (1/3/2023 Trial Tran. (Vol. 1) at 110:24 – 111:08.) As Robert Gray explained, Defendant intentionally and directly sabotaged Insurety's efforts and ability to recover its balance from AWIS. (1/4/2023 Trial Tran. (Vol. 3) at 96:25 – 97:10; 113:21 - 114:15)

In the course of flagrantly violating the non-competition covenant in his Employment Agreement, Defendant also misappropriated Plaintiffs' confidential information and trade secrets when he shared the "Updated Pagnanelli Model" with Advance Plus in order to help AWIS escape Insurety and prop up NIIA with a new advance funder in the fall of 2019. (*See, e.g.,* 1/3/2023 Trial Tran. (Vol. 1) at 106:03 – 106:09. *See also* Exhibit 70; JX 13.) As Insurety's CEO, Defendant admits that he was privy to the development of the Company's Confidential Information – which includes trade secrets as defined in Paragraph 6((B)(I) of his Employment Agreement. (*See* JX 1 ¶ 6(B)(I). *See also* Exhibits 4 and 5 ¶ 33.) Throughout his time as Insurety's CEO, Defendant repeatedly violated his obligation to safeguard such information by disclosing it to his father. (*See, e.g.,* 1/3/2023 Trial Tran. (Vol. 1) at 74:01 – 74:10. *See also* Exhibits 28, 30, 31, 35, 36, 37, 39, 40, and 41.)[8]

By a preponderance of the evidence, Plaintiffs have shown that it is more probably true than not true that the "Updated Pagnanelli Model" (JX 13) reflects Plaintiffs' Confidential Information and trade secrets. As 777 Partners' managing director, Jorge Beruff explained, the incorporation of that data and subsequent refinement of the model was "very" valuable:

---

[8] By defending his disclosure of such information to his father as subject to a "verbal NDA" between them, Defendant necessarily admits that he understood that the information was confidential. (1/3/2023 Trial Tran. (Vol. 1) at 80:20 – 82:10.) His understanding was further demonstrated when he shared Insurety's financial model with Joseph Safina and asked Safina to sign an NDA. (Exhibits 42 and 43.)

> Q.   And where does Insurety and Triple 7 get the data to support those variables?
>
> **A.   So with the persistency assumptions, that came from experience. So over CJ's tenure with Insurety, we learned a lot and observed a lot, you know, from our clients and their commissions that we had advances against, we were able to identify certain trends across different products and commissions were. So over time we were able to refine our pricing models to incorporate, you know, persistency assumption that, you know, matched our experience and, you know, historical behavior.**
>
> Q.   Are these pricing models considered valuable?
>
> **A.   Very much so, yes.**
>
> Q.   Why?
>
> **A.   It's how we compete for business. If our information is better than our competitors, then we feel confident that we can more precisely price a transaction, offer more competitive advance terms, more competitive fees, et cetera.**

(1/4/2023 Trial Trian. (Vol. 2) at 93:02 – 93:19.)

Testifying further, Mr. Beruff recognized JX 13 – and specifically, the second tab of the Excel spreadsheet titled "Added Commission", as Plaintiffs' work product and trade secrets. (*See, e.g.,* 1/4/2023 Trial Tran. (Vol. 3) at 12:03 – 19:23.) As he explained, Plaintiffs' data and work product reflected in JX 13 are trade secrets because "if you look at the returns in the two different models they're different. Our addition allowed us to more accurately price the deals and more accurately understand the potential return for Insurety on each transaction." (*Id.* at 19:25 – 20:04. *See also id.* at 69:16 – 69:24.)

The Court should not credit Defendant or his father's explanations that JX 13 is something they conveniently built from scratch with "made up" numbers and assumptions. After all, which

alternative is more probably true? On one hand, did Defendant and his father conveniently create an innocent financial model in 2019 that magically arrived at the same numbers and assumptions derived from Insurety's data, historical information, and internal modeling from Defendant's tenure as Insurety's CEO? Or, on the other hand, is Defendant lying and he really directed his father to fabricate a "new" financial model that incorporated Insurety's trade secrets that allowed them to more accurately and competitively price transactions? [9] Plaintiffs respectfully submit that the answer is obvious: the second alternative is more probably true.

