UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-20172-CIV-MARTINEZ

777 PARTNERS LLC and INSURETY
CAPITAL LLC,

      Plaintiffs,

v.

CHRISTOPHER JAMES PAGNANELLI,

      Defendant.

_____/

CHRISTOPHER JAMES PAGNANELLI,

      Counterclaim Plaintiff,

v.

777 PARTNERS LLC,

      Counterclaim Defendant.

_____/

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before this Court on the non-jury trial held in this case from January 3, 2023, to January 5, 2023, and the Court's Order Granting in Part Defendant' Motion to Amend the Court's Findings of Fact and Conclusions of Law and Judgment, [ECF No. 349]. During and after the bench trial, this Court reviewed the evidence admitted and considered applicable law and arguments presented by counsel. After careful consideration of the Parties' submissions, the following amended findings of fact and conclusions of law are made pursuant to the requirements set forth in Federal Rule of Civil Procedure 52.

## I.   FINDINGS OF FACT[1]

### A.   *The Parties*

1.      Plaintiff Insurety Capital LLC ("Insurety") is a Delaware limited liability company with its principal place of business located in Miami, Florida.

2.      Plaintiff 777 Partners LLC ("777 Partners") is a Delaware limited liability company with its principal place of business located in Miami, Florida.[2]

3.      Insurety is owned by 777 Partners as one of 777 Partners's portfolio companies.

4.      Defendant Christopher James Pagnanelli, Jr., was Plaintiffs' former employee and served as Insurety's Chief Executive Officer ("CEO") from January 2018 to April 2019.

5.      Insurety is a provider of short-term cash advances to independent marketing organizations ("IMOs"), allowing the IMOs to pay advance commissions to their independent insurance agents, commonly known as "producers." IMOs serve as intermediaries between insurance carriers and independent insurance agents. The insurance carriers underwrite insurance policies while the IMOs market, distribute, and sell those policies through agents who work for the IMOs. Insurance agents earn a commission on each insurance policy they sell, the amount of which varies based on the amount of the insurance premium. Due to the nature of insurance transactions, insurance agents typically do not receive their commissions until policyholders pay their policy premiums, typically monthly. Insurety offers IMOs the ability to satisfy and retain their insurance agents by advancing several months of future commissions earned by the insurance agents. In exchange for the commission advance, Insurety acquires the rights to the agent's future

---

[1]    Any findings of fact that may represent conclusions of law are adopted as conclusions of law when appropriate.

[2]    Insurety and 777 Partners will be collectively referred to as "Plaintiffs" throughout.

insurance commissions plus an administrative fee, which is known as the per-member per-month fee ("PMPM").

**B.** *The Employment Agreement*

6. On January 10, 2018, Defendant executed an Executive Employment Agreement, with an effective date of January 2, 2018, which serves as the basis for this action (the "Employment Agreement"). The Employment Agreement is between the "Company," on the one hand, and Defendant, on the other hand. The Employment Agreement defines the "Company" as "777 Partners, LLC and one of its portfolio companies, or subsidiaries . . . ." Two paragraphs later, the Employment Agreement states that Defendant "shall serve as the [CEO] of Insurety . . . ." 777 and Insurety are the only two business entities identified in the Employment Agreement.

7. The Employment Agreement also provided that Defendant "shall report to managing partners or such officers as the board of directors may from time to time designate."

8. Defendant understood that he was signing an Employment Agreement with Insurety.

9. Pursuant to the Employment Agreement, 777 Partners and Insurety (together, the "Company") were obligated to pay Defendant an annualized base salary of $225,000 (gross) and a "sign on bonus" of $98,082.00. In further consideration for the promises made by Defendant under the Employment Agreement, Defendant was eligible to receive an annual bonus, targeted at 50% of his base salary.

10. Defendant served as Insurety's CEO between January 2018 and April 4, 2019, on which date the Company suspended him pending an investigation into his actions.

11. Defendant's employment as Insurety's CEO was pursuant to and consistent with 777's standard corporate governance practices.

12. During his employment with Insurety, Defendant held himself out to others as its CEO.

13. During the period of his employment with the Company, pursuant to the Employment Agreement, Defendant owed a fiduciary duty and a duty of loyalty to the Company. Defendant was to act solely in the best interest of the Company and to refrain from engaging in any self-dealing or self-interested conduct or transactions adverse to the legitimate business interests of the Company.

14. Specifically, pursuant to Section 3 of the Employment Agreement, Defendant agreed to devote his full productive time and best efforts to the performance of his duties for the Company. Section 6(F) of the Employment Agreement also expressly provided that Defendant was required to comply with all Company policies, including policies regarding actual or apparent conflicts of interest.

15. On January 8, 2018, Defendant acknowledged receipt of all Company policies, including the Company's "Conflicts of Interest Policy."

16. By its terms, the Conflict of Interest Policy obligated Defendant to fulfill several critically important principles (collectively, the "Contractual Loyalty Duties"), which required that Defendant:

a) "act in the best interests of the Company" and conduct business "in accordance with all applicable laws, rules and regulations and the highest ethical standards[;]"

b) "not engage in any work, paid or unpaid, or other activities that create a conflict of interest that materially and substantially disrupt the operations of the Company[,]" including "directly or indirectly competing with the Company in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or which is in direct competition with, the business in which the Company" is engaged;

c) "not take part in or attempt to influence any Company decision or any business dealings with a current or potential competitor, customer, partner, vendor, supplier, or other business entity" in which he had "a direct or indirect financial interest;"

4

d)      "avoid the appearance of a conflict" and "disclose any direct or indirect financial interest in a current or potential competitor, customer, partner, vendor or supplier" with which he discovered the Company planned to do business;

e)      "not take personal advantage of or interfere with any existing or potential Company business opportunities[;]"

f)      "not compete with or reflect adversely on the Company or give rise to a conflict of interest" and "not engage in any outside activity that is likely to involve disclosure of Company proprietary information or that is likely to divert time and attention from [his] responsibilities at the Company[;]"

g)      "act with integrity, honesty, competence, and in an ethical manner when dealing with the public, regulators, clients, investors, prospective investors, and their fellow Employees; . . . adhere to the highest standards with respect to any potential material conflicts of interest with the Company . . . [; not] enjoy a benefit at the expense of the Company[; and] preserve the confidentiality of information that [he] may obtain over the course of business and use such information properly and not in any way adverse to the interests of the Company."

17.     Defendant acknowledged his duty to comply with the Conflicts of Interest policy and the prohibition of self-dealing.

18.     In addition to the Contractual Loyalty Duties, Defendant, pursuant to Section 6(A) of the Employment Agreement was "required to comply with all policies and procedures of the Company," including the Company's Confidentiality of Information Policy that he likewise acknowledged on January 8, 2018.

19.     Pursuant to Section 6(B) of the Employment Agreement, Defendant also agreed that he would not, during his employment with the Company or thereafter, use or disclose "Confidential Information," as defined in Section 6(B)(I) of the Employment Agreement, and together with the Company's Confidentiality of Information Policy, the "Contractual Confidentiality Obligations," for any competitive purpose or divulge "Confidential Information" to any person other than the Company or persons with respect to whom the Company has given its written consent, except for limited purposes not at issue in the instant action (such as compelled disclosure by a court or government authority or pursuant to subpoena).

20.    Pursuant to Section 6(B)(I), "Confidential Information" means the following:

trade secrets and other information specific to the Company's business and investment activities and considerations of the Company. This includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information, strategic and marketing plans, compilations of customer and supplier information, information relating to financial and marketing books, price and marketing projections, internal employer databases, analytical tools and services and information technology products and services, other information related to the tools, products and services that facilitate the Company's ability to sell and manufacture its services, or other reports, manuals and information including information related to Company, its affiliate companies, or its customers, including those documents and items which [Defendant] may develop or help develop while in the Company's employ, whether or not developed during regular working hours or on Company's premises; provided, however, that Confidential Information shall not include any information that is or becomes public through written authorization by Company.

21.    As CEO of Insurety, Defendant was privy to the development of the Company's Confidential Information, which he was obligated to use solely for Insurety's legitimate business interests and not for competitive purposes either during his employment with the Company or thereafter.

22.    Section 6(C) of the Employment Agreement governs Defendant's obligations concerning work product produced while employed with the Company and reads as follows:

C. Intellectual Property:

I. Work Product: Executive agrees that during Executive's employment with the Company pursuant to this Agreement, all materials created or modified by Executive, including, without limitation, all works of authorship, inventions, innovations, improvements, processes, methods, designs, apparatus, plans, systems and computer programs, and other tangible and intangible materials relating to the design, manufacture, use, marketing, distribution, and management of the Company's and/or its affiliates' products or services (collectively, "Work Product"), shall be "work for hire" and that the Company shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents, or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire," Executive hereby assigns ownership of all such Work Product to the Company and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company. Executive hereby appoints the Company as Executive's attorney-in-

fact with the limited power to execute assignments of such Work Product. The obligation to assign as provided in this Agreement does not apply to any Work Product to the extent such obligation would conflict with any state or federal law.

II. <u>Disclosure of Work Product</u>: Executive agrees to disclose in writing to the Board of Directors of the Company any Work Product relating to the business of the Company and/or its affiliates, which Executive develops, conceives and/or reduces to practice in connection with any work performed by Executive for the Company, either alone or with anyone else, while employed by the Company and/or within twelve (12) months of the termination of employment. Executive shall disclose all Work Product to the Company, even if Executive does not believe that assignment to the Company is required under this Agreement or applicable state or federal law. If the Company and Executive disagree as to whether or not such Work Product Is included within the terms of this Agreement, such matters will be subject to the Arbitration Rights set forth in this Agreement with the additional requirement that it will be the responsibility of Executive to prove that it is not included.

23.    Pursuant to Section 6(D) of the Employment Agreement, Defendant agreed to honor various restrictive covenants, including the following provisions:

D. <u>Non-Competition and Non-Recruitment</u>:

I.  <u>General</u>: The Company and Executive recognize and agree that: (1) Executive has received, and will in the future receive, substantial amounts of Confidential Information and Trade Secrets, as defined in the Florida Uniform Trade Secrets Act; (2) as a consequence of using or associating Executive with the Company's name, goodwill, and reputation, Executive will develop personal and professional relationships with the Company's current and prospective customers, clients, counterparties, and vendors; and (3) provision for non-competition and non-recruitment obligations by Executive is critical to the Company's continued economic well-being and protection of the Company's Confidential Information.