For a breach of contract claim under Florida law, "the goal is to place the injured party in the position it would have been in had the other party not breached the contract so as to give the aggrieved party the benefit of its bargain." *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374, 379 (Fla. 3d DCA 2013). "The damages reasonably flowing from a breach can vary greatly depending on the factual circumstances surrounding the breach, and different methods of calculation may be employed to properly compensate a successful plaintiff." *Katz*, 183 So. 3d at 380. Likewise, the Court may award damages for misappropriation of trade secrets pursuant to both 18 U.S.C. § 1836(b)(3)(B) and Fla. Stat. Ann. § 688.004.

Here, Plaintiffs' losses were itemized by its current CEO, Robert Gray:

| | |
|---|---|
| Total Amount Advanced | ($36,902,303) |
| Total Amount Collected ($28,834,283 applied to Advance repayment + $2,680,249 in PMPM fees) | $30,915,093 |
| Cost of Borrowing during AWIS relationship | ($5,404,617) |

---

[9] For the sake of argument only, "even if" Defendant and his father created JX 13 with "made-up" numbers and assumptions as they claim, it will still belong to Plaintiffs. (*See also* JX 1: Employment Agreement ¶ 6(C).)

| Legal Fees and Expenses: | |
|---|---:|
| - Legal Fees to Mayor Brown through Dec. 23, 2022: | ($929,492) |
| - Legal Fees to Whitley Penn through Dec. 23, 2022: | ($278,826) |
| - Legal Fees to Haynes and Boone through Dec. 23, 2022: | ($416,089) |
| - Related Travel and Out of Pocket Costs: | () |
| Credit for Settlement of AWIS matter | $3,302,893 |
| TOTAL: | ($9,741,401) |

(*See* 1/4/2023 Trial Tran. (Vol. 3) at 98:01 – 101:18.)

There is no dispute that the above is Plaintiffs' actual loss – Defendant introduced no evidence to the contrary.

Defendant caused these losses through a one-two punch to Insurety's gut. Initially, he personally (and secretly) profited from AWIS kickbacks while AWIS – not coincidentally – grew to become Insurety's largest customer, all while Defendant served as Insurety's CEO.  As Landon Jordan testified, that was the plan from the start. (Jordan Deposition at 51:21 – 52:02; 55:01 – 55:04 [D.E. 229-8]. *See also id.* at 70:14 – 71:07.) Then later, through his violation of the non-competition covenant of his Employment Agreement and misappropriation of trade secrets, on behalf of AWIS's successor, NIIA, Defendant actively and intentionally sought a new funding source – someone to compete in the exact same business of Insurety – to finance the continuation of stream of kickbacks.[10] By a preponderance of the evidence, Plaintiffs have proved that the above

---

[10] Among other things, the 1-year non-compete in Defendant's Employment Agreement was reasonable and necessary to protect Plaintiffs' legitimate business interests pursuant to Fla. Stat. § 542.335, including but not limited to Plaintiffs' confidential information and trade secrets, as well as their efforts to navigate

loss was caused by Defendant's numerous bad acts starting with his undisclosed kickback scheme.

(*See, e.g.,* 1/4/2023 Trial Tran. (Vol. 3) at 96:25 – 97:10; 113:21 - 114:15)

  If Defendant's liability for the damage he caused to Plaintiffs is approached as a multiple

choice question, the correct answer is clear:

> **Question: How did Defendant cause Plaintiffs' losses?**
>
>  (a) Defendant breached his Employment Agreement and fiduciary duties to Plaintiffs.
>
>  (b) Defendant breached the non-compete restrictions of his Employment Agreement.
>
>  (c) Defendant misappropriated Plaintiffs' trade secrets.
>
>  **(d) All of the above.**

  Accordingly, Plaintiffs request judgment in their favor, and against Defendant, in the

amount of $9,741,401.