II. <u>Non-Competition</u>: During [Defendant's] employment and for one (1) year following the voluntary or involuntary termination of [Defendant's] employment with the Company, [Defendant] shall not, directly or indirectly, on [Defendant's] behalf or on behalf of a third party, engage in any commercial activity in the United States that competes with the Company; provided, however, [Defendant] may own, directly or indirectly, solely as a passive investment, two percent (2%) or less of any class of securities of any entity traded on any national securities exchange. At its sole option, the Company may, by express written notice to [Defendant], waive or limit the time and/or geographic area in which [Defendant] cannot engage in competitive activity or the scope of such competitive activity.

. . . .

7

IV. <u>Non-Disparagement</u>: The Parties agree that neither Party will at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statement concerning the other Party or its affiliates or their respective partners, members, or employees. "Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged. Nothing in this Agreement shall preclude the Parties from any truthful, good faith response to any inquiries under oath or in response to governmental inquiry. The Parties agree that neither Party will speak about the other Party and/or its affiliates and/or their management or business to the media, whether electronic, print or otherwise, without the express prior written approval of the other Party.

V. <u>Non-Solicitation</u>: Executive agrees that during Executive's employment with the Company and for one (1) year thereafter, Executive's employment terminates, Executive will not, directly or indirectly, on his/her own behalf or on behalf of any other person or entity (i) hire or solicit for hire or to provide services (whether as an employee, independent contractor, or otherwise) any employee of the Company and/or its affiliates, (ii) solicit, induce, or encourage the resignation of, or attempt to solicit, induce or encourage the resignation of, to persuade any employee of the Company and or its affiliates, (iii) solicit, induce, or encourage any independent contractor providing services to the Company and or its affiliates to terminate or diminish any relationship with the Company and/or its affiliates, (iv) seek to persuade any employee, vendor, or independent contractor to breach any agreement with the Company and/or its affiliates, (v) take any action to solicit or divert any Clients, Sources, or Sellers (each as defined below) away from the Company and/or any of its affiliates, or (vi) solicit or encourage any Clients, Sources, or sellers to terminate or diminish any relationship with the Company and/or its affiliates. For purposes of this Agreement: "Clients" means all individuals or entitles who or which were customers or clients of the Company and/or its affiliates, or who or which were solicited by the Company and or its affiliates to become customers or clients of the Company and/or its affiliates (other than solicitations made solely through general, untargeted solicitations and/or mass industry mailings), during Executive's employment with the Company. "Sources" means all brokers and persons who referred transactions to the Company and/or its affiliates, or who were solicited by the Company and/or its affiliates to refer structured settlement transactions to the Company and/or its affiliates, during Executive's employment with the Company. "Sellers" means any person who has sold or agreed to sell a transaction to company and/or its affiliates, or who has been solicited by the Company and/or its affiliates to sell a transaction to the company and/or its affiliates, during Executive's employment with the company.

24. This Court refers to the restrictive covenants found in Section 6(D), collectively, as the "Restrictive Covenants."

8

25. Defendant agreed in Section 6(D)(VI) of the Employment Agreement that the restrictions "are reasonable in scope and duration."

26. Defendant also acknowledged in Section 6(D)(VII) of the Employment Agreement that the restrictions are essential, independent elements of the Employment Agreement and that, but for his agreement to comply, the Company would not have employed or continued to employ him.

27. By their terms, the Restrictive Covenants survive the termination of the Employment Agreement, and Defendant's employment thereunder, for the terms set forth in the Employment Agreement.

28. Pertinent to Defendant's termination, the Employment Agreement included the following provisions:

7. TERMINATION AND SEVERANCE:

A. Termination by the Company Without Cause or by Executive for Good Reason: Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below) or by Executive for Good Reason. In the event of a termination by the Company without Cause or by Executive for Good Reason prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to eight (8) months of Executive's then annual compensation payable over the eight (8) months immediately following the last day of employment in accordance with the Company's normal payroll practices. Executive must execute (and not revoke) a complete release of claims, acceptable in form and substance to the Company, as a condition to receiving Basic Severance and reimbursement of COBRA premiums.

I. For purposes of this Agreement, "Good Reason" shall mean any of the following "Trigger Events": (1) a material breach of this Agreement; or (2) a material diminishment in the title, position, duties, or responsibilities of Executive. Notwithstanding the foregoing, no basis for a termination by Executive for Good Reason will be deemed to exist unless (a) Executive notifies the Company in writing within thirty (30) days after the Trigger Event occurs that Executive Intends to terminate employment for Good Reason no earlier than thirty (30) days after providing such notice; (b) the Company does not cure such condition within thirty (30) days

9

following its receipt of such notice or states unequivocally in writing that it does not intend to attempt to cure such condition; and (c) the Executive resigns from employment prior to expiration of thirty (30) days after the end of the cure period described in (b) above.

II. For purposes of this Agreement, "Cause" shall mean Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement; (4) material misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) material violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or nolo contendere to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.

III. Notwithstanding anything else to the contrary in this Agreement, it is expressly understood that any obligation of the Company to pay Basic Severance shall be subject to Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the Company, its officers, Executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations (the "Continuing Obligations"). The Company will have no liability to pay any Basic Severance if Executive violates the Continuing Obligations, and the Executive shall be obliged to immediately repay any Basic Severance previously paid.

B. Termination by the Company for Cause or by Executive Without Good Reason: Executive's employment under this Agreement may be terminated at any time by the Company for Cause or by Executive without Good Reason. In the event of such a termination, Executive shall be entitled to receive: (i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; and (iii) no other severance.

C. Termination by Executive for Non-Renewal: Executive's employment pursuant to this Agreement may be terminated by Executive for Non-Renewal. Non-renewal means expiration after the third anniversary of the Effective Date. In the event of a termination of employment by Executive for Non-Renewal, Executive shall be entitled to receive Basic Severance as provided in Exhibit A, so long as Executive executes (and does not revoke) a complete release of claims, acceptable in form and substance to the Company. To exercise the right

10

of termination for Non-Renewal, Executive must provide the Company with written notice of Executive's intent to do so, and the Company must fail to cure within forty-five (45) days of receiving such notice. It is expressly understood that if prior to the expiration of any applicable cure period (1) Executive and the Company enter into a new written employment agreement; (2) the Company offers Executive employment on substantially the same or better terms as existed under the Agreement; or (3) Executive's employment has otherwise been terminated pursuant to the terms of this Agreement, then Executive shall have no right or option to terminate employment for Non-Renewal.

. . . .

G. Treatment of Basic Severance: Any Basic Severance Payment shall be subject to usual and customary Executive payroll practices and all applicable withholding requirements.

H. Other: Except for the amounts specifically provided pursuant to this Section, Executive shall not be entitled to any further compensation, bonus, damages, restitution, relocation benefits, or other severance benefits upon termination of employment. The amounts payable to Executive pursuant to this Section shall not be treated as damages, but as compensation to which Executive may be entitled by reason of termination of employment under the applicable circumstances. The provisions of this Section shall not limit Executive's rights under or pursuant to any other agreement or understanding with the Company regarding any pension, profit sharing, insurance, or other Executive benefit plan of the Company to which Executive is entitled pursuant to the terms of such plan.

29.     On April 24, 2019, the Company terminated Defendant's employment "for cause" effective April 4, 2019, after an investigation revealed he had breached the Contractual Loyalty Duties and Contractual Confidentiality Obligations, and therefore, Plaintiffs did not pay Defendant severance under the terms of the Employment Agreement.

C.     *Breach of Contract (Count I)*

1.     BREACH OF DEFENDANT'S CONTRACTUAL LOYALTY DUTIES

30.     Defendant breached his Contractual Loyalty Duties in violation of the Employment Agreement by engaging in self-dealing and self-interested transactions during his employment with the Company, which he did not disclose.

11

31. Specifically, in May and June 2018, Defendant brokered a deal between third-parties David Lindsey ("Lindsey") and Landon Jordan ("Jordan") by which Lindsey funded the acquisition of American Workers Insurance Service, Inc. ("AWIS") and Association Health Care Management, Inc. ("AHCM")[3] on June 28, 2018.

32. In exchange for brokering that deal, Defendant was paid a percentage of AWIS's fees for insurance policies sold, which was paid through a third-party entity named Mansfield Business Management LLC[4] ("Mansfield") in 2018 and 2019.

33. The agreement by which Defendant would receive a percentage of AWIS's fees for polices sold was put in place before Defendant introduced AWIS to Insurety as a potential client.

34. Defendant's percentage of AWIS's fees incentivized Defendant to direct Insurety's funding to AWIS in order for Defendant to make more money for himself.

35. Defendant used his position as Insurety's CEO to help steer Insurety funds to AWIS.

36. On or about May 9, 2018, Defendant was also promised a 20% ownership interest in AWIS through a separate holding company called Rendon Management Group, LLC[5] ("Rendon") to further incentivize him to use his position as Insurety's CEO to advance funding to AWIS.

37. The offer to Defendant of a minority ownership interest in AWIS and receive a percentage of AWIS's fees for policies sold was intended to further incentivize Defendant to use

---

[3] AWIS and AHCM are businesses in the health insurance industry. AWIS markets insurance products and AHCM administers the insurance products and acts as a third-party administrator.

[4] Mansfield provides marketing and support services to AWIS.

[5] AHCM and AWIS are 100% owned by AHCM Holdings, LLC. AHCM Holdings, LLC is 100% owned by Rendon Group Management, LLC. Rendon Group Management, LLC is 100% owned by Landon Jordan.

his position as Insurety's CEO to obtain funding for AWIS. Defendant ultimately used his position as Insurety's CEO to obtain funding for AWIS.

38. After brokering his self-interested deal, all while concealing his interest in AWIS from the Company, Defendant led Insurety into a funding relationship with AWIS in June and July 2018.

39. In the second half of 2018, AWIS, AHCM, and Insurety entered into three related agreements in which Insurety agreed to advance money to AWIS in exchange for the assignment and repayment of AWIS's future receivables.

40. At no time during the due diligence period or underwriting process, or anytime thereafter, did Defendant ever disclose his interest in AWIS's profits or the fact that he was promised ownership in AWIS through his minority interest in Rendon.