  **B.** **Defendant Should Be Ordered To Provide A Full Accounting Of All Payments From AWIS, NIIA, and Related Entities.**

  Plaintiffs also request the Court to order Defendant to provide an accounting of all

payments he has received from AWIS, NIIA, and any related entities. As Plaintiffs noted during

opening, "one of the hopes of this trial is that we can finally learn what the full extent is of

[Defendant's] wrongdoing." (15:09 – 15:11.) Unfortunately, Defendant took the stand at trial and

persisted in feigning ignorance of the full amount of his self-dealing. (*See* 1/3/2023 Trial Tran.

(Vol. 1) at 53:20 – 54:03; 125:08 – 128:17.) Defendant has also lied repeatedly about the payments

---

the recovery of their unpaid balance with AWIS/NIIA. At trial, Defendant admitted that they were reasonable in scope and duration. (1/3/2023 Trial Tran. (Vol. 1) at 100:04 – 100:16.) In his Answer, Defendant also admitted that the restrictive covenants in his Employment Agreement were necessary to protect the Company's legitimate business interests and also survive the termination of the Agreement. (*See* Exhibits 4 & 5 ¶¶ 35 – 37.) These are binding judicial admissions. *See, e.g., Cooper v. Meridian Yachts, Ltd.,* 575 F.3d 1151, 1177-78 (11th Cir. 2009).

he has received. (*See* pages 5 - 10, *supra.*)[11] Accordingly, Plaintiffs request an accounting in order to ensure that Defendant does not escape detection for all of the illicit payments he has received.

## C.   Defendant Should Be Ordered To Disgorge All Payments From AWIS and NIIA.

*Cheaters shouldn't prosper.* Plaintiffs' third request for relief is that Defendant should be ordered to disgorge his payments from AWIS (paid through Mansfield) and NIIA (paid through HIK), which Plaintiffs proved totaled at least $860,471.25 through 2021.[12] Plaintiffs further request that the Court order Defendant to disgorge and/or forego all future payments of a percentage of policies sold through AWIS and NIIA. Finally, Plaintiffs request an express ruling that such amounts were received as the result of false pretenses, false representations, and/or actual fraud, as well as Defendant's fraud and/or defalcation while acting in a fiduciary capacity.

By a preponderance of the evidence, Defendant's liability is clear. It begins with him bargaining for a self-dealing kickback scheme with AWIS as Insurety's CEO. Insurety's business model is important context for understanding the structure of Defendant's kickbacks.

If Defendant received a traditional bribe of $860,471.25 at the time he brokered his kickback scheme, there would be no question that the entire amount should be disgorged. It should not be treated any differently where Defendant opted to receive a stream of future payments in lieu of a lump-sum amount. Indeed, it makes perfect sense that Defendant opted for payments over time – essentially creating an annuity, funded by ill-gotten gains. At the most basic level, Insurety's business is based on the financial principle of "factoring", in which Insurety advances future

---

[11] Again, if there was an innocent explanation about his receipt of such payments then Defendant would not have lied to protect them.

[12] Plaintiffs are not including Defendant's $125,000 annual salary as an employee of AHCM in their request for disgorgement.

commissions in exchange for the future commission stream plus a monthly fee (the "PMPMs").[13] Defendant was involved in the initial financial modelling of applying "factoring" to this industry which he brought to Insurety in 2017. (*See, e.g.,* 01/03/2023 Trial Tran. (Vol. 1) at 120:03 – 120:05. *See also* Exhibit A.)  So it was natural for Defendant to apply his finance skills to the self-dealing kickback scheme he brokered with Landon Jordan because Defendant understood that he would ultimately make more money from a stream of payments extending into the future than he would receive from an upfront payment in the form of a traditional bribe.