41. The approval process for funding at Insurety was designed as a consensus-driven approach and a team effort between Insurety's management team (led by Defendant) and 777 Partners.

42. Accordingly, Jorge Beruff, who was a member of Insurety's board and the appointed principal on 777 Partners's investment team to oversee 777 Partners's investment in Insurety, approved every deal that Defendant brought to Insurety in reliance on Defendant's judgment.

43. 777 Partners and Beruff, however, had a veto right as "a last line of defense" on a deal. Neither 777 Partners nor Beruff had ever vetoed a deal because they trusted Defendant's judgment.

44. Defendant acknowledged that he did not believe that Beruff had the authority to veto any of Defendant's actions, as noted in text messages with non-party, Jonathan Karlin, in

which Defendant stated: "[W]hy are you so afraid of [Beruff], it's not his company, it's mine"; "Jorge can't nix a deal, he doesn't have that authority"; and "Jorge can't overrule me on anything."

45.     Therefore, Defendant successfully led Insurety into a funding relationship with AWIS.

46.     The Company relied upon the false representations made by Defendant during the due diligence period and underwriting process that led to Insurety's advanced funding relationship with AWIS.

47.     After the initial funding was provided, Defendant continued to direct Insurety's funding to AWIS in increasingly larger and riskier amounts in order to benefit himself personally, all while continuing to conceal his interest in AWIS.

48.     Defendant's text messages prove that Defendant knew what he was doing. In one text message, in response to a text that AWIS was "crushing," Defendant bragged that "Ur not thinking big picture . . . [AWIS] is an anomaly . . . bc of me . . . With[out] me [Jordan and AWIS] ha[ve] nothing" because Defendant, on behalf of Insurety, would buy "med supp books" and "make them sell [AWIS]" and thus, "line my pocket." In another exchange, Defendant bragged that he was "going down with the ship" and would just take his "fat [PMPM]" then get out of Insurety. In yet another exchange, Defendant admitted that he knew he made a bad decision offering an eight-month advance program, and "im going down" but "I just want my bonus" from 777 Partners and then "get out," and further, "I can't quit . . . Bc I make too much."

49.     The Company detrimentally and justifiably relied upon Defendant's misrepresentations and duties to act in Insurety's best interests as CEO.

50.     As soon as the Company learned of Defendant's false representations and misconduct with AWIS, it attempted to negotiate a new relationship with AWIS to "right size" its risk to protect the long-term advances made by Insurety according to Defendant's recommendation.

51.     Defendant intentionally interfered with that process by aiding in the creation of a new entity that would essentially replace AWIS, National Individual Insurance Agency, LLC ("NIIA"). All the while, Defendant was attempting to replace Insurety with a new advanced funder.

52.     NIIA was essentially a shell entity owned by Jordan that was used to step into AWIS's shoes.  As such, NIIA was a client or potential client for Insurety.

53.     NIIA itself admits that it was a shell entity used to step into AWIS's shoes in its Expedited Motion for Protective Order filed in this case. NIIA further admits that Defendant led the efforts to obtain a new commission advance partner. As Jami Guli ("Guli") testified, NIIA was the "contingency plan" for AWIS's "pump and dump."

54.     As AWIS's efforts to escape its liability to Insurety by replacing Insurety with a competing advance funder began to take shape with Defendant's assistance, AWIS withheld Insurety's collections and refused to pay Insurety.

55.     Insurety ultimately sued AWIS in Texas state court and obtained a temporary restraining order.

56.     Despite the temporary restraining order, AWIS refused to pay Insurety, causing the Texas state court to hold AWIS in contempt.

57.     Even then, AWIS refused to remit payment to Insurety.

58.     On the eve of a second contempt hearing, AWIS filed for bankruptcy.

59.     As a result of Defendant's false representations and misconduct, and his efforts to sabotage Insurety's collection efforts with AWIS, the Company suffered extensive financial loss because, instead of working with Insurety to right size the risk profile, AWIS declared bankruptcy in an attempt to avoid repaying and has not paid Insurety back in full for the advance funding that Insurety provided under Defendant's influence and direction.

60.     At all remaining times during which AWIS was a client of Insurety, Defendant was receiving a percentage of AWIS's profits for policies AWIS sold through Mansfield.

61.     After the conclusion of AWIS's bankruptcy proceeding, AWIS still owes Insurety $8,088,934.00.[6] This Court calculated that sum based on the following calculation:

$$(\$36,902,303.00^7 + \$5,404,617.00^8) - (\$30,915,093.00^9 + \$3,302,893.00^{10}) = \$8,088,934.00$$

62.     In addition to the referral fees Defendant receives for polices sold through AWIS, Defendant also receives referral fees for polices sold through NIIA, which is paid by an entity called Health Insurance King Inc[11] ("HIK").

63.     Defendant continues to receive referral fees from AWIS through Mansfield or NIIA through HIK.

64.     Rusty Brock, one of NIIA's principals, confirmed that he was responsible for calculating the referral payments from AWIS and NIIA to Defendant each month.

---

[6]   As discussed further herein, this Court finds that the amount of money Insurety purportedly incurred in its litigation against AWIS in Texas is not reasonably calculated in the amount Defendant is liable to Plaintiffs.

[7]   The amount Insurety advanced to AWIS.

[8]   The amount Insurety paid to borrow money to provide AWIS the advance.

[9]   The amount Insurety collected from AWIS.

[10]   The amount AWIS paid Insurety to settle the Texas lawsuit.

[11]   HIK provides marketing and support services to AWIS.

65.      Based on the record evidence, Defendant's dealings with AWIS and NIIA have led to Defendant receiving \$860,271.25 through the end of 2021.[12]  This sum is based on the following calculation:

$$\$8,448.05^{13} \ + \ \$13,263.55^{14} \ + \ \$116,986.85^{15} \ + \ \$252,029.55^{16} \ + \ \$469,543.25^{17} \ = \ \$860,271.25^{18}$$

### 2.      BREACH OF THE CONFIDENTIALITY OBLIGATIONS

66.      Defendant also breached his Contractual Confidentiality Obligations while he was CEO by sharing the Company's confidential information with his father, Chris Pagnanelli.

67.      By defending his disclosure of such information to his father as subject to a "verbal"[19] non-disclosure agreement between them, Defendant necessarily admits that he understood that the information was confidential. Similarly, when Defendant shared Insurety's financial model with Joseph Safina, he asked Safina to sign a non-disclosure agreement.

68.      After sharing Company's confidential information with his father, Defendant and Chris Pagnanelli used such information to substantiate, refine, update, and improve the financial

---

[12]   Although this Court notes for the record that Defendant received a total of \$860,271.25 through a variety of sources as part of his "kickback scheme," there is no support for Plaintiffs' request to disgorge Defendant's ill-gained profits in a breach of contract claim under Florida law. *See, e.g., Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1245 (11th Cir. 2009) ("As this Court has recognized, under Florida law, disgorgement of profits earned is not a remedy for breach of contract." (citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1494 (11th Cir. 1983))).

[13]   Payment from HIK to Defendant on December 18, 2019.

[14]   Defendant's 2018 IRS Form 1099-MISC from Mansfield.

[15]   Defendant's 2019 IRS Form 1099-MISC from Mansfield.

[16]   Defendant's 2020 IRS Form 1099-MISC from HIK.

[17]   Payments from HIK to Defendant from January 9, 2021, to December 3, 2021.

[18]   These payments to Defendant were not compensation for a board seat. Rather, the payments to Defendant were payments for referral fees for policies sold through AWIS and NIIA.

[19]   This Court notes that verbal can mean oral or written. Defendant likely meant that he attempted to enter into an *oral* non-disclosure agreement with his father.

modeling of Insurety's business, including but not limited to the spreadsheet file that Defendant calls the "Updated Pagnanelli Model."

69.     After Defendant was terminated by the Company, Defendant and Chris Pagnanelli in direct contravention of the Employment Agreement used the Company's confidential information to steer business away from Insurety.

70.     More specifically, Defendant used the Updated Pagnanelli Updated Model to secure funding for NIIA through Advance Plus LLC ("Advance Plus"), which is a lender of one of Insurety's competitors.

71.     Defendant successfully secured funding for NIIA through Advance Plus in November of 2019.

72.     As a result of Defendant's breach of his Contractual Confidentiality Obligations, Defendant has continued to receive illicit payments from NIIA (paid through HIK).

### 3.     BREACH OF THE RESTRICTIVE COVENANTS OF THE EMPLOYMENT AGREEMENT

73.     Defendant also violated the Non-Competition Provision of his Employment Agreement.

74.     First, Defendant, in connection with Jordan and well within the one-year non-compete, tried to arrange financing with Producer Advance (a competitor of Insurety) for existing clients at AWIS and transfer them to NIIA in violation of section 6(D)(V) the Employment Agreement.

75.     After Producer Advance declined to do business with Defendant and Jordan, Defendant tried to arrange financing for AWIS with Financial Carrier Services (another competitor of Insurety) within the one year non-compete period.

76.     After Financial Carrier Services also declined to do business with Defendant and Jordan, Defendant then reached out to Advance Plus (another competitor of Insurety) within the one year non-compete period in a last-ditch effort to establish and obtain funding for AWIS, which at this point had fully merged into NIIA.

77.     As part of those efforts, Defendant and his father built an investment analysis pro forma for a specific deal structure and accompanying PowerPoint presentation for NIIA. Defendant used those documents to make a funding pitch to various competitors of Insurety

78.     As discussed above, NIIA was a shell entity owned by Jordan that was used to step into AWIS's shoes. NIIA was, therefore, a client or potential client for Insurety.

79.     Defendant acted as the lead for NIIA in negotiating and providing information for the purpose of negotiating the eventual funding relationship between NIIA and Advance Plus, LLC. Defendant was principally responsible for NIIA's search for a funding partner in place of Insurety.

80.     Defendant successfully secured substitute funding for NIIA in late 2019, within his one-year non-compete period.

81.     When NIIA began operations in 2019, it continued the practice of paying Defendant on polices sold that started with AWIS, which were paid to Defendant through HIK.

82.     As a result of Defendant's breach of the Non-Competition Provision of his Employment Agreement (and in combination with his other bad acts), Defendant has continued to receive illicit payments from NIIA (paid through HIK).

### 4.   BREACH OF CONTRACT REMEDIES

83.   Plaintiffs have not profited from the transactions with AWIS, nor are they seeking a double-recovery. Plaintiffs only seek to recover their remaining losses resulting from Defendant's breach of contract.