To borrow a phrase from the criminal context, everything that Defendant did thereafter was "fruit of the poisonous tree." After Defendant's kickback scheme was detected and he was fired by Insurety, he did everything he could to preserve and protect his receipt of those payments. Almost immediately, Defendant violated the non-competition restrictions of his Employment Agreement by contacting Jim Terlizzi and Joseph Safina in an effort to replace Insurety with a new advance funder, eventually succeeding in replacing Insurety with Advance Plus after Defendant and his co-conspirators' shell game rolled AWIS into NIIA in the fall of 2019. (*See, e.g.,* 1/3/2023 Trial Tran. (Vol. 1) at 102:06 – 104:21.) Defendant also misappropriated Plaintiffs' trade secrets by using the financial model that had been updated and refined with Insurety's historical performance data. (*See, e.g.,* Exhibit 42, 70.[14]). (*See* pages 13-15, *supra.*)

Defendant's bad acts are not unrelated instances, each occurring in a vacuum. Instead, Defendant's actions are a single continuum of wrongful acts that originated with the kickback

---

[13] Pursuant to FRE 201, *see* https://www.investopedia.com/terms/f/factor.asp. *See also eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.,* 519 F. Supp. 3d 1129, 1132, n.2 (S.D. Fla. 2021) ("Factoring is, in general terms, the business of purchasing accounts receivable at a discounted rate, then undertaking the responsibility of collecting those accounts.").

[14] Among other evidence, the fact that the updated model was confidential is evidenced by the fact that Defendant asked Mr. Safina to sign an NDA. *See* Exhibit 43.

scheme he brokered for himself as Insurety's CEO, and the subsequent wrongs that Defendant undertook to preserve and protect his scheme after it was discovered. Accordingly, Plaintiffs respectfully submit that Defendant be ordered to equitably disgorge at least $860,471.25 for his illegal receipt of payments.

## III.     DEFENDANT'S COUNTERCLAIM SHOULD BE REJECTED.

Plaintiffs also request judgment in their favor, and against Defendant, on his Counterclaim. (*See, e.g.,* Exhibit 8: 6/11/2019 R. Gray Letter to Defendant.) For starters, Plaintiffs fully performed under the Employment Agreement by employing Defendant and paying him the agreed upon salary. But most simply, Defendant breached his Employment Agreement by brokering his kickback scheme, failing to disclose it, and recklessly advancing funds to AWIS in order to line his own pockets. Under Florida law, a party who breaches an agreement cannot enforce it. *See Bradley v. Health Coalition, Inc.*, 687 So. 2d 329, 333 (Fla. 3d DCA 1997). Accordingly, Defendant's counterclaim should be rejected.

## IV.     CONCLUSION

With the last Question & Answer of trial, Defendant was given a final opportunity to take responsibility. He refused:

> Q.   Well, this is your last chance. Are you ready
>      to take responsibility that you were not being
>      paid for being on a board?
>
> **A.   I was paid for being on a board.**
>
> Q.   So that's a no?
>
> **A.   Sorry. I don't understand the question.**

(1/5/2023 Trial Tran. (Vol. 4) at 144:24 – 145:03.)

Since Defendant refuses to take responsibility, Plaintiffs respectfully request this Court to hold him responsible at long last.

Dated:  January 17, 2023

Respectfully submitted,

_/s/ Steven M. Appelbaum_
Ashley H. Saul
Florida Bar No. 1025690
John C. Gekas
Admitted pro hac vice
John A. Turner
Florida Bar No. 000922
Steven M. Appelbaum
Florida Bar No. 71399


**SAUL EWING LLP**
Counsel for Plaintiffs
701 Brickell Ave, 17th Floor
Miami, FL 33131
Telephone:      305-428-4516
Email:
John.turner@saul.com
Steven.appelbaum@saul.com
John.gekas@saul.com
Linda.dunne@saul.com
Wpb-ctdocs@saul.com
Jessica.Barrero@saul.com
Mia-ctdocs@saul.com

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that on January 17, 2023, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a copy of the foregoing document on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF to Kenneth W. Waterway, Esq., counsel for Defendant Christopher James Pagnanelli, kwaterway@bergersingerman.com; RMartinez@bergersingerman.com ; and drt@bergersingerman.com.

<u>*Steven M. Appelbaum, Esq*</u>.
Steven M. Appelbaum
Florida Bar No. 71399