84.   The Company's loss of **$8,088,934.00** resulting from Defendant's advances to AWIS was the foreseeable and normal consequence of such transactions because Defendant knew that there was no legitimate business purpose for such advances, Defendant knew that AWIS was not a viable business and could not survive on its own, and Defendant knew that Insurety was unlikely to be repaid. This Court further finds that Plaintiffs would not have entered into an advanced funding relationship with AWIS absent Defendant's inducement—in other words, absent Defendant's breach of the Employment Agreement, Plaintiffs would not have been damaged by the funding relationship with AWIS. Accordingly, this Court finds that the **$8,088,934.00** in damages were the kind of damages that were contemplated by the Company and Defendant at the time they entered into the Employment Agreement.

85.   The Company's loss of **$8,088,934.00** is calculated by adding the amount Insurety advanced to AWIS ($36,902,303.00) and the amount Insurety paid to borrow money to provide AWIS the advance ($5,404,617.00) and subtracting from that sum ($42,306,920.00) the amount Insurety collected from AWIS ($30,915,093.00) as well as the amount AWIS paid Insurety to settle the Texas lawsuit ($3,302,893.00).

86.   Based on the evidence presented at trial, this Court finds that Plaintiffs failed to provide sufficient support for their request to recover from Defendant the amount Insurety paid in legal fees and costs related to Plaintiffs' efforts to recover monies owed by AWIS:

$1,624,407.00.[20] Preliminarily, the Employment Agreement does not provide Plaintiffs a basis to recover attorneys' fees and costs as a remedy in the event Defendant breached the Employment Agreement. In any event, Plaintiffs failed to provide this Court with documentation to support their request to recover the legal fees and costs Insurety incurred in connection with the AWIS litigation—other than the AWIS Legal Fees Demonstrative, which lacks any specificity whatsoever and was not admissible as evidence. Based on the evidence presented at trial, this Court finds that the legal fees and costs Plaintiffs paid in their effort to recover from AWIS do not naturally flow from Defendant's breach of the Employment Agreement.

87.     Accordingly, this Court finds that Plaintiffs proved by a preponderance of the evidence that they were damaged by Defendant's breach of his Employment Agreement in the amount of **$8,088,934.00.**

88.     This Court further finds that Plaintiffs are not entitled to the disgorgement of Defendant's ill-gotten profits from his kickback scheme with AWIS and NIIA under Plaintiffs' breach of contract claim.

---

[20]   Plaintiffs relied exclusively upon the following demonstrative at trial and in their Closing Statement to support their request for the legal fees and costs Insurety incurred in the AWIS litigation (the "AWIS Legal Fees Demonstrative"):

| Legal Fees and Expenses: | |
| --- | --- |
| - Legal Fees to Mayor Brown through Dec. 23, 2022: | ($929,492) |
| - Legal Fees to Whitley Penn through Dec. 23, 2022: | ($278,826) |
| - Legal Fees to Haynes and Boone through Dec. 23, 2022: | ($416,089) |
| - Related Travel and Out of Pocket Costs: | () |

89.     Moreover, under the circumstances of this case, considering how much time has passed since Defendant's termination for cause, this Court finds that the equities, on balance, do not support Plaintiffs' request for equitable tolling of the restrictive covenants of the Employment Agreement.

**D.**     ***Count II: Breach of Fiduciary Duty***

90.     Because Defendant, 777 Partners, and Insurety were parties to the Employment Agreement, this Court finds that Count II of the Amended Complaint is duplicative of Count I.

**E.**     ***Counts III and IV: Misappropriation of Trade Secrets***

91.     Defendant misappropriated the Company's trade secrets in violation of his Employment Agreement.

92.     Defendant, with his father's assistance, created unique financial models containing proprietary trade secret information including transaction structures and formulas that price new transactions and calculate persistency and attrition rates based on Insurety's historical data to more accurately understand the potential return for Insurety on each transaction.

93.     These trade secrets were developed by Defendant and his father while Defendant was employed by the Company. Defendant and his father used information not generally known to and not readily ascertainable by proper means by persons outside the Company.

94.     The subject trade secrets give the Company an advantage over its competitors by enabling it to accurately price deals, understand the potential return for Insurety on each transaction, and offer more advanced terms than its competitors.

95.     The Company was and is the owner of all the information, documents, and files Defendant and his father used to create the Updated Pagnanelli Model.

96.     The Updated Pagnanelli Model is, itself, the Company's trade secret and work product.

97.     The Company has and continues to take reasonable steps to protect the secrecy of its trade secrets. The Company requires employees to maintain the confidentiality of its trade secrets by having them sign confidentiality agreements and including confidentiality terms within its employment agreements. Only high-level employees have access to the trade secrets, and no third parties are allowed to view the information without the benefit of an executed non-disclosure agreement.

98.     The Company used its trade secrets in interstate commerce.

99.     The Company derives actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors.

100.    The trade secrets were provided to Defendant pursuant to a duty of confidentiality under the Employment Agreement.

101.    Defendant misappropriated the Company's trade secrets that he had access to during his tenure as Insurety's CEO by sharing them with his father, Chris Pagnanelli, without authorization from the Company.

102.    Defendant also misappropriated the Company's trade secrets by using and disclosing them in connection with his efforts to help NIIA solicit and secure a new advance partner.

103.    Defendant's misuse of the Company's trade secrets was willful and malicious, entirely unauthorized, improper, and constituted a theft and misappropriation of such trade secrets.

**F.     *Counterclaim: Breach of Contract Claim***

104.    Plaintiffs fully performed their duties under the Employment Agreement by employing Defendant as the CEO of Insurety and paying him the agreed-upon salary.

105.    Defendant breached his duties under the Employment Agreement by breaching the Contractual Loyalty Duties and Confidentiality Obligations.

23

106. Plaintiffs terminated Defendant for cause pursuant to the plain terms of the Employment Agreement as a direct result of Defendant having breached his Contractual Loyalty Duties and Confidentiality Obligations.

107. Plaintiffs complied with their obligations under the Employment Agreement and paid Defendant all amounts due upon his termination by Plaintiffs for cause: "(i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; and (iii) *no other severance.*"

108. Once Defendant breached his Contractual Loyalty Duties and Confidentiality Obligations under the Employment Agreement, Plaintiffs had no obligation to continue to adhere to their duties under the Employment Agreement.

109. Accordingly, Defendant is not entitled to any severance or any further benefit pursuant to the Employment Agreement.

110. Further, this Court expressly finds that they did not disparage Defendant because Defendant was involved in a profitable kickback scheme set up during his employment as the CEO of Insurety. Any statements made by Insurety concerning Defendant's character stemmed from their realization that Defendant was involved in a kickback scheme at Plaintiffs' expense. Even were Plaintiffs to have "disparaged" Defendant within the definition set forth in the Employment Agreement, Plaintiffs were not obligated to continue to adhere to the terms of the Employment Agreement following Defendant's breach of the Employment Agreement.

111. Therefore, Defendant cannot prevail on his Counterclaim for breach of the Employment Agreement.

## II.   CONCLUSIONS OF LAW

### A.   *Jurisdiction and Venue*

1.      This Court has subject matter jurisdiction over Plaintiffs' federal claim for Trade Secret Misappropriation under the Defend Trade Secrets Act of 2016 (Count IV) pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

2.      The Court has subject matter jurisdiction over Plaintiffs' and Defendant's pendent state law claims under 28 U.S.C. § 1367 because the state law claims arise out of a common nucleus of operative facts as the federal law claim.

3.      Pursuant to Section 9(F) of the Employment Agreement, venue is proper and rests exclusively in Miami-Dade County, Florida, which also is the county where the causes of action arose.

### B.   *Count I: Breach of Contract*

4.      To prevail on Count I, Plaintiffs must prove "(1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017) (citing *Murciano v. Garcia*, 958 So. 2d 423, 423 (Fla. 3d DCA 2007)).

5.      Where a valid contract exists, a court must interpret that contract in accordance with the contract's plain, unambiguous terms. *E.g.*, *CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015).

6.      "A contract is ambiguous when it is susceptible to more than one reasonable interpretation . . . ." *Id.* "[B]ut, 'where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner.'" *Id.* (quoting *BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012)).

7.     "Actual or compensatory damages are those amounts necessary to compensate adequately an injured party for losses sustained as the result of a defendant's wrongful . . . actions." *Price v. Tyler*, 890 So. 2d 246, 251 (Fla. 2004) (quoting *Bidon v. Dep't of Prof. Regulation, Fla. Real Estate Comm'n*, 596 So. 2d 450, 452 (Fla. 1992)). "The objective of compensatory damages is to make the injured party whole to the extent that it is possible to measure his injury in terms of money." *Northamerican Van Lines, Inc. v. Roper*, 429 So. 2d 750, 752 (Fla. 1st DCA 1983).

8.     "[D]ifficulty in proving damages or uncertainty as to the amount will not prevent recovery [for breach of contract] as long as there is sufficient evidence to satisfy the mind of a prudent, impartial person as to the amount . . . ." *Schimpf v. Reger*, 691 So. 2d 579, 580 (Fla. 2d DCA 1997). In other words, there must be a reasonable basis for the amount awarded in a breach of contract claim. *Id.*

9.     In Florida, "the general rule is that attorney's fees incurred while prosecuting or defending a claim are not recoverable in the absence of a statute or contractual agreement authorizing their recovery." *Price*, 890 So. 2d at 251 (quoting *Bidon*, 596 So. 2d at 452).

10.     Under the "wrongful act doctrine," however, a plaintiff may recover third-party litigation expenses as special damages when the defendant's wrongful act caused the plaintiff to litigate with a third party. *State Farm Fire & Cas. Co. v. Pritcher*, 546 So. 2d 1060, 1061 (Fla. 3d DCA 1989). Specifically, under the doctrine,

> where the wrongful act of the defendant has involved the claimant in litigation with others, and has placed the claimant in such relation with others as makes it necessary to incur expenses to protect its interest, such costs and expenses, including reasonable attorney's fees *upon appropriate proof*, may be recovered as an element of damages.

26

*Northamerican Van Lines*, 429 So. 2d at 752 (emphasis added) (quoting *Baxter's Asphalt, Etc. v. Liberty Cnty.*, 406 So. 2d 461, 467 (Fla. 1st DCA 1981)).

11.     A request for recovery for attorneys' fees under the wrongful act doctrine is a request for "special damages," which must be specially pleaded. *See Robbins v. McGrath*, 955 So. 2d 633, 634 (Fla. 1st DCA 2007) (citing *Winselmann v. Reynolds*, 690 So. 2d 1325, 1328 (Fla. 3d DCA 1997)).

12.     The wrongful act doctrine applies "only when litigation ensuing from a party's wrongful act was against a third party—not directly against the defendant." *MV Senior Mgmt., LLC v. Redus Fla. Housing, LLC*, 319 So. 3d 66, 67 (Fla. 1st DCA 2020).

13.     To recover legal fees and expenses incurred under the wrongful act doctrine for a defendant's breach of contract, a plaintiff need not "present corroborating testimony from an independent expert . . . as to the reasonableness of the fees." *Schwartz v. Bloch*, 88 So. 3d 1068, 1072 (Fla. 4th DCA 2012). Such an award needs only a reasonable basis in the evidence for the amount awarded.

14.     Here, Plaintiffs have proved by a preponderance of the evidence that the Employment Agreement is a valid and binding agreement between the Company (777 Partners and Insurety), on the one hand, and Defendant, on the other hand.

15.     Plaintiffs have proved by a preponderance of the evidence that Defendant breached the Employment Agreement in separate and independent ways.

16.     Plaintiffs have proved by a preponderance of the evidence that the Company performed its obligations under the Employment Agreement by, among other things, employing Defendant as CEO of Insurety and paying him the agreed-upon salary on the agreed-upon terms until his termination.

17. Plaintiffs proved by a preponderance of the evidence that Defendant breached his Contractual Loyalty Duties by engaging in self-interested dealings with AWIS that were not disclosed to the Company.

18. Plaintiffs proved by a preponderance of the evidence that Plaintiffs would not have entered into a funding relationship with AWIS absent Defendant's inducement.

19. Plaintiffs also proved by a preponderance of the evidence that Defendant breached his Contractual Confidentiality Obligations by improperly disclosing the Company's confidential information to his father without authorization and using such information to help AWIS and NIIA replace Insurety with a new advance partner.

20. Plaintiffs have demonstrated by a preponderance of the evidence that Defendant breached the Restrictive Covenants of his Employment Agreement by violating the Non-Competition Provision of the Employment Agreement through his efforts to secure and establish funding for AWIS and NIIA from three competitors of Insurety.

21. Under Florida law a restrictive covenant not to compete is enforceable under certain conditions. *See* § 542.335(1), Fla. Stat. (2022).

22. Section 542.335 states that the "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited." *Id.* But the following conditions must be satisfied:

> (1) The covenant must be in writing and signed by the person against whom enforcement is sought, *id.* § 542.335(1)(a);
>
> (2) "The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant[,]" *id.* § 542.335(1)(b); and

28

(3)     "[The] person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interest justifying the restriction[,]" *id.* § 542.335(1)(c).

23.     The term "legitimate business interests" includes: (1) trade secrets, as defined in section 688.002(4), Florida Statutes; (2) "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets[;]" (3) "[s]ubstantial relationships with specific prospective or existing customers, patients, or clients[;]" and (4) "[c]ustomer, patient, or client good will . . . ." § 542.335(1)(b).

24.     Defendant admits that the Restrictive Covenants survive the termination of his Employment Agreement and employment.

25.     Here, the Restrictive Covenants were set forth in writing in the Employment Agreement.  Further, the Restrictive Covenants were reasonable in time, area, and the line of business.  The Restrictive Covenants are reasonably necessary to protect the Company's legitimate business interests.

26.     The Restrictive Covenants are also reasonably necessary to protect the Company's legitimate business interests, including its trade secrets, valuable confidential business information, professional information, substantial relationships with specific prospective and existing customers, goodwill, and business knowledge and practices.

27.     Plaintiffs are not entitled to disgorgement of Defendant's ill-gotten profits as a remedy for Plaintiffs' breach of contract claim. *See, e.g.*, *Proudfoot Consulting*, 576 F.3d at 1245 ("As this Court has recognized, under Florida law, disgorgement of profits earned is not a remedy for breach of contract.") (citing *Mason*, 710 F.2d at 1494)).

28.     This Court finds that Plaintiffs are not entitled to recover the sum Insurety incurred in legal fees and costs associated with the AWIS litigation. First, the Employment Agreement does

not provide Plaintiffs the right to recover attorneys' fees and costs as a result of Defendant's breach of the Employment Agreement. *See Price*, 890 So. 2d at 251 ("[In Florida,] the general rule is that attorney's fees incurred while prosecuting or defending a claim are not recoverable in the absence of a statute or contractual agreement authorizing their recovery." (quoting *Bidon*, 596 So. 2d at 452)). Second, Plaintiffs did not specially plead that they were entitled to recover the legal fees and costs incurred in connection with the AWIS litigation in their Third Amended Complaint, or any other previously filed complaint, as special damages under the wrongful act doctrine. *See Robbins*, 955 So. 2d at 634 (citing *Winselmann*, 690 So. 2d at 1328). This Court finds, however, that the wrongful act doctrine would have allowed Plaintiffs the opportunity to argue their entitlement to recover the legal fees and costs incurred by Insurety in connection with the AWIS litigation had Plaintiffs sufficiently pleaded that they were entitled to such relief. *See id.* (citing *Winselmann*, 690 So. 2d at 1328). In any event, even were Plaintiffs to have sufficiently specially pleaded their request for the recovery of the legal fees and costs in connection with the AWIS litigation, Plaintiffs are not entitled to recover the subject legal fees because Plaintiffs failed to provide any evidentiary support for their request. *See supra* note 20 and accompanying text. Accordingly, this Court excludes the amount Plaintiffs purportedly expended in the AWIS litigation ($1,624,407.00) from its calculation of the actual damages Plaintiffs incurred due to Defendant's breach of the Employment Agreement.

29.     This Court finds that Plaintiffs are entitled to recover **$8,088,934.00** in damages as the foreseeable and normal result of Defendant's breach of the Employment Agreement—in other words, this Court expressly finds that the **$8,088,934.00** in damages are causally connected to Defendant's breach of the Employment Agreement.

30.     Final judgment shall enter in Plaintiffs' favor and against Defendant in the amount of **$8,088,934.00** as to Count I.

### C.     *Count II: Breach of Fiduciary Duty*

31.     To prevail on its breach of fiduciary duty claim in Florida, Insurety must prove "(1) the existence of a fiduciary relationship; (2) breach of a duty owed by the fiduciary; and (3) proximate cause." *See Combe v. Flocar Inv. Grp. Corp.*, 977 F. Supp. 2d 1301, 1307 (S.D. Fla. 2013) (citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)).

32.     "[A] fiduciary relation exists between two persons when one of them is under a duty to act for to give advice for the benefit of another upon matters within the scope of that relation." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002).

33.     "Officers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of authority or neglect of duty." *Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021) (citing *Flight Equip. & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958)).

34.     Two fundamental fiduciary duties are recognized in Florida: the duty of care and the duty of loyalty. *Id.*

35.     Because, however, this Court finds that Insurety is a party to the Executive Employment Agreement, judgment is entered in Defendant's favor as to Count II because it is duplicative of Count I.[21] *See XP Glob., Inc. v. AVM, L.P.*, No. 16-cv-80905, 2016 WL 4987618, at *4 (S.D. Fla. Sept. 19, 2016) ("[A] tort claim can be stated alongside a claim for breach of

---

[21]    Even were Insurety not a party to the Employment Agreement, Defendant would still owe Insurety the fiduciary duties of care and loyalty as its CEO. *See, e.g., McCoy v. Durden*, 155 So. 3d 399, 403 (Fla. 1st DCA 2014) ("In short, Florida courts have recognized that corporate officers and directors owe both a duty of loyalty and a duty of care to the corporation that they serve." (first citing *Cohen v. Hattaway*, 595 So. 2d 105 (Fla. 5th DCA 1992); and then citing *B & J Holding Corp. v. Weiss*, 353 So. 2d 141 (Fla. 3d DCA 1978))).

contract where the plaintiff has alleged conduct that does not itself constitute breach of the contract at issue.").

### D. *Counts III and IV: Trade Secret Misappropriation*

#### 1. THE DTSA (COUNT III)

36. Under the DTSA, a "trade secret" is broadly defined as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
(A) the owner thereof has taken reasonable measures to keep such information secret; and
(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C. § 1839(3).

37. The DTSA defines "misappropriation" as the

(A)     acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B)     disclosure or use of a trade secret of another without express or implied consent by a person who—
(i) used improper means to acquire knowledge of the trade secret;
(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
(I)     derived from or through a person who had used improper means to acquire the trade secret;
(II)     acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(III)     derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(iii) before a material change of the position of the person, knew or had reason to know that—
(I)     the trade secret was a trade secret; and
(II)     knowledge of the trade secret had been acquired by accident or mistake . . . .

*Id.* § 1839(5).

38.     To prevail under the DTSA, Plaintiffs must prove that they (1) "'possessed information of independent economic value' that (a) 'was lawfully owned by' [Plaintiffs] and (b) for which [Plaintiffs] 'took reasonable measures to keep secret,' and [(2) Defendant] 'used and/or disclosed that information,' despite [(3)] 'a duty to maintain its secrecy.'" *See Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 23d 1279, 1293 (S.D. Fla. 2018) (citing *Trinity Graphic USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018)).

39.     Pursuant to the DTSA, "court[s] may award . . . damages for actual loss caused by the misappropriation of the trade secret." *See* § 1836(b)(3)(B)(i)(I). Additionally, courts may, "in a civil action brought . . . with respect to the misappropriation of a trade secret, . . . grant an injunction . . . to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable," provided that the injunction meets certain statutory conditions. *See* § 1836(b)(3)(A).

40.     A court may grant an injunction under the DTSA so long as the injunction does not

(I)     prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II)     otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business.

§ 1836(b)(3)(A)(i). Such an injunction may require "affirmative actions . . . be taken to protect the trade secret" if determined appropriate by the court. *Id.* § 1836(b)(3)(A)(ii). The inunction may also condition the future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited . . . ." *Id.* § 1836(b)(3)(B)(i).

41.     If appropriate, this Court may award "(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment cause by the

33

misappropriation of the trade secret that is not addressed in computing damages for actual loss . . . ." *Id.* § 1836(b)(3)(v)(i)(I)–(II).

### 2. THE FUTSA (COUNT IV)

42. "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC,* 898 F.3d 1279, 1297 (11th Cir. 2018) (quoting *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017)).

43. Under FUTSA, a "trade secret" is defined as

information, including a formula, pattern, compilation, program, device, method, technique, or process that:
(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 688.002(4), Fla. Stat. (2022).

44. "Misappropriation" is likewise defined as

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
1. Used improper means to acquire knowledge of the trade secret; or
2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
a. Derived from or through a person who had utilized improper means to acquire it;
b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 688.002(2).

34

45.    "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998).

### 3.    DEFENDANT MISAPPROPRIATED PLAINTIFFS' TRADE SECRETS UNDER THE DTSA (COUNT III) AND FUTSA (COUNT IV)

46.    The evidence presented at trial showed that Defendant, with his father's assistance, created a unique financial model, the Updated Pagnanelli Model, which relied upon many of the Company's "trade secrets," as defined under the DTSA and FUTSA, including transaction structures and formulas that price new transactions and calculate persistency and attrition rates based on Insurety's historical data to more accurately understand the potential return for Insurety on each transaction.

47.    Plaintiffs have proved by a preponderance of the evidence that the Company was and is the owner of all the information, documents, and files Defendant and his father used to create the Updated Pagnanelli Model.

48.    Plaintiffs have proved by a preponderance of the evidence that the trade secrets were provided to Defendant pursuant to a duty of confidentiality.

49.    Although Defendant created the Updated Pagnanelli Model, pursuant to the Employment Agreement, the Updated Pagnanelli Model is, itself, the Company's trade secret and work product.

50.    Plaintiffs have proved by a preponderance of the evidence that the Company has and continues to take reasonable steps to protect the secrecy of its trade secrets. The Company requires employees to maintain the confidentiality of its trade secrets by having them sign confidentiality agreements and including confidentiality terms within its employment agreements.

Only high-level employees have access to the trade secrets, and no third parties are allowed to view the information without the benefit of an executed non-disclosure agreement.

51.     Plaintiffs have proved by a preponderance of the evidence that the subject trade secrets give the Company an advantage over its competitors by enabling it to accurately price deals, understand the potential return for Insurety on each transaction, and offer more advanced terms than its competitors.

52.     Plaintiffs have proved by a preponderance of the evidence that the Company derives actual independent economic value from these trade secrets, as they are not generally known or readily ascertainable by others or Plaintiffs' competitors.

53.     Further, Plaintiffs have proved by a preponderance of the evidence that the Company used its trade secrets in interstate commerce.

54.     Plaintiffs have proved by a preponderance of the evidence that Defendant intentionally misappropriated the Company's trade secrets that he had access to during his tenure as Insurety's CEO by sharing them with his father, Chris Pagnanelli, without authorization.

55.     Plaintiffs have proved by a preponderance of the evidence that Defendant also intentionally misappropriated the Company's trade secrets by using or disclosing them in connection with Defendant's efforts to help NIIA solicit and secure a new advance partner.

56.     Plaintiffs have proved by a preponderance of the evidence that Defendant's misuse of the Company's trade secrets was entirely unauthorized and improper and constituted misappropriation of Plaintiffs' trade secrets under the DTSA and FUTSA.

### 4.  DAMAGES UNDER THE DTSA AND FUTSA[22]

57.    Pursuant to this Court's Order Adopting Magistrate Judge Otazo-Reyes's Report and Recommendation on Defendant's Motion for Partial Summary Judgment, Plaintiffs are not entitled to lost profits as a measure of damages for their claim under the DTSA.  In any event, the evidence presented at trial does not support Plaintiffs' claims for lost profits as a result of Defendant's misappropriation under the DTSA.

58.    Plaintiffs have proved by a preponderance of the evidence that Defendant's misappropriation of the Company's trade secrets was willful and malicious, but the circumstances set forth in this case do not warrant granting Plaintiffs exemplary damages against Defendant.

59.    In the Third Amended Complaint, Plaintiffs requested disgorgement of Defendant's ill-gotten profits or gains is an available remedy under the DTSA as a form of "unjust enrichment caused by the misappropriation." *See* § 1836(b)(3)(B)(i)(II); *see also TB Food USA, LLC v. Am. Mariculture, Inc.*, No. 17-cv-9-FtM-29NPM, 2022 WL 3028061, at *18 (M.D. Fla. Aug. 1, 2022) ("Disgorgement is available under the FUTSA and DTSA." (citing *Advantor Sys. Corp.*, 678 F. App'x at 857)).

60.    In the Third Amended Complaint, Plaintiffs requested disgorgement of Defendant's ill-gotten profits or gains is an available remedy under the FUTSA as a form of "unjust enrichment caused by the misappropriation . . . ." *See* § 688.004(1), Fla. Stat.

---

[22]    Although Plaintiffs could recover damages under either its DTSA claim or FUTSA claim, each of those claims arise from a single injury: Defendant's misappropriation of Plaintiffs' trade secrets. *Supra* Part II.D.3. Plaintiffs are, therefore, entitled to only a single award of damages, regardless of which theory under which it is awarded, because "no duplicating recovery of damages for the same injury may be had." *See St. Luke's Cataract & Laser Institute, P.A. v. Sanderson*, 573 F.3d 1186, 1204 (11th Cir. 2009) (citing *White v. United States*, 507 F.2d 1101, 1103 (5th Cir. 1975)); *see also Behavior Analyst Certification Bd., Inc. v. Elvirez*, No. 21-cv-22833, 2023 1812196, at *7 (S.D. Fla. Feb. 8, 2023) (limiting plaintiff's recovery in a DTSA and FUTSA action to avoid a double recovery).

61. This Court finds that Plaintiffs did not prove by a preponderance of the evidence that Defendant profited from his misappropriation of Plaintiffs' trade secrets.

62. This Court also finds that Plaintiffs have proved by a preponderance of the evidence that they are entitled to injunctive relief against Defendant's continued unauthorized use of Plaintiffs' trade secrets. Defendant is further **ORDERED** to cease using Plaintiffs' trade secrets, including the Updated Pagnanelli Model or any "pro forma" (as Defendant refers to such models) that are derived from the Updated Pagnanelli Model or any other trade secret owned by Plaintiffs.

63. This Court further determines that both the DTSA and FUTSA permit Plaintiffs to recover reasonable attorneys' fees in this action for Defendant's misappropriation of Plaintiffs' trade secrets.

64. Plaintiffs are entitled to reasonable attorneys' fees pursuant to § 1836(b)(3)(D) and section 668.005, Florida Statutes. This Court reserves jurisdiction to determine the reasonableness of the attorneys' fees award in this action by separate motion and order.

65. Accordingly, final judgment shall enter in favor of Plaintiffs and against Defendant in the amount of **$0**, plus reasonable attorneys' fees to be determined by separate motion and order, as to Counts III and IV.

E. *Defendant's Counterclaim: Breach of Contract Against 777 Partners*

66. To prevail on his Counterclaim for breach of contract, Defendant must prove that (1) a valid contract between 777 Partners and Defendant existed, (2) 777 Partners materially breached the contract, and (3) Defendant suffered damages as a result of 777 Partners's breach. *See Deauville Hotel Mgmt.*, 219 So. 3d at 953 (citing *Murciano*, 958 So. 2d at 423).

67. Where a valid contract exists, a court must interpret that contract in accordance with the contract's plain, unambiguous terms. *E.g.*, *Turner*, 172 So. 3d at 504.

68.     In the Counterclaim, Defendant argues that 777 Partners breached the Employment Agreement by (1) failing to pay Defendant the severance pursuant to the terms of the Employment Agreement and (2) disparaging him in violation of the Non-disparagement provision. As set forth herein, this Court finds that Defendant failed to prove by a preponderance of the evidence that 777 Partners breached the Employment Agreement.

69.     The Employment Agreement contains the following provisions pertinent to the first issue in the Counterclaim:

7. TERMINATION AND SEVERANCE:

A. Termination by the Company Without Cause or by Executive for Good Reason: Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below) or by Executive for Good Reason. In the event of a termination by the Company without Cause or by Executive for Good Reason prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to eight (8) months of Executive's then annual compensation payable over the eight (8) months immediately following the last day of employment in accordance with the Company's normal payroll practices. Executive must execute (and not revoke) a complete release of claims, acceptable in form and substance to the Company, as a condition to receiving Basic Severance and reimbursement of COBRA premiums.

I. For purposes of this Agreement, "Good Reason" shall mean any of the following "Trigger Events": (1) a material breach of this Agreement; or (2) a material diminishment in the title, position, duties, or responsibilities of Executive. Notwithstanding the foregoing, no basis for a termination by Executive for Good Reason will be deemed to exist unless (a) Executive notifies the Company in writing within thirty (30) days after the Trigger Event occurs that Executive Intends to terminate employment for Good Reason no earlier than thirty (30) days after providing such notice; (b) the Company does not cure such condition within thirty (30) days following its receipt of such notice or states unequivocally in writing that it does not intend to attempt to cure such condition; and (c) the Executive resigns from employment prior to expiration of thirty (30) days after the end of the cure period described in (b) above.

II. For purposes of this Agreement, "Cause" shall mean Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of

this Agreement; (4) material misconduct, Including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) material violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or nolo contendere to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.

III. Notwithstanding anything else to the contrary in this Agreement, it is expressly understood that any obligation of the Company to pay Basic Severance shall be subject to Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the Company, its officers, Executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations (the "Continuing Obligations"). The Company will have no liability to pay any Basic Severance if Executive violates the Continuing Obligations, and the Executive shall be obliged to immediately repay any Basic Severance previously paid.

B. <u>Termination by the Company for Cause or by Executive Without Good Reason</u>: Executive's employment under this Agreement may be terminated at any time by the Company for Cause or by Executive without Good Reason. In the event of such a termination, Executive shall be entitled to receive: (i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; and (iii) no other severance.

70.     In its Affirmative Defenses, 777 Partners argues that it did not breach the Employment Agreement by failing to provide Defendant the severance package to which he claims entitlement because the Company terminated Defendant "for cause" under the plain terms of the Employment Agreement for Defendant's material breach of the Employment Agreement and no severance is due under those circumstances.

71.     Pertinent to the second issue in the Counterclaim, Employment Agreement contains the following Non-disparagement provision:

III. <u>Non-Disparagement</u>: The Parties agree that neither Party will at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statement concerning the other Party or its affiliates or their respective partners, members, or employees. "Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged.  Nothing in this Agreement shall preclude the Parties from any truthful, good faith response to any inquiries under oath or in response to governmental inquiry.  The Parties agree that neither Party will speak about the other Party and/or its affiliates and/or their management or business to the media, whether electronic, print or otherwise, without the express prior written approval of the other Party.

72.     In its Affirmative Defenses to Defendant's Counterclaim, 777 Partners argues that Defendant's material breach of the Employment Agreement discharged 777 Partners from its obligations under the Employment Agreement.

73.     Under Florida law, when a party materially breaches a contract, the non-breaching party is entitled to treat the breach as a discharge of its own contractual obligations. *See, e.g., Small v. State*, 249 So. 3d 675, 676 (Fla. 2d DCA 2018) ("It is a well-established principle of contract law that one party's material breach relieves the other party of his obligations under the contract." (citing *Green Tree Servicing, LLC v. Milam*, 177 So. 3d 7, 14 (Fla. 2d DCA 2015))); *Jones v. Warmack,* 967 So.2d 400, 402 (Fla. 1st DCA 2007) ("If one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract." (citing *Reider v. P-48, Inc.*, 362 So. 2d 105, 109 (Fla. 1st DCA 1978))); *Starling v. Allstate Floridian Ins.*, 956 So. 2d 511, 513 (Fla. 5th DCA 2007) ("In other words, a material breach of an insured's duty to comply with a policy's condition precedent relieves the insurer of its obligations under the contract."); *Colucci v. Kar Kare Auto. Grp., Inc.*, 918 So. 2d 431, 437 (Fla. 4th DCA 2006) ("[T]he general rule is that a material breach of [a contract] allows the non-breaching party to treat the breach as a discharge of his contractual liability." (quoting *Benemerito & Flores, M.D.'s, P.A. v. Roche, M.D.*, 751 So. 2d 91, 93 (Fla. 4th DCA 1999))); *Toyota Tusho*

41

*Am., Inc. v. Crittenden*, 732 So. 2d 472, 477 (Fla. 5th DCA 1999) ("When a nonbreaching party to a contract is confronted with a breach by the other party, the nonbreaching party may stop performance, treating the breach as a discharge of its contractual liability." (citing *Bradley v. Health Coalition, Inc.*, 687 So. 2d 329, 333 (Fla. 3d DCA 1997))); *Cortell v. Barrow*, 510 So. 2d 1077, 1078–79 (Fla. 5th DCA 1987) (finding employer was not bound to perform because employee breached reimbursement agreement).

74.     A breach does not relieve the obligations of the non-breaching party where the breach is merely technical and the breaching party substantially performed under the contract. 15 Richard A. Lord, *Williston on Contracts* § 44.52, 221–22 n. 17 (4th ed. 2000) (explaining that substantial performance excuses a technical breach because "actual performance is so similar to the required performance that any breach that may have been committed is immaterial").

75.     As set forth herein, this Court finds that Defendant materially breached the Employment Agreement by violating the Contractual Loyalty Duties and Contractual Confidentiality Obligations set forth in the Employment Agreement. *See supra* Part II.B. Later, Defendant breached the Restrictive Covenants.

76.     The record evidence demonstrates that, on April 4, 2019, the Company fired Defendant for cause after an investigation revealed that he had violated the Contractual Loyalty Duties and Contractual Confidentiality Obligations of the Employment Agreement.

77.     The Company did not pay Defendant a severance payment upon its termination of Defendant pursuant to Section 7(B) of the Employment Agreement because the Company terminated Defendant "for cause" following Defendant's material breach of the Employment Agreement.

42

78.     Accordingly, this Court finds that Defendant has not established by a preponderance of the evidence that he was entitled to any severance payment upon termination.

79.     Moreover, this Court finds that Defendant failed to prove by a preponderance of the evidence that 777 Partners breached the Employment Agreement by violating the Non-disparagement provision by defaming Defendant because 777 Partners was not required to continue to abide by its obligations under the Employment Agreement following Defendant's material breach.

80.     Even were 777 Partners required to have abided by its obligations under the Employment Agreement after Defendant's material breach, Defendant failed to establish by a preponderance of the evidence that employees of 777 Partners ever "disparaged" Defendant as defined under the Employment Agreement because the statements made were substantially truthful statements as this Court found that Defendant engaged in a clandestine kickback scheme at the Company's expense. *See Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474061, at *11 (S.D. Fla. July 10, 2014) ("Substantial truth is a complete defense to defamation regardless of the motives of the defamer.").

81.     Accordingly, Defendant has failed to prove by a preponderance of the evidence that 777 Partners breached the Employment Agreement, so Defendant's Counterclaim fails as a matter of law.  Final Judgment shall enter in 777 Partners's favor and against Defendant as to Defendant's Counterclaim.

CASE NO. 20-20172-CIV-MARTINEZ

**F.      *Defendant's Affirmative Defenses*[23]**

82.      The party seeking to assert an affirmative defense has the burden of proof as to that defense. *See, e.g., Pub. Health Tr. of Dade Cnty. v. Holmes*, 646 So.2d 266, 267 (Fla. 3d DCA 1994).

### 1.      SECOND AFFIRMATIVE DEFENSE

83.      Defendant's Second Affirmative Defense reads as follows:

> Plaintiffs' claim for breach of the non-compete provision in the Employment Agreement fails to state a cause of action because the entities Defendant has performed work for since his separation from Insurety, AHCM and NIIA, do not compete with Insurety.

84.      Defendant further argues that his "subsequent employment activity involves neither prospective nor existing customers of Insurety and therefore does not constitute competition."

85.      A plaintiff must prove the following elements: "(1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt.*, 219 So. 3d at 953 (citing *Murciano*, 958 So. 2d at 423).

86.      Pursuant to Section 6(D)(II) of the Employment Agreement, "[d]uring [Defendant's] employment and for one (1) year following the voluntary or involuntary termination of [Defendant's] employment with the Company, [Defendant] *shall not, directly or indirectly, on [Defendant's] behalf or on behalf of a third party, engage in any commercial activity in the United States that competes with the Company . . . .*"

87.      This Court finds that Plaintiffs proved by a preponderance of the evidence that Defendant attempted to secure and successfully secured advance funding for third parties, a clear

---

[23]   This Court addresses only those affirmative defenses that remain at issue following this Court's Order Adopting Magistrate Judge Otazo-Reyes's Report and Recommendation on Defendant's Motion for Partial Summary Judgment, which rendered Defendant's First and Fifth Affirmative Defenses moot.

commercial activity that competes with the Company, within one year of his termination by the Company. As set forth herein, this Court finds that Plaintiffs proved by a preponderance of the evidence that Defendant's breach of Employment Agreement proximately caused the Company to suffer damages in the amount of **$8,088,934.00**.

88.     Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Second Affirmative Defense. Defendant's Second Affirmative Defense is, therefore, **DENIED**.

### 2.     THIRD AFFIRMATIVE DEFENSE

Defendant's Third Affirmative Defense reads as follows:

> Plaintiffs' claim for breach of contract is barred by the doctrine of prior breach. 777 Partners breached the Employment Agreement by undermining Defendant's ability to perform his role as CEO of Insurety.  Among other actions, 777 Partners, together with Insurety, refused to permit Defendant to hire and terminate his own employees, refused to let Defendant agree to any financing terms with clients or potential clients, and required any significant decision of his to be approved by 777 Principal Jorge Beruff, notwithstanding Defendant's position as CEO.  777 Partners and Insurety also prevented Defendant from having any relationship with Insurety funding partners.

89.     "If one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract." *Jones*, 967 So. 2d at 402 (citing *Reider*, 362 So. 2d at 109)).

90.     This Court finds that Plaintiffs have proved by a preponderance of the evidence that Defendant's employment as CEO of Insurety was pursuant to and consistent with 777's standard corporate governance practices. In other words, this Court finds that Plaintiffs did not breach the Employment Agreement before Defendant.

91.     This Court finds that Defendant failed to prove by a preponderance of the evidence that Plaintiffs breached the Employment Agreement first by "undermining Defendant's ability to

perform his role" as Insurety's CEO. Therefore, Defendant's reliance on the prior breach doctrine is misplaced.

92.     Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Third Affirmative Defense. Defendant's Third Affirmative Defense is, therefore, **DENIED**.

### 3.     FOURTH AFFIRMATIVE DEFENSE

93.     Defendant's Fourth Affirmative Defense reads as follows:

Plaintiffs' claim for breach of contract is barred by Plaintiffs' own breach to the extent their claim is premised on continuing obligations under the Employment Agreement, including but not limited obligations relating to confidentiality, non-disparagement, and non-solicitation. Plaintiffs themselves breached the Employment Agreement as alleged above (in the preceding affirmative defense) by failing to pay Defendant severance due under the [Employment] Agreement and by disparaging Defendant repeatedly in violation of the [Employment] Agreement.

94.     As this Court set forth herein, Plaintiffs were not required to pay Defendant severance under the Employment Agreement because the Company terminated Defendant "for cause," and Plaintiffs were not required to abide by their obligations under the Employment Agreement following Defendant's material breach. *See supra* Part II.E; *Jones*, 967 So. 2d at 402 ("If one party to an agreement has breached the agreement, the other party's failure to continue with the agreement is not considered a default of the contract." (citing *Reider*, 362 So. 2d at 109)).

95.     Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Fourth Affirmative Defense. Defendant's Fourth Affirmative Defense is, therefore, **DENIED**.

### 4.     SIXTH, SEVENTH, EIGHTH, AND NINTH AFFIRMATIVE DEFENSES

96.     Defendant's Sixth, Seventh, Eighth, and Ninth Affirmative Defenses are denials rather than true affirmative defenses.

97.     Defendant's Sixth Affirmative Defense reads as follows:

Plaintiffs are not entitled to any relief in Counts III and IV because the two Microsoft Excel Files identified by Plaintiffs (the "Models") are not owned by Plaintiffs. The first Model was developed by Defendant and his father prior to Defendant's employment with Insurety. The second Model, which is simply an updated version of the first, was created by Defendant and his father after Defendant's separation from Insurety. Furthermore, neither Model contained any private or confidential Insurety information.

98.     Defendant's Seventh Affirmative Defense reads as follows:

Plaintiffs are not entitled to any relief in Counts III and IV because the Models are not cognizable trade secrets; rather, they are simply basic spreadsheets showing hypothetical returns on investment based on certain assumptions.

99.     Defendant's Eighth Affirmative Defense reads as follows:

Plaintiffs are not entitled to any relief in Counts III and IV because they do not establish that Plaintiffs took reasonable efforts to protect the secrecy of the Models consistent with the requirements of Fla. Stat. § 688.002 and 18 U.S.C.§ 1839. The Models were not designated as confidential information and their accessibility to employees and clients was not monitored.

100.    Defendant's Ninth Affirmative Defense reads as follows:

Plaintiffs are not entitled to any relief in Counts III and IV because they do not establish that Defendant misappropriated the Models. Defendant did not use improper means to acquire them, since Defendant and his father are the ones who created the Models. Furthermore, as CEO of Insurety, Defendant was able to consent to disclosure of the Models.

101.    Although labeled "affirmative defenses," the above statements are mere arguments that Plaintiffs' *prima facie* misappropriation of trade secret claims are defective. Such statements are, therefore, specific denials. *See Chetu, Inc. v. Salihu*, No. 09-60588-CIV, 2009 WL 3448205, at *3 (S.D. Fla. Oct. 26, 2009).

102.    As specific denials, this Court need not address the merits of Defendant's Sixth, Seventh, Eighth, or Ninth Affirmative Defenses. *See Popkovich v. Slastikhin*, No. 21-cv-20013, 2022 WL 19266303, at *3 (S.D. Fla. Aug. 10, 2022) (addressing only true affirmative defenses in

findings of fact and conclusions of law following a bench trial). In any event, considering that this Court found that Plaintiffs proved by a preponderance of the evidence that Defendant misappropriated its trade secrets under the DTSA and FUTSA, this Court finds that Defendant's Sixth, Seventh, Eighth, and Ninth Affirmative Defenses are merely denials of Plaintiffs' misappropriation of trade secrets claims. Defendant's Sixth, Seventh, Eighth, and Ninth Affirmative Defense are, therefore, **DENIED**.

### 5. TENTH AFFIRMATIVE DEFENSE

103. Defendant's Tenth Affirmative Defense reads as follows:

> Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands due to the actions they took to undermine Defendant's ability to perform his role as CEO of Insurety. Among other actions, 777 Partners, together with Insurety, refused to permit Defendant to hire and terminate his own employees, refused to let Defendant agree to any financing terms with clients or potential clients, and required any significant decision of his to be approved by 777 Principal Jorge Beruff, notwithstanding Defendant's position as CEO. 777 Partners and Insurety also prevented Defendant from having any relationship with Insurety funding partners.

104. Under Florida law, a party asserting the doctrine of unclean hands must demonstrate that it sustained some injury as a result of the adverse party's conduct. *McCollem v. Chidnese*, 832 So.2d 194, 196 (Fla. 4th DCA 2002).

105. As set forth herein, Defendant sustained no injury as a result of Plaintiffs' conduct as Defendant's scope of authority and discretion during his time as CEO was within the standard corporate governance for Plaintiffs.

106. Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Tenth Affirmative Defense. Defendant's Tenth Affirmative Defense is, therefore, **DENIED**.

### 6.   ELEVENTH AFFIRMATIVE DEFENSE

107.   Defendant's Eleventh Affirmative Defense reads as follows:

Plaintiffs are barred from any recovery against Defendant because they failed to take reasonable measures to mitigate any damages they may have incurred. Specifically, Insurety's decision to stop lending to AWIS in the summer of 2019 destroyed AWIS's ability to continue operations, forced AWIS into bankruptcy, and prevented AWIS from fully repaying Insurety for the advance funding Insurety provided. Notwithstanding their own role in destroying AWIS's ability to fully repay Insurety, Plaintiffs claim Defendant is responsible for AWIS's default.

108.   This Court finds that Plaintiffs have proved by a preponderance of the evidence that Plaintiffs tried to "right size" their risk once they learned of Defendant's self-dealing relationship with AWIS, but Defendant intentionally sabotaged that process by helping AWIS set up a new shell company (NIIA) and steer it to another funder, leading AWIS to file bankruptcy.

109.   Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Eleventh Affirmative Defense. Defendant's Eleventh Affirmative Defense is, therefore, **DENIED**.

### 7.   TWELFTH AFFIRMATIVE DEFENSE

110.   Defendant's Twelfth Affirmative Defense reads as follows:

To the extent Plaintiffs are entitled to recover any sums against Defendant, Defendant is entitled to a setoff for any amounts recovered by Plaintiffs from AWIS's bankruptcy proceeding in the Northern District of Texas.

111.   Because Plaintiffs are not seeking recovery from Defendant for monies recovered from AWIS's bankruptcy proceeding in the Northern District of Texas—as highlighted in *supra* note 10—Defendant is not entitled to any further setoff.

112.   Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to Defendant's Twelfth Affirmative Defense. Defendant's Twelfth Affirmative Defense is, therefore, **DENIED**.

### 8. THIRTEENTH AND FOURTEENTH AFFIRMATIVE DEFENSES

113. Defendant's Thirteenth Affirmative Defense Reads as follows:

With respect to Counts I and II, Plaintiffs are barred from recovering damages from Defendant for any outstanding balance owed by AWIS to Insurety; the cost of borrowing during the AWIS relationship; legal fees; travel and out-of-pocket costs; and balances owed to Insurety on an "8 Month Advance Program" and "9 Month Advance Program." Plaintiffs have incorrectly characterized these alleged monetary damages as "the foreseeable and normal consequences flowing directly from Defendant's wrongful conduct." Plaintiffs cannot demonstrate that their supposed damages resulted from Defendant's alleged breaches, as opposed to any alleged breach by AWIS or others.

114. Defendant's Fourteenth Affirmative Defenses reads as follows:

With respect to Counts I and II, Plaintiffs are barred from recovering damages from Defendant for any outstanding balance owed by AWIS to Insurety; the cost of borrowing during the AWIS relationship; legal fees; travel and out-of-pocket costs; and balances owed to Insurety on an "8 Month Advance Program" and "9 Month Advance Program." Plaintiffs are applying an invalid measure of damages because they seek neither lost profits nor true out-of-pocket costs.

115. As set forth herein, Plaintiffs proved by a preponderance of the evidence that they are entitled to, pertinent to this affirmative defense, **$8,088,934.00** in damages, which is calculated by adding the amount Insurety advanced to AWIS ($36,902,303.00) and the amount Insurety paid to borrow money to provide AWIS the advance ($5,404,617.00) and subtracting from that sum ($42,306,920.00) the amount Insurety collected from AWIS ($30,915,093.00) as well as the amount AWIS paid Insurety to settle the Texas lawsuit ($3,302,893.00). As set forth herein, this Court finds that the **$8,088,934.00** in damages were the kind of damages that were contemplated by the Company and Defendant at the time they entered into the Employment Agreement. The **$8,088,934.00** in damages naturally flowed from Defendant's breach of the Employment Agreement because, absent Defendant's breach of the Employment Agreement, Plaintiffs would not have entered into an advanced funding relationship with AWIS and would not have been damaged.

116. Defendant, however, is not liable to Plaintiffs for the amount of money Insurety paid in legal fees and costs related to Plaintiffs' efforts to recover monies owed by AWIS, $1,624,407.00, because the legal fees and costs Plaintiffs paid in their effort to recover from AWIS do not naturally flow from Defendant's breach of the Employment Agreement.

117. Moreover, and Plaintiffs concede as much, Defendant is not liable to Plaintiffs for Plaintiffs' travel costs associated with their effort to recover monies owed by AWIS.

118. Accordingly, except to the extent that Defendant argues that Plaintiffs are not entitled to recover from Defendant the legal fees and costs and travel expenses related to Plaintiffs' effort to recover from AWIS, Defendant has failed to meet his burden of proof with regard to his Thirteenth and Fourteenth Affirmative Defenses. Defendant's Thirteenth and Fourteenth Affirmative Defenses are, therefore, **DENIED IN PART** as set forth herein.

### 9. FIFTEENTH AFFIRMATIVE DEFENSE

119. Defendant's Fifteenth Affirmative Defense reads as follows:

> Plaintiffs' requests throughout 3AC to recover attorney's fees lack any basis in contract or statute such that even if Plaintiffs prevail on one or more of their claims, there would not be any valid basis for the Court to award Plaintiffs attorney's fees.

120. Because this Court finds that Defendant misappropriated Plaintiffs' trade secrets, Plaintiffs are entitled to their attorney's fees and costs pursuant to § 1836(b)(3)(D) and section 668.005, Florida Statutes. As stated herein, this Court reserves jurisdiction to determine the reasonableness of the award of attorneys' fees and costs by separate motion and order.

121. Accordingly, this Court finds that Defendant failed to meet his burden of proof with regard to his Fifteenth Affirmative Defense. Defendant's Fifteenth Affirmative Defense is, therefore, **DENIED**.

### III. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

CASE NO. 20-20172-CIV-MARTINEZ

1.       Plaintiffs are entitled to judgment in their favor and against Defendant as to Counts I, III, and IV of the Third Amended Complaint.

2.       Defendant is entitled to judgment in his favor and against Plaintiffs as to Count II of the Third Amended Complaint.

3.       Plaintiffs are entitled to judgment in their favor and against Defendant as to the Counterclaim.

4.       Plaintiffs are awarded **$8,088,934.00** in damages, plus interest at the statutory rate from the date of the Final Judgment.

5.       Plaintiffs are entitled to attorneys' fees under the DTSA or FUTSA, in an amount to be determined by separate motion and order. This Court reserves jurisdiction to tax costs and determine the extent to which Plaintiffs are entitled to attorneys' fees.

6.       Defendant is **ORDERED** to cease using Plaintiffs' trade secrets, including the Updated Pagnanelli Model or any "pro forma" (as Defendant refers to such models) that are derived from the Updated Pagnanelli Model or any other trade secret owned by Plaintiffs.

7.       Final Judgment shall enter by separate order.

8.       The Clerk is **DIRECTED** to **CLOSE** this case and **DENY** all pending motions as **MOOT**.

**DONE AND ORDERED** in Miami, Florida, this 5 day of March 2026.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

cc:     all counsel of record

52